FILED
SCRANTON

JUN 0 7 2000

PER _____
DEPUTY CLERK

### In the United States District Court
### for the Middle District of Pennsylvania

---

**United States of America**
**ex re. Huang Ai Jin**

           **Petitioner,**

      **v.**

**Janet Reno, United States Attorney General,**

           **Respondent.**

**Petition for Writ of**
**Habeas Corpus**
**Docket No.**

# 1 : CV 00 - 1029

---

### EXHIBITS

# Table of Contents

Exhibit A                          Transcript dated October 23, 1996.

Exhibit B                          Relevant portions of the 1995 U.S.

                                   State Department report on

                                   Country conditions in China.

Exhibit C                          Copies of the June 10. 1996 and

                                   July 15, 1996 notices from the

                                   Fujain Police Department

Exhibit D                          Copies of photographs of

                                   petitioners' house locked-up by the

                                   Chinese Public Security officers.

Exhibit E                          Immigration Court Decision dated

                                   November 1, 1996

Exhibit F                          Board of Immigration Appeals

                                   decision dated October 28, 1999

Exhibit G                          Board of Immigration Appeals

                                   decision dated December 23, 1999.

U.S. Department of Justice
Executive Office for Immigration Review
Immigration Court


Matter of                                          File A 29 638 497
                                                        A 29 638 498


                                    )
                                    )
KUR LIAN ZHANG                      )
IJING HUANG                         )          IN EXCLUSION Proceedings
          Applicants                )
                                    )          Transcript of Hearing


Before WILLIAM VAN WYKE, Immigration Judge


Date:  October 23, 1996              Place:   York, Pennsylvania


Transcribed by DEPOSITION SERVICES, INC. At Rockville, Maryland


Official Interpreter:   John Cheung


Language:   Foo Chow


Appearances:

      For the Immigration and          For the Applicants:
      Naturalization Service:


      Jeff Duvier, Esquire             Stuart Pierce, Esquire

bw

1    JUDGE FOR THE RECORD

2            This is United States Immigration Court in York,

3    Pennsylvania.  I'm William Van Wyke, Immigration Judge presiding.

4    Today is October 23, 1996.  These are joint exclusion proceedings

5    at an individual calendar hearing for Zhang, Kur Lian.  Zhang,

6    Z-h-a-n-g is the family name, 29 638 497.  And Huang, Ijing.

7    Huang, H-u-a-n-g is the family name, 29 638 498.  Both applicants

8    are in INS custody.  They are present here in the courtroom with

9    counsel.  They are husband and wife.  As far as has been

10   represented to me.

11   JUDGE TO MR. PIERCE

12           Q.   And I'd like to ask counsel to please state his

13   appearance.

14           A.   Stuart Pierce of the law offices of Henry Lee

15   Fong, 7-H Times Square, Suite Number 503, New York, New York

16   10038.

17           Q.   Thank you, Mr. Pierce.

18   JUDGE TO MR. DUVIER

19           Q.   And the INS is represented.  Would you state your

20   appearance?

21           A.   Jeff Duvier (phonetic sp.) for the Service.

22   JUDGE FOR THE RECORD

23           All right, and we have an interpreter in the Foo Chow

24   language, Mr. John Cheung, C-h-e-u-n-g.

25   JUDGE TO THE INTERPRETER

A 29 638 497              16              October 23, 1996

bw

```
1              Q.    Mr. Cheung, would you please raise your right hand
2       to take the following interpreter's oath?  Do you swear that you
3       are fluent in Foo Chow and English and you'll interpret
4       faithfully and accurately from one language to the other in these
5       proceedings?
6              A.    Yes, Your Honor.
7              Q.    Okay, you may be seated, sir.
8       JUDGE TO MR. ZHANG
9              Q.    And through the interpreter to Mr. Zhang, would
10      you please state your full name, sir?
11             A.    Zhang, Kur Lian.
12      JUDGE TO MS. HUANG
13             Q.    All right and through the interpreter to Ms.
14      Huang, would you please state your name?
15             A.    Huang, Ijing.
16             Q.    Okay.  And Mr. Pierce is here as your lawyer.  May
17      he speak for you today?
18             A.    Yes.
19      JUDGE FOR THE RECORD
20             All right.  We set this for a hearing when we had
21      another date -- when we had this date become available, moved it
22      up because it's a husband and wife who I was told have not been
23      able to see each other while they're in prison.  And because it's
24      a husband and wife, in most circumstances, I thought that was
25      worth using as soon a space as possible to hear the case.
```

A 29 638 497                    17                    October 23, 1996

bw

1    MR. PIERCE TO JUDGE

2              Q.    Your Honor, not to interrupt, but --

3              A.    Go ahead.

4              Q.    Before we get too far into this, Mr. Cheung just

5    informed me of a potential interpretation problem, and I'll let

6    him explain it to you.

7              A.    Okay.

8    INTERPRETER TO JUDGE

9              Q.    Okay, the husb -- the person that actually speaks

10   Fuqing, which is a subset of Foo Chow dialect, they're very

11   similar but yet there are some differences in certain areas and

12   so I'd like to point that out.

13             A.    Okay, you're in the best position to evaluate

14   that.   You speak Foo Chow and not Fuqing?

15             Q.    Foo Chow and not Fuqing.

16             A.    All right.

17             Q.    And they are very similar between the two and yet

18   there are some minor difference and I have talked to them briefly

19   before the case opened and they say that if they come to a term

20   where there are actual difference between Fuqing and Foo Chow

21   that I don't understand, they can -- we, you know, we clarify the

22   term in Mandarin which I am not certified for, but I understand

23   and I -- you know, I'm capable of understanding all the Mandarin

24   and able to interpret that.   And so that's only when there are

25   difference in Fuqing and Foo Chow language, so --

A 29 638 497                    18              October 23, 1996

bw

1          A.    In English comparing what we speak in the United

2     States with some other form of English or something that's

3     similar, how would you analogize the difference?

4          Q.    I would say it's like a northern and a southern

5     dialect.

6          A.    That's not too mad -- too bad.

7          Q.    It's not too bad, but yet there are --

8          A.    Say, like from the United States and England

9     perhaps you might say lorry instead of truck?

10         Q.    Yeah, something like that.

11         A.    Okay.

12    JUDGE TO MR. PIERCE

13         Q.    All right, do you have any objections to having a

14    Foo Chow interpreter at least to the point of finding out whether

15    or not we can proceed?

16         A.    I have no objections.  I did call the Court about

17    the Fuqing.  They said they do not -- called Berlitz, they did

18    not have any available, but we communicate with them mostly in

19    Mandarin.  But in Foo Chow also, so I have no objection to trying

20    it the -- to do it this way.

21         Q.    Okay.  I know it was in another case we also had a

22    request for a Fuqing interpreter because I made some notes about

23    it.  I didn't make the notes here on this one.

24    JUDGE TO THE INTERPRETER

25         Q.    Okay, as long as you're mindful of the problem,

A 29 638 497                    19              October 23, 1996

bw

1    Mr. Cheung, and let the Court know when you feel you may need to

2    take a guess.  What you might do is if you think you're -- if you

3    feel that you're fairly confident about the guess, go ahead and

4    say the interpretation and then tell us what you guessed at and

5    we can check into it whether if we think it's material or

6    important.

7              A.    Okay.

8    JUDGE TO THE APPLICANTS

9              Q.    Okay, through the interpreter to the applicants,

10   Mr. Zhang, Ms. Huang, today is the day we're going to hear your

11   application for -- your testimony on your applications for

12   political asylum.  I first want to make sure that your lawyer,

13   the Immigration Service's lawyer and I all have the same papers

14   before us.

15   JUDGE FOR THE RECORD

16             Okay, now the cases are consolidated and I have the

17   lead case as that of Mr. Zhang, number 497, so I'm going to first

18   mark the exhibits in that case.  His Form I-122 is Exhibit 1.  It

19   was pleaded to by a written pleading through a different

20   attorney, Mr. Cox.

21   JUDGE TO MR. PIERCE

22             Q.    Are you aware of that pleading?

23             A.    Yes, I am.

24             Q.    All right, what we have is that the fraud charge

25   was denied.  The 212(a)(7)(A) charge was denied and the

A 29 638 497                    20                    October 23, 1996

bw

1    212(a)(7)(B)(ii) charge was not addressed.  Is there any change

2    in the pleading this morning?

3             A.    Yes, Your Honor.

4             Q.    This afternoon?

5             A.    Yes.  The fraud charge is still being denied, the

6    (6)(C).  However, the (7)(A) charge is being admitted and the

7    (7)(B) charge is being denied.

8             Q.    All right.

9    JUDGE FOR THE RECORD

10             In light of the admission of the (7)(A) charge, I'll

11    dismiss the (7)(B) charge as inconsistent.  And we'll hold a

12    hearing today on the (6)(C) charge.  And this will be Exhibit 1

13    in case number 497.  There's a motion to change venue, which I

14    generally don't mark as an exhibit, but since it makes some

15    factual allegations and has some documents attached, I'll mark

16    that as Exhibit 2.  That's signed by Attorney Cox and has

17    attached to it a naturalization certificate of Claudia Che Fong

18    Lee, who is apparently Mr. Zhang's sister-in-law.  And the

19    naturalization certificate of Xing Qiong Huang.  I'm not sure who

20    that person is that's related to Ms. Huang.  A passport of Huang

21    Ding Yu (phonetic sp.) and a resident alien card of Huang Ding

22    Yu.  Those documents collectively will be Exhibit 2.  Actually,

23    that motion to -- just for the record here to make it clear, that

24    motion to change venue was submitted to Seattle, to the

25    Immigration Court in Seattle, not here.  And the motion -- and

A 29 638 497                    21                October 23, 1996

bw

1    the venue was changed from Seattle to here rather than New York

2    City as requested.  And the Service did submit an opposition to

3    that motion.  Okay, the written pleading to who -- who it's

4    signed by -- Mr. Cox?  Dated -- received September 13, dated

5    September 12.  That'll be Exhibit 3.  Exhibit 4 is the asylum

6    application of Mr. Zhang.  It has attached to it Exhibits A, B, C

7    and D.  A is a certificate of translation.  I'm sorry, a marriage

8    certificate with a certificate of translation.  B is a note from

9    the police office of Quqian City, Fujian Province with a

10   translation.  C is a notice of the police office of Quqian City

11   with a translation.  And D are photographs, three of them with

12   translations.  Oh, this is actually the case where we tried to

13   find out about a Fuqing interpreter.

14   JUDGE TO MR. PIERCE

15        Q.   Did the court clerk inform you that one wasn't

16   available?

17        A.   Yes, they did.  And I tried to switch it to

18   Mandarin, but I wasn't able to get it in -- in any writing but I

19   did --

20        Q.   Oh, okay.

21   JUDGE FOR THE RECORD

22        We have a -- a withdrawal of Mr. Cox as the attorney.

23   And I'm going to just -- no sense having two attorneys here.  I'm

24   going to just make sure the record's, clear and make that an

25   exhibit, Exhibit 5.  Okay, that's what we have in 497 on Mr.

A 29 638 497                    22              October 23, 1996

bw

1    Zhang.   498, Ms. Huang, we have the I-122 with a written

2    pleading.   The written pleading concedes deportability under

3    212(a)(7)(A)(ii), denies deportability under 212(a)(6)(C)(i).

4    That's a -- that's a written pleading which will make this

5    Exhibit 2 and Exhibit 1 will be the I-122.   The pleading is dated

6    September 12.   And it addresses both of the charges.   Exhibit 1

7    will be the I-122.   And Exhibit 2 the written pleading.   The

8    asylum application will be Exhibit 3.   I should just state here

9    so it's clear to (indiscernible) how I view this, there are two

10   separate asylum applications.   Either person or both persons

11   could be grant -- people could be granted or denied.   If either

12   one is granted asylum and if they're husband and wife, then the

13   other person, also denied asylum could -- would be

14   administratively entitled to asylum as a derivative of the person

15   who's grant -- granted political asylum.   In that sense it means

16   they each have two bites of the apple, since they are married.

17   That'll be Exhibit 3 and I'll consider the other exhibits, the

18   attachments A, B, C, D and any other evidence in both cases.   In

19   fact, I'll consider all the evidence in both cases unless there's

20   a specific request not to.

21   MR. PIERCE TO JUDGE

22            Q.   No, that's fine.

23   JUDGE FOR THE RECORD

24            And I'll refer to the cases as 497 and 498, perhaps

25   meaning the complete A number, 497 being the lead case, that of

A 29 638 497                23                October 23, 1996

bw

1    Mr. Zhang.  Okay, we received a State Department opinion which I

2    gave both parties just before we began today.  I'll put that in

3    case number 497 and it will be Exhibit 5.

4    JUDGE TO COUNSEL

5    Q.   Is there any other document that either party

6    wishes to submit or thoughts -- thought has been submitted and

7    called off?

8    A.   (Mr. Pierce) I don't believe so, Your Honor.

9    Q.   Any objection to any of the documents submitted?

10    A.   (Mr. Pierce) I don't have any objection.

11    A.   (Mr. Duvier) None from the Government.

12    Q.   All right.

13    JUDGE TO APPLICANTS

14    Q.   To Mr. Zhang and Ms. Huang, we have your -- both

15    of your asylum applications.  We have some documents that you

16    submitted that -- such as your marriage certificate and some

17    documents from the police in Quqian and some photographs.  We

18    have a report from the United States State Department that

19    discusses the human rights situation in China.  It discusses --

20    it's discussion includes observations about the practice of

21    religion in China.  Now apart from that and apart from what's in

22    these documents, the rest of what I learn about you will come

23    from your testimony today.  I'm consolidating your two cases,

24    which means that I'll consider all of the evidence that I hear

25    today in each of your two cases.  And I'll make a decision about

A 29 638 497            24            October 23, 1996

bw

1    each of your two cases.  Under U.S. law, if you're husband and

2    wife and either of you is granted political asylum, the other may

3    be granted asylum as a derivative.  When you give your testimony

4    today, I'd like to ask you -- ask you to speak in a loud voice.

5    I'll be very interested in hearing what you say, and I'll listen

6    carefully.  If you don't understand a question that's asked,

7    please say you don't so that we can clarify it for you.  You'll

8    notice how as I speak right now through the interpreter, I pause

9    so that he can interpret for you.  When you speak, I'd like to

10   ask you to do the same.  I know this is not a natural way of

11   speaking, but it helps me understand best what you're saying.

12   And sometime either the interpreter or I may raise our hands like

13   this and what this will mean is just pause for a moment for the

14   translation and then you may continue afterwards.  You will get a

15   chance to say everything that's relevant and it's best if each

16   segment be translated as soon as possible after you say it.  I

17   understand that you speak Fuqing instead of Foo Chow dialect.  If

18   -- let me ask both of you so far whether you have understood

19   what's been interpreted to you in Foo Chow?

20   JUDGE TO THE INTERPRETER

21            Q.   Mr. Cheung?

22            A.   He fully understand but when he speaks in Foo

23   Chow, he might have difficulty a little bit.

24   JUDGE TO MR. ZHANG

25            Q.   Okay, Mr. Zhang, are you intending to speak in Foo

     A 29 638 497              25              October 23, 1996

bw

1    Chow or speak in Fuqing?

2             A.    Can I speak Fuqing?

3    JUDGE TO THE INTERPRETER

4             Q.    Well, this is a question to the interpreter now,

5    if he speaks Fu -- I don't know how big a differences we're

6    speaking -- speaking of here.  If he speaks Fuqing, will you be

7    able to understand him?

8             A.    So far that he has speak -- speak in Fuqing, that

9    I understand, but you know, I never really hear a lot of Fuqing.

10   But as far as what we have conversations before the Court opens

11   and as far as what he is saying, I understand.  And I had also

12   mentioned previously that if I don't understand what he's talking

13   about, he will able to perhaps if it's a technical term, he will

14   able to speak in Mandarin, which I will understand.  In fact, I

15   would able to translate that into English.

16            Q.    Okay.  Okay.

17   JUDGE TO MR. ZHANG

18            Q.    And, I understand you also speak some Mandarin.

19   In case there are some things that you say that the interpreter

20   might not understand, you may both understand in Mandarin.  Okay,

21   Mr. Zhang, if you speak Fuqing, do you believe somebody who

22   speaks Foo Chow will be able to understand you?

23            A.    He say I understands Foo Chow and also use

24   normally they would -- the people who speak Foo Chow would

25   understands Fuqing.  Only the perhaps there's a few places that

A 29 638 497                    26              October 23, 1996

bw

1    we might not able to understand and I will speak in Mandarin.

2            Q.    Okay.  Then I suggest if you're most comfortable

3    speaking what you call Fuqing, go ahead and do that and the

4    interpreter will raise with us any questions that he has about

5    proper interpretation.

6    JUDGE TO MS. HUANG

7            Q.    Ms. Huang, have you understood what's been said so

8    far?

9            A.    If I speak a little slower, I will understand.  If

10   I --

11           Q.    If the interpreter speaks a little slower, you

12   will understand?  Okay.

13   JUDGE TO THE INTERPRETER

14           Q.    Well, can you address that then, Mr. Cheung, by --

15           A.    Yes.

16           Q.    -- speaking more slowly?  Also, if you do have any

17   interpretation questions, for instance, you want to ask them to

18   clarify a word or so, tell us on the record first, okay, so that

19   if -- if it's necessary to try to get a different interpreter or

20   if it's necessary to -- whatever's going on with respect to the

21   language, you want to have that appear on the record so if we do

22   have problems, we know it.

23           A.    Okay.

24           Q.    Okay.

25   JUDGE TO APPLICANTS

A 29 638 497                    27              October 23, 1996

bw

1          Q.    Mr. Zhang and Ms. Huang, your attorney, Mr.

2     Pierce, has signed your asylum applications saying that the

3     contents were read to you and you know what they contain.  I

4     would ask -- I would like to ask each of you to stand please and

5     take the following oath.  Would you raise your right hand?  Do

6     each of you swear that the testimony you give in the Court today

7     will be the truth, the whole truth and nothing but the truth?

8     JUDGE TO MR. ZHANG

9          Q.    Mr. Zhang?

10         A.    Yes.

11    JUDGE TO MS. HUANG

12         Q.    Okay, and Ms. --

13                        (OFF THE RECORD)

14                        (ON THE RECORD)

15    JUDGE TO THE INTERPRETER

16         Q.    Okay, that happened while we were changing tapes.

17    Ms. Huang says yes as well.

18    JUDGE TO APPLICANTS

19         Q.    Do each of you swear that you know the contents of

20    your asylum application for political asylum and that it is true

21    to the best of your knowledge?

22    JUDGE TO MR. ZHANG

23         Q.    Mr. Cheung?

24         A.    Yes.

25    JUDGE TO MS. HUANG

A 29 638 497                    28              October 23, 1996

bw

1           Q.   And, Ms. Huang?

2           A.   Yes.

3    JUDGE TO APPLICANTS

4           Q.   You may be seated.

5    JUDGE TO MR. PIERCE

6           Q.   And, Mr. Pierce, you may call your clients in the

7    order in which you --

8           A.   Yes, I've discussed this with my clients and I

9    guess if it's all right with the Court, we'd prefer to have the

10   husband start.

11          Q.   All right.

12   JUDGE TO MR. ZHANG

13          Q.   Mr. Zhang, would you come and have a seat up here

14   please?  And you may be seated, sir.

15   JUDGE TO MR. PIERCE

16          Q.   Go ahead, Mr. Pierce.

17          A.   Thank you, Your Honor.

18   JUDGE TO MR. ZHANG

19          Q.   Your attorney's going to ask you questions.  You

20   may face him.  Later, Mr. Duvier will ask questions for the

21   Immigration Service.

22   MR. PIERCE TO MR. ZHANG

23          Q.   And, sir, what is your date of birth?

24          A.   August 6th, 1964.

25          Q.   And what town were you born in?

A 29 638 497                    29              October 23, 1996

bw

```
 1          A.   Quqian City, Fujian Province, China.

 2          Q.   And, sir, are you married?

 3          A.   Yes, married.

 4          Q.   And is your wife in this courtroom today?

 5          A.   Yes.

 6          Q.   And when were you married?

 7          A.   I am married at 1987, January 1st, and I'm

 8   registered the marriage in 1986, December 30th.

 9          Q.   All right.  And what town were you married in?

10          A.   Quqian Town.

11          Q.   And, sir, do you have any children?

12          A.   Yes.

13          Q.   How many children do you have?

14          A.   Two.

15          Q.   What is your oldest child's name?

16          A.   Zhang Kur Lian.

17          Q.   Is that a male or a female child?

18          A.   A boy.

19          Q.   And what is his date of birth?

20          A.   August 19th, 1988.

21          Q.   And what town was he born in?

22          A.   Quqian Town also.

23          Q.   And what is the second child's name?

24          A.   Zhang Liu.

25          Q.   Is that a male or a female.
```

A 29 638 497                    30                    October 23, 1996

bw

| | | |
|---|---|---|
| 1 | A. | It's a female. |
| 2 | Q. | And what is her date of birth? |
| 3 | A. | April 24th, 1994. |
| 4 | Q. | And what town was she born in? |
| 5 | A. | She also born in Quqian Town, but in the hospital. |
| 6 | Q. | Was your first child born in the hospital? |
| 7 | A. | Yes. |
| 8 | Q. | And where are your children now? |
| 9 | A. | They both with my mother-in-law. |
| 10 | Q. | And what town is that? |
| 11 | A. | It's -- it's in Fu-Quqian Pro -- Quqian Town also. |

12    It's in a remote area.

| | | |
|---|---|---|
| 13 | Q. | And, sir, when did you leave China? |
| 14 | A. | June 28th. |
| 15 | Q. | What year? |
| 16 | A. | '96. |
| 17 | Q. | And when did your wife leave China, if you know? |
| 18 | A. | Same time. |
| 19 | Q. | You left together with your wife? |
| 20 | A. | Yes. |
| 21 | Q. | And what was your purpose for leaving China? |
| 22 | A. | It was prosecuted by Chinese government. |
| 23 | Q. | When was the first time you experienced any |

24    problems with the Chinese government?

| | | |
|---|---|---|
| 25 | A. | May 26th. |

A 29 638 497                              31                    October 23, 1996

bw

1              Q.    What year?

2              A.    1996.

3              Q.    And what happened on May 26th?

4              A.    Well, the priest was having a session and the

5     Public Security came in.

6              Q.    And where was this?

7              A.    At my home.

8              Q.    All right.  And what was happening in your home on

9     that day?

10             A.    During the sessions the Public Security drive a

11    car by and try and arrest -- arrest us.

12             Q.    Well, my question was, what was going on inside

13    your house?

14             A.    They were -- we were studying the Bible.

15             Q.    How many people?

16             A.    One father.

17             Q.    Well, how many people were in the house?

18             A.    Fifty to 60.

19             Q.    And where was your wife at this time?

20             A.    Also in the house.

21             Q.    And your children, where were they?

22             A.    It's a Sunday and both the kids are also at home.

23             Q.    How long were these people there, these 50 to 60

24    people there, before the Public Security came by?

25             A.    About an hour.

A 29 638 497                      32              October 23, 1996

bw

1        Q.    Okay, and then what happened when you -- well, how

2    did you know the Public Security came by?

3        A.    When they -- when the Public Security car came by,

4    there's a siren that goes on.

5        Q.    Okay.  And did you hear the siren?

6        A.    As soon as I hear the siren, I went to the window

7    and I saw the cars that coming into the village and so we try to

8    escape through the back door.

9        Q.    And how many car or cars did you see?

10       A.    Two.

11       Q.    Why did you feel you needed to escape?

12       A.    On May 3rd, I had received a warning from them

13   that we are not supposed to have group gathering.

14       Q.    May 3rd of what year?

15       A.    1996.

16       Q.    What kind of warning was this?

17       A.    They come -- they -- they drive by and give me a

18   piece of paper and also told me that you're not allowed to have

19   group gathering.

20       Q.    And how often did you have group gatherings in

21   your home?

22       A.    Once a week on Sunday.

23       Q.    When did that start?

24       A.    January 14th, 1996.

25       Q.    And why was your home the place for these

A 29 638 497                    33                    October 23, 1996

bw

1    gatherings?

2            A.    On January the 3rd, 1996, my son was very sick,

3    and I had sought my friend and he had advised me that I pray to

4    the God, so therefore the -- we are -- I have re-requested the

5    gathering in my house.

6            Q.    And how did you know this friend who you

7    consulted?

8            A.    He is my son's classmate's father.

9            Q.    And what was wrong with your son, if you know?

10           A.    High fever.

11           Q.    And did your son seek any medical treatment?

12           A.    He was -- my son was in school, and the teacher

13   had took my son to the hospital.

14           Q.    And how long was your son in the hospital?

15           A.    He was in on the 3rd and he didn't get out of the

16 - hospital until the 8th.

17           Q.    And did your son see a doctor?

18           A.    Yes, but didn't have any result.

19           Q.    Did you speak to the doctor who treated your son?

20           A.    I had talked to the doctor and the doctor said

21   he's having a fevers of 40 degrees Celsius and he had treated him

22   for two days and didn't see any result.

23   JUDGE FOR THE RECORD

24           I'll just state for the record that I take judicial

25   notice that I believe 98.6 comes down to 37 degrees Celcius.  So

A 29 638 497                    34                    October 23, 1996

bw

1    that's probably nearly six degrees of fever.

2    MR. PIERCE TO MR. ZHANG

3        Q.    And when you said you were advised to pray to God,

4    where did you do this?  I'm sorry, did you pray to God at that

5    time?

6    INTERPRETER TO JUDGE

7        Q.    May -- may I clarify with him?

8        A.    Go ahead.

9    MR. PIERCE TO MR. ZHANG

10        A.    I prayed for the God for two days and then my son

11    gets better on the 7th and they get out of the hospital on the

12    8th, and because two years ago the person that showed me how --

13    how to pray to God, his son also had a serious problem and prayed

14    and got well.

15        Q.    Where did you pray to God?

16    INTERPRETER TO MR. PIERCE

17        Q.    When or where?

18        A.    Where?

19    MR. PIERCE TO MR. ZHANG

20        A.    In Fujian -- a Fuqing Town called Chantow

21    (phonetic spp) Number 16 Church.

22        Q.    Now was this --

23    JUDGE TO THE INTERPRETER

24        Q.    Would you say the first part of that again?

25    Fuqing?

A 29 638 497                35                October 23, 1996

bw

```
1              A.   Fuqing, yeah.  Fuqing.

2              Q.   And then Gow (phonetic sp.) Shan (phonetic sp.) --

3              A.   Tow.

4    JUDGE TO MR. ZHANG

5              Q.   Tow?  Is that like a division, a subdivision?

6              A.   It's a street.

7              Q.   Okay.

8    JUDGE TO THE INTERPRETER

9              Q.   And then the rest of it was?

10             A.   Number 16.

11             Q.   Number 16.

12             A.   Church.

13             Q.   Church.  And --

14             A.   Church Number 16.

15   JUDGE TO MR. ZHANG

16             Q.   Church Number 16 or building number 16 which

17   happens to be a church?

18             A.   Is a church and have a number 16 on the door.

19             Q.   Okay.

20   MR. PIERCE TO MR. ZHANG

21             Q.   Did this church have a name?

22             A.   It's called Sha (phonetic sp.) Christian Church.

23             Q.   Had you ever been to this church before this time

24   -- that time you went?

25             A.   No.
```

A 29 638 497                    36                    October 23, 1996

bw

1          Q.    Were you a -- what is your religion?

2          A.    Christian.

3          Q.    When did you become a Christian?

4          A.    At that time I didn't -- I weren't able to locate

5  any father or priest and weren't able to find any books related

6  on the religions and we just believe it in our heart.  And my

7  home to the church is 30 kilometers and we don't have

8  transportations.

9          Q.    So how did you get to this church to pray?

10        A.    Bicycle.

11        Q.    How long did it take you to get to the church?

12        A.    About three to four hours.

13        Q.    And what date did you go to this church?

14        A.    January the 5th.

15        Q.    And where was your wife when you went to the

16  church on January 5th?

17        A.    She's in the hospital.

18        Q.    How did you pray at the church?

19        A.    The father in the sky, my son has been seriously

20  sick and running a fever.  And I pray to the God to save my son's

21  life.  And my son's also very intelligent whens -- when he's in

22  school.  He is always number one.  And so please save my son's

23  life.  And so he become healthy again and can go back to school

24  to learn.  So thank you for the Jesus and amen.

25        Q.    All right.  Sir, do you know who Jesus is?

A 29 638 497              37             October 23, 1996

bw

| | | |
|---|---|---|
| 1 | A. | Jesus. |
| 2 | Q. | Do you know when he was born, Jesus? |
| 3 | A. | December 25th. |
| 4 | Q. | And do you know what holiday that is? |
| 5 | A. | What? |
| 6 | Q. | Does that day have any celebration or anything |
| 7 | | like that? |
| 8 | A. | Christmas. |
| 9 | Q. | And do you know who Jesus's mother was? |
| 10 | A. | Maria. |
| 11 | Q. | And do you know who Jesus's father was? |
| 12 | A. | Yeloha (phonetic sp.). |
| 13 | Q. | Did Jesus have a -- |

14 JUDGE TO THE INTERPRETER

| | | |
|---|---|---|
| 15 | Q. | I didn't hear that. |
| 16 | A. | Yeloha. |
| 17 | Q. | Yeloha?  I think we're dealing with |

18 transliterations of Hebrew names by way of Greek by way of
19 English as it comes into my ear by way of Mandarin -- I mean Foo
20 Chow.

21 JUDGE TO MR. PIERCE

| | | |
|---|---|---|
| 22 | Q. | Go ahead. |

23 MR. PIERCE TO MR. ZHANG

| | | |
|---|---|---|
| 24 | Q. | And do you know when Jesus died? |
| 25 | A. | In April, first Friday. |

bw

1          Q.   How did he die?

2          A.   He died on the cross.

3          Q.   And then what happened to Jesus?

4          A.   He came back to life in three days.

5          Q.   And do you know the name of that happening?

6     INTERPRETER TO MR. PIERCE

7          Q.   The name?

8     MR. PIERCE TO MR. ZHANG

9          Q.   That event?

10    INTERPRETER TO JUDGE

11         Q.   I -- my mind just went blank regarding on that

12    day.   I know what he is talking about.

13         A.   What it is in English?

14         Q.   Yeah, in English.   Easter.

15    MR. PIERCE TO MR. ZHANG

16         Q.   And, sir, the church that you went to pray, do you

17    know if that's a registered church in China?

18         A.   What?

19         Q.   Does the government -- do they know about this

20    church, to your knowledge?

21         A.   I don't know.

22         Q.   What did this church look like?

23         A.   It had a very pointy roof pitch with a cross on

24    the top.

25         Q.   And were you a member of ever a member of that

A 29 638 497                    39              October 23, 1996

bw

1      church?

2                    A.    No.

3                    Q.    How did it come about that the meetings would be

4      in your home?

5                    A.    After my son got well and my fri -- through my

6      friend, I have meet the father and because my son was safe by

7      Lord, by Jesus and so I request to have sessions in my house.

8      That's how it come about.

9                    Q.    What's the -- when you say the father, what's his

10     name?

11                   A.    John Zu (phonetic sp.) Chi (phonetic sp.).

12                   Q.    And what -- how would people know to come to your

13     home?

14                   A.    He had promised us that he would come to my house

15     beginning on January the 14th.  And so when I went back to the

16     village, I tell everybody.  Because in my village, there's quite

17     a bit of people who believe in that.

18                   Q.    Were there any of these -- were any other meetings

19     in other people's homes in your area, to you knowledge?

20                   A.    No.  No.  No, in my village it was at my home.

21                   Q.    And when you say you told other people about what

22     was happening in your home, what would you say to other people?

23                   A.    We -- I told them that on January the 14th, we --

24     we have a father that will come to the village because it's very

25     difficult to get a father to the village, and so anybody who's

A 29 638 497                          40                    October 23, 1996

bw

1    interested in come to listen for the sessions, they're welcome

2    to.

3              Q.    And how many people did you tell this?

4              A.    Anybody that I saw and I told them the situations

5    and I told them that next Sunday the father would be in my home.

6              Q.    Where would you see these people?

7              A.    They all would be -- they all in the village.

8              Q.    And what would happen at these meetings at your

9    home?

10   INTERPRETER TO MR. PIERCE

11             Q.    He didn't quite understand what I said.  He want

12   me to repeat.

13   MR. PIERCE TO MR. ZHANG

14             Q.    Typically what would go on at these meetings in

15   your home?

16             A.    We discussed Jesus's story.

17             Q.    What is Jesus's story?

18             A.    How he -- how he saved people.  How he cure people

19   who sick.

20             Q.    And how did he do that?

21             A.    I will remember -- I remember one of the sessions.

22   You want me to --

23             Q.    Yes.

24             A.    -- give the story?  Jesus Christ has saved a lot

25   of people.  At one day, he just came out of a church.  He had

     A 29 638 497                    41              October 23, 1996

bw

1    arrived to seaman's -- ser -- sermons -- seaman's home.  Seaman

2    was sick having a fever.  And somebody have ask Jesus Christ to

3    save him.  And Jesus have went next by him.  He used his hand to

4    touch his body and then his fevers had gone.  And then Seaman got

5    up and served Jesus Christ.

6              Q.   Is this story written anywhere?

7              A.   There is the father read that in a book -- in the

8    -- in the book and but we couldn't buy the books in China.

9              Q.   Do you know the name of that book?

10             A.   Bible.

11             Q.   Have you ever read the Bible?

12             A.   In China they have very little circulations of the

13   Bible and I'm here I have briefly -- I have read some and also

14   from the priest -- from the father that we have a chance to look

15   at shortly.

16             Q.   Sir, getting back to the time when you heard the

17   sirens and you tried to escape, can you tell us what happened at

18   that point?

19   INTERPRETER TO MR. PIERCE

20             Q.   I'm sorry, what -- what is --

21   MR. PIERCE TO MR. ZHANG

22             Q.   Yeah, getting back to the testimony where you said

23   you were at your home and you heard sirens and then you tried to

24   escape, what happened at that point?

25             A.   All right, when the siren comes on, I and my wife

A 29 638 497                    42              October 23, 1996

bw

1    went out to the front door and saw the car coming in.  And so I

2    went in and tell everybody to go away and I was holding my son

3    and my wife was holding -- I was holding my child and my wife was

4    holding one child also with the priest and we just went through

5    the back door.

6              Q.    Where'd you go?

7              A.    I went to my mother-in-law's home.

8              Q.    How far away was that from your house?

9              A.    About 30 kilometer.

10             Q.    How'd you get there?

11             A.    I have went to a road.  There's a road and then

12   there are transportation cars there that you can get on.

13             Q.    A road?

14             A.    A road.  A side road.

15             Q.    Okay.  And then what did you do?

16             A.    I ride the car to my mother-in-law's home.

17             Q.    All right.  And after you got to your mother-in-

18   law's, what did you do?

19             A.    And -- and the father told me in China you don't

20   have the freedom of religions.  And the father told me that he

21   would try to find a way so that I and my wife can leave China.

22             Q.    Then what happened?

23             A.    The -- the father requested two photograph each.

24   And now -- and also need $40,000 or renminbi.  And the $20,000 is

25   used to buy plane tickets, so to -- to come to United States.

A 29 638 497                    43                  October 23, 1996

bw

1    The father said he will have one of his friends to help me to

2    coordinate the trip.

3    JUDGE TO MR. ZHANG

4         Q.    This is the religious father you're speaking of?

5         A.    Yes, is the religious father.

6    MR. PIERCE TO MR. ZHANG

7         A.    He took two photograph from each of us and with

8    20,000 renminbi to one of his friends to as soon as he have that

9    set up, he will let me know.

10        Q.    All right.  And to your knowledge, do you know if

11   the father was involved in doing this with any other people?

12        A.    I don't know.  He said the -- the father says that

13   we do that to save people to -- this is a good things to do.

14        Q.    All right.  Now, sir, are --

15   JUDGE TO MR. ZHANG

16        Q.    Can you -- can you say whether he did this for

17   other people then?

18        A.    I don't know, but the reason he did that because

19   he has seen what had happened to me and because it's also because

20   of happening in June which a lot of times they might use it --

21   the government might use that excuses.  They would -- they might

22   use because of the June, they might use the June 4 excuses to

23   also get me to serious problems -- troubles.  So I -- I have to

24   -- the father said I have to save you guys.

25        Q.    Do you know what -- why the June 4th would have

A 29 638 497                    44              October 23, 1996

bw

1    come in?  Would have been involved?  Do you know why the June 4th

2    was brought up?

3    INTERPRETER TO MR. PIERCE

4              Q.    I'm sorry.  I didn't --

5    MR. PIERCE TO MR. ZHANG

6              Q.    Why was the June 4th mentioned?

7    JUDGE TO THE INTERPRETER

8              Q.    Why -- why would June 4th serve as an excuse for

9    serious troubles?

10   MR. PIERCE TO MR. ZHANG

11             A.    Okay, because it happens on May 26th and is very

12   close to a -- the June 4th, seventh anniversary and the -- and

13   the governments might worry that these group need a -- it's

14   related to the June 4th seventh anniversary and they were -- the

15   government were afraid that they were going to have problems

16   related to the June 4th movements.

17   JUDGE FOR THE RECORD

18             Let's change tapes.

19                            (OFF THE RECORD)

20                            (ON THE RECORD)

21   JUDGE TO THE INTERPRETER

22             Q.    Was that the end of the translation?

23   MR. PIERCE TO MR. ZHANG

24             A.    And also on the May 3rd, there's a warning to us

25   and we thought that that's just not hurting people, so we still

        A 29 638 497                45              October 23, 1996

bw

1    continue to have the meetings.  And -- but on the May -- on the

2    May 26th and they come and try to arrest all of us.

3         Q.   Sir, I just want to get clarified, you received a

4    warning on May 3rd.  If you received that warning, why did you

5    actually feel you could continue the meetings, you need to

6    continue the meetings?

7         A.   On May 3rd, they have the warning of the

8    gathering, but what I thought was because they were worrying

9    about because we're so close to the June 4th seventh year

10   anniversary that they were thinking about the gatherings might be

11   later on any kind of future movements.  But what I -- what I

12   truly believe is -- is just a religious gathering is a good

13   things to do and I don't foresee that's going to be a problem

14   with the gov-governments.  It's not what the government thinks,

15   so I think it's safe to do.

16        Q.   Sir, on what day, if any, do you feel was the day

17   you became an active Christian?

18        A.   The most affirmative belief is really happens is

19   on the 5th where my son was -- on January 5th when my son was

20   very sick and after praying on the 7th, he got well, and so I and

21   my wife went to the church.  I have my wife on that day was got

22   very much into it.  And also I have -- and so I and my wife have

23   talk about that I will bring -- I will preacher this to all the

24   people on the good things on Jesus.

25   JUDGE FOR THE RECORD

A 29 638 497                   46              October 23, 1996

bw

1                Let's take a brief recess here for five minutes.   And

2     we'll resume again at 2:30.

3                              (OFF THE RECORD)

4                              (ON THE RECORD)

5     JUDGE FOR THE RECORD

6                We're back on the record after recessing.

7     JUDGE TO MR. PIERCE

8                Q.   Mr. Pierce?

9     MR. PIERCE TO MR. ZHANG

10               Q.   Sir, is there any particular procedure that you

11    had to go through in order to become a Christian?

12               A.   You have to be baptized by the father.

13               Q.   And were you ever baptized?

14               A.   Yes.

15               Q.   When?

16               A.   March 10th.

17               Q.   Okay.   This is '96?

18               A.   Yes.

19               Q.   How were you baptized?

20               A.   You have to be knee and then a cup of water on the

21    head.

22               Q.   And what did this mean?

23               A.   That's baptized.

24               Q.   What's the meaning of baptized?

25               A.   If I have any wrongdoing before that, this water

A 29 638 497                      47              October 23, 1996

bw

1    will purify me.

2                Q.   And who baptized you?

3                A.   Father John.

4                Q.   Where did he baptize you?

5    INTERPRETER TO MR. PIERCE

6                Q.   Where?

7                A.   Where?

8    MR. PIERCE TO MR. ZHANG

9                A.   At my home.

10               Q.   So -- so you testified the arrangements were made

11   for plane tickets.  Did you go anywhere?

12               A.   I was informed by the father on June 25th.

13               Q.   Yes.  And?

14               A.   The father had obtained June 28th plane tickets

15   from Shanghai to United States.

16               Q.   Was it a direct flight?

17               A.   It stop in Alaska.

18               Q.   And other than your wife, do you have any

19   relatives in the United States?

20               A.   I have a brother, older brother.

21               Q.   Same parents as you?

22               A.   Yes.

23               Q.   Do you know his Immigration status?

24               A.   Yes.

25               Q.   What is it?

A 29 638 497                    48            October 23, 1996

bw

1          A.    Green card.

2          Q.    And where does your brother live?

3   INTERPRETER TO MR. PIERCE

4          Q.    I'm sorry?

5   MR. PIERCE TO MR. ZHANG

6          Q.    Where does your brother live?

7          A.    New York.

8          Q.    Do you know when he came to the United States?

9          A.    1989.

10         Q.    Okay.  Sir, do you know what happened, if

11 anything, at your house after you left?

12         A.    They have --

13   INTERPRETER TO JUDGE

14         Q.    I -- I need to clarify.

15         A.    Okay, you want to give us what you have so far or

16 -- tell us what he said?

17         Q.    I -- I -- I couldn't understand a few things, so I

18 want to --

19         A.    All right.

20   MR. PIERCE TO MR. ZHANG

21         A.    Okay, the Public Security have came to -- to my

22 house.  And my mom was at home.  And they asked my mom to -- if

23 she know where I and my wife is.  And -- and my -- and my mom

24 don't know.  Told them that she don't know where I and my wife

25 is.  And the Public Security had lock my house off.

A 29 638 497            49           October 23, 1996

bw

1          Q.   And when did they lock your house up?

2          A.   July 10th, '96.

3          Q.   Why did they lock your house up?

4          A.   Because they want to arrest I and my wife and they

5  couldn't find us.

6          Q.   How do you know they wanted to arrest you and your

7  wife?

8          A.   You mean, how do I know now or at that time?  Well

9  --

10         Q.   How -- how do you know now?  Let's start with that

11  and see if the other one makes a different.

12  INTERPRETER TO MR. PIERCE

13         Q.   Thank you.

14  MR. PIERCE TO MR. ZHANG

15         A.   My brother told me.

16         Q.   What did your brother tell you?

17  INTERPRETER TO MR. PIERCE

18         Q.   When?

19  MR. PIERCE TO MR. ZHANG

20         Q.   What did your brother tell you?

21         A.   My person at China called by brother and told my

22  brother the situations.

23         Q.   What was the situation?

24         A.   That's when the Public Security came to my house

25  and asked my mom to where my wife and I was and my mom didn't

A 29 638 497               50            October 23, 1996

bw

1    tell them and they went and locked up the house.

2            Q.    Okay.  When did you first find out they wanted to

3    arrest you?

4            A.    At -- at May the 26th is when they have two car

5    come and they try to arrest us.

6            Q.    Do you know what happened on May 26th after you

7    left?

8            A.    On the 26th, we had escaped and later heard that

9    they have arrest a few people in the group and they have tried to

10   look for I and my wife.

11           Q.    How did you find out they arrested a few people?

12           A.    I learned that through my brother because he --

13   that a person call him and from what he learned, there's six

14   people being arrested.

15           Q.    Is this your brother -- where was your brother at

16   that time?

17           A.    In New York.

18           Q.    Why did they contact him?

19           A.    Because I was at that time because it's a such a

20   serious problem, they informed my brother in United States and I

21   was in Seattle and I also call him and he also call China to find

22   out exactly what's going on.

23           Q.    Okay.  And is your brother here today?

24           A.    No.

25           Q.    Did you ask him to come?

A 29 638 497                    51                October 23, 1996

bw

1              A.   No, I didn't even know I had to come here for a

2       hearing today.  When I was in jail, I don't even know what day

3       today is and things like that.

4              Q.   And did you know any of the six people that were

5       arrested?

6              A.   I -- yes, those are the peoples also in my house

7       that attends the session.

8              Q.   Do you know the names of any of them?

9              A.   One is named Jonwin (phonetic sp.), Seam (phonetic

10      sp.) Seachu (phonetic sp.), Ben For (phonetic sp.) Fuway

11      (phonetic sp.), Ling Asam (phonetic sp.), and two lad -- and two

12      other ladies.  One is Jonjowjus's (phonetic sp.) wife.  And one

13      is Jon Ing (phonetic sp.) Ju (phonetic sp.).

14             Q.   And what happened to them after they were

15      arrested, if you know?

16      INTERPRETER TO MR. PIERCE

17             Q.   What happened?

18      MR. PIERCE TO MR. ZHANG

19             Q.   What happened to them after they were arrested?

20             A.   From what I heard they were being hitten by the

21      government.  Beaten.

22             Q.   Hit?

23             A.   Yeah.  Beat.  And they used the excuses of

24      grouping to set up movements for June 4th.

25             Q.   And do you know if they were detained after they

A 29 638 497                    52              October 23, 1996

bw

1    were arrested?

2    INTERPRETER TO JUDGE

3              Q.    I didn't understand what he said.  I need to --

4    MR. PIERCE TO MR. ZHANG

5              A.    Yes, they are arrest and detained.

6              Q.    How long?

7              A.    Until now I don't even know they have release or

8    not.

9              Q.    Did you try and find out?

10             A.    I have asked my brother and it's a collect call,

11   so I've asked my brother what the situation is.  He hasn't really

12   got a chance to call back, so he -- she's not sure.  And -- and

13   my brother as a company in United States and he's very busy.  I

14   seldom -- if it's not important, I don't try to bother him very

15   much.

16             Q.    All right.  So what do you think would happen to

17   you if you were to return to China?

18             A.    They will prosecute -- persecute me.

19             Q.    In what way?

20             A.    They will prob -- they will use the excuses of

21   June 4th anniversary movement grouping.

22             Q.    To do what?

23             A.    For the seventh year June 4th anniversary

24   revolutionary -- try to start a revolutionary for the June 4th

25   seventh anniversary movement.

A 29 638 497                    53                    October 23, 1996

bw

1              Q.   And what do you think they would do to you, if

2    anything?

3              A.   They will probably jail me.  How long I don't

4    know.

5              Q.   And other than for religious reasons, was there

6    any other reason you left China?

7              A.   And also my wife's having -- inserting the

8    I.U.D.'s and they want the I.U.D. take off -- well, she wants the

9    I.U.D. take off and on that matter.

10             Q.   Has your wife ever had an I.U.D.?

11             A.   Yes.

12             Q.   When was that?

13             A.   After the first birth in 1988.

14             Q.   How long after the first birth?

15             A.   After the few days after the baby's birth.  I was

16   begging them not to take her until a month after the birth

17   because the baby was large and her vagina was splitten and needs

18   to be stitched, but they only take her after a few days after the

19   baby's born.

20             Q.   Who did you beg to?

21             A.   I was begging the family planning agency.

22             Q.   Where -- were were you begging?  (Indiscernible)?

23   INTERPRETER TO MR. PIERCE

24             Q.   Where?

25   MR. PIERCE TO MR. ZHANG

     A 29 638 497                    54              October 23, 1996

bw

1          Q.    Yeah, where were you when you were speaking to the

2    family planning (indiscernible)?

3          A.    They had -- they are at my house.

4          Q.    What were they doing at your house?

5          A.    When my wife had the first birth, the hospital

6    notifies the planning agencies so then after a few days they will

7    come to my home and want to take her to put up -- put in the

8    I.U.D.'s.

9          Q.    So where did your wife have the I.U.D.?  Where was

10   your wife when she had the I.U.D.?

11   JUDGE TO MR. PIERCE

12         Q.    When it was inserted?

13   MR. PIERCE TO MR. ZHANG

14         Q.    Yeah, when it was inserted, yeah.

15         A.    In September 1988.

16         Q.    Where was your wife when she had the I.U.D.

17   inserted?

18   INTERPRETER TO MR. PIERCE

19         Q.    Where?

20         A.    Yes.

21   MR. PIERCE TO MR. ZHANG

22         A.    It's in the family planning agency.  They had a

23   small hospital there.

24         Q.    And did you -- to your knowledge, did your wife

25   agree to have the I.U.D.?

A 29 638 497               55             October 23, 1996

bw

1          A.    No, she disagreed.

2          Q.    Why was -- why did she have to have an I.U.D.?

3          A.    They were afraid she have a second child.

4          Q.    How many children were you allowed to have?

5          A.    They only allow one child.

6          Q.    And what happened to the I.U.D.?

7          A.    My wife spend money to get a doctor to take out

8    I.U.D.

9          Q.    When was that?

10         A.    June 1993.

11         Q.    And why did she do that?

12         A.    Because both of us loves childrens and we want to

13   have another baby.

14         Q.    How many children did you want to have?

15         A.    As -- as being a parent, we like to have as much

16   as -- the more, the better.

17         Q.    But did you ever discuss with your wife

18   approximately or how many children you wanted?

19         A.    Four to five.

20         Q.    All right.  So were there any consequences for

21   removing the I.U.D.?

22         A.    Yes, after the birth they will sterilize you and

23   if it's --

24   INTERPRETER TO JUDGE

25         Q.    Let me ask him --

A 29 638 497                    56                   October 23, 1996

bw

1    MR. PIERCE TO MR. ZHANG

2                A.    -- also on top of that, they will fine me.

3                Q.    Were you or your wife ever sterilized?

4    INTERPRETER TO MR. PIERCE

5                Q.    I'm sorry?

6    MR. PIERCE TO MR. ZHANG

7                Q.    Were you or your wife ever sterilized?

8                A.    They -- up to now they don't know I have the

9    second child, so no.

10               Q.    Were you ever fined?

11               A.    No, because the second child has not registered.

12               Q.    But you said the second child was born in the

13   hospital, is that correct?

14               A.    That hospital was the small hospital in the

15   village that we know that they don't report to the family

16   plannings.

17               Q.    Is it a government hospital?

18               A.    It is a private, half-private, in the village.

19               Q.    Okay.  And why was the child never registered, the

20   second child?

21   INTERPRETER TO MR. PIERCE

22               Q.    Wh --

23   MR. PIERCE TO MR. ZHANG

24               Q.    Why was the second child never registered?

25               A.    As we were afraid that if we registered, then they

A 29 638 497                    57              October 23, 1996

bw

1    would come sterilize and also fine.

2         Q.    Why did you think that would happen?

3         A.    They have advertisements on televisions telling us

4    that you can only have one children and you can't have two.  And

5    if it happens, you'll be fined and sterilized.

6         Q.    So, sir, if you and your wife were to go back to

7    China, do you feel you could have more children?

8         A.    No.  No, right now if we go back, they will arrest

9    me and I already have two, so if they find out, I'm already in

10   trouble, how can I have another children?

11        Q.    Okay.

12   MR. PIERCE TO JUDGE

13        Q.    Okay, at this time, Your Honor, I would offer the

14   witness for cross-examination.

15        A.    Okay.

16   JUDGE TO MR. DUVIER

17        Q.    Go ahead, Mr. Duvier.

18   MR. DUVIER TO MR. ZHANG

19        Q.    Sir, on May 3rd, when the pol -- when the Public

20   Security came and gave you a warning, did they speak to you that

21   day?

22        A.    When the siren came on, the two cars came by, I

23   saw them came in and I went back and told father and then the

24   whole group.  And that's what we escaped from the

25   (indiscernible).

A 29 638 497                    58              October 23, 1996

bw

1          Q.    I'm talking to you about May 3rd, when you
2    received this warning.

3          A.    Yes.

4          Q.    Did you speak to someone that day?

5          A.    Yes, they hand me a -- a note and tell me that you
6    cannot have group meetings.

7          Q.    What did the note say?

8          A.    This is warning you that you are not allowed to
9    have group meetings.  If there's anything happen, you will be
10   responsible for.

11         Q.    How many people dropped off this note?

12         A.    Two.

13         Q.    How long were they there?

14         A.    After they had informed me the situations, they
15   left.

16         Q.    This -- was this at your house where this
17   happened?

18         A.    Yes, it came to my house.

19         Q.    What day of the week was it?

20         A.    It's on Sunday.

21         Q.    Were you having a meeting then, right then?

22         A.    No.

23         Q.    Had you already had a meeting?

24         A.    We don't have a meeting that day.

25         Q.    Why not?

bw

1          A.   It's not on a Sunday.  Only the -- the meetings on

2     a Sunday.

3          Q.   Well, I just asked you what day of the week it was

4     that they gave you this warning, and you told me a Sunday.  So

5     what I'm trying to find out is did the police -- sir, let me

6     finish my question please.  So what I'm trying to find out is,

7     did the police come and give you this warning while a meeting was

8     going on?

9          A.   The day is May 3rd and I heard, I thought I heard

10    from the interpreter he was saying on the May 26th.

11         Q.   Do you know what day of the week it was when the

12    police came and gave you this warning?

13         A.   I don't remember what day it is, because I -- it's

14    that day I didn't have a meeting.  I -- I didn't know.  And that

15    -- that is a school day that my wife had just took the kids to

16    school and I was at home.

17         Q.   Did you keep a copy of this warning?

18         A.   When they lock up the house, they can't -- it's at

19    home, but when they lock up the house, nobody can get anything in

20    the house.

21         Q.   They locked up the house July 10th, correct?

22         A.   Yes.  July 10th.

23         Q.   Did they tell you how it was they knew you were

24    having group meetings in your house?

25    INTERPRETER TO MR. DUVIER

      A 29 638 497                    60              October 23, 1996

bw

1          Q.    I'm sorry?

2    MR. DUVIER TO MR. ZHANG

3          Q.    Did the -- did the two Public Security officers

4    explain to you how they found out that you had been having these

5    meetings?

6          A.    They didn't tell me, and I was at home and two of

7    them had come and knock on the door.

8          Q.    Now, your attorney has submitted some evidence on

9    your behalf, including two notices from the police.  Do you know

10   how you were able to get these notices to your attorney?

11         A.    Those are the notes that were sent from my mother

12   to my brother in United States.

13         Q.    Do you know how your mother got these?

14         A.    One note I bring with me when I leave China to

15   United States.  The June 20th one.

16         Q.    Do you know how your mother got the July 15 one?

17         A.    The Public Security went to my house.

18         Q.    Well, that doesn't answer my question, sir.  How

19   did you get the July 15 one?

20   JUDGE TO MR. DUVIER

21         Q.    How did -- I believe the question is how did your

22   mother get it?

23         A.    Okay.

24   MR. DUVIER TO MR. ZHANG

25         Q.    How did your mother get it?

bw

1          A.    When the Public Security came to my home and

2    couldn't find me, they have take that to my mother and ask my

3    mother to inform me.

4          Q.    Where does your mother live?

5          A.    He live with my younger brother.

6          Q.    And how far away is that from your house?

7    INTERPRETER TO JUDGE

8          Q.    You mean she?

9          A.    I mean, I'm sorry.  She lived with my younger

10   brother.

11   MR. DUVIER TO MR. ZHANG

12         Q.    How far away is that from your house?

13         A.    Walking about five to six minutes.

14         Q.    Do you know how they knew where she lived?

15         A.    I -- I -- I was here.  I don't know how they find

16   out.

17         Q.    You said first they went to your house and when

18   you weren't there, they went to your mother's house?  Is that

19   what you said?

20         A.    The details I don't know because I was here.  When

21   I was calling my brother, that's what he said, that, you know,

22   they tried to look for me and that they -- they found my mother

23   and get the note and all the stuff.

24         Q.    Did your brother tell you how he learned these

25   details?

A 29 638 497                    62              October 23, 1996

bw

1        A.    He didn't say.   The only thing he said was in

2    (indiscernible) Public Security have been -- has been looking for

3    me and they couldn't find me.

4        Q.    Now, do I understand you correctly, sir, that the

5    reason your brother's not here today is because you didn't know

6    you had a hearing today?

7        A.    No, I don't even know I have a hearing today.

8        Q.    Your attorney didn't tell you you had a hearing

9    today?

10       A.    The attorney had told me, but I don't know what

11   day is today.

12       Q.    Did you say to your attorney, why don't you see if

13   my brother can come since he knows so much about my claim and he

14   can help me stay in this country?

15       A.    No, I didn't.

16       Q.    Why not?

17       A.    Because I -- I know that he's very busy.

18       Q.    You think he's too busy to take one day out of his

19   life and drive four hours and help you and your wife get into

20   this country or otherwise you face return to China?

21       A.    I don't know if the attorney have inform or I

22   don't -- I really don't know.

23       Q.    Now, were you aware of Christianity before your

24   son got sick?

25       A.    Before I knew about it, and I believe in God in my

A 29 638 497                    63              October 23, 1996

bw

1    heart.

2            Q.    Well, what did you know about it?

3    JUDGE TO MR. DUVIER

4            Q.    Before he became a Christian?

5    MR. DUVIER TO MR. ZHANG

6            Q.    Before -- well, before your son got sick --

7    JUDGE TO MR. DUVIER

8            Q.    Before your son got sick?

9    MR. DUVIER TO MR. ZHANG

10            Q.    -- what did you know about Christianity?

11            A.    Because at that village a lot of people have

12    believing the Christians and -- but there's no father that comes

13    to the village and there's transportation that is very

14    inconvenient and so we just believe it in our own heart.

15            Q.    Well, what did you believe?  What did you even

16    know about it to believe in your heart?

17                          (OFF THE RECORD)

18                          (ON THE RECORD)

19    MR. DUVIER TO MR. ZHANG

20            A.    At that time we believed that if you believe in

21    Lord, if you need help and you will be save by the Jesus Christ

22    and if you want certain things done in a good way, that they will

23    help you.  Jesus Christ will help you.  And they said if you

24    believe in Jesus Christ, you will become their son and daughter

25    and you will live forever.

        A 29 638 497                    64              October 23, 1996

bw

1          Q.   Now, how did you learn all that before your son

2     got sick?

3          A.   Before they told me.

4          Q.   He told you this before your son got sick?

5          A.   That when my son was sick in the hospital for two

6     days and both of he and his wife had visit the hospital and saw

7     my son.  And that's when he told me the situa -- this.

8          Q.   When you were growing up, did your parents teach

9     you any particular religion?

10          A.   When we -- when I grow up, I mean, we were in a

11    village and we heard about things.  We really had a very vague

12    idea of what it is.  Even my parents had a very vague idea of

13    what it is.

14          Q.   Sir, my question is, were you raised in any

15    particular religion?

16          A.   Yeah, as ever since a kid, we know -- I know that

17    my parents are Christian and so we just -- we didn't be able to

18    do anything or learn anything about it and because my parents

19    didn't know anything about it, we just know Christian and so at

20    that time I believe I'm a Christian.

21          Q.   The whole time you were growing up you believed

22    you were a Christian, but you didn't know anything about it and

23    your parents didn't do anything about it?

24          A.   Yes, as we grow up, we in a remote village we

25    don't have any books.  It just proof of village people that most

A 29 638 497                      65                  October 23, 1996

bw

1    of them believe in Christian and so everybody just follows and

2    believe in Christian -- Christians and we -- we don't know.  We

3    have a very vague idea of what it is I feel.  I did go and heal

4    my son.  God said that we had really find out.

5            Q.    After you started getting more heavily involved in

6    Christianity, did you study the Bible?

7            A.    We can't heavy ~~study it~~ because we have problem

8    getting Bi-Bibles.  I really want to study it and but we --

9    there's no opportunity for me there.

10           Q.    How long did the services last at your house every

11   Sunday?

12           A.    About one and a half hour.

13           Q.    And during that time, what would happen?

14           A.    We study the stories about Jesus Christ and also

15   learn where he (indiscernible).  Also sang.

16           Q.    Why did only your wife and yourself and the priest

17   and your two children escape on May 27th?

18   JUDGE TO MR. DUVIER

19           Q.    I don't think that there's testimony to that, Mr.

20   Duvier.

21   MR. DUVIER TO MR. ZHANG

22           Q.    Sir, do you remember testifying earlier that you,

23   your wife, each of you holding your children and the priest ran

24   through the back door to escape on May 26th?

25   INTERPRETER TO MR. DUVIER

A 29 638 497                    66              October 23, 1996

bw

| | | |
|---|---|---|
| 1 | Q. | Do you remember? |
| 2 | A. | Yes. |

3    MR. DUVIER TO MR. ZHANG

4          A.    Yes.

5          Q.    Did anybody else escape at that time?  You, your

6    wife and the priest and your kids?

7          A.    Yes.  The -- it's only six people got arrest.

8    Everybody else had ran -- have escaped.

9          Q.    Did you try to find out anything about what

10    happened to those six people while you were still in China?

11          A.    No.

12          Q.    What about the priest?  Do you know if he tried to

13    find out anything about what happened to those other six people?

14          A.    I don't know if he had tried.

15          Q.    As far as you know, they could have been released

16    the very day they were arrested, is that true?

17          A.    It's impossible, because when I was in Seattle,

18    and I call my brother and he told me that the six people are

19    still locked up.

20          Q.    He told you they were still locked up?

21          A.    While I was in Seattle, yes.

22          Q.    Did he tell you how he knew that?

23          A.    Because my mother had phone calls to him.

24          Q.    Did he tell you how your mother found that out?

25          A.    No, he didn't.

A 29 638 497                        67                    October 23, 1996

bw

1          Q.    Did the father give you anything other than plane

2    tickets when you left China in order to get on the plane and come

3    to this country?

4          A.    He also give me two papers that have photograph.

5    Each person have two and they put -- they were two put together.

6          Q.    What did he tell you those were?

7          A.    No, he didn't.  He said, using this is good

8    enough.  It's not the father that hands to me, it's his friends

9    that hands to me.

10         Q.    What did you do when you arrived at the airport in

11   Alaska?

12         A.    When I arrive, I don't know where I'm at.  I gave

13   to the person who's there, and then they said this is a false and

14   I don't know what.  Because I don't know it was false.  If I know

15   that this is lie and being a Christian, you're not supposed to do

16   that.

17         Q.    Well, what did you think you were handing them?

18         A.    The person who hand me the -- the paper said this

19   is the paper I need.  So when I arrive there, I -- I gave to the

20   person, and I don't know how to fill out the form.  I even -- I

21   gave back to fill out the form.

22         Q.    Now, you and your wife have been living together

23   with your two children in your home in China since shortly after

24   the birth of your daughter in 1994, correct?

25   INTERPRETER TO MR. DUVIER

A 29 638 497                    68              October 23, 1996

bw

1              Q.    They were living in their home shortly after the

2     daughter was born in 19 --

3              A.    '94.  Yes.

4     JUDGE TO THE INTERPRETER

5              Q.    Since.

6     MR. DUVIER TO INTERPRETER

7              Q.    Since -- since that time.

8     JUDGE TO MR. DUVIER

9              Q.    Since that time, right?

10    INTERPRETER TO MR. DUVIER

11             Q.    Since 1994 -- since 1994?

12             A.    Yes.

13    JUDGE TO THE INTERPRETER

14             Q.    Living together since the child was born in 1994,

15    the second child.

16    INTERPRETER TO MR. DUVIER

17             Q.    In that house.  Is that the question?

18             A.    Yes.  Yes.

19    MR. DUVIER TO MR. ZHANG

20             A.    The house was built in 1988.

21             Q.    What I mean is it's been you, your wife and both

22    of your children living together in that house since the second

23    child was born?  Obviously you all four weren't there before she

24    was born.

25    JUDGE TO MR. DUVIER

      A 29 638 497                   69              October 23, 1996

bw

1           Q.    Let's get the question clear.

2     JUDGE TO MR. ZHANG

3           Q.    Did you live -- you and your wife live anywhere

4     else after your second child was born?  Or did you only live in

5     the house where you had your -- or did you only live in the house

6     where you had your worship meetings?

7           A.    When he -- when she have the birth of -- she was

8     staying at --

9     INTERPRETER TO JUDGE

10          Q.    Let me -- let me ask -- let me try to understand

11    him again.  I think I forgot something that --

12          A.    What did he give an address?

13          Q.    I forgot something that he said.

14          A.    All right.

15    JUDGE TO MR. ZHANG

16          A.    Okay, she -- she was two months in the pregnancy

17    and she was living with my mother-in-law.  And after one month

18    and two days the child was born, she came back to live in the

19    house, and the child stays in mother-in-law's house.

20    MR. DUVIER TO MR. ZHANG

21          Q.    So since the second child has been born, your wife

22    has been living with you and your first child, but your second

23    child has been living at your mother-in-law's house, is that what

24    you're saying?

25          A.    The second child was stay in my mother-in-law's

A 29 638 497                    70              October 23, 1996

bw

1    house until the new year time, then we bring her back.

2            Q.    New year, 1995?

3            A.    Yes, is the new year that fall in there is like if

4    it's 1996 then the new year would be 1997 if we're living in

5    1996.  So if it's 1994 when she born, so that would be -- the

6    following would be 1995 new year.

7            Q.    You -- you have not tried to hide your second

8    child, correct?

9            A.    What -- what did you say?

10           Q.    You -- you have not tried to hide the fact that

11    you have a second child?  She's lived with you and your wife and

12    your first child openly in your house, correct?

13           A.    The -- the government wouldn't know because I

14    didn't register the child.

15           Q.    All right, beyond not registering the child, you

16    haven't taken any steps to -- to keep the government from finding

17    out about her existence, have you?

18           A.    No, the only thing is if you don't register, then

19    later on you -- you can't go to school.

20           Q.    What did you do for a living in China?

21           A.    I'm a cook.  I -- I do like when people have

22    banquet for their marriage or for -- for their newborns.  I cooks

23    for them.

24           Q.    The notice from the police dated June 20th, 1996,

25    how did you get that document?

A 29 638 497                       71              October 23, 1996

bw

1          A.    The -- the document went to my mother-in-law's

2    house.

3    INTERPRETER TO JUDGE

4          Q.    I didn't understand what he was saying.  I tried

5    to -- I'm sorry.

6          A.    I'm going to need to hear enough of what you do

7    understand and then we'll go back and clarify it, okay?  I can't

8    just have conversation going back and forth.

9          Q.    Okay.

10          A.    All right, the question was how did you get --

11          Q.    How did you get the --

12    MR. DUVIER TO MR. ZHANG

13          A.    They sent the document to my mother-in-law's

14    place.

15          Q.    Who's they?

16          A.    My mother sent.

17          Q.    How did your mother get it?

18          A.    She didn't say.  She just sent it to my mother-in-

19    law's house.

20          Q.    Did your mother ever live at your house with you

21    and your wife?

22          A.    No, she lived in my younger brother's house.

23          Q.    Okay.  Do you have any idea how she is getting all

24    of these -- how she was getting notices and then sending them to

25    your mother-in-law?

A 29 638 497                        72                  October 23, 1996

bw

1          A.    No, she didn't say.  She just had them sent to me.

2    MR. DUVIER TO JUDGE

3          Q.    No further questions.

4          A.    Pardon me?

5          Q.    No further questions.

6    JUDGE TO MR. ZHANG

7          Q.    Sir, the church that you described that had a

8    steep roof and a cross on the top, where was that located?

9          A.    It's in Fujian -- Fuqing Town Gow Shan Tow.

10         Q.    Did people attend that church regularly?

11         A.    The -- Mr. Lin had took me there.

12         Q.    Did people attend that church for worship services

13   regularly?

14         A.    Yes, because on January the 17th that I was -- on

15   January the 7th when I was there, I saw people in there also.

16         Q.    And is -- and the father who came to your village,

17   to your house, was he a priest or minister at that church?

18         A.    No, he's not.

19         Q.    Where did he regularly do his religious work?

20         A.    He told me that anywhere that people who needed me

21   to preach, then I go.

22         Q.    And his name was John Zu Chi?  That was his name?

23         A.    John Zu Chi.

24         Q.    Okay, and John Zu Chi, did he have a regular

25   church that -- that he had worship services at?

A 29 638 497                    73                    October 23, 1996

bw

1          A.    He didn't mention and I don't know.  He only comes

2    into Sundays my house.

3          Q.    How -- what day of the week would he come to your

4    house?  If it was the same day each time?

5    INTERPRETER TO JUDGE

6          Q.    If -- if it was the?

7    JUDGE TO MR. ZHANG

8          Q.    If it was the same day of the week -- first of

9    all, how often would he come to your house, say in a month's

10   time?

11         A.    Every Sunday he comes and so four days a month.

12         Q.    Before he went to your house on Sundays, what did

13   he do on Sundays?

14         A.    I don't know, because he didn't tell me.

15         Q.    Where did he come from?

16         A.    He's from Ling (phonetic sp.) Chung (phonetic

17   sp.).

18         Q.    And what's Ling Chung?

19         A.    It's about half an hour from my house.

20         Q.    Did any other of the -- any of the other people

21   who were at your meeting the day that you fled, did any of them

22   leave China besides you and your wife?

23         A.    No, I don't know.

24         Q.    Do you know whether the people who worshiped at

25   the church building in Fuqing were arrested around the time of

A 29 638 497              74              October 23, 1996

bw

1    May 1996?

2              A.    I have not heard anything about that.

3              Q.    Which father helped you get the tickets?

4              A.    John Zu Chi.

5              Q.    Did you ask John Zu Chi if the same thing that you

6    feared was happening to you was happening to other Christians in

7    your area?

8              A.    He told me it doesn't happen like that before.

9              Q.    Did the police know that he's the father who was

10   in charge of those worship services?

11             A.    Police don't know.

12             Q.    Was John Zu Chi afraid of what might happen to

13   him?

14             A.    I don't know.  After that -- after the day I left,

15   I haven't heard from him.

16             Q.    Well, how about before the day you left, did you

17   ask for any counsel or advice from him as to what you should do?

18             A.    Yeah, I did ask him what his opinion was because

19   it's so close to a June 4th anniversary and so they have this

20   movements coming down, and that could be the only reasons that

21   that happened.

22             Q.    He got you the tickets after the June 4th

23   anniversary, didn't he?

24             A.    June 25th is when I got the ticket.

25             Q.    And on June 25th, did he believe that you still

A 29 638 497                    75              October 23, 1996

bw

1     ran any risk because of the worship services in your house?

2              A.    On the 25th his -- his friend informed me that the

3     tickets arrived and (indiscernible) after -- shortly after that I

4     had left.  So I really don't know what his thinking or his

5     feelings were.

6              Q.    Well, now, you were leaving behind your family,

7     your children and he's the one who informed you that he thought

8     you were in trouble because of the June 4th movement, and those

9     circumstances didn't seem important to you to ask if the danger

10    was over now that June 4th was past?

11             A.    Two days after we escaped from the meetings, the

12    father had took the 20,000 renminbi and left.

13             Q.    Two days after we escaped from the meeting, the

14    father took 20,000 renminbi and left?  Is that what?

15             A.    Yes.

16             Q.    The answer (indiscernible).  What 20,000 renminbi

17    are you referring to?

18             A.    The 20,000 -- after we escaped, in two days later

19    he come and he received $20,000 for buying the plane tickets.

20    JUDGE TO THE INTERPRETER

21             Q.    Twenty thousand dollars or 20,000 renminbi?

22             A.    Twenty thousand renminbi, that's what he said.

23             Q.    Okay.

24    JUDGE TO MR. ZHANG

25             Q.    And where did he receive that?  Whom did he

A 29 638 497                    76                    October 23, 1996

bw

1    receive that from?

2            A.    I -- I received that from my mother-in-law and

3    then I gave that to the father.

4            Q.    Why did you think the father would have any

5    special ability to get a ticket for you to leave China?

6            A.    He told me that my friend -- his friend have the

7    abilities to get me out of the countries and he -- his friends

8    need $20,000 renminbi -- 20,000 renminbi, I'm sorry.

9            Q.    Besides your brother, do you have any other family

10   here in the United States?

11           A.    No.

12           Q.    Does your wife have any family here in the United

13   States?

14           A.    No.

15           Q.    Does she have any close relatives?

16           A.    No.

17           Q.    Do you know who Huang Jing Yeu (phonetic sp.) is?

18   JUDGE TO MS. HUANG

19           Q.    This is -- the question's directed to him.

20   JUDGE TO MR. ZHANG

21           A.    No, I don't know.

22           Q.    Do you know who Xing Qiong Huang is?  Xing, X-i-n-

23   g, Qiong Q-i-o-n-g, Huang.

24   INTERPRETER TO JUDGE

25           Q.    I-o-n-g and --

A 29 638 497                    77                    October 23, 1996

bw

1          A.     Huang, H-u-a-n-g.

2          Q.     H-u-a-n-g.

3          A.     I have feeling that Huang is the last name rather

4     than part of the first name.

5     JUDGE TO MR. ZHANG

6          A.     No, I don't.

7          Q.     Do you know who Claudia Che Fong Lee is?  Che, C-

8     h-e.  Fong, F-o-n-g, Lee.

9          A.     No.

10         Q.     One of the reports from the State Department

11    that's in your file here says that a lot of people in your area

12    have two or even three children.  Do you believe that all those

13    -- all the people who have two or more children are punished?

14         A.     Yeah, I think they -- I believe they're punished.

15    Some of them that when they don't have money to fine them, they

16    took all their furnitures.  A lot of them are -- are abusing the

17    -- the government system when they collect the money from the --

18    the -- from us, they just pocket it themselves.

19         Q.     Okay.

20    JUDGE TO MR. PIERCE

21         Q.     Redirect, Mr. Pierce?

22         A.     Thank you, Your Honor.

23    MR. PIERCE TO MR. ZHANG

24         Q.     Sir, when you were in China, how come you didn't

25    try and find out about the people who were arrested at your home?

A 29 638 497                    78              October 23, 1996

bw

1          A.    I was -- I was jailed and how can I look for

2     informations.

3     JUDGE TO THE INTERPRETER

4          Q.    Let's see if you can get a clarification.

5     JUDGE TO MR. ZHANG

6          Q.    Would you repeat your answer, sir?

7     INTERPRETER TO JUDGE

8          Q.    I was jailed and --

9          A.    No, to him.

10    JUDGE TO MR. ZHANG

11         Q.    Would you repeat your answer please?

12         A.    What do you want?

13         Q.    Why -- why did you not try to find out about the

14    fate of the other people who were arrested at your home?

15    MR. DUVIER TO JUDGE

16         Q.    Did -- I don't mean to put words in your mouth,

17    but do you mean while he was in China, because I believe that was

18    Mr. Pierce's question.

19    JUDGE TO MR. ZHANG

20         Q.    I'm sorry, while you were in China.

21         A.    Because I was hiding in my mother-in-law's places

22    at that area that I was even afraid to come back down and it's --

23    it -- was worrying about they arresting me and I -- and at that

24    time I didn't even know they were arrested.

25    MR. PIERCE TO MR. ZHANG

A 29 638 497                    79                    October 23, 1996

bw

1         Q.   And after the June 4th -- June 4th passed in '96,

2   did you feel you could continue your meetings in your home?

3         A.   It's -- no.  Because they had already locked up

4   the house.

5         Q.   And if you were permitted to remain in the United

6   States, would you continue to practice your religion?

7         A.   Yes, I also at the time I was praying to Jesus

8   Christ, I have promised him that I will send all his messengers

9   to everybody.  Message --

10  JUDGE FOR THE RECORD

11        Let's change tapes.

12                 (OFF THE RECORD)

13                 (ON THE RECORD)

14  JUDGE TO THE INTERPRETER

15         Q.   What's the correction on that last phrase?

16         A.   Messages -- message.

17         Q.   Okay.

18         A.   Instead of messenger.

19  MR. PIERCE TO MR. ZHANG

20         Q.   And, sir, do you feel that you could practice your

21   religion in China?

22         A.   I didn't understand what you're talking about.

23  JUDGE TO MR. PIERCE

24         Q.   Okay, you want to repeat the question, counsel?

25  INTERPRETER TO JUDGE

A 29 638 497              80          October 23, 1996

bw

1          Q.    Do you want me to repeat or --

2          A.    Let's -- let's have counsel repeat the question so

3     we're sure that you get it straight as well.

4     MR. PIERCE TO MR. ZHANG

5          Q.    Do you feel you can continue to practice your

6     religion in China?

7          A.    If they didn't arrest me or they didn't try to

8     arrest me, I will continue to practice my religions there.

9          Q.    Do you feel there's any other place in China you

10    could go where you would be safe and could practice your

11    religion?

12         A.    I -- it is by transportation very far and I don't

13    know if there are places that I can practice.

14    MR. PIERCE TO JUDGE

15         Q.    All right, I have nothing further.

16    JUDGE TO MR. DUVIER

17         Q.    Recross?

18         A.    I just have a couple.

19    MR. DUVIER TO MR. ZHANG

20         Q.    Sir, how did you learn that the people who were

21    arrested at your house were beaten by the government and the

22    government used the excuse of the June 4th meeting to do that?

23         A.    When I'd speak to my brother over the phone and he

24    -- my brother had heard from the people who's in the area.  When

25    I heard that, I was crying and the person -- and the people in

A 29 638 497                        81              October 23, 1996

bw

1     there asked why -- why am I crying.

2              Q.   This is your brother here in the United States?

3              A.   Yes.

4              Q.   This is your older brother?

5     INTERPRETER TO JUDGE

6              Q.   Well, I need to clarify, because what he said gor

7     (phonetic sp.) is older brother.

8              A.   All right.

9     JUDGE TO MR. ZHANG

10             Q.   Okay, well, just make sure this is your older

11    brother that lives in the United States.

12             A.   Yes.

13             Q.   All right, and you say your mother lives with

14    another brother and he's younger?

15             A.   My younger brother, my younger brother's wife and

16    my father and -- and my younger brother's son live --

17             Q.   And your mother?  And your mother and father?

18             A.   Yes, and my mother.  Five people.

19             Q.   And the person who informed you about what's going

20    on is your older brother here in the United States, is that

21    right?

22             A.   Yes.

23             Q.   Today when you said your brother gave you the

24    information, is he the one you were always referring to or did

25    you get some information from your younger brother in China?

A 29 638 497                    82              October 23, 1996

bw

1              A.    It's my older brother in United States.

2              Q.    Okay.

3       JUDGE TO MR. DUVIER

4              Q.    Go ahead.

5       MR. DUVIER TO MR. ZHANG

6              Q.    So somebody in China told your brother in the

7       United States that these people were beaten and why they were

8       beaten, is that your testimony?

9              A.    Yes.

10             Q.    Did he tell you whether or not he knew how they

11      knew that?  Did your brother tell you how he -- strike that.  Did

12      you tell your priest about the May 3rd warning that you received

13      from Public Security?

14             A.    I -- I didn't told him because I thought that was

15      not nothing serious at that time.  And until after we had escaped

16      and then I have informed him afterwards.

17             Q.    Why didn't you think it was anything serious?

18             A.    Because I -- I believed that's just a religious

19      gathering and I don't think that's serious and I don't know that

20      becomes serious.

21             Q.    Well, had the Public Security ever visited your

22      house before May 3rd?

23             A.    No.

24             Q.    But you didn't think it was serious that two

25      officers from the government of China came to your home, ordered

A 29 638 497                    83              October 23, 1996

bw

1    you not to have gatherings and gave you writing about that, you

2    didn't think that was serious?

3         A.    Yeah, I don't think it was serious because we were

4    doing the religious gathering and what I thought is they were

5    just trying to crank down on because it's so close on June 4th

6    anniversary and since we are not doing the June 4th anniversary

7    thing, it's just a few of religious thing, so I don't think that

8    they have anything to do with -- with what actually happened

9    afterwards.

10        Q.    Well, did you think that they were handing out

11   these warnings to everybody?

12        A.    See what -- what my original thought was because

13   when they hand this out they were worrying about the so close to

14   the June 4th.  And since my case is basically for the religious,

15   that's why I think that it wasn't important at all since I'm

16   actually doing the religion, it's not what they think they're

17   doing, so and -- and now afterwards I have no idea that the

18   consequence is -- is happening that way.

19        Q.    How did you know that they thought or that they

20   were worried about the June 4th movements?

21        A.    Because it's very close to the June seventh year

22   anniversary and -- and that's why I was thinking that way.

23        Q.    Well, sir --

24        A.    And also being heard that on every anniversaries

25   usually that they were trying to prevent any group gatherings for

bw

1    serious oppositions to the governments.

2            Q.    Sir, have you ever hosted any gatherings in your

3    house with respect to the June 4th movement?

4            A.    No.  No, mainly -- mainly when I doing this is

5    after my son is got well and -- and mainly it's for the religions

6    gatherings.  And the main -- the main thing we did is just get

7    gatherings and for the Christians.

8            Q.    I don't know what you mean by mainly.  Did you

9    ever have meetings like this before your son was born?  I'm

10    sorry, before your son was sick?

11    INTERPRETER TO MR. DUVIER

12            Q.    Did he ever have meetings --

13    JUDGE TO MR. ZHANG

14            Q.    Did you ever have large gatherings in your house

15    for religious purposes, is this --

16    JUDGE TO MR. DUVIER

17            Q.    Do you want me to say it like this?

18    JUDGE TO MR. ZHANG

19            Q.    For religious purposes before your son was born --

20    before your son was sick?

21            A.    No.

22    MR. DUVIER TO MR. ZHANG

23            Q.    Did you ever have large gatherings in your house

24    for any purpose other than to practice your religion?

25            A.    No.

A 29 638 497                    85                October 23, 1996

bw

1          Q.   So the only large gatherings you had in your house

2     were from January 1996 to May 1996 and they were only for the

3     purpose of practicing your religion, correct?

4          A.   Yes.

5          Q.   And -- and when two officers of the Chinese

6     government came to your house and told you to stop having

7     gatherings in your house and gave you a piece of paper that

8     ordered you not to have or that warned you not to have gatherings

9     in your house, you didn't think that was connected to the

10    gatherings you were having in your house for religious purposes?

11         A.   After the sirens went -- went off, when the two

12    police car come in, you know, I don't know what's going on.  But

13    first thing I knew was to try to escape.

14    MR. DUVIER TO JUDGE

15         Q.   No further questions.

16    JUDGE TO MR. PIERCE

17         Q.   Your other witness, Mr. Pierce?

18         A.   Yes, the wife.

19         Q.   Let's take a very brief recess here just for a few

20    minutes.  You can get a drink and use the restrooms.  I want to

21    start in five minutes.

22                         (OFF THE RECORD)

23                         (ON THE RECORD)

24    JUDGE FOR THE RECORD

25         Okay, we're back after a recess.

A 29 638 497                    86              October 23, 1996

bw

1    JUDGE TO MR. PIERCE

2              Q.   I want to just clarify something, Mr. Pierce?

3              A.   Yes.

4              Q.   Your clients, both of them submitted an asylum

5    application, biographical information and Mrs. Huang's

6    application is of course her own and there's an attachment to it

7    and the attachment is the same, it's as much as the same as it

8    is, a copy of her husband's.  In fact it starts off, my name is

9    Kur Lian Zhang, which is not her name, it's his name.  I just

10   want to make sure that I have everything she submitted and there

11   was not another affidavit that I didn't perhaps miss?

12             A.   No, Your Honor, they're using the same

13   application.  I'm -- I'm glad you can -- consolidated the two

14   cases, because basically --

15             Q.   Okay.  I just want to make sure that --

16             A.   -- it's nothing el --

17             Q.   -- that she didn't have another af-affidavit that

18   by mistake was not served on me, but a second copy of his was.

19             A.   I -- I understand that.  It shouldn't have been.

20   That -- that -- should have -- the name should have been changed

21   there.  Because they have him in the wife's statement, I guess

22   that's why they left it.

23             Q.   Uh-huh.

24             A.   But I had it in the -- during the recess I had a

25   discussion with the Government and for the wife's testimony with

A 29 638 497                     87                  October 23, 1996

bw

1    what it would help or the process where I would defer to the

2    trial attorney and then reserve any questions after that.

3           Q.    You have no direct examination?

4           A.    Huh?

5           Q.    You have no direct examination?

6           A.    Correct.  Correct.  I expect since I expected it

7    to be the same as the husband's, I figured we'd get right to the

8    --

9           Q.    Okay.

10          A.    -- cross and then if I had anything after that, I

11   would explore --

12          Q.    All right.

13          A.    -- if I may.  If that's all right with the Court.

14          Q.    Yeah, that's okay with the Court and in -- maybe

15   to do this in a formal way, I'll ask her a question.

16   JUDGE TO MS. HUANG

17          Q.    Ma'am, you're under oath, do you understand that?

18          A.    What did you say?

19          Q.    When you stood up and swore to tell the truth,

20   that means that you've taken an oath and that you will speak the

21   truth.  Do you understand that?

22          A.    Yes.

23          Q.    Okay, you were here when your husband gave all of

24   his testimony just now, is that right?

25          A.    Yes.

A 29 638 497                    88              October 23, 1996

bw

1          Q.    Okay, do you -- do you -- if you were to have been

2     -- if you were asked the same questions, would you have given the

3     same answers?  Do you agree with what he said?

4          A.    There are some difference.

5          Q.    All right, I suspect there might be some

6     differences with respect to your knowledge of family -- your

7     family members here in the United States.

8     JUDGE TO MR. PIERCE

9          Q.    Well, there may be some other differences.   All

10    right, and then we probably want to take this route.  Go ahead

11    and still -- what I'll do is I'll permit you to do cross-examina

12    -- redirect that will go beyond the extent of cross-examination

13    if necessary.

14         A.    Okay.  And thank you.

15    JUDGE TO MR. DUVIER

16         Q.    Okay, you may go ahead, Mr. Duvier.

17    JUDGE TO MS. HUANG

18         Q.    Ma'am, let me ask you, to the best of your -- of

19    your recollection as you're sitting here right now, what is it

20    that you would like to tell this Court that is different in any

21    way from what your husband just told?

22         A.    What he -- what my husband says regarding the

23    persecutions by the Chinese government is not detailed enough.

24         Q.    Okay.  Where was your first child born?

25         A.    Quqian Town.

A 29 638 497                    89                October 23, 1996

bw

1           Q.   Born in a hospital?

2           A.   Yes.

3           Q.   And where was your second child born?

4           A.   It's in Shan-Shanya (phonetic sp.).  Song Jing

5    (indiscernible) health sector.

6           Q.   Is that a hospital as well?

7           A.   It's not consider a hospital.

8           Q.   How far is it from where you live?

9           A.   Twenty --

10   INTERPRETER TO JUDGE

11          Q.   I need to clarify the term dejuneay (phonetic

12   sp.).

13          A.   A different measure than the kilometers?

14          Q.   Yeah, it's a different -- I believe -- I think it

15   is so --

16          A.   Okay, so she said it's 20 lea (phonetic sp.) from

17   where she lives?

18          Q.   Twenty lea from --

19          A.   Okay, how much is --

20   JUDGE TO MS. HUANG

21          Q.   Do you know how much a lea is compared to

22   kilometers?

23          A.   Our kilometer is 2 lea.

24          Q.   That would be 10 kilometers.

25   JUDGE TO MR. DUVIER

A 29 638 497                    90              October 23, 1996

bw

1          Q.    Go ahead.

2     MR. DUVIER TO MS. HUANG

3          Q.    And is there any particular reason why your

4     children were born in two different places?

5          A.    Because being abused by the Chinese government.

6          Q.    Do you consider yourself a Christian, ma'am?

7          A.    I have not been baptized, so I'm not supposedly a

8     Christian.

9          Q.    Why have you not been baptized?

10         A.    Be-because I am illiterate and I haven't really

11    learned the religions.  Therefore I have not been baptized.

12         Q.    Did -- were you present at -- in your home when

13    you had -- when these religious gatherings were held every

14    Sunday?

15         A.    Yes.

16         Q.    Did your husband do any -- take part in any

17    religious activities that were any different from the ones that

18    you took part in every week at these meetings?

19         A.    Yes.

20         Q.    In what way?

21         A.    You mean to attend the meetings, the stuff --

22    JUDGE TO MS. HUANG

23         Q.    Did he do any -- what did he do at the meetings

24    different from what you did, if you know?

25         A.    No, they are -- we do the same thing.

A 29 638 497                    91              October 23, 1996

bw

1    MR. DUVIER TO MR. ZHANG

2           Q.   Did he go to any classes or -- or try to study

3    Christianity at any time other than at these meetings once a week

4    at your home?

5           A.   No.

6           Q.   Then I'm not really sure I understand why he was

7    baptized and you weren't.

8           A.   Because I -- I don't know how to read and write

9    and some things he understands I didn't quite pick up.

10          Q.   Did your -- did your -- the priest or the pastor

11   who was running these services ever tell you that you had to be

12   able to read and write in order to be baptized?

13          A.   I did not (indiscernible) myself that I want to --

14   to baptize later because I have not really know what's going on.

15          Q.   Where were you when the Public Security came and

16   warned you all not to have any more gatherings at your house?

17          A.   I was not home.  I was taking my son to school.

18          Q.   Did your husband tell you about this warning?

19          A.   Yes.

20          Q.   Did he show you the -- the written warning that

21   they gave him?

22          A.   He show me.  I don't know how to read.  I don't

23   know what it says.

24          Q.   What did you think the reason was that the Public

25   Security was telling you not to have gatherings in your home

A 29 638 497                    92                    October 23, 1996

bw

1   anymore?

2          A.   I thought that the government was against the

3   individual to organize a group to against the June 4th

4   anniversary to set up something for a June 4th anniversary.

5          Q.   So you didn't think that this warning had anything

6   to do with the religious meetings you'd been having in your

7   house?

8          A.   Would you repeat that again?

9          Q.   You didn't think that this warning had anything to

10  do with the fact that you had been having these religious

11  meetings in your house, is that what you're saying?

12         A.   The -- the (indiscernible) the warning indicates

13  that you're not just -- you're not allowed to have a group

14  gathering in your house and I thought that what we have is a

15  religious gathering is a good thing and I have not thought of

16  that what we are doing is wrong and therefore we -- I didn't

17  think it's important.

18         Q.   Well, did -- did you have any idea in your mind

19  why the Public Security would be telling you and your husband not

20  to have gatherings in your house to commemorate the June 4th

21  movement?

22  INTERPRETER TO MR. DUVIER

23         Q.   I didn't understand the question.

24  MR. DUVIER TO MS. HUANG

25         Q.   Well, had -- had you and your husband ever had any

A 29 638 497                    93              October 23, 1996

bw

1    gatherings in your house of politically minded people who wanted

2    to do a demonstration about the June 4th movement?

3            A.    No.

4            Q.    What hospital was your son at when he was sick?

5            A.    Ing (phonetic sp.) Si Hospital.

6            Q.    And where is that hospital?

7            A.    It's not too far from my house, about 10 minutes

8    by bike.

9            Q.    Is it -- was he -- is that the hospital that he

10   was born in?

11           A.    No.

12           Q.    What was the name of the doctor who was treating

13   him?

14           A.    We did -- I didn't ask the name.  Everybody said

15   doctor, doctor.

16   MR. DUVIER TO INTERPRETER

17           Q.    I'm sorry, I'm asking the interpreter, everybody

18   said doctor, doctor?

19           A.    Every -- everybody call him doctor, doctor.

20   MR. DUVIER TO MS. HUANG

21           Q.    What was -- what was he doing to treat your son's

22   illness, if you know?

23           A.    They have needles and also have I.V. but the fever

24   stays.

25           Q.    Did the doctor tell you what he thought might be

A 29 638 497                        94                        October 23, 1996

bw

1    causing the fever?

2            A.    The doctor didn't say.  He didn't know why the

3    fever's not going down.

4            Q.    Did you ask him whether or not it might be

5    contagious?

6            A.    He -- he didn't say about contagious.  He said if

7    it continues to have high fever, it -- it would be dangerous to

8    the childr -- to the child.

9            Q.    Did you ask him whether he was concerned that

10   whatever your son's problem was it might be contagious?

11           A.    I did ask him and he -- he said no, he's just

12   running a fever and just don't know why the fever's not going

13   down.

14           Q.    Did you tell the doctor that you had a second

15   child at home?

16           A.    Yes.

17           Q.    Were you present at home on May 26th, 1996 when

18   the Public Security officers came?

19           A.    Yes.

20           Q.    When did you first become aware that the Public

21   Security officers were there?

22           A.    When what?

23           Q.    When did you first become aware that the Public

24   Security officers were -- were at the home or were about to come

25   to the home?  How did you first become aware that there was a

A 29 638 497                    95              October 23, 1996

bw

```
 1   problem?

 2            A.   About 11 a.m.

 3            Q.   How is it that you became aware that the -- the

 4   police were there or were about to be there?

 5            A.   The sirens that came on.

 6            Q.   What did you do?

 7            A.   I went to the doors and looked and saw the cars

 8   coming in.

 9            Q.   Then what'd you do?

10            A.   I went in and tell the peoples to run away.

11            Q.   Then what'd you do?

12            A.   And then I and the child and my husband and the

13   father went to my mother-in-law's house.

14            Q.   What door did you go out of?

15            A.   Our back door.

16            Q.   Had other people already left ahead of you?

17            A.   The same time, some before me and some after me.

18            Q.   How many people were in the house that day?

19            A.   Fifty some people.

20            Q.   When did you and your husband decide to leave

21   China?

22            A.   After I had escaped to my mother-in-law's house

23   and two days after that pri -- father had indicate that is not

24   safe to stay in Unite -- stay in China.  Actually the father says

25   you don't have the freedom of religions in China and you have --
```

A 29 638 497                        96                    October 23, 1996

bw

1    you can leave China.

2              Q.    Where was the father while you and your husband

3    were at your mother-in-law's house?

4              A.    The father had came to my mother's house together

5    when we escape.

6              Q.    How long did he stay at your mother-in-law's

7    house?

8              A.    Two days.  Two days.  He stayed for two days and

9    then left.

10             Q.    Do you know where he left to?  Where he went to?

11             A.    I don't know.

12             Q.    Do you know where he lived?

13             A.    Now, I don't and before I know.

14             Q.    Do you know why he stayed with you and your

15   husband at your mother-in-law's house for two days?

16             A.    Because they -- he escaped with us and he was

17   hiding there for two days.

18             Q.    Now at that point you had no idea what had

19   happened to the rest of the people in your house that morning, is

20   that correct?

21             A.    At that time I don't know.

22             Q.    Had you done anything to try to find out what had

23   happened?

24             A.    I afraid to do investigations at that time.

25             Q.    By the way, was your husband's mother at the

bw

1    church service that day?

2              A.    Yes.

3              Q.    Where did she go?

4              A.    My mother's at home.

5              Q.    Let me make sure you understood my question.  Was

6    your husband's mother, your mother-in-law, was she at your house

7    on May 26th when the Public Security officers came?

8              A.    No, she -- no, she -- she's not there.

9              Q.    Do you know why she wasn't there?

10   INTERPRETER TO JUDGE

11             Q.    Too fast, I didn't understand.

12   MR. DUVIER TO MS. HUANG

13             A.    Because she says she's in old age.  She's also il-

14   illiterate and have bad memories and therefore I -- she didn't

15   attend and she said that after you all learn what, you know,

16   learn what -- study what have to be studied and you can come back

17   and slowly and tell me what's going on.

18             Q.    What about your husband's brother?  Was he there

19   that day?

20             A.    He works on Sundays and he doesn't attend.

21   JUDGE TO MS. HUANG

22             Q.    Was your own mother there?

23             A.    No.

24   MR. DUVIER TO MS. HUANG

25             Q.    Why not?

A 29 638 497                      98              October 23, 1996

bw

1          A.    My -- my own mother is at my mother's -- my own

2     mother's house.

3          Q.    Was she aware of the -- of the recovery of your

4     son?

5                        (OFF THE RECORD)

6                        (ON THE RECORD)

7     MR. DUVIER TO MS. HUANG

8          A.    No, because they were so far away and didn't have

9     communication.

10         Q.    Your -- your mother was not even aware that your

11    son had been sick and that your husband had -- had prayed for his

12    recovery and he was well again?  Your mother -- you hadn't told

13    her about that?

14         A.    No, because she was far away and in a moun -- in a

15    very remote area had no phones, no communications.

16         Q.    Had you been aware of Christianity before your son

17    getting sick?

18         A.    No.  Vaguely.  Don't know exactly what it is.

19    MR. DUVIER TO INTERPRETER

20         Q.    Did -- did -- did you say they?  Mr. Interpreter?

21         A.    No.  Vaguely.  Very vaguely.

22    JUDGE TO MR. DUVIER

23         Q.    No, vaguely.  Vaguely.

24    MR. DUVIER TO MS. HUANG

25         Q.    Had -- did you ever go to the church that your

A 29 638 497                    99            October 23, 1996

bw

| | | |
|---|---|---|
| 1 | | husband went to when he prayed for your son? |
| 2 | A. | No. |
| 3 | Q. | Have you ever been to any church? |
| 4 | A. | Yes, once. |
| 5 | Q. | When was that? |
| 6 | A. | January the 7th after my son had recovered from |
| 7 | | his sickness. |
| 8 | Q. | What church did you go to on January 7th? |
| 9 | A. | The Gow Shan Tow -- Gow Shan Tow. |
| 10 | Q. | Is that the same church that your husband and -- |
| 11 | | had prayed for your son's recovery at? |
| 12 | A. | Yes. |
| 13 | Q. | Did your son go with you and your husband? |
| 14 | A. | No, he's still in hospital. |
| 15 | Q. | When was he released from the hospital? |
| 16 | A. | Eighth. |
| 17 | Q. | Did your -- your pastor Zu Chi John, to your |
| 18 | | knowledge, did he have any other gatherings in people's homes |
| 19 | | that he went to other than the one in you and your husband's |
| 20 | | home? |
| 21 | | INTERPRETER TO MR. DUVIER |
| 22 | Q. | The pastor John Zu Chi? |
| 23 | | MR. DUVIER TO MS. HUANG |
| 24 | A. | This I don't know. |
| 25 | Q. | Did you ever ask him? |

A 29 638 497                     100                     October 23, 1996

bw

1          A.   No, I did not.

2          Q.   Did you ever ask him anything about his life prior

3     to the time that he started showing up at your house every Sunday

4     conducting church services?

5          A.   No, I didn't ask any.

6     MR. DUVIER TO JUDGE

7          Q.   I have nothing further at this time.  I would like

8     a moment to go through my notes if there's any redirect rather

9     than waste time in silence if Mr. Pierce or if the Court has any

10     --

11     JUDGE TO MR. PIERCE

12          Q.   Do you have any questions?

13     MR. PIERCE TO MS. HUANG

14          Q.   What do you think would happen to you if you went

15     back to China?

16          A.   They -- they will sterilize me and they might

17     sentence me.

18          Q.   Why do you think you'd be sterilized?

19          A.   Because in China they're not allowed to have

20     second child and I already have second child and they probably

21     know by now.

22          Q.   What makes you think that you in particular would

23     be sterilized?

24          A.   Because I have two childrens and now all this

25     things happen and now everybody know that I have two children and

A 29 638 497                        101              October 23, 1996

bw

1      if I go back now they will have -- they will sterilize me.

2                    Q.    Why do you think you'd be sentenced?

3                    A.    I think they will because of the June 4th

4      anniversary gatherings.

5                    Q.    But were they June 4th anniversary gatherings?

6      INTERPRETER TO MR. PIERCE

7                    Q.    Were they?

8      MR. PIERCE TO MS. HUANG

9                    Q.    Were they or were there any June 4th anniversary

10     gatherings at your home?

11                   A.    No.

12                   Q.    So why do you think you'd be sentenced for that?

13                   A.    Even if the Chinese government suspected you of

14     and they will try to sentence.

15                   Q.    Is it true that an I.U.D. was inserted in your

16     body?

17                   A.    Yes.

18                   Q.    How did you feel about that?

19                   A.    After they inserted the I.U.D., I was bleeding.

20     And I have filed applications to ask them to removed it.   And

21     they not al -- they not allow.   And they have not took the I.U.D.

22     out and we have seen doctors after that and spend a lot of money

23     on it.   And -- and find that they have not taken the I.U.D. out

24     because they didn't allow and then spend a lot of money to -- to

25     try to cure it and then eventually it got cured.

       A 29 638 497                        102              October 23, 1996

bw

1          Q.    Okay.

2     INTERPRETER TO JUDGE

3          Q.    Too fast.  She have a highly accent.

4     MR. PIERCE TO MS. HUANG

5          A.    After ever since the I.U.D.'s are inserted, I

6     hasn't been feeling comfortable as far as the feelings.  And --

7     and the back continues to hurt.  And also bleed often.  Bleeding.

8          Q.    Okay.  Now, ma'am, I'm referring to something you

9     testified to earlier, was there any particular part about your

10    husband's testimony that you felt was not detailed enough?

11         A.    No.

12         Q.    Do you have any plans to continue to learn about

13    Christian -- Christianity?

14    INTERPRETER TO MR. PIERCE

15         Q.    I'm sorry, I didn't --

16    MR. PIERCE TO MS. HUANG

17         Q.    Do you have any plans to continue with Christi-

18    Christianity in any way?

19         A.    If I have not been prosecuted by the Chinese

20    government, I am -- I will continue to send message for Jesus

21    Christ.

22         Q.    Do you plan on having any more children in the

23    future?

24         A.    I -- I have -- I'd like to have, but the Chinese

25    government are not allow and the second one is already have a lot

A 29 638 497                    103             October 23, 1996

bw

1    of risk.

2    MR. PIERCE TO JUDGE

3            Q.    I have nothing further, Your Honor.

4    JUDGE TO MR. DUVIER

5            Q.    All right, any recross?

6            A.    Yeah, just a couple.

7    MR. DUVIER TO MS. HUANG

8            Q.    Ma'am, why do you say that now everybody knows

9    that you have two children?

10           A.    At that time we didn't -- I didn't tell people and

11   people think that child was somebody else's.

12           Q.    Well, what makes you think that people know who's

13   child it is now?

14           A.    After this and also from the -- the -- my daughter

15   had been calling me mom and mom and everybody had know.

16           Q.    Ma'am, are you saying that for about two years you

17   had a child living in your house with you and your husband and

18   your son and you told all your friends it was somebody else's

19   child?

20           A.    She has seldom go outside.  Also go outside to

21   play.

22           Q.    Well how has anything changed with that respect?

23           A.    Because of the gatherings in our house.

24           Q.    Well, ma'am, before you left China the government

25   knew about the gatherings in your house, didn't they?

A 29 638 497                    104                 October 23, 1996

bw

1    JUDGE TO MR. DUVIER

2              Q.   I think the intention about what she said is

3    that's how everybody knows about her daughter rather than how the

4    government knows about something.  If -- if I'm not mistaken.  We

5    can go into that.

6    MR. DUVIER TO MS. HUANG

7              Q.   Ma'am, you believe that the government now knows

8    that you have two children?

9              A.   They -- the government should know I have two

10   children because of there are people arrested.

11             Q.   You mean because the people who were arrested at

12   your house on May 26th?

13   INTERPRETER TO JUDGE

14             Q.   I didn't understand.  I didn't understand.

15   MR. DUVIER TO MS. HUANG

16             A.   Because of the gathering they tried to -- the

17   government tried to arrest me.  And then because of that, they

18   would do investigations on I and my husband concerning on -- in

19   all scopes.  From that and they had talked to people around there

20   and they find out I have the second child.

21             Q.   Well, ma'am, since the time that the police raided

22   your house on May 26th, they've sent out at least two notices to

23   you and your husband to come and talk to them, haven't they?

24             A.   Yes.

25             Q.   And neither one of those notices mentions anything

A 29 638 497                    105              October 23, 1996

bw

1    about the fact that you have two children, does it?

2            A.    No.    No, they didn't mention anything like that.

3            Q.    Thank you.

4    MR. DUVIER TO JUDGE

5            Q.    I have no further questions.

6    MR. DUVIER TO MS. HUANG

7            A.    The -- that belongs to -- to the two departments.

8    That is on one thing and the birth with two childrens are usually

9    issued by birth control -- I mean, Family Control Planning

10   Agencies.

11           Q.    Well, what makes you think the Family Control

12   Planning Agency is going to know that the Public Security

13   officers are looking for you because you've been having June 4

14   meetings in your home?

15           A.    The Publ -- normally the Public Social -- Public

16   Security officer will notify the Family Planning Agencies.

17           Q.    Well, don't you think they would have done that by

18   now, ma'am?

19           A.    Yes.

20           Q.    And you're not aware of anything as you sit here

21   today that would lead you to believe that the Chinese government

22   either knows that you have two children or if they know, that

23   they care that you have two children, isn't that correct, ma'am?

24           A.    Because they have -- I'm -- I'm here in the United

25   States now.    If I going back, they will look after me because

A 29 638 497                    106                    October 23, 1996

bw

1    even now the Public Social -- the Public Security Agency couldn't

2    find us.  And what can the Family Planning Agency do?

3    MR. DUVIER TO JUDGE

4            Q.   I have any -- no further questions.

5            A.   Okay.

6    JUDGE TO MS. HUANG

7            Q.   Thank you.  You may go have a seat by your

8    husband, ma'am.

9    JUDGE TO COUNSEL

10           Q.   All right, I'd like to hear a brief closing from

11   both parties.  It seems to me there are two issues that form the

12   basis of her claim -- their claim I should say.  The family

13   planning issue and the religious persecution issue, and the issue

14   of credibility looms as a significant issue.  The new statute

15   passed September 30th has some matters that appear to be in

16   effect already, a new definition or amendment to the definition

17   of well-founded fear of persecution seems relevant in this case.

18   I'd like to hear both parties, if you're prepared to do so, how

19   you think that that may be relevant.  It's Section 6 -- I'll have

20   to check it.  I think it's 6 -- 600 or 601.  Yeah, it's 601 that

21   amendment, the definition of a well-founded fear and how -- it

22   seems to me one of the issues under that is still the genuineness

23   of the fear which goes to credibility and the other is the harm -

24   - what is the harm that would constitute the persecution for

25   political grounds based on opposition to application of the

A 29 638 497                    107                October 23, 1996

bw

1    family planning program to these people?  It is Section 601.  It

2    amends Section 101(a)(42)(A).

3    JUDGE TO MR. PIERCE

4            Q.    Are you ready, Mr. Pierce, or do you need a --

5            A.    Yes, yes, Your Honor.  I believe it's extremely

6    relevant to these proceedings here today.  I believe that section

7    of law which as you mentioned passed September 30th in effect is

8    overruling the previous law that the Court has been following.

9    That law being of Matter of Chang and Matter of G-, which gave

10   the definition of only a very narrow exception to this type of

11   persecution that the applicants face in returning to China.  I

12   believe it states now that if you're persecuted or fleeing

13   persecution due to restrictive family matters can constitute a

14   well-founded fear of persecution under the Act.  And I believe

15   the applicants here today have demonstrated that they fall under

16   this section and that they have this relief available to them as

17   the law is today.  They stated that they have -- it's a one child

18   policy and there is pressure to only have one child.  And the

19   fact that they have two children and I believe they've openly

20   tried to keep the second child a secret.  The main reason I say

21   that is because they did not register the second child and that

22   has consequences in China which they took the risk of in the

23   future that child would not be able to go to school, but they

24   didn't let the child go out to play.  They tried to keep this

25   child -- child a secret.  I don't think a family should have to

A 29 638 497                    108                    October 23, 1996

bw

1    go through that.  I don't think a family should have to be

2    pressured by the government as to the number of children they

3    should have, although I understand the government has a right --

4    or to protect its people and if they feel it's too many people,

5    it could cause a danger to everyone.  But I feel -- well, I think

6    from what the applicants testified that they're trying to avoid

7    persecution that the government -- that they see is happening in

8    their area.  That they see people being sterilized for having a

9    second child and also the applicant, the wife, underwent measures

10   herself against her will.  They entered an I.U.D., which she did

11   not agree to.  It caused her some problems which she did not feel

12   was warranted in having -- and they removed the I.U.D. which was

13   an open act of defiance against the law of the one child policy.

14   And then they did have the second child.  So I believe the way

15   the law is now, that can be characterized as opposing the policy

16   as their political opinion.  And she believes the government is

17   now aware that they have these two children.  So I believe the

18   fear they face in returning to China for having the second child

19   is a credible fear and a well-founded fear of persecution.  I ask

20   the Court not to have her sent back with the possibility, the

21   credible possibility, that she would be sterilized.  She's

22   testified that she wanted more than two children.  Her husband

23   testified that they can -- he would like four or five children.

24   And I believe the way the country reports say that China is now

25   and what they testified to, that's not possible in China.  And

A 29 638 497                        109                  October 23, 1996

bw

1    that's why I believe they come under this law.  As for

2    credibility, I submit to the Court that the applicant -- both of

3    them were very credible.  I think they were very consistent.  We

4    have before us an application for asylum with the addendum.  They

5    share the same addendum because they share the same experience,

6    but they gave a lot of detail about what's written in the asylum

7    application and I believe it's consistent with the application.

8    I believe they were specific in telling what happened to them in

9    China.  They were detail specific, coherent and it provides a

10   plausible account in light of the State Department opinion and in

11   light of the credibility.  In order to be found credible.  I

12   don't think we heard anything today that would be specifically

13   not credible.  There was a point in the testimony, a key point,

14   where when they got the notice on May 3rd and they felt this was

15   no big deal and they did not tell the pastor or priest or -- what

16   was happening.  Maybe it seems they should have.  Maybe it seems

17   that they should have thought this was serious.  But I don't

18   think we can use this to show that they're incredible.  Maybe

19   they were not -- they weren't for lack of a better word maybe

20   intelligence that they should have done that in hind sight.  When

21   the husband says oh, when I saw the police -- when I saw the

22   sirens, I knew.  Now I knew.  But he made a mistake.  He should

23   have told the priest what happened.  He should have thought it

24   was serious.  But the fact that he didn't should not be held

25   against him.  People make mistakes.  People sometimes don't think

A 29 638 497                    110                    October 23, 1996

bw

1   clearly.  And I don't believe that should be a ground to find

2   incredibility.  Maybe just lack of what the right thing to do

3   was.  I believe we do have as far as the second ground,

4   persecution as to religion, I believe it is a short time that

5   they were practicing religion, but I don't think the time should

6   have an effect on what happened to them in China.  The fact that

7   they were -- suffered persecution, the church was far away and

8   was not convenient to get to, but he invited the priest to come

9   at his own home.  And I think the reasons why he did that were

10  very admirable, very credible.  And the fact that he went out to

11  tell other people to come to his home, I believe supports a

12  backdrop of the -- what's happening in the State Department

13  report as to proselytizing.  I believe going out and telling

14  other people, hey, there's a meeting in my home about religion.

15  Everyone's invited.  And the fact that he'd been having 50 or 60

16  people come shows that there's been an interest in the community

17  to learn about this religion.  That's been, as the applicant's

18  wife put it, a vague thought before about Christianity.  They

19  (indiscernible) out into the open, but they opened up to the

20  village.  And I believe because it is proselytizing the

21  government felt threatened that they wanted to suppress what was

22  happening.  This is why we have the notice on May 3rd.  This is

23  why we have the subsequent notices on June 20th and July 15th.

24  And from the photos we submitted of the applicant's door being

25  shut down on July 10th, 1996, we don't just have the applicant's

A 29 638 497                    111              October 23, 1996

bw

1    testimony, we have evidence in the record.

2         Q.    You say the applicant's door?

3         A.    I'm sorry.  I didn't say -- door -- door.  Yes,

4    (indiscernible) from the photos.  So it is not just the

5    applicant's own testimony even though I do believe it would

6    suffice because of how credible it was, how detailed and

7    specific.  But we also have other evidence in the record.  And I

8    ask the Court to grant their application for asylum so that they

9    can practice their religion in a country where they're free to do

10   so, so they can have more children in a country where they're

11   free to do so.  Thank you, Your Honor.

12        Q.    Thank you, sir.

13   JUDGE TO MR. DUVIER

14        Q.    Mr. Duvier?

15        A.    The Government opposes the application.  I believe

16   the applicants haven't shown that they're statutorily eligible

17   for asylum or that their testimony has been credible.  First, I

18   think it's clear on this record that there has not been any past

19   persecution or a well-founded fear of pers-persecution with

20   respect to this claim for religion.  Nothing has happened to them

21   in China except unless you believe them that a religion service

22   was broken up, they fled.  They were not arrested.  They were not

23   harmed.  And we have no -- no real basis for understanding what

24   it is that they fear.  And we don't believe their testimony's

25   been credible at all with respect to this.  Their explanation for

A 29 638 497                    112              October 23, 1996

bw

1    why they didn't take seriously this warning that they received on

2    May 3rd is ridiculous.  The only gatherings they've ever held in

3    their home at any time were for religious purposes.  It's a huge

4    change in their life.  A complete conversion to religion, so

5    complete that they invite people into their home every week, have

6    services, 50 to 60 people.  It's a huge event in their life.  A

7    huge change in their life and then they get a not only a note

8    from the government, but a visit from two government officers

9    telling them, stop.  You cannot have gatherings in your home.

10   And it doesn't occur to them that this refers to their religious

11   gatherings?  It -- it's -- it totally begs credulity to believe

12   that.  And along with that, why they wouldn't tell their pastor

13   about this and why they wouldn't take some precautions.  There --

14   there -- the thought that well, gee, this must be about the June

15   4th movement doesn't make any sense whatsoever.  They did not

16   inquire as to the fate of the other people who were arrested at

17   their homes.  And significantly, one of the people that the

18   applicant says was arrested at his home and according to his 589

19   is still being detained by the government, although he said today

20   that he had no idea, is the very person Guo, G-u-o Fei, F-e-i,

21   Lin, L-i-n, who -- who converted them essentially -- the father

22   of the son's classmate who introduced them to the pastor, who

23   told them to come pray, who helped save their son's life, if

24   they're to be believed.  He was arrested at their house.  And

25   they -- they don't know anything about it and apparently haven't

A 29 638 497                   113              October 23, 1996

bw

1    bothered to ask anything about it, nor has the pastor who saved
2    them.  Because I asked him whether the pastor had inquired about
3    any of these people and he said he had not either.  So you have
4    this pretty miraculous situation.  You have 60 people in your
5    home.  The police come and break it up.  Everybody runs out and
6    two days later you're paying 20,000 renminbi to leave China.  You
7    have no idea what happened and apparently when you do find out
8    what happened it's that the very person who may have brought all
9    this about had been arrested and you don't acquire -- inquire
10   about them at all.  And I can't comment on this claim without
11   mentioning the -- the huge absence of the applicant's brother who
12   apparently could corroborate all of this and more.  And I would
13   note, Your Honor, that the motion for change of venue which is
14   Exhibit 2 in this record, filed before the Court in Seattle, not
15   by applicant's current counsel but by a prior counsel, noted that
16   the respondent's closest relatives and potential witnesses all
17   reside in the New York City area and if the case were transferred
18   to York, it would be possible for witnesses and family members to
19   attend their hearings.  And attached were documents relating to
20   immediate family members, including the brother and two other
21   people who it has gone completely unremarked here, the applicant
22   didn't know who they were.  But where's the brother?  The brother
23   who found out, I'd love to know how, not only that these people
24   are still detained but that they'd been beaten up and not only
25   that the reason they'd been beaten up.  They know why the police

A 29 638 497                        114                    October 23, 1996

bw

1    are beating these people up.  This incredible network apparently

2    that they have to find out what's happening to these people in

3    detention back in China.  It's amazing that that person is not

4    here.  And what did the applicant say?  First, he said, I didn't

5    even know I had a hearing today.  Then he said, well, my

6    brother's very busy.  He runs a business.  And then finally he

7    said I'm not sure if my -- if I told my attorney or I'm not sure

8    if my attorney told him.  His absence, I believe on this record

9    looms very, very large.  It's clear under the new Act passed

10    September 30th that this is not a case of past persecution with

11    respect to the child policy.  The Act is clear that in order to

12    have past persecution, you have to have been forced to abort a

13    pregnancy or undergo involuntary sterilization or have been

14    persecution for failure or refusal to undergo such a procedure or

15    for other resistance to a coercive population control program.

16    Now the fact is, none of those things happened to them in the

17    past.  They had the child.  They were not sterilized.  They did

18    not undergo a forced abortion.  And they didn't -- and so they

19    had not been persecuted in the past.  So the only then issue with

20    respect to that question for this Court is, have they shown a

21    well-founded fear of persecution in the future based upon this

22    claim?  Well, we submit they haven't because, first of all, we

23    submit they haven't been credible.  And so you can't believe what

24    they've told you about their fears.  But also, you can't just

25    because of this new change in the law come into Court, I -- the

A 29 638 497           115           October 23, 1996

bw

1    Government believes and say, well, I want to have more kids and,

2    of course, I'm not going to be able to and I'll forced to be --

3    I'll be sterilized or my wife will have to have an abortion and

4    therefore I get asylum.  There still has to be some kind of a

5    nexus between you and what it is that you fear.  And here there

6    is none.  They've had this second child for over two years.  They

7    had it in a hosp -- the second child in a hospital.  The

8    government apparently knows so much about them that they are

9    aware that they're having meetings in their house and the

10   government has been to their house twice, once to warn them to

11   stop having meetings and the second time to arrest -- to break up

12   the meeting.  I take that back.  They've been at least four

13   times.  And then two more times to drop off these warning notices

14   that we've seen.  They know where his mother lives, because when

15   they couldn't find him at home, they went to his mother's house.

16   They know everything they could possibly know about these people,

17   and there's no suggestion in this record that they know anything

18   or that they care about a second child.  And it -- and everything

19   to suggest that they would have known about it by now.  Nothing

20   in the two notices from the police that they have submitted which

21   says anything about a second child.  And so with respect to the

22   -- the coercive birth control policy, we just don't believe

23   they've made out a claim.  But we're not here to argue that

24   China's birth control policy is the correct one at all.  The

25   question is whether these applicants have shown a well-founded

A 29 638 497                    116              October 23, 1996

bw

1    fear of that policy as defined in the Act and we don't believe on

2    this record that they have.

3    JUDGE TO MR. PIERCE

4            Q.    I'll going to give you a moment for a rebuttal in

5    a second.  And I want to address a question to Mr. Duvier.

6    JUDGE TO MR. DUVIER

7            Q.    It's the Government's view that Section 601 of the

8    September 30 Act does not simply mean that if a person wants to

9    have more children than just two that -- and they come from China

10   that the background -- the contextual situation there does not

11   give them a claim to fear persecution.  That almost sounds right

12   almost by, you know, as a rhetorical statement, and yet I look at

13   the definition and I look at Matter of Chang.  In the Board's

14   decision in Matter of Chang it says that China needs to be doing

15   something about its birth control and it's okay if it at least

16   sterilizes people and does some of the other things that are

17   mentioned in that case.  And now Congress is saying, we don't

18   look at it that way anymore.  As policy of the United States, if

19   anybody's forced to go under such a procedure or has a well-

20   founded fear that they will have to undergo such a procedure,

21   they should be deemed to have a well-founded fear of persecution.

22   It almost seems to me that that applies to anybody in China who

23   wants to have more than one child or two children or depending

24   again what the factual situation is and perhaps the factual

25   situation in the particular area as it's supplied, and of course

A 29 638 497                117                October 23, 1996

bw

1    the only evidence we have about that is what's given in the State

2    Department report here.  I wonder if you could comment on that

3    and see what the -- you know, does the -- if the policy -- what

4    the -- what Congress seems to have said is that this is not a

5    legitimate way for a government to control bir -- try to control

6    births in its population.  And if it does it, at least through

7    ster -- sterilization or forced sterilization or abortion, it's

8    stepping over the lines between what's not persecution and what

9    is persecution for political views.  Now, I don't think this

10   applies to compulsory use of birth control as such.  It doesn't

11   by its own terms and the insertion of an I.U.D. or other non --

12   or other reversible birth control matters, but does specifically

13   apply to sterilization.  Does this mean that -- and that's why

14   there's a thousand limit, which I have no idea how it's going to

15   be appli -- implemented.  But everybody in China, or at least the

16   first thousand each year will be in this lottery able to come

17   into the United States as refugees because of fleeing the birth

18   control policy.

19            A.   Well, I think if there were -- I think I guess

20   then what the issue gets down to is -- is the -- is there

21   background evidence to suggest that everyone gets sterilized or

22   had a forced abortion?  If that were the case, then I would -- I

23   would tend to agree with -- with Mr. Pierce's view or -- or with

24   the view that you've just suggested which is if you're from China

25   and you want to have more than two kids, you have a well-founded

bw

1    fear of persecution because if you attempt to have more than two

2    kids, you will be sterilized and/or your wife will have her

3    pregnancies aborted.  And I don't think the background evidence

4    suggests that.  In fact, the background evidence suggests a very

5    spotty enforcement of this, depending on where you live, who you

6    are, how much money you have, what the particular birth control

7    rates are in any particular region at any particular time such

8    that there is pressure from the central government on a

9    particular location to get their rates down so to speak.  I do --

10   it is our position that you -- you still have to have an

11   individualized claim.  You have to have some sort of reason for

12   the Court to believe that if you go back, you will be sterilized

13   or you will undergo an abortion.  Or obviously that it's already

14   happened to you.  But with respect to the future, it -- it is our

15   position that you still have to have a particularized claim.  You

16   can't just stand up and say I want to have two kids, therefore

17   I'm a refugee.

18   JUDGE TO MR. PIERCE

19           Q.    Okay, Mr. Pierce?

20           A.    Your Honor, individualized claim, I think Mr.

21   Duvier's going back to <u>Matter of Chang</u>, that you have to prove

22   something specific happened to you.  I think what he's saying, it

23   depends who you are.  They --

24   JUDGE FOR THE RECORD

25           Let's change tapes.

A 29 638 497                    119                    October 23, 1996

bw

1                        (OFF THE RECORD)

2                        (ON THE RECORD)

3    JUDGE TO MR. PIERCE

4              Q.   Go ahead.

5              A.   It depends who you are, whether they want to get

6    their birth policy down.  It could happen anytime, anywhere,

7    anyplace.  You just don't know.  I think this is why the new law

8    took affect.  I think is there a credible, is there a well-

9    founded fear that if you have two children this will mean you're

10   subject to sterilization or if he attempts to have another child,

11   that child will be aborted.  I think there is a credible, well-

12   founded fear of that happening, and I think Congress addressed

13   that, that you don't have to show it's so individualistic anymore

14   because of what's going on in China, because it was written

15   what's going on in China from the State Department report.  We

16   don't know that everybody who has two children is going to be

17   sterilized or have forced abortions.  We can't know that.  But we

18   do know it's happening and I think Congress is trying to prevent

19   it.  The reason they limit it to 1,000 is because they know what

20   they're saying is that we're giving everybody who has more than

21   one child in China asylum.  They know they're doing that.  How do

22   they prevent that?  They limit it to 1,000.  They know it's

23   wrong, but they can't give everybody asylum from China who has

24   two children.  It just doesn't make sense and it's not practical.

25   Congress is -- I think their intent is to do something that's

     A 29 638 497                    120              October 23, 1996

bw

1    practical, at the same time doing what they know is right.  Okay,

2    in rebuttal to what Mr. Duvier said that there was no past

3    persecution and -- with religion, I don't think that's correct.

4    We have in that record that their home was sealed, the home where

5    they lived.  We have in the record that their home was raided.  I

6    don't think -- I think that can constitute a form of harassment

7    and that they had to flee and get out of China.  And when they

8    were at -- in hiding, they were afraid to go out to find out

9    about what happened to the people.  I believe (indiscernible)

10   persecution.  It's credible that when they said they were in

11   hiding, a lot of things were happening at once.  But I do think

12   they cared about the people who were arrested.  I'll have you

13   remember that -- recall that when I asked the applicant who were

14   the people who were detained, and he did -- he knew all six

15   people.  He knew all their names, and there was no hesitation.

16   And then he said he cried when he heard that they were beaten.

17   Okay, so the brother knows it, so he don't know if he has

18   accurate information or not.  But we certainly have his feeling

19   of what he testified to how he felt when he heard that it's

20   possible they could have been beaten.  He says everyone just seen

21   him cry.  As far as what he said about this complete change, I

22   think Mr. Duvier used the word about finding this religion this

23   huge change.  It's not incredible because we do have something

24   that can spark this huge change.  His son was very sick.  I think

25   they thought their son may not make it.  The son was in the

A 29 638 497                    121                    October 23, 1996

bw

1    hospital for a week.  His fever would not go down.  He prayed and

2    the son got better.  I --

3         Q.    I don't think -- and this is (indiscernible) to

4    what I believe Mr. Duvier was saying --

5         A.    Uh-huh.

6         Q.    -- and you can address it in a perspective at

7    least in which I heard him -- in which I heard it.  It's not that

8    he believed the conversion was not credible but the fact that

9    with -- given the conversion and the huge change that it did

10   represent, the fact that they should get a warning and relate it

11   to something other than what's been going on in their house

12   because of this big change is not credible.  So that's more the

13   issue of their credibility.

14        A.    Okay.

15        Q.    And when they gave their response and he pointed

16   out that this response, why has this become an issue?  Why did

17   they say this?  It became an issue because they had testified

18   that they didn't tell the pastor about the notice.

19        A.    Yes.

20        Q.    And that begs for an explanation if they're now

21   seeking to live in another country because of what's implied in

22   that very same threat in that he didn't tell the very pastor.

23        A.    But I believe --

24        Q.    Priest.

25        A.    I'm sorry.  That is explained.  And we do have in

A 29 638 497                    122              October 23, 1996

bw

1    the asylum application, it's not just coming out here today, that
2    they didn't think when they received the warning, but we thought
3    the government -- I'm reading from the fifth paragraph down from
4    the top, or the second one up from the bottom, but we thought the
5    government just scared people to get together to do something
6    against the government because the time was close to June 4th
7    student movement and we think we didn't do anything wrong.  We
8    just practice our religion and it didn't hurt anybody.  I think
9    if -- when we try and find out what the situation was like at
10   that time, what was going on, what the pastor was saying to them,
11   that maybe it wasn't the most prudent thing, of course, not to
12   tell the pastor, but I don't think this crosses the line to
13   incredibility.  They made a mistake.  They -- they knew
14   basically, they got the big oops when the sirens came that this
15   was a big deal and we should have realized it was a big deal.
16   But as far as to having to explain themselves to stay in this
17   country, I don't think that's totally fair.  I think people
18   should be allowed to make bad judgement calls.  That's really all
19   I can offer to the Court.  If it is a reason why it would cross
20   the line to incredibility, I just hope it wouldn't.  That's all I
21   can tell the Court.  They're being detained, obviously, and when
22   he said, I didn't know I had a hearing today, I think when he
23   clarified that, I don't -- I know what day the hearing is, but
24   since I'm in detention, you don't know, you know, one day from
25   the next.  It's true the brother's not here, and that definitely

A 29 638 497                    123              October 23, 1996

bw

1    counts against them, but I hope the presence of another person

2    doesn't hurt what's happening here today.  And to -- finally,

3    when he said there was no, according to the statute with the

4    birth control policy, I do believe there was resistance to the --

5    (indiscernible) resistance to the population control policy, as

6    I've outlined earlier.  And also there was past persecution in

7    measures with the involuntary insertion of the I.U.D. and the

8    bleeding and the pain that accompanied it.  I do believe the

9    statement that there was no past persecution is -- is not

10   accurate.  There was and I believe the child having not to be

11   registered was also -- which could have consequences.  There were

12   acts that happened in China that didn't come up after they left

13   China.  So I believe past persecution has been established, and I

14   believe there's a very well-founded fear of future persecution.

15   Thank you.

16   JUDGE TO COUNSEL

17           Q.    Okay, thank you gentlemen.  We've run -- we've run

18   out of time today.  I'm going to have to reset this for a

19   decision.  Let's go off the record and find a time.

20                         (OFF THE RECORD)

21                         (ON THE RECORD)

22   JUDGE FOR THE RECORD

23           All right, we're going to reset this case for November

24   1 at 2 o'clock in the afternoon for a decision.  The Court will

25   waive the physical appearance of the applicant's counsel.

     A 29 638 497                    124              October 23, 1996

bw

1    JUDGE TO MR. PIERCE

2        Q.   And this makes it sound like I think you look

3    funny.  You're not going to need to appear here in Court, but do

4    -- but you do need to appear by telephone, and we'll -- we'll

5    call you at that time.  It's just for the giving of the decision,

6    no more evidence or argument.

7    JUDGE TO COUNSEL

8        Q.   I'll just say this about argument, if either party

9    wishes, I'm not going to require it nor frankly will I expect it

10   here, but if either party wishes to brief the issue of the

11   application of Section 601, you're welcome to submit something as

12   long as I receive it the day before the hearing, by Thursday the

13   31st of October.  We'll give you a hearing notice for this.

14   JUDGE TO THE INTERPRETER

15       Q.   And I'd like to ask the interpreter to explain

16   this to the parties after we go off the record.

17                        <u>HEARING CONTINUED</u>

18

19

20

21

22

23

24


A 29 638 497                    125                  October 23, 1996

U.S. Department of Justice
Executive Office for Immigration Review
Immigration Court


Matter of                                    File A 29 638 497
                                                  A 29 638 498


                                    )
                                    )
KUR LIAN ZHANG                      )
IJING HUANG                         )          IN EXCLUSION Proceedings
        Applicants                  )
                                    )          Transcript of Hearing


Before WILLIAM VAN WYKE, Immigration Judge


Date:  November 1, 1996              Place:  York, Pennsylvania


Transcribed by DEPOSITION SERVICES, INC. At Rockville, Maryland


Official Interpreter:  Yong Yeh


Language:  Foo Chow


Appearances:

        For the Immigration and           For the Applicants:
        Naturalization Service:

        Jeff Duvier, Esquire               Stuart Pierce, Esquire

bw

1    JUDGE FOR THE RECORD

2            All right, this is the United States Immigration Court

3    in York, Pennsylvania.  I'm William Van Wyke, Immigration Judge,

4    presiding.  Today is Oct -- November 1, 1996.  These are

5    continued individual calendar proceedings in exclusion for a

6    couple Zhang, Kur Lian, file number 29 638 497, and Huang Ijing,

7    29 638 498.  Ms. Huang and Mr. Zhang are in INS custody and are

8    represented by counsel who is preparing -- appearing by telephone

9    today with permission of the Court.

10   JUDGE TO MR. PIERCE

11           Q.    Would you state your appearance please?

12           A.    Stuart Pierce of the law offices of Henry Lee

13   Fong.

14   JUDGE FOR THE RECORD

15           All right, and the Immigration Service is present here

16   in the Court with its representative.

17   JUDGE TO MR. PIERCE

18           Q.    Would you state your appearance please?

19           A.    Jeff Duvier for the Service.

20           Q.    All right.

21   JUDGE FOR THE RECORD

22           And the interpreter is in the Mandarin language -- I'm

23   sorry, Foo Chow language, Mr. Yong Yeh, Y-o-n-g Y-e-h.

24   JUDGE TO THE INTERPRETER

25           Q.    Mr. Yeh, would you please raise your right hand

A 29 638 497              126              November 1, 1996

bw

1    and take the following interpreter's oath?  Do you swear that you

2    are fluent in Foo Chow and English and that you'll interpret

3    faithfully and accurately from one language to the other in these

4    proceeds?

5            A.    Yes, I do, Your Honor.

6            Q.    Okay, thank you, sir.

7    JUDGE FOR THE RECORD

8            Now, this matter has been set for a decision today and

9    the Court's going to render its decision now.  We've heard all

10   the testimony at a prior hearing on November 1, 19 -- I'm sorry

11   on October 23, 1996.  And we've heard the argument of both

12   counsel.  And the Court will now render its decision.

13   JUDGE TO THE INTERPRETER

14           Q.    We're going -- we've asked for the interpreter to

15   be here so you can interpret the decision simultaneously.

16           A.    Sure.

17           Q.    If you would sit in the back next to or between

18   the two applicants.  Maybe have them sit a little further over

19   where the brother is right now so they're far away from the

20   microphones so your voice won't be picked up by microphone to

21   disturb the transcriber, if any.

22   JUDGE TO MR. ZHANG

23           Q.    Through the interpreter to Mr. Huang -- I'm sorry,

24   Mr. Zhang, would you please state your name for the record?

25           A.    Zhang, Kur Lian.

         A 29 638 497                127              November 1, 1996

bw

1   JUDGE TO MS. HUANG

2        Q.   All right, and Ms. Huang, would you state your

3   name please?

4        A.   Huang, Ijing.

5   JUDGE TO MR. ZHANG AND MS. HUANG

6        Q.   Your lawyer is Mr. Pierce and he is on this

7   telephone next to me.  The only purpose for the hearing today is

8   for me to give a decision in your case.  I'm going to ask the

9   interpreter to interpret simultaneously, that is while I speak,

10  in a low voice.  While I speak, I'll ask him to speak in a low

11  voice to both of you.  I suspect you won't understand everything

12  because it relates to the United States law, but there's a good

13  part you will understand and I'll ask you to listen carefully.

14  And, of course, your attorney will be hearing and he will

15  understand what I'm saying.  Does either of you have any

16  questions before we begin?

17       A.   No, no question.

18       Q.   Okay.

19                    JUDGE RENDERS ORAL DECISION

20  JUDGE TO COUNSEL

21       Q.   Okay, well, this is new ground and if either party

22  wishes to appeal, an appeal needs to be filed by December 2.

23  JUDGE TO MR. ZHANG AND MS. HUANG

24       Q.   To Mr. Zhang and Ms. Huang, I believe you came to

25  the United States at a time that made a big difference in your

A 29 638 497                    128              November 1, 1996

bw

1    claim.  If I had decided this case two months ago, my decision

2    very likely not have gone in your favor.  On September 30 the

3    Congress of the United States changed the law of the United

4    States to address the very problem that you've raised about your

5    children.  And I've addressed it in some detail and I hope you

6    have understood what's necessary for you to understand in that --

7    in that finding.  You can and certainly should discuss this

8    matter further with your attorney.  There could be an appeal in

9    your case in which case you should stay in close contact with

10   your attorney so you know what to do next.  And there's an aspect

11   of this law which I don't know exactly how it will be

12   implemented, and that is that the Congress of the United States

13   has said that as severe as this harm that you fear is, it's only

14   going to grant asylum to 1,000 people per year on this ground.

15   And so it appears in a sense that if more than 1,000 people

16   apply, there's a kind of lottery and I don't know how the winners

17   in that lottery will be chosen.  This is all the more reason to

18   stay in close communication with your lawyer so that if there are

19   any other requirements for you to follow to consummate your

20   asylum status that are imposed in the future, you will be able to

21   do so.  Now, I want to give you a welcome.  As a refugee in the

22   United States, you will become eligible to become a permanent

23   resident after a year and a citizen after five years.  I

24   encourage both of you to try to learn English.  That will be very

25   helpful for you and it will also make -- make it more -- it will

A 29 638 497              129              November 1, 1996

bw

1    facilitate our benefitting as a nation from your being here.  You

2    both come with certain values that you've stated here in this

3    proceeding.  I welcome and encourage you to exercise the freedom

4    that is given here to be true believers in your values, including

5    the values about the importance of your family.  I want to warn

6    both of you that it is possible to lose this status if you

7    violate significant laws in the United States.  And you must make

8    it your responsibility to find out what is required of you under

9    the law and make sure that you obey the law in the United States.

10   On the positive side, I want to invite both of you to see how you

11   might contribute to this country out of your own experience, your

12   own resources, your own values, your own perspectives.  I'm proud

13   as American -- an American that and an official of the United

14   States Government that people from so many countries find this

15   such an attractive place to be.  I know there are a lot of

16   reasons for that.  I also believe that one of the reasons is that

17   people do want to live under a government that they know respects

18   them as individuals and that is what has happened here in this

19   court with you today and in your past hearings.  I hope that as

20   time goes on, you will desire to pay back the people of this

21   country and this government for the benefit that you've been

22   given today.  The unique thing about this country is that both of

23   you have the possibility of becoming as American as anybody else

24   and I hope you see that as not just an opportunity but as a

25   responsibility to the rest of the people in this country.  So I

A 29 638 497                      130              November 1, 1996

bw

1   wish the best to both of you.  I'll give you a copy of my

2   decision and what I'm going to do is write a separate order for

3   each case, just so that I have an order with each name on it,

4   although the proceedings are joint.

5   JUDGE TO COUNSEL

6           Q.   Is there anything further from either party while

7   we're on the record here?

8           A.   (Mr. Duvier) Nothing from the Government.

9           A.   (Mr. Pierce) No, Your Honor.

10  JUDGE FOR THE RECORD

11          All right, this matter then is closed.

12                      <u>HEARING CLOSED</u>

13

14

15

16

17

18

19

20

21

22

23

24

25

A 29 638 497                    131                    November 1, 1996



United States Department of State

*Washington, D.C.  20520*

Bureau of Democracy, Human
Rights and Labor
December 11, 1995 (rev-a)

## CHINA - COUNTRY CONDITIONS AND COMMENTS ON ASYLUM APPLICATIONS

### Table of Contents

| | | Page |
|---|---|---|
| I. | Introduction | 2 |
| II. | Overview and Recent Developments | 2 |
| III. | Most Frequently Occurring Claims | 4 |
| IV. | Miscellaneous Considerations for Adjudicators | 6 |
| | A. Prior Persecution | 6 |
| | B. Internal Flight Alternatives | 6 |
| | C. Treatment of Korean and Other Minorities | 7 |
| | D. Household Registration and Identity Cards | 8 |
| | E. Work Units and Decision-Making | 10 |
| | F. Work Choices | 10 |
| | G. Passports and Exit Permits | 12 |
| | H. Family Housing | 13 |
| | I. Documentation | 13 |
| | J. The Taiwan Factor | 13 |
| | K. Place Names and Dialects | 14 |
| | L. Alternative Reasons for Migration | 15 |
| | M. Treatment of Returning Illegal Emigrants | 17 |
| | N. Homosexuality | 18 |
| | O. Military Service | 19 |
| V. | Claims Based on Political Opinion | 20 |
| | A. Activities In China | 20 |
| | B. Activities In the United States | 23 |
| VI. | Claims Based on Religion | 27 |
| VII. | Claims Based on Coercive Family Planning | 32 |
| | A. Fujian Province | 35 |
| | B. Zhejiang Province | 43 |
| | C. Guangdong Province | 50 |
| | D. Births in the U.S. | 52 |

CHINA/27

## VI.   CLAIMS BASED ON RELIGION

The Government's attitude toward religion has vacillated since it instituted its policy of reform and opening to the outside in 1979.  Originally, the Government viewed religion as the opiate of the masses that must be eradicated under socialism.  Later, the line changed to "religion is a cultural phenomenon present in any society."  More recently, the Communist Party has said that "religion can [meaning "must"] serve socialism."  Most Party and Government officials still view any religion as feudal superstition, the elite is generally a-religious or anti-religious, and central policy is to cajole or force all groups to join official "patriotic religious organizations" for control purposes.

All religious observances were forcefully suppressed during the 1966-76 Cultural Revolution.  Most churches, temples and mosques were closed and many destroyed or occupied by Government offices or factories.  Since the reforms which began in 1979, the Government gradually has restored or replaced many, but by no means all, confiscated churches, temples, mosques and monasteries.  However, much has not been returned or repaid.

The official religious organizations administer 13 Protestant and 12 Catholic seminaries, nine advanced Muslim institutes, and numerous Buddhist and Daoist monasteries.  Students who attend these institutes are supposed to demonstrate "political reliability" along with theological knowledge in order to qualify for the clergy.  In recent years, a small number of students from Catholic and Protestant seminaries and Islamic institutes have been permitted to pursue further study abroad.

The Government supervises limited publication and distribution of religious materials to ensure religious and political conformity.  In theory, religious books are not permitted in ordinary bookstores, although in China's increasingly open cultural environment, this rule is sometimes ignored.  Nonetheless, complaints persist that the number of Bibles and the amount of other religious material allowed to be printed fall far short of demand.  Religious proselytizing is proscribed and sometimes punished, although some discreet proselytizing and distributing of religious texts outside official channels is tolerated.  Some local authorities have confiscated private property under the guise of searching for illegal religious materials.  Officially-sanctioned religious organizations are permitted to maintain international contacts as long as these do not entail foreign control.  Some foreign clergy have been permitted to preach or teach with prior permission, but proselytizing by foreign groups is forbidden.

On February 6, 1994, the Chinese Government released the texts of State Council regulations governing the sites of religious activities and the role of foreigners in China's religious life. In a demonstration of those rules, seven foreigners including three American citizens were later detained in Henan Province for

organizing an 80-person prayer meeting, and for illegally importing 40 kilos of religious printed materials.  The foreigners' personal property, including US$5,000 in cash, was confiscated and one of the American citizens was expelled.  Subsequently, however, there has been little interference in ongoing non-publicized and quiet religious observances involving participation by foreigners in Chinese unsanctioned religious activity.

A growing number of cases from China, especially from the Fuzhou area in Fujian Province, claim persecution on account of religion.  Most asylum applications on account of religion are by claimed members of the unsanctioned Christian churches in China, both Catholic and Protestant.  Many also now are claiming persecution of Buddhists and others (see below).

In the 1950s, the Government, to curb perceived foreign domination of Christian groups, established the Catholic Patriotic Association (independent of the Vatican) and the (Protestant) Three-Self Patriotic Movement.  These are the only Christian establishments authorized to operate openly.  Government-registered religious organizations include more than 6 million "official" Protestants and about 4 million "official" Catholics.

There are now two national organizations dealing with official Protestant church matters.  The Three-Self Patriotic Movement committee, established in 1954, is a "mass" political organization to promote patriotism and the three principles of self-administration, self support, and self propagation.  In 1980, China established the China Christian Council (CCC).  Its role is to "serve" China's Protestant churches in line with the new post 1979 policies of opening to the outside and allowing more freedom of religious activity.  The CCC administers seminaries, publishes Bibles, facilitates international exchanges and oversees ordination of ministers.  It was admitted into the World Council of Churches in 1991.

The official Catholic Church also has two national organizations.  The Catholic Patriotic Association, also established in the 1950s, is a mass organization analogous to the Three-Self Patriotic Movement.  The National Bishops Conference, established after China began its reforms, is analogous to the China Christian Council.

Unregistered Christians in China include Vatican-oriented Catholic and "house church" Protestants (some of the latter are registered but most are not).  We have received one estimate, from what appears to be a knowledgeable source, that there are now over 8,000 registered churches and 20,000 house churches.  We do not have comprehensive statistics, but the number of unsanctioned church members clearly surpasses the number of members of "sanctioned" churches.  The government generally tolerates the existence and activities of the unsanctioned churches, as long as services are small and there is no higher-level organizing.  In many areas these churches cooperate with the sanctioned churches,

but the authorities are sensitive to proselytizing.

Sporadic repression in some areas has reflected official concern over the Government's inability to control the rapid growth of membership in Christian groups. In general, individual worshippers are not harassed by the regime, whose efforts principally target leaders. Some priests, particularly those who maintain connections with Rome, have been arrested over the years, as have some Protestant leaders. Many of those detained at some point, however, have been released. A number of religious activists remained imprisoned last year. There was some evidence that authorities have increasingly used short-term detentions, rather than long prison terms, when dealing with unauthorized religious activities. Some of those released from penal detention were apparently placed under house arrest or other restrictions. (See the State Department's 1994 Human Rights Report for further details.)

The Government has intermittently harassed unregistered churches, and has declared its intent to register all of them by the end of 1995, but implementation continues to be more vigorous in some regions than in others. According to the 1994 Human Rights Report: "There continued to be credible reports... of efforts by authorities in some areas to rein in activities of the unapproved Catholic and Protestant movements, including raiding and closing a number of unregistered churches." The 1994 report provides further information and comment on detention of Christians, foreigners' unauthorized proselytizing, and closings of churches in some areas, noting, on the other hand, that authorities elsewhere tolerate the existence of unofficial Catholic and Protestant churches as long as they remain small and discreet. The report for 1994 noted also that in some parts of China official and underground churches seem to coexist and even cooperate. It is not unusual for a house church to be forced at some point to discontinue meeting, only to have the authorities turn their backs when the church resumes meeting as before. Sanctioned Catholic churches, depending on location, do conduct mass both in Chinese and in Latin. Characteristic of the current murky relationship is the fact that some Vatican-approved religious materials have been employed by Fuzhou Catholics. In Sichuan Province's capital city, Chengdu, a Christmas Eve 1993 mass was celebrated for the first time in Chinese, in addition to Latin.

Chinese members of the Church of Jesus Christ of Latter-Day Saints (many of whom joined while students in the U.S. or other western countries) are not permitted to gather together for church meetings or to participate in religious ordinances or rituals. In addition, they are not permitted to participate in church meetings where foreigners are present. Proselytizing for this religion, as others, would not be permitted. However, since the LDS Church does not allow its members to proselytize in areas where that activity is proscribed by law, it is not an issue for Mormons in China.

Buddhism is practiced in many forms by an estimated 100 million persons in China, by far the largest body of religious believers there.  Most Buddhists are from the dominant Han ethnic group.  Han Buddhist leaders generally cooperate with the Government and there have been few complaints of Government restrictions (excluding Tibet and Tibetan Buddhists in Inner Mongolia).  Although we are now seeing some asylum applications from Fujian (and more rarely, some other localities) claiming that the authorities and/or neighbors harassed them or gave them serious problems because of their Buddhism, our posts have found no corroboration of this.  Our Consul General in Guangzhou, commenting on findings from visits to the Fuzhou area, recently wrote as follows:

As to religious ... persecution, while it undoubtedly exists, our consular officers report neither seeing nor hearing any evidence of it during their interviews.  We would expect [visa applicants, including dependents of asylees] to raise those issues if they possibly could.  Buddhist temples have been and continue to be refurbished and patronized.  Churches are open -- Three Self Protestant and Patriotic Catholic services are known to be held. ...  House churches [in this area] are probably monitored and perhaps harassed as elsewhere in China, but we have no reports thereof, either from [visa] applicants or Christian activists abroad.*

Daoism, widely practiced in South China, is officially respected and an important part of traditional Chinese culture.  However, practices conflicting with Government strictures against superstition and waste of arable land have been sharply criticized in the press, but we are not aware of official harassment.  Traditional folk religion appears to be flourishing in some areas (parts of rural Sichuan, for example) despite official opposition to "feudal superstition."

Yiguandao.  We have observed since last year the appearance of asylum requests based on claimed membership in the Yiguandao (Yi Guan Dao) religious sect, a putative justification for asylum not encountered, as far as we know, prior to last year.  Yiguandao can be translated as "Way of Unity" or "Way of Pervasive Unity."  We are aware that, among many secret societies, there is an Yiguandao sect active in China (including Fujian, where visitors from Taiwan have also played a role unwelcome to the authorities) and that the Chinese authorities have long considered it a threat.  However, most of the individuals whose files we have reviewed have been in their teens and twenties, have arrived here recently from Changle county in Fujian Province (but a number from Zhejiang and a few from elsewhere), and have similarly-worded applications, which seem to be produced by a single preparer.  We believe that INS adjudicators can make a distinction between sect leaders or chief

*see also New York Times of 10/3/95 for report of relaxed restrictions on Christian worship in Changle county.

office holders, on the one hand, and rank and file members, on the other: we believe that leaders are much more likely to be targeted by security officials than younger followers.  There is no doubt that the Beijing authorities regard this sect negatively, along with other quasi-Daoist and quasi-Christian sects that have surfaced.  However, there is reason to doubt the bone fides of the Yiguandao-related applications we have seen.

China's Muslims number about 17 million, many of whom live in compact ethnic communities but have not regularly practiced Islam. Muslims are, nevertheless, taking advantage of the Government's more tolerant attitude toward religion to expand the number of mosques, Islamic schools and institutes.  Religious instruction is readily available to Muslim youngsters, despite official prohibition.  Chinese authorities officially claim that China has over 25,000 mosques served by over 30,000 Imam.  A Muslim association, we understand, intercedes with authorities on such matters as publications found to be offensive to Moslems.  Islamic religious activities do not appear to be hindered or harassed on a regular basis to the same extent that Catholic and Protestant activities have been.  But, since the breakup of the Soviet Union and the founding of cross-border Islamic states, authorities have been especially sensitive and alert to periodic outbreaks of religious-based ethnic nationalism in the northwest province of Xinjiang.

(Section VII begins on the next page.)

## VII. CLAIMS BASED ON COERCIVE FAMILY PLANNING

China's population policy has undergone major changes since the PRC was founded in 1949.  Initially, Chinese leaders felt that overpopulation could not be a problem in a communist state, but, even in the first decade, they began to seek a slowing of growth. By the mid-1970s, China had stepped up efforts to limit population and had begun to popularize the two-child family.  In 1979, the PRC promulgated a comprehensive and highly-intrusive "one-child" policy, which is still in force, although it has changed over time and its implementation has varied from place to place.  But the result is that China, as population authority Dr. Judith Banister said in 1993, "has achieved unusually low fertility for a country at its level of development."

Dr. Banister stated that this success is attributable in part to elements in the Chinese situation that "could also be used in voluntary family planning programs."  However, she stressed, "we now have a decade and a half of powerful evidence showing that compulsion is a major element of the Chinese program."

A 1994 analysis by the State Department's Bureau of Intelligence and Research included the following paragraph:

Last year [1993] China held its birth rate to 18 per 1,000, the lowest natural growth rate since the "Great Leap" famine years of the early 1960s.  But the average fertility rate was 1.7 births per woman, an indication that the one-child policy is loosely enforced.  In cities the goal is more nearly achieved, owing to high rates of contraceptive use, higher average first-marriage ages, tighter housing, and growing economic opportunities -- especially for women.  In the countryside numerous "special circumstances," including the birth of a daughter, qualify rural residents for a second child.

China's birth control program has been criticized for many years as being harshly coercive, especially the use of physical force to compel abortions.  How family planning personnel at the grass roots implemented the policy in the early 1980s has been the subject of particular attention, but criticisms of current methods continue.  Dr. Banister noted in 1993 that tightening in recent years of the implementation of birth restrictions and required sterilization, IUD insertion and abortion has been based on instructions in a 1986 Communist Party document, buttressed by a 1991 decision issued jointly by China's State Council and Party Central Committee.

The policy relies on education, propaganda and economic incentives as well as more coercive measures, including psychological pressure and economic penalties.  Rewards for couples

who adhere to policy include monthly stipends and preferential medical, food and educational benefits. Disciplinary measures against those who violate the policy can include stiff fines, withholding of social services, demotion and other administrative punishments, including, in some instances, loss of employment. Unpaid fines can result in confiscation of personal property, or even destruction of houses. Because penalties can be levied against a spouse's work unit or against local officials for allowing their jurisdictions to exceed a quota, many individuals are affected, providing multiple sources of pressure.

The central Government claims it does not authorize physical force to submit to abortion or sterilization, but there are reports that this continues to occur as local population authorities strive to meet population targets. Many observers believe that these abuses have the tacit approval, despite denials, of those at the top, who foist the blame on lower levels. Chinese officials acknowledge privately that forced abortions and sterilizations still occur in remote areas where family planning personnel may be uneducated and ill-trained. We believe that the number of such cases is well below levels of the early and mid-1980s.

The family planning policy most heavily affects Han Chinese living in urban areas, where a one-child policy generally is adhered to. Employees of government-owned entities, universities, hospitals and local administrations are subject to especially strict controls.

In rural areas, most provinces permit at least a "one-and-a-half-child" policy (with liberalizing conditions such as two children permitted if the first is a girl), or a "two-child policy". Guangdong Province is in the latter category; Fujian and Zhejiang in the former.

The evolution of national policy and its current implementation has been importantly affected by the reaction of targeted couples, including at the village level, and there are, not surprisingly, differences between formal and informal policies. Family planning committees are generally in place down to the township level, but implementation at the village level, relevant to most asylum applicants now claiming victimization by birth control policies, is the responsibility of local officials. These may include the head of the women's league and chief birth-planning cadre, as well as the Party secretary (and perhaps others, but not normally public security officers). In the words of scholar Susan Greenhalgh, who has done extensive village level research (but not in Fujian), village cadre, as members of local society, "are pre-disposed by cultural values and social obligations to soften state policies to accommodate pressing peasant demands." Thus, as she points out, there is substantial "negotiation" on how policy is implemented in the villages; and feedback on this, in turn, has contributed to changes in guidance coming down from higher levels.

Greenhalgh's report of one conversation helps us understand

some ingredients of local decision-making on family planning:

The women's head and chief birth-planning cadre of [the village being studied by Greenhalgh], a woman of 39, had served in that capacity since 1969, the year she married into the village.  From many late-night conversations with her (I stayed in her home), I believe that in her heart of hearts she held most of the views I have just described as belonging to ordinary peasants.  So did the local communist party secretary.  In fact, she herself was not sterilized although she had three children (she did, however, use an IUD).  In her talks with me, she expressed willingness to enforce the policy in a reasonable manner, bending the rules somewhat for people in difficult circumstances (such as having two daughters but no son).  However, when birth control campaigns were launched at higher levels and actively promoted by city and township officials, she felt she had little choice but to do her best to reach the targets, as long as doing so did not require her to violate sacrosanct values.

For minority ethnic groups and the large "floating" population, the policy is more relaxed and/or sporadically applied, although authorities are making an effort to tighten up controls on the floating population.

Whether in the cities or countryside, abortion and sterilization are important methods, along with inter-uterine devices (IUDs), employed in implementation of the policy.  According to data from China's Ministry of Public Health, there were in 1990 about 15.9 million IUD insertions*, 10.6 million abortions, 6.9 million tubal ligations, and 3 million vasectomies (the comparable figures for the peak year of 1983: 17.7 million IUD insertions, 14.3 million abortions, 16.4 million tubal ligations and 4.4 million vasectomies).  Pills and, to a lesser extent, condoms are used; but not so much in rural as urban areas.

Minimum marriage age in China is 22 for males and 20 for females.  (In some localities the ages are set higher, we are told, but we are not aware of any deviation, in Fujian, from the 22/20 rule, although there may be some there.)  Whatever the regulated marriage age, however, couples normally are encouraged -- or pressed -- to delay pregnancies, but not always.  We understand that persons marrying before the stipulated age would generally not be allowed to register the marriage or obtain a notarized certificate of marriage.

As indicated in Section III, the strong majority of Chinese asylum applicants currently are from Fujian Province; the plurality of these claim persecution arising from the implementation of family planning there.  The following segments report on the situation in Fujian, as well as other principal places of origin of asylum

*Researchers have found that deliberate removal of IUDs has been a constant problem, which to some extent has been accommodated by

officials.

applicants. Although the information is divided by area, comments about one area may also be applicable to others. We report particularly fully on findings in the Wenzhou area of Zhejiang Province because considerations highlighted by Consulate General Shanghai's reporting, although initially related to Zhejiang, may be useful also in evaluating claims of applicants from other Chinese areas.

A.   Fujian Province

Fujian Province is in the Consular District of our Consulate General in Guangzhou (Canton), which is the capital of Guangdong Province, just to Fujian's south. Fujian, a traditional seafaring province, is also now the primary source (the role played by Guangdong Province until well after WW II) of Chinese emigation to the United States. Virtually all recent emigration from Fujian to the U.S. has been from the area of the capital city of Fuzhou (which also has agricultural districts within its borders), and the nearby counties of Changle, Tingjiang and Lianjiang. (See Section IV for discussion of these place names.)

The 1991 Almanac of Fujian's Economy, according to our Guangzhou Consulate General, reports that, in 1990, 59.1 percent of births were to couples abiding by the one child policy, 11.7 percent higher than the previous year. Women giving birth to second children accounted for 28.7 percent of the births, while those who had a third child or more accounted for 12.2 percent of births.

Fujian authorities, following a conference in 1990, reported that Province's population density was twice as high as the nation's average, adding that, if Fujian's birth rate were to remain at its then-current level, its population would by far surpass the state's planned target by the end of this century. The conference (as reported by the Foreign Broadcast Information Service, from Fujian Ribao) called for a strengthening of family planning work at all levels. The conference concluded: "We should make extensive efforts to advocate marrying and having children at an older age and insist that a couple should have only one child. Those (including rural families having only one girl) who are allowed to have a second child, should also be kept under close supervision." The conference paper also mentioned "punishing those who have a second child without prior approval...tighten control over family planning work among the floating population... strive to prevent people from having children secretly..."

Fujian Province data for subsequent years has shown a continuing decline in the birth rate, reflecting a stricter implementation of policy. However, some localities in the Province, including those from which many asylum applicants come, apparently continue to implement the policy loosely.

CHINA/36

Because of the large number of Fujian residents applying for visas through our Guangzhou Consulate General and their predominance among those applying for asylum in the United States, our consular officers have extensively observed the situation in Fujian, especially in the Fuzhou area. Our officers have visited there and they have interviewed thousands of visa applicants from Fuzhou, Changle, Tingjiang and Lianjiang counties.

This report on the situation in Fujian, therefore, benefits by drawing on resources not easily available to others and reflects substantial direct observation of the prevailing circumstances. Nevertheless, it must be considered indicative rather than definitive. We simply are not sufficiently knowledgeable about how things happen in the countryside near Fuzhou to generalize categorically from our findings. However, we believe that, along with lessons learned in comparable rural areas of other provinces (e.g. Zhejiang), our observations are valid indicators of the environment from which these asylum applicants come to the United States.

We would emphasize that information reported in this memorandum about implementation of this policy in Fujian does not originate mostly from Chinese officials, whose objectivity of course is open to question. Our information is derived substantially from on-the-ground observation and by interviews of visa applicants, as well as consulting other sources.

Much of our information about Changle County and the other rural areas near Fuzhou city comes from visa interviews of dependents of persons already granted asylum. These dependents have no reason to fear that what they tell us about family planning will effect their chances of coming to the U.S., since their petitioner-relatives are already legally in this country. The China-resident relatives would reap no benefit from downplaying to American interviewers the severity of local implementation of family planning policy. Yet their unmistakable message is that the family planning picture in their home area is not as harsh as that generally painted.

Particularly pertinent here is that even in cases (of which there have been many) where a spouse and children are applying for visas to join successful asylum applicants in the United States who gained asylum by claiming they were victims of coercive birth control policy, these relatives often deny that their families have suffered from this policy. This is not to say that coercion is not an element of the policy, in rural Fujian as elsewhere in China, but it is to say that it often is not significant - or even an element -- in the narratives of these visa applicants, even when several children are involved, and generalizations about the rest of China -- even about elsewhere in Fujian -- can not be automatically applied to how the policy is implemented in the localities producing most applicants. (Another perspective from which the birth control situation in relevant localities can be viewed is provided by what asylum applicants themselves say when

seeking asylum here.  We have seen dozens of statements in or
appended to I-589s to the effect that "in our area, only two
children are allowed," "because of Government policy
against three children," or similar assertions.  We have also seen
many I-589s of applicants from this area who base their
applications on persecution <u>not</u> involving coercive birth control
(e.g. religious persecution), while reporting that they have three
or four children.  These persons do not report any problems,
because of that, from the authorities.)  Giving another
perspective, the wife of an asylum grantee from Changle County told
interviewers in our Consulate General in Guangzhou in December,
1992 as she applied for a visa for herself and three children, that
there were <u>no</u> child limits in her area. This presumably was not the
desire of authorities at the provincial level, or the view of some
other officials down the line, but it evidently was this person's
<u>genuine</u> perception, especially since, in that context, she would
have had no reason to misrepresent this.

     <u>1992 Visit</u>.  In part because of the dramatic rise in arrivals
here from Fujian, officers from Guangzhou in 1992 visited four
municipalities and two districts of Fujian, including localities in
Fuzhou City and environs, to examine the family planning situation
and control measures there.  Despite the implications of the Fujian
conference paper referred to above, the Consulate General officers
found in their 1992 visit relatively lax local implementation of
family planning strictures.

     In their on-the-spot 1992 investigation in Fujian, as in their
interviews of Fujianese applying in Guangzhou for visas, Guangzhou
officers found that strong persuasion through public and other
pressure was used, but they did not turn up any cases of physical
force actually being employed in connection with abortion or
sterilization.  This does not, of course, rule <u>out</u> physical force,
but it certainly is inconsistent with the assertions by the large
number of asylum applicants from that area, then and later, whose
applications are based solely on that claim.*

     <u>March 1994 Visit</u>.  A Consulate General officer, following up
the earlier visit, talked in March 1994 with provincial authorities
with family planning responsibilities.  Our post reported that
these discussions confirmed that "Fujian regulations lack
transparency and enforcement is arbitrary.  It is impossible to
define exactly where and to whom child limitations and penalties
apply.  Numerous variables determine the decisions made in each
case."

     That early 1994 visit also found that the Fujian officials
described central and provincial regulations as "flexible" and

     *The <u>New York Times</u> 10/3/95 article, cited previously, also
describes a Changle mother's brother's report that she paid a $200
fine for a second child and agreed to be sterilized.  The <u>Times</u>
said that "persecution did not seem to be a factor" in this
instance.

suggested numerous exceptions to penalties prescribed by family planning guidelines.  Our post reported that definitions and parameters of regulations and exceptions, however, were vague and ambiguous.  Violators of the law, our post reported, were often subject to decisions based upon information contained in the household registry, which the Consulate General characterized as an antiquated and arbitrary identification system, often based on incorrect information, which frequently results, in the family planning context, in inconsistent determinations of whether individuals are rural or city residents.  Visa interviews of Fujianese in Guangzhou also revealed widespread exceptions to child limitations and inconsistent application of the law.  The Consulate General reported that "although many violators pay nominal fines, [the post] has seen no evidence of more draconian measures such as forced abortion or property confiscation."

The family planning officials in Fujian whom a consular officer interviewed on one trip, while being emphatic that claims of persecution under family planning regulations are "simply not true," proceeded to describe a policy that is ambiguous and selectively enforced.  While defending limits on family size by citing severe overpopulation and limited resources, they said that their policy emphasizes education, late marriages and infant health, rather than strict limitations on number of births per family.  They claimed that the average number of children per family is greater than two in Fujian's rural areas and admitted that some 20 percent of the Province's births are not in line with the stated policy.

According to the report on the March 1994 visit, the officials were ambiguous in spelling out specific regulations regarding permissible births and exceptions to family-size limitations.  They stated that residents of "rural" areas were exempt from the one-child limits, but seemed not able to define the legal distinction between "urban" and "rural."  They concluded that "considerations of tradition" determine if a particular population center is designated rural or urban with no specific regard to number of inhabitants or political structure.  The family planning officials conceded that this allows for many haphazard situations in which some municipalities are considered to be urban (and child limits apply) while some population centers with larger populations are considered rural and are exempt from limits. (In fact, American scholars have found in conferences with Chinese officials and scholars from throughout China that the distinctions between rural and urban are indeed unclear, and the Chinese authorities themselves are still trying to establish definitions.)

Further illustrating the confusion and ambiguities in this context, our representative was told that a Fujianese is viewed as a resident of a rural area only if the individual's household registry indicates "rural resident," a status which in most cases has been inherited from parents or work units.  One official proudly told our consular officer that because his parents were

peasants and his household registry indicated he was originally from a rural area, he is exempt from the one-child policy despite having lived in Fuzhou City (population 3 million) for fifteen years. Other officials said that within municipal, and officially urban, zones, some localities could be considered rural. For example, for Fuzhou city's Lang Qi district (where many asylum applicants originate), most inhabitants, but not all, are registered as rural residents, whereas in Ma Wei district (another claimed native place for many applicants) most but not all are urban registered. Ethnic minorities are officially exempt from one-child limitations; the only way any individual is considered a minority is if the nationality affairs commission determines the individual inherited minority status and the designation has been made in the household registry.

Interviews of persons from the Fuzhou area applying in Guangzhou for visas have confirmed much of what authorities said in the March 1994 discussions about family planning. There are widespread exceptions to the one-child policy, and known first-time violators are, at most, assessed nominal fines. Education and a rising standard of living, according to applicants interviewed in Guangzhou, have decreased the desire of urban residents to have more than one child while rural residents and minorities all seem to have little difficulty in having two or three children. The Consulate General, however, reported that it has little information to clarify penalties for repeat offenders of the regulations. Consular officers rarely encounter young families with more than three bonafide offspring.

Our visiting officers in 1992 had reported that fines for birth control violations were "affordable" (e.g. 1,000 RMB in rural areas; 3,000 RMB in cities). They also reported that demands for payment of fines were flexible and that enforcement could be lax. In the March 1994 Fujian trip, the Consulate General reported finding that economic fines -- "birth beyond the state plan fees" -- were levied on the first birth over the limit, but officials insisted that there were so many exceptions to the policy that fines were rarely applied. The officials said that violators must ease the social burden of an additional child by paying reasonable fines that amount to "two times the total of the couple's most recent annual salary." Regarding the fines, we understand that since they are based on declared or publicly-known income, their impact is significantly less severe. As for second violations (e.g. third pregnancies) the officials said that abortions are suggested, but not forced. When pressed to clarify action taken in cases where the transgressor does not voluntarily seek an abortion, they replied that in urban areas third pregnancies "simply do not occur" and in rural areas the violators are "too poor to have many benefits taken away." In other instances, we were told, accused violators bring their cases to court and gain legal authority to have children above the proclaimed limit. We do not have independent confirmation of this, but believe it possible.

December 1994. Officers from our Consulate General visited

CHINA/40

Fuzhou and nearby counties for one week December 11-17, 1994, to interview and/or screen more than 500 Chinese citizens to determine their eligibility to join Chinese relatives, many of whom had successfully sought asylum here.  Although most of the asylee petitioners had claimed, to obtain asylum, that they had fled persecution stemming from family planning problems, the consular officers were told by their relatives in Fujian that few, if any, of those asylees had actually left China for reasons related to family planning.  Economic opportunity seemed to be the primary motivator.

Coercion Related to Politics or Religion?  The consular officers neither saw nor heard, in all these interviews, evidence that family planning policies were being selectively applied to any particular group for political or religious reasons.  Those implementing family planning policy, according to our officers' observations, did so in the context of that policy alone and did not relate it to religion or politics.  We are not aware otherwise that religious or political activity has played any role in implementation of family planning policy.

Our officers on this December 1994 trip once again found the traditional Chinese desire for multiple male offspring to be apparent among the rural Fujianese.  The average number of children in asylee-relative families in this group was between two and three, but the officers found some who had as many as five.

The Consulate General had asked applicants, prior to their interviews, to complete questionnaires.  A compilation of the answers found the typical adult applicant to be a 35-year-old woman from Changle county, a sixth grade education and no knowledge of English.  The husband of this typical applicant had left China three or four years earlier via Hong Kong or Thailand.  Half the men from the village typically were working abroad.  The husband would take three years to pay off the $30,000 debt owed a "snakehead," remitting an average of $5,000 annually to family in Fujian.  The typical visa applicant in this exercise had no income from Chinese sources, but those who did work had an average monthly income of 450 RMB, about $50.

Documents.  As our officers had found on other occasions, they concluded, as they sought to verify relationships of applicants claiming to be spouses or children, that official documents from the Fuzhou/Changle area were fraudulently obtained or so easily falsified as to be  virtually useless.  These questionable documents included birth certificates, notarial documents, household registers and hospital documents.

Some elements of stories that have reappeared in Fujian cases over a long time could, we believe, bear importantly on individual applicants' credibility.  For example, an asylum applicant here may assert that zealous birth control officials tried to impose fines that were allegedly so high that he and his family were unable to pay.  Nevertheless, an applicant frequently goes on to say there

CHINA/41

was no choice, therefore, but to escape to the United States. Measured against the cost of being smuggled to the U.S., the amount of the fine would be hardly significant.

Other elements common to many claims include: that a wife was ill and could not undergo sterilization, so the husband was chosen to have the procedure and therefore had to flee to the U.S.; that the husband feared that sterilization would permanently sap his strength; that a couple offended birth control cadre by adopting a foundling, who, the officials charged, was the couple's natural child; that a couple had left inadequate spacing between children; that an applicant fled the country because he got into a physical fight with aggressive birth control officials (this is a frequently-appearing claim by young unmarried applicants who say they were protecting their relatives); that houses were damaged by angry birth control officials; that children over the limit were born after sterilization procedures were faked or that interuterine devices (IUDs) were surreptitiously removed to permit new pregnancies; that IUDs failed; or that a wife had to leave her home area to avoid her pregnancy being discovered by officials.

We know from various sources that each of these types of events occur. Reporting by our Consulate General strengthens doubt, however, that in these areas of Fujian, apparently relatively liberal in implementing the policy, the events described in the foregoing paragraph have occurred with the frequency asserted by asylum applicants. Regarding those women who leave home temporarily to avoid pressure during pregnancy and to have a baby elsewhere, the Consulate General has noted that nearly all children, in the documents reviewed by our officers, are declared as born in the same town as the parents' residence. Furthermore, Guangdong and Fujian officials both insist that refusal to submit to a sterilization order would be punishable by a fine and not by physically-forced sterilization. (But we can not, of course, rule out the possibility of exceptions to this.)

Adjudicators may wish to examine closely those whose families fit the parameters where coercion could apply for indications of whether the applicants can show that they individually were coerced or fear coercion. Sterilization (which we believe asylum applicants often falsely characterize as punishment for having had too many children rather than, more accurately, as a measure to prevent more children after a "reasonable" number of births*) appears to be urged only for families who have already had two children or perhaps three (if the first two are girls), even if

*However, village researcher Greenhalgh (cited above) reports some relevant findings about punishment: "...Some level of noncontraception was tolerated, even among couples with two or three children, as long as the couple did not make trouble. Once they created headaches -- by trying to have, or worse yet, succeeding in having, more children than regarded as necessary -- they were punished by being targeted for an abortion or sterilization during the next campaign."

CHINA/42

the extra child was approved.  We think that parents are probably aware before having a child whether or not sterilization would be called for afterward. Most asylum applicants in the U.S. to which this could pertain are males who assert that they personally face coercive sterilization.  While figures cited above indicate as many as three million vasectomies in China in 1990, officers at our Guangzhou Consulate General, during thousands of interviews, have never heard of a case wherein a vasectomy was imposed - or attempted to be imposed -- as punishment.

Regarding certain specific issues arising in cases of applicants from Fujian Province, the Consulate General has also reported as follows:

-Forced abortion of children of early marriage couples.  The Consulate General was not aware of any such cases (but could not, of course, exclude this possibility).  It reported that if a couple lived together and conceived a child before legal marriage, the child would be treated as if it were born out of wedlock.  Parents might register such children, but if the family lived in an urban area it would find it more difficult to qualify for larger housing and better educational opportunities for their out-of-wedlock children.

-Forced abortion or mistreatment of a parent in instances of illegitimate pregnancies/births.  The Consulate General was not aware of mistreatment [including forced abortion] in such cases, except for the loss of entitlement to social benefits, especially in the case or "excessive children."  (However, there was a case, which was publicized in the Xiamen Daily in early 1992, of mistreatment of an unwed woman who became pregnant.  While the press did not say that the woman was subsequently forced to have an abortion, she reportedly was harassed so    persistently that the male partner assaulted birth control   cadres and was, himself, arrested and imprisoned.)

--Punishment for not leaving enough time between children.  According to our Consulate General's findings, the one-child policy is less concerned with spacing, relating more to the number of children, although spacing is a significant factor. In some south China urban areas if the parents' first child is female, they may apply after a set number of years to conceive a second child in hopes it will be a male.  In rural areas the one child policy is less strictly enforced, and in recent years two children have been permitted without the necessity of paying a fine for the second child.  Based on the Consulate General's experience with visa applicants, the spacing rule is not taken seriously in Fujian rural areas.  It is not uncommon for immigrant visa families (especially from the countryside) to consist of three or more children, with only one or two years between children.

Finally, in regard specifically to Fujian, a consular officer in the March 1994 visit asked provincial officials about a supposed event that figures in some asylum applicants' claims: a crackdown, in the spring of 1992, on violators of family planning regulations. The officials responded that enforcement of family planning regulations and policies was "being intensified all the time." They said that provincial regulations on family planning issued on July 7, 1989, preceded the central government's population control and family planning changes (see 1st page of Section VII) by nearly two years. In their view, the central government's 1991 action had no significant influence on provincial regulations, and, in any event, the two had only minor differences.

B.       Zhejiang Province

         As noted in Section III, the Wenzhou area of China's Zhejiang Province is also a source of claims (but still only less than 1/10th of the number from Fujian) based on fleeing coercive birth control practices. The area covered includes Wenzhou city, the three municipal districts of Lecheng, Longwan and Ouhai, the county-level city of Ruian, and the seven counties of Yongjia, Leqing (sometimes translated as Yueqing), Dongtou, Pingyang, Cangnan, Wencheng, and Taishun. Wenzhou city, Yongjia and Leqing comprise the principal source today -- virtually the only source -- of applications from Zhejiang. The following is prepared principally on the basis of reporting from our Consulate General in Shanghai, from which that post's staff visited the Wenzhou area in March 1993 and again in September 1995 to update our information; but it also draws from other Consulate reports.

         Despite Zhejiang Province's overall success in reducing its population growth, its Wenzhou area has long been known as one with special characteristics, given its isolation from the rest of the Province and strong overseas connections (similar to those found in Fuzhou less than 200 miles to the south).

         A 1989 report by our Shanghai officers stated that Zhejiang provincial officials called Wenzhou a "population disaster area." More recently, Shanghai family planning officials cited Wenzhou as an example of what is happening in much of rural southern China, where big families and clan ties are still extremely important (unlike urban centers such as Shanghai) and where increasingly prosperous "rural" southerners were continuing their traditions and paying for the extra children. As rural China develops, according to the Shanghai sources, family planning will have to be based more on education and voluntary birth control.

         Zhejiang's family planning law stipulates a one-child policy with exceptions for circumstances under which a second child is authorized. The head of Wenzhou municipality's family planning told us in September 1995 that nearly every couple in rural Wenzhou has the option of a second child if the first is female. Most second children are authorized under the "farmers and fishermen"

# C E R T I F I C A T I O N

I, SIU CHUN YU, CERTIFY THAT I AM COMPETENT TO TRANSLATE THIS
DOCUMENT, AND THAT THIS TRANSLATION IS TRUE AND ACCURATE TO THE
BEST OF MY ABILITIES.

DATED THIS    1st    DAY OF   OcToBER 1996.

_SIU CHUN YU_

STATE OF NEW YORK
                            ) S.S.
COUNTY OF NEW YORK

SWORN BEFORE ME THIS 1st   DAY OF  OcToBer 1996.

YU WING KIN
Notary Public, State of New York
No. 24-4946199
Qualified in Kings County
Commission Expires January 27, 1997

**POLICE OFFICE OF FU QING CITY FU JIAN PROVINCE**

To: Ke Liang Zhang, Ai Jin Huang

It is suspected that you, on the pretext of religion, have convened illegal meetings to gather the jobless people to participate in the unlawful activities. This has caused an adverse effect to the society. You are, therefore, required to come to our office before July 5 to clarify this matter.

Police Office of Fu Qing City
Stamped: Police Office of Fu Qing City
June 20, 1996

# 福建省福清市公安局

陈可亮、黄爱金：

本局怀疑你俩非法召集社会闲散人员以宗教为由，从事不良污动，造成极坏影响。为此，限你俩于九月五日之前来我局澄清此事。

（公章：福清市公安局）

一九九七年八月廿日

# C E R T I F I C A T I O N

I, SIU CHUN YU, CERTIFY THAT I AM COMPETENT TO TRANSLATE THIS
DOCUMENT, AND THAT THIS TRANSLATION IS TRUE AND ACCURATE TO THE
BEST OF MY ABILITIES.

DATED THIS   1ST   DAY OF  OCTOBER 1996.

_____

SIU CHUN YU

STATE OF NEW YORK

               ) S.S.

COUNTY OF NEW YORK

SWORN BEFORE ME THIS  1ST  DAY OF  OCTOBER 1996.

YU WING KIN
Notary Public, State of New York
No. 24-4946199
Qualified in Kings County
Commission Expires January 27, 1997

POLICE OFFICE OF FU QING CITY FU JIAN PROVINCE

N O T I C E

To: Ke Liang Zhang, Ai Jin Huang

Upon investigation, it is evident that you, on the pretext of religion, have convened illegal assemblies to gather the jobless people and to collaborate with foreign bad elements to participate in the destructive activities. This has caused an adverse effect to the society. You are, therefore, ordered to submit yourself to the Police Office of Fu Qing before July 20. Otherwise, further action will be taken against you.

Police Office of Fu Qing City
Stamped: Police Office of Fu Qing City
July 15, 1996

福建省福清市公安局

通　　　知

张才亮、黄爱金：

　　经调查你俩确系非法召集
社会闲散人员以京教为由勾结
国外不良分子进行破坏活动
造成严重影响。为此，本局限
你俩在七月廿日到福清公安局
自首。否则我局将持取行动。



福清市公安局
一九九二年七月十五日

# CERTIFICATION

I, Coco Ng, certify that I am competent to translate this document, and that this translation is true and accurate, to the best of my abilities.

Date this 2nd day of October, 1996

_____
Coco Ng

State of New York  )
                   )  ss:
County of New York )

Sworn before me this 2nd of Oct, 1996

_____
Notary Public

STUART M. PIERCE
Notary Public, State of New York
No. 43-4988714
Qualified in Richmond County
Commission Expires Nov. 18, 199_

Applicant's Home
in China



Closed down by FuQing
Public Security Bureau
on 7/10/96

Closed down by FuQing
Public Security Bureau
on 7/10/96

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
York, Pennsylvania

File No.:   A 29 638 497                           November 1, 1996
            A 29 638 498


In the Matter of

                                    )
    ZHANG, KUR LIAN              ; ) IN EXCLUSION PROCEEDINGS
    HUANG, IJING                    )
                    Applicants      )


CHARGE:         INA Section 212(a)(6)(C)(i), 212(a)(7)(B)(ii),
                212(a)(7)(A)(ii) in case number 29 638 497.

                Section 212(a)(6)(C)(i), 212(a)(7)(A)(ii) in case
                number 29 638 498.


APPLICATIONS:   Political asylum and withholding of deportation to
                the People's Republic of China.


ON BEHALF OF APPLICANTS:            ON BEHALF OF SERVICE:

Stuart Pierce, Esquire              Jeffrey Duvier, Esquire
Law Office of Henry Lee M. Fong     Assistant District Counsel
7-8 Chaplin Square, Number 800      U.S. INS, 3400 Concord Road
New York, New York 10038            York, Pennsylvania 17402


### ORAL DECISION OF THE IMMIGRATION JUDGE

        Mr. Zhang and Ms. Huang are a married couple, husband
and wife, who came to the United States together on or about June
28th, 1996, at which time they did not appear admissible to the
Immigration inspectors and they were charged as recited above and
put in exclusion proceedings.  Since that date they have been
detained here in the York County Prison.  The Court expedited
their cases as much as possible in light of the fact that they
are a married couple and were not permitted to see each other

bw

while they were incarcerated, and the Court found a space that was mutually convenient to both parties on October 23, 1996 and has set the hearing for that date. Mr. Zhang is 32 years old and Ms. Huang is also 32. The couple has two children, one a male born August 19, 1988 (now eight years old) and the other a female born April 24, 1994 (now two years old).

At a prior hearing the Court noted that a written pleading was submitted by the counsel. Excludability under 212(a)(6)(C) was denied in both cases and excludability under 212(a)(7)(A)(ii) was originally denied in both cases. But at the hearing on the merits, that plea was changed so that the applicants both admitted excludability under 212(a)(7)(A)(ii), that is that they are intending immigrants without an immigrant visa. The charge under 212(a)(6)(C) was still denied and the matter was addressed at the hearing on the merits and the Court will address it now.

Only Mr. Zhang gave testimony as to his manner of entry into the United States. And the only thing he said about it was that the airplane landed in Alaska and he did not know where he was. And he handed something to some people (presumably Immigration inspectors) and didn't know what he was handing that person. That is the extent of the testimony on the fraud issue. The Court finds that this testimony is not sufficient to sustain the charge of fraud in Mr. Zhang's case, especially when the Board will look at a finding of fraud with "close scrutiny"

A 29 638 497                    2                    November 1, 1996

bw

pursuant to its long line of cases on this issue.  No testimony
was given about Ms. Huang's alleged fraud and the evidence
therefore fails in that case as well.

      With respect to the application for political asylum,
the applicants held a joint hearing and this is the decision
about both cases.  Each has submitted an application for
political asylum, although Ms. Huang's application only gives
biographical data that is different than the application of her
husband and she does not have a separate affidavit or statement
of acts upon which she fears persecution independent of the claim
made by her husband.  The Court considers all the evidence that
was submitted in both cases to apply to both cases and sees each
applicant as having a separate application for political asylum
and each being included as a derivative in the application of the
other.

      Both applicants allege two grounds for fearing
persecution in China.  The first is that they are Christians and
had an apparently political problem because they were holding
meetings at a suspicious time, just prior to the seventh
anniversary of the June 4th movement uprisings.  They were doing
this in June of 1996.  And the government suspected them of
holding meetings to plan for commemorations of the June 4th
uprisings.  The other claim is based on their fear of being
sterilized.  Each of them fears being sterilized because they
have two children.  They testified that when Ms. Huang gave birth

A 29 638 497                    3              November 1, 1996

bw

to their second child, she did so away from the home at another
hospital that didn't report to the Family Planning Agency and
that the child lived at first with her grandmother prior to
coming to their home.  In the home, Ms. Huang let on as if the
child was a child she was simply taking care of, but now that the
child is nearly two years of age, it starts calling her mother
and people know that she has two children.  Nonetheless, the
couple claims that they did not register the second child because
they had removed an I.U.D. with the help of a doctor from Ms.
Huang so that she could become pregnant.  And she did this
without getting the permission of the government.  They feared
that if her pregnancy were discovered and she did not have
permission for the second child that she would be forced to abort
the child.  They feared that if she asked for permission for the
second child, it would be denied and it would be discovered that
she had illegally removed the I.U.D. from her body.  They
testified that the child is not registered and, as a result of
this, will not be eligible for recognition as a person eligible
for the numerous benefits that are otherwise available to
families and their children in China.

        With respect to the first claim, Mr. Zhang testified
that his son became extremely ill with a very high fever in
January of this year.  After a couple of days in the hospital,
the fever did not subside.  A friend advised he pray to God and
he got some advice on how to do this.  And he did so and his

A 29 638 497                    4              November 1, 1996

bw

child's fever subsided.  Both Mr. Zhang and Ms. Huang attributed their child's curing to their answered prayers.  They began to show their gratitude by holding religious meetings in their home In March of this year, Mr. Zhang was baptized, but Ms. Huang said she was not baptized because she could not read or write, although the connection between needing to read and write and being able to be baptized was never satisfactorily explained.

The family lived in a village that was some distance from the central village.  The central village was Fuqing, where there was a church with a cross on the top and a father or priest or pastor.  It was not clear whether this church was of any particular denomination, whether it was Catholic or Protestant. And Mr. Zhang was unable to say whether it was registered with the government or not.  The priest or pastor in that church put Mr. Zhang in contact with another person that he described as "father," meaning a religious father who attended services at the home of Mr. Zhang and Ms. Huang.  In their home they invited other people from their local village called Qiqian, who they said were Christians, many of them for a long time in a dormant manner with some vague beliefs and understandings but had never developed their faith because their had never been a church or pastor or priest in their village.  Now, they held regular meetings and a fair number of people attended these meetings in their home each Sunday.

On May 3, 1996, the government warned them through the

A 29 638 497                      5                  November 1, 1996

bw

Public Security that they should not hold any more gatherings in
their home.  Two Public Security officials came to their home and
left a written note.  The note was eventually obtained by Mr.
Zhang's mother and was forwarded to him here in the United
States.  A later note was given to them dated June 20, 1996 from
the police office of Qiqian City and this note was submitted as
Exhibit 5-B.  It stated "it is suspected that you on the pretext
of religion have convened illegal meetings to gather the jobless
people to participate in the unlawful activities.  This has
caused an adverse affect to their society.  You are therefore
required to come to our office before July 5 to clarify this
matter."  It is handwritten.  It appears to be on a letterhead
which reads, "Police Office of Qiqian City, Fujian Province."
And it's signed and dated with a seal at the bottom.  And it is
this note that was left for the applicant's mother.  The warning
on May 3 was a verbal warning.

    Mr. Zhang testified that he did not inform the pastor
or priest about the warning on May 3.  He thought it was nothing
serious, he said, because their gathering was simply a religious
gathering and the constitution of China and the practice in China
permitted people to hold religious gatherings.  He thought that
the police officers intention was to close down the possibility
that he was organizing a June 4th anniversary celebration, and
since he was not doing that, he had no fear of the police and
thought it was not necessary to tell the pastor about the request

A 29 638 497                    6              November 1, 1996

bw

that they shut down the gathering.

On May 26th, while a religious service was in process at their home, both of the applicants heard a siren and saw a police car approaching. Everybody ran for the doors and both Mr. Zhang and Ms. Huang escaped out the back door. They said they never went back again. They heard that the police had arrested some six people. They had heard that these were people who had attended the worship meetings at the home. They said they heard this through Mr. Zhang's brother, who is a U.S. resident and lives in New York City. The brother was not present for the hearing, although he's here today for the decision of the Court.

Because the couple feared now after the police approached that they would be arrested, they went into hiding and obtained help from the pastor to obtain documents to leave China because he convinced them that there is no freedom of religion in China and that they should therefore leave. The father who was also present at the worship meeting and apparently fled as well, apparently remained in China. The applicants did not know much about this father, where he had come from, what work he had done prior to coming to their church, what work he did the rest of the week when he was not attending their worship services or even where he lived. They communicated with him because he'd come to Mr. Zhang's mother-in-law's house after the police had approached the house on May 26th.

The applicant testified that he learned through his

A 29 638 497                    7                    November 1, 1996

bw

brother that his mother had said that the Public Security officers in Qiqian came back to his own home to look for him. But she would not say where Mr. Zhang and Ms. Huang were. The couple fears that if they return to China, they will be in political trouble because they were viewed as preparing for a June 4th demonstration and regardless of how they were viewed, they were ordered to restrain from holding meetings in their home and they held meetings anyway. Because of the lack of religious freedom, they believed they would not be able to practice their religion in freedom if they returned.

The couple also makes a claim for asylum on a ground that appears unrelated. The Court has already stated the basic thrust of their claim; i.e., that they have a second child without authorization and without permission, that because it was without authorization or permission and because it followed their removing the I.U.D. from Ms. Huang's body illegally, they kept the existence of their child unknown to the government by not registering the child. They believe that they will both suffer persecution if they return in the form of sterilization and a fine. Sterilization to prevent them from having future children and a fine to pay for their past errors. They both testified that they would like to have more children. Mr. Zhang would even like to have four or five. And Ms. Huang stated that she would like to have more children as well, but that they cannot legally do so in China and they fear that they will be sterilized.

A 29 638 497                    8                    November 1, 1996

bw

Background evidence discusses sterilization to some extent, and it appears that either one of them runs an actual risk of being sterilized, given the birth of two children.  The fact that Ms. Huang is still only 32 years of age and has expressed an interest in having another child and has violated the birth control measures in the past by having a child secretly.

With respect to the claim regarding religion, the Court believes that the testimony of the applicants has not been detailed or particularly plausible in some important respects. While it is always conceivable that a person with a new found faith would be very excited about that faith and share it with others, and that may have happened here, there are indications in the testimony of events which the Court finds detract from this claim.  One is the fact that they knew nothing about the priest who was going to be the pastor of their congregation, who met with them every Sunday in a country where religion, especially a Western religion, is at least problematic, even though the actual meetings for worship might not be obstructed by the government on a regular basis.  And yet they knew nothing about this person.  A religious community is a community of people who know each other, who care about each other, who know about each other.  And it seems that it strains the imagination to think that this priest dropped out of the sky as it were to come and help them and then went on with a life during the rest of the week that they knew nothing about.  Ms. Huang's explanation as to why she was

A 29 638 497                    9                    November 1, 1996

bw

baptized, that is that she can't read or write seems to be non-secular from all that the Court gathers in its general knowledge about ~~religion~~ that baptism in any religion is a question of faith rather than intellectual ability. ~~Mr. Zhang's testi~~mony that he did not share with the priest the information about the warning not to meet in his house again also strains credulity. He stated that the reason was that he did not consider the matter important, but as was pointed out by the INS in its closing, there was no other conceivable reason why the warning was made other than for the religious meetings being held in the house, even if the government's subjective motive in addressing those meetings was to guard against the planning of celebrations of the June 4th movement in the weeks that followed. It obviously has bearing on the safety of the people meeting and the exercise of the group's religion. And it's hard to imagine the applicant's being so naive as to believe that the government of China was simply not concerned at all about the religious meetings given the history, especially in past years, of considerable persecution against religion in China.

The Immigration Service also pointed out that its a ~~glaring~~ defect in their presentation of their case that their brother, who had all of the important information directly from the source and was present in the United States in New York City did not come and testify on their behalf. That indicates a lack of belief on the part of the applicants themselves that their

A 29 638 497                    10                    November 1, 1996

bw

brother actually has information to corroborate their claim.  The
brother's appearance today in Court to hear the decision raises
further questions as to why he was not present because it is
clear that it is at least possible for him to come to Court.

Finally, it's been argued by the Immigration Service
and the Court is in agreement that if the evidence is taken at
face value, it still does not show the reasonable fear of
persecution.  The only event that happened was the approach of
the police cars with their sirens on and the escape of this
family from their home.  Background evidence shows that there are
some arrests of people involved in proselytizing, especially
priests, but there is not even a claim in this case that the
priest involved in this case was arrested, was threatened with
arrest or was even concerned that he might be arrested.  He was
rather helping other members of his flock, in particular these
two people, to escape because "there's no religious freedom" in
China.  The family has not been persecuted as such on the grounds
of their religion.  There's no indication that the reason that
the police came was to keep them from practicing their religion.
In fact, it's been testified that they believed that the reason
was to keep them from planning for the June 4th movement, which
they were not doing anyway.  The Court is not unmindful that the
background evidence describes the government of China as being
authoritarian, extremely conscious about its security, intolerant
of people questioning its authority.  In fact people questioning

A 29 638 497                  11                  November 1, 1996

bw

its authority or challenging it are "often dealt with harshly and arbitrarily." The State Department opinion, Exhibit 5, page 3. Nonetheless, the same State Department exhibit goes into some detail about the treatment of religion by the government and that is the only evidence in this record about the treatment of religion in China. And the Court finds that that background evidence demonstrates that some people who are extremely active and especially insisting on prosthetizing have been detained and there may be many more people actually detained for longer periods of time than what's reported. Nonetheless, the State Department reports that there are some 20,000 house churches, which is what the applicant was conducting; some 8,000 registered churches and that the government includes within the registered churches some six million "official" Protestants and some four million "official" Catholics. The State Department opinion at page 28. Nothing more was claimed by this couple than that they had meetings in their house. And when they as well as 20,000 other people are doing it and the evidence supporting the entire scenario is as weak as the evidence in this case, the Court believes that they have not made out a claim to show that they have a well-founded fear of persecution on account of their religion if they return to China. Ipso facto, they have not shown that they have a clear probability of persecution.

With respect to the claim regarding their being subject to the birth control policies of China, the Court has no reason

A 29 638 497                    12                    November 1, 1996

bw

to doubt that they have two children.  Given the background

evidence showing the requirement to get permission to have a

second child, the large number of people who do have second

children without getting permission and the persistence of the

government in seeking to enforce sometimes in systematic and

sometimes in more haphazard manners the birth control policy of

limiting each family to one child or in some regions two

children, the Court really does not doubt the testimony that they

hid from the birth control authorities when Ms. Huang was to give

birth to their second child.  This fits in with the background

evidence and is plausible in light of a national policy so

intrusive as the policy of the Chinese government as it's

described in the background evidence and the Court finds the

testimony regarding these events to be sufficiently detailed and

plausible to establish the facts on which this aspect of their

claim is based.  They do have two children.  An I.U.D. was

removed against the law.  The second child has not been

registered with the government and the couple fears that either

of them might be sterilized if they returned to China because of

their demonstrated disregard for birth control laws in the past

and the presumption that that raises that they will continue to

disregard the birth control laws while Ms. Huang continues in

child bearing age.

        Shortly before the hearing in this case, the Congress

of the United States amended for the first time the definition of

A 29 638 497                    13                  November 1, 1996

bw

refugee for purposes of political asylum claims under Section
101(a)(42) of the Immigration and Nationality Act.  Section 601
of the Immigration Act of September 30, 1996 says as follows,
"Section 101(a)(42) [of the INA] is amended by adding at the end
the following: 'For purposes of determinations under this Act, a
person who has been forced to abort a pregnancy or to undergo
involuntary sterilization, or who has been persecuted for failure
or refusal to undergo such a procedure or for other resistance to
a coercive population control program, shall be deemed to have
been persecuted on account of political opinion, and a person who
has a well-founded fear that he or she will be forced to undergo
such a procedure or be subject to persecution for such failure,
refusal or resistance, shall be deemed to have a well-founded
fear of persecution on account of political opinion.'"

     By specifically stating in an act of Congress that
resistance to such a policy is a manifestation of a "political
opinion," it is obvious to the Court that the Congress is
referring to the decision of the Board of Immigration Appeals in
Matter of Chang and Matter of G-.  This Court is bound to follow
the decisions of the Board of Immigration Appeals as precedent
when those decisions interpret the law that is found in the
statute.  There is as yet no interpretation of this new law which
is effective now and so the Court believes that the decisions in
Chang and G-, although they relate, are binding on the language
of Section 101(a)(42) as it appeared prior to this amendment, do

A 29 638 497                    14            November 1, 1996

bw

not even purport to interpret the new language, and the Court must address this new language as a matter of first impression.

In understanding what Congress has done in amending Section 101(a)(42), the Court goes back to a case which was decided following other amendments to the Immigration law relating to persecution back in 1969. The case is <u>Kovak v. INS</u>, 407 F.2d 102. In that case, the 9th Circuit discussed the old definition of persecution as "physical" persecution. <u>See</u> page 106. And it said that in removing the word physical the Congress meant that the word persecution should bear its everyday meaning and it cited Webster's Dictionary to quote that everyday meaning as being "the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive." This definition has been adopted by the Board of Immigration Appeals in <u>Matter of Acosta</u> as well, and the Court finds some guidance in what Congress has intended here by looking at this definition of the word persecution. The 9th Circuit says at page 107 "no doubt 'persecution' is too strong a word to be satisfied by proof of the likelihood of minor disadvantage or trival inconvenience." When Congress used the word "persecution" in Section 601 amending Section 101(a)(42) of the Act, it states explicitly that a person that has a well-founded fear that they will be forced to undergo sterilization has a well-founded fear of "persecution" and that that "persecution" is "on account of political opinion." In other words, while the focus of many

A 29 638 497                          15                    November 1, 1996

bw

decisions of the Board and circuit courts have been on whether or
not the harm feared is "on account of political opinion" there is
also an aspect to which the Board's decisions are based on the
view that the harm suffered is not sufficiently serious to
constitute persecution. The Congress in amending this and in
adding the amended language establishes both that the persecution
is on account of political opinion and that it is persecution.
That is, it can no longer be viewed as any "minor disadvantage or
trivial inconvenience" but is sufficiently severe harm to
constitute use of the term of art "persecution."

    Applying this definition to the facts in this case, it
is clear first of all that neither applicant has suffered past
persecution. Ms. Huang has undergone an involuntary insertion of
an I.U.D. into her body as a birth control measure against her
will. She committed an illegal act in removing it. The act of
Congress relates to a forced abortion of a pregnancy or an
involuntary sterilization but does not refer to involuntary birth
control measures. And it is clear that Mr. Zhang has not
suffered past persecution as well.

    Nor, has either party suffered past persecution because
of their failure or refusal to undergo such a procedure. They
did try to avoid such a procedure. They did not register their
child in order to avoid such a procedure. But the Court does not
find that that harm is sufficiently severe to constitute
persecution nor does it believe that the Congress intended every

A 29 638 497                    16                 November 1, 1996

bw

act of avoidance of that policy to constitute the "infliction of suffering or harm" that constitutes persecution under Kovak and the Board's decisions.

On the other hand, it does appear that both applicants have a reasonable fear that they will be forced to undergo one of the two procedures which Congress has singled out, either an abortion or involuntary sterilization. Obviously, Mr. Zhang cannot fear undergoing an abortion himself, but he can fear undergoing involuntary sterilization. Ms. Zhang can fear with an involuntary sterilization or abortion. The Immigration Service argued in its argument also first impression on this matter that there should be some nexus shown between the possible action by the government and the specific individual facts in the case. That is not established one way or the other, but the Court believes that in this case the nexus is present. It is not pure conjecture on the applicant's part that they will be subject to such a procedure as a forced sterilization if they return. In fact, the background evidence makes it clear that they have a reasonable possibility of being subject to such a procedure even if Ms. Huang does not become pregnant again, especially because of her past flaunting of the birth control measures by having her I.U.D. removed and getting pregnant without government permission. Because the nexus here is the family's already having two children and having violated the birth control policies in the past, it is not at all unlikely, in fact it is a

A 29 638 497                    17            November 1, 1996

bw

reasonable possibility, that they will be forced to undergo either sterilization procedures or if Ms. Huang becomes pregnant, she will be forced to undergo an abortion if returned to China. The Court notes that the definition of withholding of deportation has not changed with this change by Congress of Section 101(a)(42). It would find on the basis of these facts, however, that the applicants have not shown a "clear probability" that either of them would be subject to such a procedure because the actions which they have suffered so far and the actions that they have taken so far do not bear a strong enough relation to the policy to indicate that they would "probably" suffer sterilization or abortion if returned to China. The Court does believe that they have shown that there is a "reasonable possibility" of their suffering such a procedure and that that procedure itself, if they underwent it, would be the "suffering or harm" that constitutes the persecution and it would be deemed to occur "on account of their political opinion." Their political opinion in this case is nothing more than their desire to have children free of government interference.

In trying to assess Congress's intent on this case, in light of the Board's decisions, the Court does believe that the Congress has considered the Board's findings in <u>Matter of Chang</u> not to represent the policy of the United States. In particular, the Board's observation that China must do something to control its population and the implicit finding that what China does do

A 29 638 497                18                November 1, 1996

bw

is not in violation of fundamental human rights norms or that if it is, it does not violate those norms "on account of" any particular parent's political opinion or other characterization. The Congress is stating that it is the public policy of the United States to give international protection to those who flee these coercive practices as long as they have a "reasonable possibility" of suffering them and to give protection. The Court interprets this because of what is stated in Matter of Chang and Matter of G- and what is stated in the new Act, and it also interprets this way because of what is stated in Section B of Section 601 of the Act of September 30, because Congress has placed a numerical limitation of 1,000 people per year. The regulations have been promulgated showing how this limitation will be effectuated, but given that the statute as applied to the facts in these applicants' case shows them to meet the definition of refugee, the Court will make a finding that they are refugees subject to whatever other administrative regulations or practices are promulgated that actually effectuates the Court's finding.

The Supreme Court has stated in Matter of Cardoza-Fonseca that after there is a finding that a person is a "refugee" under Section 101(a)(42), the Attorney General must make a second finding as to whether or not the person should be granted refugee status in the exercise of discretion, and the Court will now address that issue. In this case, the Court believes it is bound still by the Board's determination in Matter

A 29 638 497                    19                    November 1, 1996

bw

of Pula, that a well-founded fear of persecution is already a
strong equity in considering whether or not to exercise
discretion in favor of a person who meets the refugee definition.
In that case, 19 I&N Dec. 467 (BIA 1987), the Board was
addressing the entry of a person into the United States through
fraud and the circumvention of orderly refugee processing.  And
the Board held that in the absence of any adverse factors, asylum
should be granted in the exercise of discretion.  It says
further, "A situation of particular concern involves an alien who
has established his statutory eligibility for asylum that can't
meet the higher burden required for withholding of deportation.
Deportation to a country where the alien may be persecuted thus
becomes a strong possibility.  In such a case the discretionary
factors should be carefully evaluated in light of the unusually
harsh consequences which may befall an alien who has established
a well-founded fear of persecution.  The danger of persecution
should generally outweigh all but the most egregious of adverse
factors."  At page 474.  Here, the possibility of a forced
sterilization or forced abortion is now by definition of Congress
one of the "unusually harsh consequences which may befall an
alien who has established a well-founded fear of persecution."
There is, of course, in the background evidence sufficient basis
to find that the government would carry out such an action, that
the government of China would jealously protect its authority and
exercise its authority to do what it wishes to any particular

A 29 638 497                    20                   November 1, 1996

bw

family that may wish to violate the absolute legal requirements
regarding family size and the Court sees the Congress's
definition or inclusion within the definition of "persecution" a
finding that such a sterilization or abortion would be one of the
"unusually harsh consequences" of a deportation to China.  The
Court should be careful and is careful here and mindful of the
fact that after hearing many Chinese asylum applications over a
period of a year and a half, it has gotten to see the fear of a
sterilization as being something "minor" in a sense, because it
is not the kind of harm that the Board under Chang and G-
protected applicants against.  But now the Court believes it must
squarely accept the seriousness of such harm, given Congress's
definition and in this case it does not see strong adverse
factors that would justify not granting asylum to people who fear
such unusually harsh consequences of their past violation of the
birth control laws and their simple desire to have more than the
two children they have now.  The Court in coming to this
conclusion considers the shakiness of the testimony regarding the
other claim which was really the principal claim on which they
relied in this case, at least in terms of the amount of time
spent on it, but believes that the record does not support a
finding that there was an intention of lying about the claim or
other sort of fraud upon the Court.  Given the Board's decision
in Matter of Pula and its drawing back from the decision in
Matter of Salim, even fraud may allow the granting of political

A 29 638 497                    21                    November 1, 1996

bw

asylum, but the Court in this case does not find that that describes the facts before it and does not find that the applicants have committed fraud or intentionally lied in order to press their claim in this case.  In light of the foregoing, therefore, the Court will exercise its discretion in favor of this couple and grant political asylum in the United States and will deny the application for withholding of deportation to People's Republic of China.

ORDER

IT IS ORDERED that the application for political asylum in both cases be and is hereby granted.

IT IS FURTHER ORDERED that the application for withholding of deportation to China in both cases be and is hereby denied.

IT IS FURTHER ORDERED that both applicants shall be admitted to the United States as political asylis, subject to any numerical limitations that may be imposed administratively and that these proceedings be terminated.


_____
WILLIAM VAN WYKE
Immigration Judge


A 29 638 497                    22                    November 1, 1996

<u>CERTIFICATE PAGE</u>

I hereby certify that the attached proceeding before

JUDGE WILLIAM VAN WYKE, in the matter of:

KUR LIAN ZHANG

A 29 638 497

IJING HUANG

A 29 638 498

York, Pennsylvania

was held as herein appears, and that this is the original

transcript thereof for the file of the Executive Office for

Immigration Review.


_____
(Barbara Webber, Transcriber)


Deposition Services, Inc.
6245 Executive Boulevard
Rockville, Maryland  20852
(301) 881-3344


____January 28, 1997_____
(Completion Date)

**U.S. DEPARTMENT OF JUSTICE**
Executive Office for Immigration Review
Office of the Immigration Judge

In the Matter of:                                      Case No.: A _29-638-498_

_Huang Aiving_                                         Docket: _York PA_
_____
                    APPLICANT                          IN EXCLUSION PROCEEDINGS

## ORDER OF THE IMMIGRATION JUDGE

This is a summary of the oral decision entered on ___Nov 1 1996___ . This memorandum is solely for the convenience of the parties. If the proceedings should be appealed or reopened, the oral decision will become the official opinion in this case.

☐    Applicant has been ordered excluded and deported from the United States.

☒    Applicant is admitted to the United States as a _political asylum_ until _indefinitely_

☐    As a condition of admission, the applicant is to post a $ _____ Maintenance of Status and Departure Bond.

☐    Applicant's request to withdraw the application for admission to United States is granted. If the applicant fails to depart on or before the date set by the District Director, Immigration and Naturalization Service, the following order shall become immediately effective: Applicant shall be ordered excluded and deported from the United States.

☒    Applicant's application for asylum was (X)granted ( )denied ( )withdrawn ( )other.

☒    Applicant's application for withholding of deportation was ( )granted (X)denied ( )withdrawn ( )other.

☐    Applicant's application for waiver under Section _____ of the Immigration and Nationality Act was ( )granted ( )denied ( )withdrawn ( )other.

☒    Proceedings were terminated.

☐    The application for adjustment of status under Section (216)(216A)(245)(249) was ( )granted ( )denied ( )withdrawn ( )other. If granted, it was ordered that the applicant be issued all appropriate documents necessary to give effect to this order.

☐    Other _____

_____

Immigration Judge

Date: _11/1/96_

_Due December 2, 1996_

Appeal: RESERVED/WAIVED ( A / I / B )

Form EOIR - 38
REV. - JUNE 93

Department of Justice
Immigration and Naturalization Service

# Notice of Action

## THE UNITED STATES OF AMERICA

| | |
|---|---|
| **RECEIPT NUMBER**<br>SRC-97-214-52239 | **CASE TYPE** I730<br>REFUGEE ASYLEE RELATIVE PETITION |
| **RECEIPT DATE**<br>July 22, 1997 | **PRIORITY DATE** | **PETITIONER** A29 638 497<br>ZHANG, KE LIANG |
| **NOTICE DATE**<br>December 15, 1997 | **PAGE** 1 of 1 | |

| | |
|---|---|
| STUART M. PIERCE<br>7 8 CHATHAM SQUARE<br>SUITE 800<br>NEW YORK NY 10038 | Notice Type:  Approval Notice<br>Class: ASY |

Your "Refugee/Asylee Relative Petition" has been approved for the family member(s) listed on this notice, in accordance with Section 208 of the Immigration and Nationality Act, and forwarded to the Department of State. A separate notice will be sent for any person listed on your Form I-730 but not listed on this notice. This completes all INS action on this petition.

The Department of State will notify the U.S. Embassy or Consulate abroad having jurisdiction over the area where your relative(s) resides. The consular post will contact your relative(s) regarding procedures to be followed for travel to the United States.

THIS FORM IS NOT A VISA NOR MAY IT BE USED IN PLACE OF A VISA.

Family members:

| Name | DOB | COB | Class |
|---|---|---|---|
| ZHANG, GE JIE | 08/19/88 | CHINA, PEOPLE'S REPUBLIC OF | ASY  A76 455 276 |
| ZHANG, LU | 04/24/94 | CHINA, PEOPLE'S REPUBLIC OF | ASY  A76 455 275 |

"A" NUMBERS ADDED MANUALLY AT NSC

Please see the additional information on the back. You will be notified separately about any other cases you filed.
NEBRASKA SERVICE CENTER
U. S. IMMIG. & NATZ. SERVICE
P.O. BOX 82521
LINCOLN NE 68501-2521
Customer Service Telephone: 402-437-5218



**U.S. Department of Justice**                    Decision of the Board of Immigration Appeals

Executive Office for Immigration Review

Falls Church, Virginia 22041

Files:   A29 638 497 - York                    Date:
         A29 638 498                                        SEP 2 8 1999

In re:   KE LIANG ZHANG
         AI JIN HUANG

IN EXCLUSION PROCEEDINGS

APPEAL

ON BEHALF OF APPLICANTS:   Stuart M. Pierce, Esquire
                           7-8 Chatham Square, Suite 503
                           New York, New York  10038

ON BEHALF OF SERVICE:   Jeffrey T. Bubier
                        Assistant District Counsel

EXCLUDABLE:   Sec.   212(a)(6)(C)(i), I&N Act [8 U.S.C. § 1182(a)(6)(C)(i)] -
                     Fraud or willful misrepresentation of material fact [1]
                     (both applicants)

              Sec.   212(a)(7)(A)(i)(I), I&N Act [8 U.S.C. § 1182(a)(7)(A)(i)(I)] -
                     No valid immigrant visa [2] (both applicants)

              Sec.   212(a)(7)(B)(i)(I), I&N Act [8 U.S.C. § 1182(a)(7)(B)(i)(I)] -
                     Nonimmigrant without valid passport (A29 638 497)

APPLICATION:   Asylum; withholding of exclusion and removal


    The Immigration and Naturalization Service has filed a timely appeal of the November 1,
1996, decision of the Immigration Judge, which granted the applicant's application for asylum
under section 208(a) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a). [3] The appeal
will be sustained.

---

[1] The fraud charge was not sustained.

[2] A finding of excludability under section 212(a)(7)(A) of the Immigration and Nationality Act
renders excludability under the provisions of section 212(a)(7)(B) of the Act, inapplicable. See
Matter of Healy and Goodchild, 17 I&N Dec. 22, 26 (BIA 1979).

[3] The applicants are husband and wife. Except where otherwise indicated, the term "applicant"
refers to the husband, the principal applicant herein.

A29 638 497
A29 638 498

The Immigration Judge denied the applicant's asylum application as to his claim of religious persecution, finding his account not credible (I.J. at 9-11). The Immigration Judge also determined that, even if the applicant's testimony were credible, the applicant had not demonstrated that he experienced past persecution on account of religion or that he has a well-founded fear of future persecution with respect to his religion claim (I.J. at 11-12). However, the Immigration Judge found the applicant's testimony credible with respect to his fear of sterilization and granted the applicant's asylum application on that basis (I.J. at 12-22). The Immigration Judge denied withholding of exclusion and deportation (I.J. at 22).

On appeal, the Service argues that the applicant's testimony, having been found not credible with respect to the religion claim, is also not credible with respect to the family planning claim. The Service also argues that the applicant's testimony, even if credible, would not constitute a basis for a finding of past persecution or well-founded fear of persecution.

Upon review of the record, we agree, for the reasons set forth by the Immigration Judge, that the applicant's testimony as to the major aspects of his case was not credible.[4] The Immigration Judge's credibility assessment finds significant support in the record. A persecution claim that lacks veracity cannot satisfy the burdens of proof and persuasion necessary to establish eligibility for asylum and withholding of deportation. See generally Matter of S-S-, Interim Decision 3257 (BIA 1995); Matter of Mogharrabi, 19 I&N Dec. 439, 445 (BIA 1987); 8 C.F.R. §§ 208.13(a) and 208.16(b). Generally, an Immigration Judge's findings regarding matters of credibility are accorded significant deference. See, e.g., Sarvia-Quintanilla v. INS, 767 F.2d 1387, 1395 (9th Cir. 1985); Matter of Kulle, 19 I&N Dec. 318, 331-32 (BIA 1985), aff'd, 825 F.2d 1188 (7th Cir. 1987), cert. denied, 484 U.S. 1042 (1988). We recently reaffirmed this principle in Matter of A-S-, Interim Decision 3336 (BIA 1998). We note that the lack of plausibility and the inconsistencies in the applicant's testimony cast substantial doubt on the credibility of all aspects of the applicant's testimony, including his family planning claims. We also agree with the Immigration Judge that, even if the testimony were credible, it does not, for the reasons stated by the Immigration Judge, demonstrate that the applicants have a well-founded fear of persecution on account of religion (I.J. at 11-12).

We also find that the two applicants have not demonstrated that they have a subjective fear of persecution with respect to their family planning claims. They did not attempt to flee until 2 years after the birth of their second child, although they had the opportunity to do so. The applicant states in his appeal brief that it does not matter what his reasons were for leaving China as long as he has a well-founded fear of persecution (Applicant's Appeal Brief at 3). However, it is clear that, without a subjective fear, an asylum applicant cannot demonstrate a well-founded fear. The applicants' failure to depart promptly or to be able to provide an explanation for their apparent lack of fear leads to the conclusion that a subjective fear of sterilization may not exist.

---

[4] The applicant's claim regarding religion encompassed by far the greater part of the applicant's testimony and appears to have been the major basis for the applicant's asylum case, as the Immigration Judge noted (I.J. at 21). However, we agree with the applicant that that fact does not mean that it is impossible to find the less-emphasized aspect of the asylum claim valid while rejecting the other.

A29 638 497
A29 638 498

We further find, even if it were determined that the applicants have a subjective fear of persecution, which we do not find, that the fear would not be well founded, as there is little indication of an inclination on the part of the Chinese authorities to persecute the applicants. The birth of their second child was not hidden; the child was born in a hospital rather than at home (Tr. at 57). While it is claimed that the police delivered notices to the applicant concerning alleged religious or political infractions, the notices mention nothing regarding family planning matters (Tr. at 105-06). The authorities were capable of ascertaining that the applicants had a second child, and may have known about it, yet no threats or warnings of impending sterilization were received. We do not agree with the applicant's contention at page 5 of his brief that, because his wife had her IUD removed, she or her husband might be sought for sterilization as a result. Finally, the authorities' apparent lack of interest in punishing the applicants for having a second child, or in seeking to forcibly sterilize either applicant, is consistent with U.S. State Department reports that enforcement of the "one-child" policy in Fujian Province is lax in many instances and that punitive measures are not enforced in any uniform fashion. The Immigration Judge, in assuming that the applicants face a reasonable possibility of undergoing coercive sterilization, did not take into account this reliable evidence of conditions in Fujian Province, which strongly suggests that such coercive measures are not characteristic of local birth control enforcement. See United States Department of State, Bureau of Democracy, Human Rights, and Labor, China - Country Conditions and Comments on Asylum Applications, December 11, 1995 (Exh. 5).

With respect to the applicant's documentation, we note that the applicant has failed to submit documents to support his claim that he has two children or to support any other aspect of his family planning claim other than the fact of his marriage. The applicant has not met his burden of proof with respect to his family planning claims because of his failure to produce readily available corroboration. See Matter of S-M-J-, Interim Decision 3303 (BIA 1997); Matter of Dass, 20 I&N Dec. 120 (BIA 1989); see also Matter of Y-B-, Interim Decision 3337 (BIA 1998) (noting that the weaker an applicant's testimony, the greater the need for corroborative evidence), and Matter of M-D-, Interim Decision 3339 (BIA 1998) (holding that, when evidence has not been submitted to corroborate a claim in situations where it is reasonable to expect such evidence, the alien has failed to satisfy his burden of proof). The applicant states on appeal that there were valid reasons for his brother's failure to testify, despite his availability and presence in this country (Applicant's Appeal Brief at 7). However, we note that the brother could have submitted a corroborative affidavit or statement to support the applicant's account, but did not do so.

Inasmuch as the applicants have failed to satisfy the lower statutory burden of proof required for asylum, it follows that they have also failed to satisfy the clear probability standard of eligibility required for withholding of deportation. See Matter of Mogharrabi, supra. The applicant's claim that the Immigration Judge should have granted withholding of exclusion and deportation is thus rejected.

3

A29 638 497
A29 638 498

ORDER:   The appeal is sustained and the decision of the Immigration Judge is vacated.

FURTHER ORDER:   It is ordered that the applicants be removed from the United States.

FOR THE BOARD

4

**U.S. Department of Justice**
Executive Office for Immigration Review

Decision of the Board of Immigration Appeals

Falls Church, Virginia 22041

Files:  A29 638 497 - York
   A29 638 498

Date:

**DEC 23 1999**

In re:  KE LIANG ZHANG
   AI JIN HUANG

IN EXCLUSION PROCEEDINGS

MOTION

ON BEHALF OF APPLICANTS:  Stuart M. Pierce, Esquire
             7-8 Chatham Square, Suite 503
             New York, New York 10038

EXCLUDABLE: Sec. 212(a)(6)(C)(i), I&N Act [8 U.S.C. § 1182(a)(6)(C)(i)] -
         Fraud or willful misrepresentation of material fact [1]
         (both applicants)

      Sec. 212(a)(7)(A)(i)(I), I&N Act [8 U.S.C. § 1182(a)(7)(A)(i)(I)] -
         No valid immigrant visa [2] (both applicants)

      Sec. 212(a)(7)(B)(i)(I), I&N Act [8 U.S.C. § 1182(a)(7)(B)(i)(I)] -
         Nonimmigrant without valid passport (A29 638 497)

APPLICATION: Reopening; reconsideration

   This case was last before us on September 28, 1999, when we sustained the Service appeal from the Immigration Judge decision to grant the applicants' applications for asylum and withholding of exclusion and deportation under sections 208(a) and 243(h) of the Immigration and Nationality Act, 8 U.S.C. §§ 1158(a) and 1253(h). The applicants have since filed a motion to reopen and reconsider. [3] The motion will be denied.

   Pursuant to 8 C.F.R. § 3.2(c), a party may request that this Board reopen or reconsider any case in which we have issued a decision. A party seeking to reopen exclusion or deportation proceedings

---

[1] The fraud charge was not sustained.

[2] A finding of excludability under section 212(a)(7)(A) of the Immigration and Nationality Act renders excludability under the provisions of section 212(a)(7)(B) of the Act, inapplicable. See Matter of Healy and Goodchild, 17 I&N Dec. 22, 26 (BIA 1979).

[3] The applicants are husband and wife.

A29 638 497
A29 638 498

must state the new facts he or she intends to establish and must support the motion with affidavits or other evidentiary material. 8 C.F.R. §§ 3.2(c), 103.5; INS v. Jong Ha Wang, 450 U.S. 139 (1981); Matter of Leon-Orosco and Rodriguez-Colas, 19 I&N Dec. 136 (BIA 1983; A.G. 1984); Matter of Reyes, 18 I&N Dec. 249 (BIA 1982). A motion to reopen shall not be granted unless it appears to the Board that the evidence sought to be offered is material, was not previously available, and could not have been discovered or presented at the original hearing. 8 C.F.R. § 3.2. The alleged new facts must be sufficient, if proved, to change the result of the previous decision; that is, a prima facie showing must be made, both that the alien is statutorily eligible for the relief sought and that he or she warrants that relief in the exercise of discretion. See INS v. Doherty, 502 U.S. 314 (1992); INS v. Abudu, 485 U.S. 94 (1988); Matter of Coelho, 20 I&N Dec. 464 (BIA 1992).

As a part of their motion, the applicants submitted copies of the birth certificates of their children, stating that the children were not registered until after their parents came to the United States. Therefore, the evidence was not previously available (Applicants' Motion at 2). We find, in the circumstances of these proceedings, that a consideration of the birth certificates would not alter the outcome of these proceedings. We previously found that, even if the applicants' testimony were determined to be credible and even if they had a subjective fear of persecution, the applicants' fears were not well founded. See BIA decision dated September 28, 1999, at 3 para. 1. The applicants have not made a prima facie showing.

Regarding the applicants' request for reconsideration, we note that a motion to reconsider is a request that the original Board decision be reexamined in light of additional legal arguments, a change of law, or an argument or aspect of the case that was overlooked. See Matter of Cerna, 20 I&N Dec. 399 (BIA 1991) (quoting Hurwitz, Motions Practice Before the Board of Immigration Appeals, 20 San Diego L. Rev. 79, 90 (1992). A motion to reconsider must state the reasons for reconsideration and be supported by any pertinent precedent decisions. 8 C.F.R. § 103.5. A motion to reconsider based on a legal argument that could have been raised earlier in the proceedings will be denied. See Matter of Tiwari, 20 I&N Dec. 254 (BIA 1991), citing Matter of Medrano, 20 I&N Dec. 216 (BIA 1990, 1991).

In their motion, the applicants made no legal arguments and mentioned no changes in the law. The issues they have addressed in their motion involve the following: 1) our conclusion that current conditions in China indicate that there is little likelihood that the applicants will be persecuted upon return; 2) our statement that testimony from the brother of one of the applicants could have helped satisfy the applicants' burden of proof and bolster their credibility overall; 3) our conclusion, contrary to that of the Immigration Judge, that the applicants' account lacked credibility; and 4) our conclusion that the applicants do not appear to have a subjective fear of persecution.

We first note that, although we disagreed with the views of the Immigration Judge, our conclusion regarding current conditions in China was well supported by the record. The applicants concede that the country conditions report submitted by the United States Department of State (Exh.

A29 638 497
A29 638 498

5) describes lax enforcement of the one-child policy in rural areas of China such as the area from which the applicants have come. They failed to provide sufficient reason to alter our decision. Second, in our September 28, 1999, decision, we expressed our view that testimony from the brother of one of the applicants could have helped satisfy the applicants' burden of proof and bolster their credibility. While such testimony might have assisted in presenting a persuasive claim and in fulfilling the applicants' burden of proof, we did not state that the brother's testimony was an absolute requirement. Third, the applicants contend that the Board should agree with the Immigration Judge's finding that their birth control claim is credible and valid. In our September 28, 1999, decision, we agreed with the applicants that the fact that the birth control claim was a relatively minor aspect of their original claim would not prevent it from being valid. The applicants now state that, because we stated that the lesser claim could be valid in some circumstances, we should therefore not reverse the decision of the Immigration Judge. However, in our decision, we held that, in the circumstances of these proceedings, their birth control claim was without merit. We set forth our reasoning in reaching that conclusion explained that the applicants had not proven that they have a well-founded fear of persecution. The applicants have not provided a reason to change that conclusion.

Finally, the applicants claim that, contrary to our conclusion, the 2 years that passed before they left China does not tend to indicate a lack of subjective fear on their part. They state that their subjective fear of persecution is demonstrated by their hiding their second child and by the fact that they did not register their children until they left China, noting that it is not easy to leave China quickly. No evidence on the difficulty of leaving China was provided during the applicants' hearing. We do not find their arguments persuasive with respect to the applicants' alleged subjective fear of persecution, for the reasons set out in our decision. Furthermore, as we previously stated, even if the applicants' alleged fears were subjectively felt by them, we have found that their fear is not well founded. We find that the applicants' arguments are without merit and that they have not refuted the conclusions we set forth in our decision. Accordingly, the motion will be denied.

ORDER: The applicants' motion to reopen and reconsider these exclusion proceedings is denied.

_____
FOR THE BOARD

3