*see also*

(4)

7/27/00
CY

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

HARRISBURG, PA

JUL 0 7 2000

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

| | | |
|---|---|---|
| HUANG AI JIN, | : | |
| | : | |
| Petitioner | : | |
| | : | |
| v. | : | CIVIL NO. 1:CV-00-1029 |
| | : | |
| JANET RENO, | : | (Judge Kane) |
| | : | |
| Respondent | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| ZHANG KE LIANG, | : | |
| | : | |
| Petitioner | : | |
| | : | |
| v. | : | CIVIL NO. 1:CV-00-1030 |
| | : | |
| JANET RENO, | : | (Judge Kane) |
| | : | |
| Respondent | : | |

**ORDER**

Certified from the record
Date 7/7/00
Mary E. D'Andrea, Clerk
Per _____
Deputy Clerk

**Background**

Both of the above-captioned petitions for writ of habeas

corpus were filed under 28 U.S.C. § 2241.  This court has

reviewed the matters and found that they involve common issues of

law and fact.  For the reasons outlined below, the cases will be

consolidated pursuant to Federal Rule of Civil Procedure 42(a)

and the consolidated matter will proceed under Civil Action No.

1:CV-00-1029, which was the initially filed action.

## DISCUSSION

Rule 42(a) of the Federal Rules of Civil Procedure states:

> When actions involving a common question
> of law or fact are pending before the
> court, it may order a joint hearing or
> trial of any or all the matters in issue
> in the actions; it may order all the
> actions consolidated; and it may make
> such orders concerning proceedings therein
> as may tend to avoid unnecessary costs or
> delay.

Fed. R. Civ. P. 42(a).

Petitioners Huang Ai Jin and Zhang Ke Liang are husband and

wife. Both are natives of China and are presently represented by

legal counsel employed by the same law firm. Neither petitioner

is presently confined. The petitions similarly name United

States Attorney Janet Reno as sole respondent.

Following a consolidated hearing for both petitioners in

York, Pennsylvania on October 23, 1996, an Immigration Judge

granted them asylum based on their fears of being sterilized if

returned to China. Following cross appeals by petitioners and

2

the Immigration and Naturalization Service, an order of removal

of both petitioners was entered by the Board of Immigration

Appeals (BIA) on September 28, 1999.  By order dated December 23,

1999, the BIA denied their motion for reconsideration.

The factual averments and legal arguments set forth in the

present petitions are identical.  Specifically, both petitions

are challenging the BIA's order of September 28, 1999.  Jin and

Liang each similarly maintain that they are entitled to a grant

of political asylum because of fear of sterilization and

religious persecution if returned to their homeland.

Consequently, since both petitions contain common factors of law

and fact, this court will order the consolidation of the two

actions pursuant to Rule 42(a) and will proceed with the

consolidated matter under the initially filed action, Civil

Action No. 1:CV-00-1029.

AND NOW, THEREFORE, THIS    7ᵗʰ  DAY OF ~~JUNE~~, July 2000, IT IS

HEREBY ORDERED THAT:

1.    The Clerk of Court is directed to consolidate

Liang v. Reno, Civil No. 1:CV-00-1030 into

Jin v. Reno, Civil No. 1:CV-00-1029, pursuant

to Federal Rule of Civil Procedure 42(a).

2.    The Clerk of Court is directed to close the case

of <u>Liang v. Reno</u>, Civil No. 1:CV-00-1030.

_____

YVETTE KANE
United States District Judge

YK:jvw

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

\* \* MAILING CERTIFICATE OF CLERK \* \*

July 7, 2000

Re:  1:00-cv-01030   Liang v. Reno

True and correct copies of the attached were mailed by the clerk
to the following:

Lawrence A. Dubin, Esq.
401 Broadway
New York, NY  10013

cc:
Judge                        ( )
Magistrate Judge             ( )
U.S. Marshal                 ( )
Probation                    ( )
U.S. Attorney                ( )
Atty. for Deft.              ( )
Defendant                    ( )
Warden                       ( )
Bureau of Prisons            ( )
Ct Reporter                  ( )
Ctroom Deputy                ( )
Orig-Security                ( )
Federal Public Defender      ( )
Summons Issued               ( ) with N/C attached to complt. and served by:
                                 U.S. Marshal ( )    Pltf's Attorney ( )

Standard Order 93-5          ( )
Order to Show Cause          ( ) with Petition attached & mailed certified mail
                                 to: US Atty Gen ( )   PA Atty Gen ( )
                                     DA of County ( )   Respondents ( )

Bankruptcy Court             ( )
Other_____PTLSLC_____    ( )

MARY E. D'ANDREA, Clerk

DATE: _____7/7/00_____          BY: _____
                                        Deputy Clerk

FILED
SCRANTON

JUN 07 2000

**In the United States District Court**
**for the Middle District of Pennsylvania**   PER _____

DEPUTY CLERK

---

**United States of America**
**ex re. Zhang Ke Liang**

**Petitioner,**

v.

**Janet Reno, United States Attorney General,**

**Respondent.**

**Petition for Writ of**
**Habeas Corpus**
**Docket No.**

**: CV00-1030**

---

Zhang Ke Liang hereby states as follows:

1.    I reside in New York, New York.

2.    I am in "custody" by virtue of an order of removal dated September

28, 1999, from the United States, issued by the United States

Department of Justice, Executive office for Immigration Review.  Board

of Immigration Appeals ("BIA") (Case No. A 29 638 497).

1

3.     This petition is submitted in support of my application for relief pursuant to 18 U.S.C. 2241.

4.     Petitioner and her husband entered the United States in Alaska on or about June 28, 1996.

5.     We were immediately detained by the Immigration and Naturalization Service ("INS") and subsequently charged with being removable upon the grounds of (1) not possessing a valid immigrant, visa pursuant to Immigration & Naturalization Act' ("INA") §212(a)(7)(A)[1] and (2) committing fraud or willful misrepresentation of a material fact pursuant to INA §212(a)(6)(c)(i)[2].  Essentially the INS alleged that petitioner and her husband tried to enter the United States with false and fraudulent documents.

6.     Petitioner's husband was also charged with being a non-immigrant without a valid passport pursuant to INA §212(a)(7)(B)[3].

7.     Petitioner denied such charges and submitted an application for political

---

[1] 8 U.S.C. 1182(a)(7)(A)

[2] 8 U.S.C. 1182 (a)(6)(C)(i)

[3] 8 U.S.C. 1182(a)(7)(B)

2

asylum and withholding of deportation based on religious persecution and fear of sterilization because of China's one-child policy.

8.  On August 7, 1996, the Immigration court granted a defense motion to change venue and transferred this matter to York, Pennsylvania.

9.  On October 23, prior to commencing a formal hearing, petitioner admitted that she was removable from the United States because she did not have a valid immigrant visa.  The Court dismissed the charge against petitioner's husband of being a non-immigrant without a valid passport (INA §212(a)(7)(B) as inconsistent with the admission under INA §212 (a)(7)(A).  A copy of the transcript dated October 23, 1996 is attached hereto as Exhibit A.

10. Also, on October 23, 1996, the Court commenced a hearing, without a jury, on the political asylum and withholding of deportation claims, as well as the fraud charge.  This hearing was consolidated with that of my husband, Zhang Ke Liang, who likewise admitted that he was removable pursuant to charge of not having an immigrant visa and submitted the same asylum and withholding of deportation application.

11. Evidence at the hearing consisted of the testimony of petitioner and her

3

husband as well as documentary evidence, including the 1995 United States State Department report on country conditions in China. (copy of the relevant portions attached hereto as Exhibit B), copies of notices to petitioner from the Chinese police (attached hereto as Exhibit C) and photographs of petitioner's house in China locked up by the police (attached hereto as Exhibit D).

12. On or about November 1, 1996, the Court denied the religious persecution claim but granted asylum based on fear of sterilization in China. The Court also dismissed the fraud charges because the evidence was insufficient. A copy of the Court's decision, dated November 1, 1996, is attached hereto as Exhibit E.

13. The INS appealed the granting of the asylum and petitioner cross-appealed the denial of asylum based on religious persecution.

14. On or about September 28, 1999, the BIA, sustained INS' appeal, denied petitioners cross appeal, and ordered that petitioner and her husband be removed from the United States back to China. A copy of BIA decision dated September 28, 1999 is attached hereto as Exhibit F.

15.    On or about October 21, 1999, petitioner submitted a motion for reconsideration to the BIA.

16.    On or about December 23, 1999, the BIA denied the motion in its entirety.   A copy of the BIA decision dated December 23, 1999, is attached hereto as Exhibit G.

17.    Throughout the proceedings in York, Pennsylvania, including the motion for reconsideration, petitioner was represented by Stuart Pierce, Esq.

18.    The petitioner is entitled to Habeas Corpus relief for being unlawfully held in custody because:

   a.    Petitioner is entitled to a grant of political asylum based on fear of sterilization because she demonstrated ample credible evidence to support the claim.

   b.    Petitioner is entitled to a grant of political asylum based on petitioner's fear of religious persecution because she demonstrated credible, detailed and sufficient evidence to provide a basis for relief.

19.    The facts supporting petitioner's claim based on religious persecution are

5

as follows:

From 1988 through 1996, petitioner resided in the village of Qugian located in the province of Fujian, China.  On or about January 3, 1996, her eldest child became ill with fever.  He was brought to the local hospital where doctors apparently could not help him.  (Ex. A at 34) Petitioner knew the doctor only as a doctor because that is what everyone else called him.  (Id. at 94) While petitioner's husband was speaking to a friend, the friend suggested that praying to God in order to help his son.  He told petitioner's husband that his son once had problems and when he prayed to God, the son got well.  This friend then told petitioner's husband how to pray and where the nearest "Sha" (Christian church) was located.  (Id. at 34-6)

Not having a church in their own village, on January 5 and 6, 1996, petitioner's husband rode his bicycle 30 kilometers to pray for his son at the church.  (Ex. at 37) Petitioner joined him to pray on January 7, 1996 (Id. at 100) Miraculously, the son began to get well and was discharged from the hospital on January 8, 1996.  Petitioner believed her child's recovery was a direct result of her and her husband's prayers.  (Id. at 34-7, 40-6, 66)  In light of the child's recovery, petitioner, vowed to continue her Christian practice. (Id. at 64, 66, 80)

6

Petitioner, however, knew of the hardship in traveling so far to the Church. (Ex. A at 81) Subsequently, petitioner's husband's friend introduced him to a "Father" who could come to petitioner's village to hold Christian services every Sunday. (Id. at 40) Similar to the doctor who treated her son in January 1996, petitioner knew very little about the Father other than the village he was from and his name, but simply accepted him as a religious authority because that is how he was introduced. (Id. at 73-4)

A short time later, January 14, 1996, the services commenced at petitioner's home, each one lasting about one hour and a half. (Ex. A at 33-4, 66) Wanting to spread Jesus' message and share his faith, petitioner's husband had told the people in his village about the Father coming to hold services, many of whom we believed to be Christian who had no access to a church, priest or religious books. (Id at 40-1, 64-6, 80) Approximately 50 people attended the services regularly. (Id. at 32) It was at these services that petitioner was able to learn more about Christianity. (Id at 40-42) She always had a vague idea about Christianity, but since no books or bibles were available to petitioner[4], she began learning through the teachings and biblical discussions with the Father and from reading the Father's Bible during the services. (Id. at 40-1, 65-6) Petitioner's husband was formally baptized in March, 1996. (Id at

---

[4] The 1995 country report confirms that there is limited publication and distribution of religious material which falls short of the demand. (See Ex. E at p. 27)

7

47) Petitioner decided to wait for a formal baptism because she wanted to learn more and feel worthy of such a sacred rite.

On May 3, 1996, the two public authority officers came to petitioner's home and issued a formal verbal warning that no group gatherings were to occur anymore. (Ex. A at 59)

At the time, petitioner thought that the warning was in relation to the government's fear of uprising because of the upcoming 7th year anniversary of the Tiananmen Square revolt. Because she knew his gatherings[5] were religious and had nothing to do with the Tiananmen Square anniversary, she did not immediately foresee any problems. Therefore, she did not give the warning further thought and did not tell anyone. (Ex. A at 45-6, 84-5, 92-3) The Sunday services were continued.

Later on May 26, 1996, during a religious service at petitioner's home, sirens were heard approaching the house. (Ex. A at 33) Petitioner and her husband saw the Public Authority officials rapidly approaching. Fearing that they were coming to arrest people because of the continued gatherings,

---

[5] There are credible reports of the government's efforts to reign the activities of unauthorized churches including "raiding and closing a number of unregistered churches." (See Exhibit E. at p. 29)

everyone fled out the back door[6].  (Ex. A at 33, 42-3, 51, 58) Petitioner, her husband, his two children and the "Father" went into hiding at petitioner's mother's house.  They stayed there never risking going back to their home for fear of being arrested.  (Id at 79) Petitioner and her husband eventually left China in June, 1996.

At petitioner's mother's house, petitioner told the Father about the May 3 warning.  (Ex. A at 83)  The Father, who only stayed for two days, told petitioner that there was no religious freedom in China and that in order to continue practicing his faith, she would need to leave China.  (Id at 93-4)  The Father also told petitioner that he could obtain travel documents and plane tickets for a fee.  Desperately wanting to pursue her religious practice without interference from the Chinese government, petitioner and her husband paid the fee and supplied photographs for the documents.  (Id at 43)  On June 25, 1996, a third party gave petitioner's husband the travel documents and plane tickets.

On June 28, 1996, having secured arrangements for petitioner's mother to care for the children until they settled, petitioner and her husband left for the United States where they intend to continue practicing Christianity without

_____

[6]Petitioner's husband subsequently learned through his relatives that six of the people attending the service that day were later arrested and detained. (See Ex. A at 51-2)

interference.

Once in the United States, while being detained by INS, petitioner's husband learned through his relatives in the United States that the Chinese government was looking for them.  (Exhibit A, at 49-50)  On June 10, 1996, Public Security officers had come to their house, locked it up[7] and left a notice stating:

> It is suspected that you, on the pretext of religion, have convened illegal meetings to gather the jobless people to participate in the unlawful activities.  This has caused an adverse effect to the society.  You are, therefore, require to come to our office July 5 to clarify this matter.[8]

The officers also went to petitioner's husband's mother's house looking for them.  (Ex.A at 62) On July 15, 1996, another notice with essentially the same warning as the June 10th notice was posted on her home.  Petitioner's husband's mother eventually secured copies of these notices and mailed them to petitioner's husband.

20.    Based on the foregoing, petitioner has demonstrated a detailed and reasonable fear of persecution and a reasonable possibility of that

---

[7] See Exhibit D

[8] See Exhibit C

10

persecution if removed to China.

21.    Facts which support the petitioner's claim based on fear of sterilization are as follows:

On August 19, 1988, Petitioner and her husband gave birth to their first child, a son.  The birth was in the local hospital in Qugian, where it was duly registered with the Chinese government.[9]  (Ex. A at 30, 55) A few days after the birth, petitioner and her husband were approached by the family planning agency who demanded that petitioner have an IUD installed so that the couple could have no more children in accordance with China's one-child policy. Neither petitioner nor her husband wanted the IUD because they both wanted more children.   Petitioner's husband tried to delay this procedure because petitioner had to recover from giving birth having ruptured her vagina during delivery.  They were denied and the IUD was installed anyhow.  (Ex. A at 54-6) Later, they petitioned the government to remove the IUD but were again denied.  (Id at 102) The IUD caused petitioner to bleed often and made her very uncomfortable.

Still wanting more children and knowing they would never receive authorization from the government, in June, 1993 they located and paid a

---

[9] See Exhibit C

11

doctor who was willing to remove the IUD.  (Ex. A at 56)  Petitioner feared that

if the government learned of removing the IUD, she or her husband would be

sterilized, fined and/or arrested or petitioner would be forced to have an

abortion[10].  (Id at 56-7)  Petitioner knew that other people in their village were

fined for having more than one child and that those who could not pay the fine

had their furniture taken[11]. (Id at 78)

The couple proceeded to have their second child, a girl, who was born on

April 24, 1994.  Knowing that the hospital were their son was born would report

the removal of the IUD and the unauthorized birth of their second child, this

child was delivered in a small local health center in a nearby town, Shun-

Shanya, which did not report to the government but which was considered a

small "hospital" by the local villagers.  The child was not registered with the

government.  (Ex. A at 57, 90)  Because this child could not be registered, the

child would not be eligible for many benefits from the government such as

education. (Id. at 71)

---

[10] There are confirmed reports and acknowledgments by Chinese
officials of forced abortions and sterilizations.  (See Exhibit E at p. 33)

[11] "Disciplinary measures against those who violate the policy can
include stiff fines, withholding of social services, demotion and other
administrative punishments, including, in some instances, loss of
employment.  Unpaid fines can result in confiscation of personal property, or
even destruction of houses."  Exhibit E at p. 33.

Fearing that the government would learn of the unauthorized birth, this second child stayed with petitioner's mother for the remainder of the year. At the beginning of 1995, the child came to live with petitioner and her husband. (Ex. A at 70)  They told people in the village that the child was not theirs and they were taking care of her for other people.  However, as the child grew older, particularly in the first half of 1996, she began to call petitioner "mom". Petitioner and her husband became increasingly worried that people and the government would realize that the child was theirs.  (Id. at 104)  It was during this time that the religious gatherings were occurring in the home.

After receiving the verbal warning on May 3, hearing the sirens and being chased from their home on May 26, petitioner feared that the government, once inspecting you for something, will check all aspects of you and your family thus enabling them to learn about the IUD removal and unauthorized birth of the second child.  (Ex. A at 105)  Having left China and knowing the government is looking for them, petitioner fears going back to China because the government will certainly learn of the IUD removal and second child and force petitioner, who is in her 30s, to be sterilized and fined.  (Id. at 58)  Petitioner and her husband still want more children. (Id. at 56, 103)

22.    Based on the foregoing petitioner has demonstrated a detailed reasonable

13

fear of persecution and a reasonably possibility of that persecution if returned to China.

23.   Petitioner has not filed any previous petitions for habeas corpus, motions under 28 U.S.C. 2255 or any other applications petitions or motions with respect to this conviction except as set forth above.

24.   None of the grounds set forth herein have been presented to this or any other Federal Court.

14

Executed at New York, New York

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 23, 2000

_Zhang, Ke Liang_

Zhang, Ke Liang

**GOLDBERGER & DUBIN, P.C.**

ATTORNEYS AT LAW

401 BROADWAY, NEW YORK, NY 10013

(212) 431-9380

FAX (212) 966-0588

E-MAIL: GND401@AOL.COM

http://www.ny-attorney.com

PAUL A. GOLDBERGER
LAWRENCE A. DUBIN

June 5, 2000

United States District Court
Middle District of Pennsylvania
235 North Washington Avenue
Scranton, PA 18501-1148
Attn: Clerk of the Court

Re: *Zhang Ke Liang v.*
*Janet Reno, United*
*States Attorney General*

Dear Sir/Madam:

Enclosed for filing kindly find an original and 2 copies of a Petition for Writ of Habeas Corpus, and 3 copies of Exhibits. Also enclosed is a check in the amount of $5.00 made payable to the clerk of the court.

Lastly, enclosed is my petition for admission Pro Hac Vice and a check in the amount of $25.00 made payable to the clerk of the court.

Kindly mail the receipts and the extra copies of the petition and exhibits to my office via Federal Express with our account number (102891120). Thank you for your assistance.

Very truly yours,

Lawrence A. Dubin

LAD/er
enclosures

FILED
SCRANTON

JUN 0 7 2000

**In the United States District Court**
**for the Middle District of Pennsylvania**

PER _____
DEPUTY CLERK

---

**United States of America**
**ex re. Zhang Ke Liang**

**Petition for Writ of**
**Habeas Corpus**

**Petitioner,**

**v.**

Docket No.

**1 : CV00 - 1030**

**Janet Reno, United States Attorney General,**

**Respondent.**

---

**EXHIBITS**

U.S. Department of Justice
Executive Office for Immigration Review
Immigration Court

Matter of                                    File A 29 638 497
                                                  A 29 638 498

                              )
                              )
KUR LIAN ZHANG                )
IJING HUANG                   )        IN EXCLUSION Proceedings
        Applicants           )
                              )          Transcript of Hearing


Before WILLIAM VAN WYKE, Immigration Judge


Date:  October 23, 1996          Place:  York, Pennsylvania


Transcribed by DEPOSITION SERVICES, INC. At Rockville, Maryland


Official Interpreter:  John Cheung


Language:  Foo Chow


Appearances:

      For the Immigration and          For the Applicants:
      Naturalization Service:

      Jeff Duvier, Esquire             Stuart Pierce, Esquire

bw

1    JUDGE FOR THE RECORD

2            This is United States Immigration Court in York,

3    Pennsylvania.  I'm William Van Wyke, Immigration Judge presiding.

4    Today is October 23, 1996.  These are joint exclusion proceedings

5    at an individual calendar hearing for Zhang, Kur Lian.  Zhang,

6    Z-h-a-n-g is the family name, 29 638 497.  And Huang, Ijing.

7    Huang, H-u-a-n-g is the family name, 29 638 498.  Both applicants

8    are in INS custody.  They are present here in the courtroom with

9    counsel.  They are husband and wife.  As far as has been

10   represented to me.

11   JUDGE TO MR. PIERCE

12           Q.   And I'd like to ask counsel to please state his

13   appearance.

14           A.   Stuart Pierce of the law offices of Henry Lee

15   Fong, 7-H Times Square, Suite Number 503, New York, New York

16   10038.

17           Q.   Thank you, Mr. Pierce.

18   JUDGE TO MR. DUVIER

19           Q.   And the INS is represented.  Would you state your

20   appearance?

21           A.   Jeff Duvier (phonetic sp.) for the Service.

22   JUDGE FOR THE RECORD

23           All right, and we have an interpreter in the Foo Chow

24   language, Mr. John Cheung, C-h-e-u-n-g.

25   JUDGE TO THE INTERPRETER

A 29 638 497                    16              October 23, 1996

bw

1              Q.    Mr. Cheung, would you please raise your right hand

2       to take the following interpreter's oath?  Do you swear that you

3       are fluent in Foo Chow and English and you'll interpret

4       faithfully and accurately from one language to the other in these

5       proceedings?

6              A.    Yes, Your Honor.

7              Q.    Okay, you may be seated, sir.

8       JUDGE TO MR. ZHANG

9              Q.    And through the interpreter to Mr. Zhang, would

10      you please state your full name, sir?

11             A.    Zhang, Kur Lian.

12      JUDGE TO MS. HUANG

13             Q.    All right and through the interpreter to Ms.

14      Huang, would you please state your name?

15             A.    Huang, Ijing.

16             Q.    Okay.  And Mr. Pierce is here as your lawyer.  May

17      he speak for you today?

18             A.    Yes.

19      JUDGE FOR THE RECORD

20             All right.  We set this for a hearing when we had

21      another date -- when we had this date become available, moved it

22      up because it's a husband and wife who I was told have not been

23      able to see each other while they're in prison.  And because it's

24      a husband and wife, in most circumstances, I thought that was

25      worth using as soon a space as possible to hear the case.

        A 29 638 497                    17              October 23, 1996

bw

1    MR. PIERCE TO JUDGE

2              Q.    Your Honor, not to interrupt, but --

3              A.    Go ahead.

4              Q.    Before we get too far into this, Mr. Cheung just

5    informed me of a potential interpretation problem, and I'll let

6    him explain it to you.

7              A.    Okay.

8    INTERPRETER TO JUDGE

9              Q.    Okay, the husb -- the person that actually speaks

10   Fuqing, which is a subset of Foo Chow dialect, they're very

11   similar but yet there are some differences in certain areas and

12   so I'd like to point that out.

13             A.    Okay, you're in the best position to evaluate

14   that.  You speak Foo Chow and not Fuqing?

15             Q.    Foo Chow and not Fuqing.

16             A.    All right.

17             Q.    And they are very similar between the two and yet

18   there are some minor difference and I have talked to them briefly

19   before the case opened and they say that if they come to a term

20   where there are actual difference between Fuqing and Foo Chow

21   that I don't understand, they can -- we, you know, we clarify the

22   term in Mandarin which I am not certified for, but I understand

23   and I -- you know, I'm capable of understanding all the Mandarin

24   and able to interpret that.  And so that's only when there are

25   difference in Fuqing and Foo Chow language, so --

A 29 638 497                  18              October 23, 1996

bw

1          A.   In English comparing what we speak in the United

2    States with some other form of English or something that's

3    similar, how would you analogize the difference?

4          Q.   I would say it's like a northern and a southern

5    dialect.

6          A.   That's not too mad -- too bad.

7          Q.   It's not too bad, but yet there are --

8          A.   Say, like from the United States and England

9    perhaps you might say lorry instead of truck?

10         Q.   Yeah, something like that.

11         A.   Okay.

12    JUDGE TO MR. PIERCE

13         Q.   All right, do you have any objections to having a

14    Foo Chow interpreter at least to the point of finding out whether

15    or not we can proceed?

16         A.   I have no objections.  I did call the Court about

17    the Fuqing.  They said they do not -- called Berlitz, they did

18    not have any available, but we communicate with them mostly in

19    Mandarin.  But in Foo Chow also, so I have no objection to trying

20    it the -- to do it this way.

21         Q.   Okay.  I know it was in another case we also had a

22    request for a Fuqing interpreter because I made some notes about

23    it.  I didn't make the notes here on this one.

24    JUDGE TO THE INTERPRETER

25         Q.   Okay, as long as you're mindful of the problem,

A 29 638 497               19              October 23, 1996

bw

1   Mr. Cheung, and let the Court know when you feel you may need to

2   take a guess.  What you might do is if you think you're -- if you

3   feel that you're fairly confident about the guess, go ahead and

4   say the interpretation and then tell us what you guessed at and

5   we can check into it whether if we think it's material or

6   important.

7           A.   Okay.

8   JUDGE TO THE APPLICANTS

9           Q.   Okay, through the interpreter to the applicants,

10  Mr. Zhang, Ms. Huang, today is the day we're going to hear your

11  application for -- your testimony on your applications for

12  political asylum.  I first want to make sure that your lawyer,

13  the Immigration Service's lawyer and I all have the same papers

14  before us.

15  JUDGE FOR THE RECORD

16          Okay, now the cases are consolidated and I have the

17  lead case as that of Mr. Zhang, number 497, so I'm going to first

18  mark the exhibits in that case.  His Form I-122 is Exhibit 1.  It

19  was pleaded to by a written pleading through a different

20  attorney, Mr. Cox.

21  JUDGE TO MR. PIERCE

22          Q.   Are you aware of that pleading?

23          A.   Yes, I am.

24          Q.   All right, what we have is that the fraud charge

25  was denied.  The 212(a)(7)(A) charge was denied and the

        A 29 638 497                  20              October 23, 1996

bw

1    212(a)(7)(B)(ii) charge was not addressed.  Is there any change

2    in the pleading this morning?

3              A.    Yes, Your Honor.

4              Q.    This afternoon?

5              A.    Yes.  The fraud charge is still being denied, the

6    (6)(C).  However, the (7)(A) charge is being admitted and the

7    (7)(B) charge is being denied.

8              Q.    All right.

9    JUDGE FOR THE RECORD

10              In light of the admission of the (7)(A) charge, I'll

11   dismiss the (7)(B) charge as inconsistent.  And we'll hold a

12   hearing today on the (6)(C) charge.  And this will be Exhibit 1

13   in case number 497.  There's a motion to change venue, which I

14   generally don't mark as an exhibit, but since it makes some

15   factual allegations and has some documents attached, I'll mark

16   that as Exhibit 2.  That's signed by Attorney Cox and has

17   attached to it a naturalization certificate of Claudia Che Fong

18   Lee, who is apparently Mr. Zhang's sister-in-law.  And the

19   naturalization certificate of Xing Qiong Huang.  I'm not sure who

20   that person is that's related to Ms. Huang.  A passport of Huang

21   Ding Yu (phonetic sp.) and a resident alien card of Huang Ding

22   Yu.  Those documents collectively will be Exhibit 2.  Actually,

23   that motion to -- just for the record here to make it clear, that

24   motion to change venue was submitted to Seattle, to the

25   Immigration Court in Seattle, not here.  And the motion -- and

A 29 638 497                  21              October 23, 1996

bw

1    the venue was changed from Seattle to here rather than New York

2    City as requested.  And the Service did submit an opposition to

3    that motion.  Okay, the written pleading to who -- who it's

4    signed by -- Mr. Cox?  Dated -- received September 13, dated

5    September 12.  That'll be Exhibit 3.  Exhibit 4 is the asylum

6    application of Mr. Zhang.  It has attached to it Exhibits A, B, C

7    and D.  A is a certificate of translation.  I'm sorry, a marriage

8    certificate with a certificate of translation.  B is a note from

9    the police office of Quqian City, Fujian Province with a

10   translation.  C is a notice of the police office of Quqian City

11   with a translation.  And D are photographs, three of them with

12   translations.  Oh, this is actually the case where we tried to

13   find out about a Fuqing interpreter.

14   JUDGE TO MR. PIERCE

15        Q.   Did the court clerk inform you that one wasn't

16   available?

17        A.   Yes, they did.  And I tried to switch it to

18   Mandarin, but I wasn't able to get it in -- in any writing but I

19   did --

20        Q.   Oh, okay.

21   JUDGE FOR THE RECORD

22        We have a -- a withdrawal of Mr. Cox as the attorney.

23   And I'm going to just -- no sense having two attorneys here.  I'm

24   going to just make sure the record's clear and make that an

25   exhibit, Exhibit 5.  Okay, that's what we have in 497 on Mr.

A 29 638 497                 22              October 23, 1996

bw

1    Zhang.  498, Ms. Huang, we have the I-122 with a written

2    pleading.  The written pleading concedes deportability under

3    212(a)(7)(A)(ii), denies deportability under 212(a)(6)(C)(i).

4    That's a -- that's a written pleading which will make this

5    Exhibit 2 and Exhibit 1 will be the I-122.  The pleading is dated

6    September 12.  And it addresses both of the charges.  Exhibit 1

7    will be the I-122.  And Exhibit 2 the written pleading.  The

8    asylum application will be Exhibit 3.  I should just state here

9    so it's clear to (indiscernible) how I view this, there are two

10   separate asylum applications.  Either person or both persons

11   could be grant -- people could be granted or denied.  If either

12   one is granted asylum and if they're husband and wife, then the

13   other person, also denied asylum could -- would be

14   administratively entitled to asylum as a derivative of the person

15   who's grant -- granted political asylum.  In that sense it means

16   they each have two bites of the apple, since they are married.

17   That'll be Exhibit 3 and I'll consider the other exhibits, the

18   attachments A, B, C, D and any other evidence in both cases.  In

19   fact, I'll consider all the evidence in both cases unless there's

20   a specific request not to.

21   MR. PIERCE TO JUDGE

22        Q.   No, that's fine.

23   JUDGE FOR THE RECORD

24        And I'll refer to the cases as 497 and 498, perhaps

25   meaning the complete A number, 497 being the lead case, that of

A 29 638 497                     23              October 23, 1996

bw

1    Mr. Zhang.  Okay, we received a State Department opinion which I

2    gave both parties just before we began today.  I'll put that in

3    case number 497 and it will be Exhibit 5.

4    JUDGE TO COUNSEL

5          Q.   Is there any other document that either party

6    wishes to submit or thoughts -- thought has been submitted and

7    called off?

8          A.   (Mr. Pierce) I don't believe so, Your Honor.

9          Q.   Any objection to any of the documents submitted?

10         A.   (Mr. Pierce) I don't have any objection.

11         A.   (Mr. Duvier) None from the Government.

12         Q.   All right.

13    JUDGE TO APPLICANTS

14         Q.   To Mr. Zhang and Ms. Huang, we have your -- both

15    of your asylum applications.  We have some documents that you

16    submitted that -- such as your marriage certificate and some

17    documents from the police in Quqian and some photographs.  We

18    have a report from the United States State Department that

19    discusses the human rights situation in China.  It discusses --

20    it's discussion includes observations about the practice of

21    religion in China.  Now apart from that and apart from what's in

22    these documents, the rest of what I learn about you will come

23    from your testimony today.  I'm consolidating your two cases,

24    which means that I'll consider all of the evidence that I hear

25    today in each of your two cases.  And I'll make a decision about

bw

1    each of your two cases.  Under U.S. law, if you're husband and

2    wife and either of you is granted political asylum, the other may

3    be granted asylum as a derivative.  When you give your testimony

4    today, I'd like to ask you -- ask you to speak in a loud voice.

5    I'll be very interested in hearing what you say, and I'll listen

6    carefully.  If you don't understand a question that's asked,

7    please say you don't so that we can clarify it for you.  You'll

8    notice how as I speak right now through the interpreter, I pause

9    so that he can interpret for you.  When you speak, I'd like to

10   ask you to do the same.  I know this is not a natural way of

11   speaking, but it helps me understand best what you're saying.

12   And sometime either the interpreter or I may raise our hands like

13   this and what this will mean is just pause for a moment for the

14   translation and then you may continue afterwards.  You will get a

15   chance to say everything that's relevant and it's best if each

16   segment be translated as soon as possible after you say it.  I

17   understand that you speak Fuqing instead of Foo Chow dialect.  If

18   -- let me ask both of you so far whether you have understood

19   what's been interpreted to you in Foo Chow?

20   JUDGE TO THE INTERPRETER

21           Q.    Mr. Cheung?

22           A.    He fully understand but when he speaks in Foo

23   Chow, he might have difficulty a little bit.

24   JUDGE TO MR. ZHANG

25           Q.    Okay, Mr. Zhang, are you intending to speak in Foo

A 29 638 497                    25                    October 23, 1996

bw

1    Chow or speak in Fuqing?

2                A.    Can I speak Fuqing?

3    JUDGE TO THE INTERPRETER

4                Q.    Well, this is a question to the interpreter now,

5    if he speaks Fu -- I don't know how big a differences we're

6    speaking -- speaking of here.  If he speaks Fuqing, will you be

7    able to understand him?

8                A.    So far that he has speak -- speak in Fuqing, that

9    I understand, but you know, I never really hear a lot of Fuqing.

10   But as far as what we have conversations before the Court opens

11   and as far as what he is saying, I understand.  And I had also

12   mentioned previously that if I don't understand what he's talking

13   about, he will able to perhaps if it's a technical term, he will

14   able to speak in Mandarin, which I will understand.  In fact, I

15   would able to translate that into English.

16               Q.    Okay.  Okay.

17   JUDGE TO MR. ZHANG

18               Q.    And, I understand you also speak some Mandarin.

19   In case there are some things that you say that the interpreter

20   might not understand, you may both understand in Mandarin.  Okay,

21   Mr. Zhang, if you speak Fuqing, do you believe somebody who

22   speaks Foo Chow will be able to understand you?

23               A.    He say I understands Foo Chow and also use

24   normally they would -- the people who speak Foo Chow would

25   understands Fuqing.  Only the perhaps there's a few places that

A 29 638 497                    26                 October 23, 1996

bw

1    we might not able to understand and I will speak in Mandarin.

2         Q.    Okay.  Then I suggest if you're most comfortable

3    speaking what you call Fuqing, go ahead and do that and the

4    interpreter will raise with us any questions that he has about

5    proper interpretation.

6    JUDGE TO MS. HUANG

7         Q.    Ms. Huang, have you understood what's been said so

8    far?

9         A.    If I speak a little slower, I will understand.  If

10   I --

11        Q.    If the interpreter speaks a little slower, you

12   will understand?  Okay.

13   JUDGE TO THE INTERPRETER

14        Q.    Well, can you address that then, Mr. Cheung, by --

15        A.    Yes.

16        Q.    -- speaking more slowly?  Also, if you do have any

17   interpretation questions, for instance, you want to ask them to

18   clarify a word or so, tell us on the record first, okay, so that

19   if -- if it's necessary to try to get a different interpreter or

20   if it's necessary to -- whatever's going on with respect to the

21   language, you want to have that appear on the record so if we do

22   have problems, we know it.

23        A.    Okay.

24        Q.    Okay.

25   JUDGE TO APPLICANTS

A 29 638 497                      27              October 23, 1996

bw

1          Q.   Mr. Zhang and Ms. Huang, your attorney, Mr.

2    Pierce, has signed your asylum applications saying that the

3    contents were read to you and you know what they contain.  I

4    would ask -- I would like to ask each of you to stand please and

5    take the following oath.  Would you raise your right hand?  Do

6    each of you swear that the testimony you give in the Court today

7    will be the truth, the whole truth and nothing but the truth?

8    JUDGE TO MR. ZHANG

9          Q.   Mr. Zhang?

10         A.   Yes.

11   JUDGE TO MS. HUANG

12         Q.   Okay, and Ms. --

13                         (OFF THE RECORD)

14                         (ON THE RECORD)

15   JUDGE TO THE INTERPRETER

16         Q.   Okay, that happened while we were changing tapes.

17   Ms. Huang says yes as well.

18   JUDGE TO APPLICANTS

19         Q.   Do each of you swear that you know the contents of

20   your asylum application for political asylum and that it is true

21   to the best of your knowledge?

22   JUDGE TO MR. ZHANG

23         Q.   Mr. Cheung?

24         A.   Yes.

25   JUDGE TO MS. HUANG

A 29 638 497                    28              October 23, 1996

bw

```
1                Q.   And, Ms. Huang?

2                A.   Yes.

3    JUDGE TO APPLICANTS

4                Q.   You may be seated.

5    JUDGE TO MR. PIERCE

6                Q.   And, Mr. Pierce, you may call your clients in the

7    order in which you --

8                A.   Yes, I've discussed this with my clients and I

9    guess if it's all right with the Court, we'd prefer to have the

10   husband start.

11               Q.   All right.

12   JUDGE TO MR. ZHANG

13               Q.   Mr. Zhang, would you come and have a seat up here

14   please?  And you may be seated, sir.

15   JUDGE TO MR. PIERCE

16               Q.   Go ahead, Mr. Pierce.

17               A.   Thank you, Your Honor.

18   JUDGE TO MR. ZHANG

19               Q.   Your attorney's going to ask you questions.  You

20   may face him.  Later, Mr. Duvier will ask questions for the

21   Immigration Service.

22   MR. PIERCE TO MR. ZHANG

23               Q.   And, sir, what is your date of birth?

24               A.   August 6th, 1964.

25               Q.   And what town were you born in?
```

A 29 638 497                    29                October 23, 1996

bw

1      A.    Quqian City, Fujian Province, China.

2      Q.    And, sir, are you married?

3      A.    Yes, married.

4      Q.    And is your wife in this courtroom today?

5      A.    Yes.

6      Q.    And when were you married?

7      A.    I am married at 1987, January 1st, and I'm

8   registered the marriage in 1986, December 30th.

9      Q.    All right.  And what town were you married in?

10      A.    Quqian Town.

11      Q.    And, sir, do you have any children?

12      A.    Yes.

13      Q.    How many children do you have?

14      A.    Two.

15      Q.    What is your oldest child's name?

16      A.    Zhang Kur Lian.

17      Q.    Is that a male or a female child?

18      A.    A boy.

19      Q.    And what is his date of birth?

20      A.    August 19th, 1988.

21      Q.    And what town was he born in?

22      A.    Quqian Town also.

23      Q.    And what is the second child's name?

24      A.    Zhang Liu.

25      Q.    Is that a male or a female.

bw

1          A.    It's a female.

2          Q.    And what is her date of birth?

3          A.    April 24th, 1994.

4          Q.    And what town was she born in?

5          A.    She also born in Quqian Town, but in the hospital.

6          Q.    Was your first child born in the hospital?

7          A.    Yes.

8          Q.    And where are your children now?

9          A.    They both with my mother-in-law.

10         Q.    And what town is that?

11         A.    It's -- it's in Fu-Quqian Pro -- Quqian Town also.

12    It's in a remote area.

13         Q.    And, sir, when did you leave China?

14         A.    June 28th.

15         Q.    What year?

16         A.    '96.

17         Q.    And when did your wife leave China, if you know?

18         A.    Same time.

19         Q.    You left together with your wife?

20         A.    Yes.

21         Q.    And what was your purpose for leaving China?

22         A.    It was prosecuted by Chinese government.

23         Q.    When was the first time you experienced any

24    problems with the Chinese government?

25         A.    May 26th.

A 29 638 497                 31            October 23, 1996

bw

1          Q.   What year?

2          A.   1996.

3          Q.   And what happened on May 26th?

4          A.   Well, the priest was having a session and the

5     Public Security came in.

6          Q.   And where was this?

7          A.   At my home.

8          Q.   All right.  And what was happening in your home on

9     that day?

10         A.   During the sessions the Public Security drive a

11    car by and try and arrest -- arrest us.

12         Q.   Well, my question was, what was going on inside

13    your house?

14         A.   They were -- we were studying the Bible.

15         Q.   How many people?

16         A.   One father.

17         Q.   Well, how many people were in the house?

18         A.   Fifty to 60.

19         Q.   And where was your wife at this time?

20         A.   Also in the house.

21         Q.   And your children, where were they?

22         A.   It's a Sunday and both the kids are also at home.

23         Q.   How long were these people there, these 50 to 60

24    people there, before the Public Security came by?

25         A.   About an hour.

A 29 638 497                    32              October 23, 1996

bw

1       Q.   Okay, and then what happened when you -- well, how

2 did you know the Public Security came by?

3       A.   When they -- when the Public Security car came by,

4 there's a siren that goes on.

5       Q.   Okay.  And did you hear the siren?

6       A.   As soon as I hear the siren, I went to the window

7 and I saw the cars that coming into the village and so we try to

8 escape through the back door.

9       Q.   And how many car or cars did you see?

10      A.   Two.

11      Q.   Why did you feel you needed to escape?

12      A.   On May 3rd, I had received a warning from them

13 that we are not supposed to have group gathering.

14      Q.   May 3rd of what year?

15      A.   1996.

16      Q.   What kind of warning was this?

17      A.   They come -- they -- they drive by and give me a

18 piece of paper and also told me that you're not allowed to have

19 group gathering.

20      Q.   And how often did you have group gatherings in

21 your home?

22      A.   Once a week on Sunday.

23      Q.   When did that start?

24      A.   January 14th, 1996.

25      Q.   And why was your home the place for these

A 29 638 497                33              October 23, 1996

bw

1   gatherings?

2            A.   On January the 3rd, 1996, my son was very sick,

3   and I had sought my friend and he had advised me that I pray to

4   the God, so therefore the -- we are -- I have re-requested the

5   gathering in my house.

6            Q.   And how did you know this friend who you

7   consulted?

8            A.   He is my son's classmate's father.

9            Q.   And what was wrong with your son, if you know?

10           A.   High fever.

11           Q.   And did your son seek any medical treatment?

12           A.   He was -- my son was in school, and the teacher

13  had took my son to the hospital.

14           Q.   And how long was your son in the hospital?

15           A.   He was in on the 3rd and he didn't get out of the

16  hospital until the 8th.

17           Q.   And did your son see a doctor?

18           A.   Yes, but didn't have any result.

19           Q.   Did you speak to the doctor who treated your son?

20           A.   I had talked to the doctor and the doctor said

21  he's having a fevers of 40 degrees Celsius and he had treated him

22  for two days and didn't see any result.

23  JUDGE FOR THE RECORD

24           I'll just state for the record that I take judicial

25  notice that I believe 98.6 comes down to 37 degrees Celcius.  So

A 29 638 497                    34                October 23, 1996

bw

1      that's probably nearly six degrees of fever.

2      MR. PIERCE TO MR. ZHANG

3              Q.    And when you said you were advised to pray to God,

4      where did you do this?  I'm sorry, did you pray to God at that

5      time?

6      INTERPRETER TO JUDGE

7              Q.    May -- may I clarify with him?

8              A.    Go ahead.

9      MR. PIERCE TO MR. ZHANG

10             A.    I prayed for the God for two days and then my son

11     gets better on the 7th and they get out of the hospital on the

12     8th, and because two years ago the person that showed me how --

13     how to pray to God, his son also had a serious problem and prayed

14     and got well.

15             Q.    Where did you pray to God?

16     INTERPRETER TO MR. PIERCE

17             Q.    When or where?

18             A.    Where?

19     MR. PIERCE TO MR. ZHANG

20             A.    In Fujian -- a Fuqing Town called Chantow

21     (phonetic spry Number 16 Church.

22             Q.    Now was this --

23     JUDGE TO THE INTERPRETER

24             Q.    Would you say the first part of that again?

25     Fuqing?

A 29 638 497                    35              October 23, 1996

bw

1            A.   Fuqing, yeah.  Fuqing.

2            Q.   And then Gow (phonetic sp.) Shan (phonetic sp.) --

3            A.   Tow.

4  JUDGE TO MR. ZHANG

5            Q.   Tow?  Is that like a division, a subdivision?

6            A.   It's a street.

7            Q.   Okay.

8  JUDGE TO THE INTERPRETER

9            Q.   And then the rest of it was?

10           A.   Number 16.

11           Q.   Number 16.

12           A.   Church.

13           Q.   Church.  And --

14           A.   Church Number 16.

15  JUDGE TO MR. ZHANG

16           Q.   Church Number 16 or building number 16 which

17  happens to be a church?

18           A.   Is a church and have a number 16 on the door.

19           Q.   Okay.

20  MR. PIERCE TO MR. ZHANG

21           Q.   Did this church have a name?

22           A.   It's called Sha (phonetic sp.) Christian Church.

23           Q.   Had you ever been to this church before this time

24  -- that time you went?

25           A.   No.

A 29 638 497                    36                  October 23, 1996

bw

1          Q.    Were you a -- what is your religion?

2          A.    Christian.

3          Q.    When did you become a Christian?

4          A.    At that time I didn't -- I weren't able to locate

5     any father or priest and weren't able to find any books related

6     on the religions and we just believe it in our heart.  And my

7     home to the church is 30 kilometers and we don't have

8     transportations.

9          Q.    So how did you get to this church to pray?

10         A.    Bicycle.

11         Q.    How long did it take you to get to the church?

12         A.    About three to four hours.

13         Q.    And what date did you go to this church?

14         A.    January the 5th.

15         Q.    And where was your wife when you went to the

16    church on January 5th?

17         A.    She's in the hospital.

18         Q.    How did you pray at the church?

19         A.    The father in the sky, my son has been seriously

20    sick and running a fever.  And I pray to the God to save my son's

21    life.  And my son's also very intelligent whens -- when he's in

22    school.  He is always number one.  And so please save my son's

23    life.  And so he become healthy again and can go back to school

24    to learn.  So thank you for the Jesus and amen.

25         Q.    All right.  Sir, do you know who Jesus is?

A 29 638 497                    37              October 23, 1996

bw

1          A.   Jesus.

2          Q.   Do you know when he was born, Jesus?

3          A.   December 25th.

4          Q.   And do you know what holiday that is?

5          A.   What?

6          Q.   Does that day have any celebration or anything

7     like that?

8          A.   Christmas.

9          Q.   And do you know who Jesus's mother was?

10         A.   Maria.

11         Q.   And do you know who Jesus's father was?

12         A.   Yeloha (phonetic sp.).

13         Q.   Did Jesus have a --

14     JUDGE TO THE INTERPRETER

15         Q.   I didn't hear that.

16         A.   Yeloha.

17         Q.   Yeloha?  I think we're dealing with

18     transliterations of Hebrew names by way of Greek by way of

19     English as it comes into my ear by way of Mandarin -- I mean Foo

20     Chow.

21     JUDGE TO MR. PIERCE

22         Q.   Go ahead.

23     MR. PIERCE TO MR. ZHANG

24         Q.   And do you know when Jesus died?

25         A.   In April, first Friday.

A 29 638 497                    38                    October 23, 1996

bw

1         Q.    How did he die?

2         A.    He died on the cross.

3         Q.    And then what happened to Jesus?

4         A.    He came back to life in three days.

5         Q.    And do you know the name of that happening?

6    INTERPRETER TO MR. PIERCE

7         Q.    The name?

8    MR. PIERCE TO MR. ZHANG

9         Q.    That event?

10   INTERPRETER TO JUDGE

11        Q.    I -- my mind just went blank regarding on that

12   day.  I know what he is talking about.

13        A.    What it is in English?

14        Q.    Yeah, in English.  Easter.

15   MR. PIERCE TO MR. ZHANG

16        Q.    And, sir, the church that you went to pray, do you

17   know if that's a registered church in China?

18        A.    What?

19        Q.    Does the government -- do they know about this

20   church, to your knowledge?

21        A.    I don't know.

22        Q.    What did this church look like?

23        A.    It had a very pointy roof pitch with a cross on

24   the top.

25        Q.    And were you a member of ever a member of that

A 29 638 497                      39                October 23, 1996

bw

1    church?

2                    A.    No.

3                    Q.    How did it come about that the meetings would be

4    in your home?

5                    A.    After my son got well and my fri -- through my

6    friend, I have meet the father and because my son was safe by

7    Lord, by Jesus and so I request to have sessions in my house.

8    That's how it come about.

9                    Q.    What's the -- when you say the father, what's his

10   name?

11                   A.    John Zu (phonetic sp.) Chi (phonetic sp.).

12                   Q.    And what -- how would people know to come to your

13   home?

14                   A.    He had promised us that he would come to my house

15   beginning on January the 14th.  And so when I went back to the

16   village, I tell everybody.  Because in my village, there's quite

17   a bit of people who believe in that.

18                   Q.    Were there any of these -- were any other meetings

19   in other people's homes in your area, to you knowledge?

20                   A.    No.  No.  No, in my village it was at my home.

21                   Q.    And when you say you told other people about what

22   was happening in your home, what would you say to other people?

23                   A.    We -- I told them that on January the 14th, we --

24   we have a father that will come to the village because it's very

25   difficult to get a father to the village, and so anybody who's

A 29 638 497                        40                    October 23, 1996

bw

1    interested in come to listen for the sessions, they're welcome

2    to.

3                Q.    And how many people did you tell this?

4                A.    Anybody that I saw and I told them the situations

5    and I told them that next Sunday the father would be in my home.

6                Q.    Where would you see these people?

7                A.    They all would be -- they all in the village.

8                Q.    And what would happen at these meetings at your

9    home?

10   INTERPRETER TO MR. PIERCE

11               Q.    He didn't quite understand what I said.  He want

12   me to repeat.

13   MR. PIERCE TO MR. ZHANG

14               Q.    Typically what would go on at these meetings in

15   your home?

16               A.    We discussed Jesus's story.

17               Q.    What is Jesus's story?

18               A.    How he -- how he saved people.  How he cure people

19   who sick.

20               Q.    And how did he do that?

21               A.    I will remember -- I remember one of the sessions.

22   You want me to --

23               Q.    Yes.

24               A.    -- give the story?  Jesus Christ has saved a lot

25   of people.  At one day, he just came out of a church.  He had

A 29 638 497                      41                    October 23, 1996

bw

1     arrived to seaman's -- ser -- sermons -- seaman's home.  Seaman

2     was sick having a fever.  And somebody have ask Jesus Christ to

3     save him.  And Jesus have went next by him.  He used his hand to

4     touch his body and then his fevers had gone.  And then Seaman got

5     up and served Jesus Christ.

6            Q.   Is this story written anywhere?

7            A.   There is the father read that in a book -- in the

8     -- in the book and but we couldn't buy the books in China.

9            Q.   Do you know the name of that book?

10           A.   Bible.

11           Q.   Have you ever read the Bible?

12           A.   In China they have very little circulations of the

13    Bible and I'm here I have briefly -- I have read some and also

14    from the priest -- from the father that we have a chance to look

15    at shortly.

16           Q.   Sir, getting back to the time when you heard the

17    sirens and you tried to escape, can you tell us what happened at

18    that point?

19    INTERPRETER TO MR. PIERCE

20           Q.   I'm sorry, what -- what is --

21    MR. PIERCE TO MR. ZHANG

22           Q.   Yeah, getting back to the testimony where you said

23    you were at your home and you heard sirens and then you tried to

24    escape, what happened at that point?

25           A.   All right, when the siren comes on, I and my wife

A 29 638 497                         42                    October 23, 1996

bw

1    went out to the front door and saw the car coming in.  And so I

2    went in and tell everybody to go away and I was holding my son

3    and my wife was holding -- I was holding my child and my wife was

4    holding one child also with the priest and we just went through

5    the back door.

6              Q.    Where'd you go?

7              A.    I went to my mother-in-law's home.

8              Q.    How far away was that from your house?

9              A.    About 30 kilometer.

10             Q.    How'd you get there?

11             A.    I have went to a road.  There's a road and then

12    there are transportation cars there that you can get on.

13             Q.    A road?

14             A.    A road.  A side road.

15             Q.    Okay.  And then what did you do?

16             A.    I ride the car to my mother-in-law's home.

17             Q.    All right.  And after you got to your mother-in-

18    law's, what did you do?

19             A.    And -- and the father told me in China you don't

20    have the freedom of religions.  And the father told me that he

21    would try to find a way so that I and my wife can leave China.

22             Q.    Then what happened?

23             A.    The -- the father requested two photograph each.

24    And now -- and also need $40,000 or renminbi.  And the $20,000 is

25    used to buy plane tickets, so to -- to come to United States.

A 29 638 497                    43                October 23, 1996

bw

1    The father said he will have one of his friends to help me to

2    coordinate the trip.

3    JUDGE TO MR. ZHANG

4        Q.    This is the religious father you're speaking of?

5        A.    Yes, is the religious father.

6    MR. PIERCE TO MR. ZHANG

7        A.    He took two photograph from each of us and with

8    20,000 renminbi to one of his friends to as soon as he have that

9    set up, he will let me know.

10        Q.    All right.  And to your knowledge, do you know if

11    the father was involved in doing this with any other people?

12        A.    I don't know.  He said the -- the father says that

13    we do that to save people to -- this is a good things to do.

14        Q.    All right.  Now, sir, are --

15    JUDGE TO MR. ZHANG

16        Q.    Can you -- can you say whether he did this for

17    other people then?

18        A.    I don't know, but the reason he did that because

19    he has seen what had happened to me and because it's also because

20    of happening in June which a lot of times they might use it --

21    the government might use that excuses.  They would -- they might

22    use because of the June, they might use the June 4 excuses to

23    also get me to serious problems -- troubles.  So I -- I have to

24    -- the father said I have to save you guys.

25        Q.    Do you know what -- why the June 4th would have

A 29 638 497                    44                    October 23, 1996

bw

1    come in?  Would have been involved?  Do you know why the June 4th

2    was brought up?

3    INTERPRETER TO MR. PIERCE

4           Q.    I'm sorry.  I didn't --

5    MR. PIERCE TO MR. ZHANG

6           Q.    Why was the June 4th mentioned?

7    JUDGE TO THE INTERPRETER

8           Q.    Why -- why would June 4th serve as an excuse for

9    serious troubles?

10   MR. PIERCE TO MR. ZHANG

11          A.    Okay, because it happens on May 26th and is very

12   close to a -- the June 4th, seventh anniversary and the -- and

13   the governments might worry that these group need a -- it's

14   related to the June 4th seventh anniversary and they were -- the

15   government were afraid that they were going to have problems

16   related to the June 4th movements.

17   JUDGE FOR THE RECORD

18          Let's change tapes.

19                           (OFF THE RECORD)

20                           (ON THE RECORD)

21   JUDGE TO THE INTERPRETER

22          Q.    Was that the end of the translation?

23   MR. PIERCE TO MR. ZHANG

24          A.    And also on the May 3rd, there's a warning to us

25   and we thought that that's just not hurting people, so we still

A 29 638 497                    45              October 23, 1996

bw

1    continue to have the meetings.  And -- but on the May -- on the

2    May 26th and they come and try to arrest all of us.

3         Q.   Sir, I just want to get clarified, you received a

4    warning on May 3rd.  If you received that warning, why did you

5    actually feel you could continue the meetings, you need to

6    continue the meetings?

7         A.   On May 3rd, they have the warning of the

8    gathering, but what I thought was because they were worrying

9    about because we're so close to the June 4th seventh year

10   anniversary that they were thinking about the gatherings might be

11   later on any kind of future movements.  But what I -- what I

12   truly believe is -- is just a religious gathering is a good

13   things to do and I don't foresee that's going to be a problem

14   with the gov-governments.  It's not what the government thinks,

15   so I think it's safe to do.

16        Q.   Sir, on what day, if any, do you feel was the day

17   you became an active Christian?

18        A.   The most affirmative belief is really happens is

19   on the 5th where my son was -- on January 5th when my son was

20   very sick and after praying on the 7th, he got well, and so I and

21   my wife went to the church.  I have my wife on that day was got

22   very much into it.  And also I have -- and so I and my wife have

23   talk about that I will bring -- I will preacher this to all the

24   people on the good things on Jesus.

25   JUDGE FOR THE RECORD

A 29 638 497                    46              October 23, 1996

bw

| | | |
|---|---|---|
| 1 | | Let's take a brief recess here for five minutes.  And |
| 2 | we'll resume again at 2:30. | |
| 3 | | (OFF THE RECORD) |
| 4 | | (ON THE RECORD) |
| 5 | JUDGE FOR THE RECORD | |
| 6 | | We're back on the record after recessing. |
| 7 | JUDGE TO MR. PIERCE | |
| 8 | Q. | Mr. Pierce? |
| 9 | MR. PIERCE TO MR. ZHANG | |
| 10 | Q. | Sir, is there any particular procedure that you |
| 11 | had to go through in order to become a Christian? | |
| 12 | A. | You have to be baptized by the father. |
| 13 | Q. | And were you ever baptized? |
| 14 | A. | Yes. |
| 15 | Q. | When? |
| 16 | A. | March 10th. |
| 17 | Q. | Okay.  This is '96? |
| 18 | A. | Yes. |
| 19 | Q. | How were you baptized? |
| 20 | A. | You have to be knee and then a cup of water on the |
| 21 | head. | |
| 22 | Q. | And what did this mean? |
| 23 | A. | That's baptized. |
| 24 | Q. | What's the meaning of baptized? |
| 25 | A. | If I have any wrongdoing before that, this water |

A 29 638 497                          47                          October 23, 1996

bw

1    will purify me.

2                Q.    And who baptized you?

3                A.    Father John.

4                Q.    Where did he baptize you?

5    INTERPRETER TO MR. PIERCE

6                Q.    Where?

7                A.    Where?

8    MR. PIERCE TO MR. ZHANG

9                A.    At my home.

10                Q.    So -- so you testified the arrangements were made

11    for plane tickets.  Did you go anywhere?

12                A.    I was informed by the father on June 25th.

13                Q.    Yes.  And?

14                A.    The father had obtained June 28th plane tickets

15    from Shanghai to United States.

16                Q.    Was it a direct flight?

17                A.    It stop in Alaska.

18                Q.    And other than your wife, do you have any

19    relatives in the United States?

20                A.    I have a brother, older brother.

21                Q.    Same parents as you?

22                A.    Yes.

23                Q.    Do you know his Immigration status?

24                A.    Yes.

25                Q.    What is it?

A 29 638 497                    48                    October 23, 1996

bw

1          A.    Green card.

2          Q.    And where does your brother live?

3  INTERPRETER TO MR. PIERCE

4          Q.    I'm sorry?

5  MR. PIERCE TO MR. ZHANG

6          Q.    Where does your brother live?

7          A.    New York.

8          Q.    Do you know when he came to the United States?

9          A.    1989.

10         Q.    Okay.  Sir, do you know what happened, if

11  anything, at your house after you left?

12         A.    They have --

13  INTERPRETER TO JUDGE

14         Q.    I -- I need to clarify.

15         A.    Okay, you want to give us what you have so far or

16  -- tell us what he said?

17         Q.    I -- I -- I couldn't understand a few things, so I

18  want to --

19         A.    All right.

20  MR. PIERCE TO MR. ZHANG

21         A.    Okay, the Public Security have came to -- to my

22  house.  And my mom was at home.  And they asked my mom to -- if

23  she know where I and my wife is.  And -- and my -- and my mom

24  don't know.  Told them that she don't know where I and my wife

25  is.  And the Public Security had lock my house off.

A 29 638 497                49               October 23, 1996

bw

1          Q.   And when did they lock your house up?

2          A.   July 10th, '96.

3          Q.   Why did they lock your house up?

4          A.   Because they want to arrest I and my wife and they

5     couldn't find us.

6          Q.   How do you know they wanted to arrest you and your

7     wife?

8          A.   You mean, how do I know now or at that time?  Well

9     --

10         Q.   How -- how do you know now?  Let's start with that

11    and see if the other one makes a different.

12    INTERPRETER TO MR. PIERCE

13         Q.   Thank you.

14    MR. PIERCE TO MR. ZHANG

15         A.   My brother told me.

16         Q.   What did your brother tell you?

17    INTERPRETER TO MR. PIERCE

18         Q.   When?

19    MR. PIERCE TO MR. ZHANG

20         Q.   What did your brother tell you?

21         A.   My person at China called by brother and told my

22    brother the situations.

23         Q.   What was the situation?

24         A.   That's when the Public Security came to my house

25    and asked my mom to where my wife and I was and my mom didn't

A 29 638 497                    50              October 23, 1996

bw

1      tell them and they went and locked up the house.

2              Q.    Okay.  When did you first find out they wanted to

3      arrest you?

4              A.    At -- at May the 26th is when they have two car

5      come and they try to arrest us.

6              Q.    Do you know what happened on May 26th after you

7      left?

8              A.    On the 26th, we had escaped and later heard that

9      they have arrest a few people in the group and they have tried to

10     look for I and my wife.

11             Q.    How did you find out they arrested a few people?

12             A.    I learned that through my brother because he --

13     that a person call him and from what he learned, there's six

14     people being arrested.

15             Q.    Is this your brother -- where was your brother at

16     that time?

17             A.    In New York.

18             Q.    Why did they contact him?

19             A.    Because I was at that time because it's a such a

20     serious problem, they informed my brother in United States and I

21     was in Seattle and I also call him and he also call China to find

22     out exactly what's going on.

23             Q.    Okay.  And is your brother here today?

24             A.    No.

25             Q.    Did you ask him to come?

A 29 638 497                    51                    October 23, 1996

bw

1          A.    No, I didn't even know I had to come here for a
2    hearing today.   When I was in jail, I don't even know what day
3    today is and things like that.

4          Q.    And did you know any of the six people that were
5    arrested?

6          A.    I -- yes, those are the peoples also in my house
7    that attends the session.

8          Q.    Do you know the names of any of them?

9          A.    One is named Jonwin (phonetic sp.), Seam (phonetic
10   sp.) Seachu (phonetic sp.), Ben For (phonetic sp.) Fuway
11   (phonetic sp.), Ling Asam (phonetic sp.), and two lad -- and two
12   other ladies.   One is Jonjowjus's (phonetic sp.) wife.   And one
13   is Jon Ing (phonetic sp.) Ju (phonetic sp.).

14         Q.    And what happened to them after they were
15   arrested, if you know?

16 -  INTERPRETER TO MR. PIERCE

17         Q.    What happened?

18   MR. PIERCE TO MR. ZHANG

19         Q.    What happened to them after they were arrested?

20         A.    From what I heard they were being hitten by the
21   government.   Beaten.

22         Q.    Hit?

23         A.    Yeah.   Beat.   And they used the excuses of
24   grouping to set up movements for June 4th.

25         Q.    And do you know if they were detained after they

A 29 638 497                    52              October 23, 1996

bw

1    were arrested?

2    INTERPRETER TO JUDGE

3         Q.   I didn't understand what he said.  I need to --

4    MR. PIERCE TO MR. ZHANG

5         A.   Yes, they are arrest and detained.

6         Q.   How long?

7         A.   Until now I don't even know they have release or

8    not.

9         Q.   Did you try and find out?

10         A.   I have asked my brother and it's a collect call,

11   so I've asked my brother what the situation is.  He hasn't really

12   got a chance to call back, so he -- she's not sure.  And -- and

13   my brother as a company in United States and he's very busy.  I

14   seldom -- if it's not important, I don't try to bother him very

15   much.

16         Q.   All right.  So what do you think would happen to

17   you if you were to return to China?

18         A.   They will prosecute -- persecute me.

19         Q.   In what way?

20         A.   They will prob -- they will use the excuses of

21   June 4th anniversary movement grouping.

22         Q.   To do what?

23         A.   For the seventh year June 4th anniversary

24   revolutionary -- try to start a revolutionary for the June 4th

25   seventh anniversary movement.

A 29 638 497                    53              October 23, 1996

bw

1    Q. And what do you think they would do to you, if

2 anything?

3    A. They will probably jail me.  How long I don't

4 know.

5    Q. And other than for religious reasons, was there

6 any other reason you left China?

7    A. And also my wife's having -- inserting the

8 I.U.D.'s and they want the I.U.D. take off -- well, she wants the

9 I.U.D. take off and on that matter.

10    Q. Has your wife ever had an I.U.D.?

11    A. Yes.

12    Q. When was that?

13    A. After the first birth in 1988.

14    Q. How long after the first birth?

15    A. After the few days after the baby's birth.  I was

16 begging them not to take her until a month after the birth

17 because the baby was large and her vagina was splitten and needs

18 to be stitched, but they only take her after a few days after the

19 baby's born.

20    Q. Who did you beg to?

21    A. I was begging the family planning agency.

22    Q. Where -- were were you begging?  (Indiscernible)?

23 INTERPRETER TO MR. PIERCE

24    Q. Where?

25 MR. PIERCE TO MR. ZHANG

A 29 638 497      54      October 23, 1996

bw

1          Q.    Yeah, where were you when you were speaking to the

2     family planning (indiscernible)?

3          A.    They had -- they are at my house.

4          Q.    What were they doing at your house?

5          A.    When my wife had the first birth, the hospital

6     notifies the planning agencies so then after a few days they will

7     come to my home and want to take her to put up -- put in the

8     I.U.D.'s.

9          Q.    So where did your wife have the I.U.D.?  Where was

10    your wife when she had the I.U.D.?

11    JUDGE TO MR. PIERCE

12         Q.    When it was inserted?

13    MR. PIERCE TO MR. ZHANG

14         Q.    Yeah, when it was inserted, yeah.

15         A.    In September 1988.

16         Q.    Where was your wife when she had the I.U.D.

17    inserted?

18    INTERPRETER TO MR. PIERCE

19         Q.    Where?

20         A.    Yes.

21    MR. PIERCE TO MR. ZHANG

22         A.    It's in the family planning agency.  They had a

23    small hospital there.

24         Q.    And did you -- to your knowledge, did your wife

25    agree to have the I.U.D.?

A 29 638 497                     55                October 23, 1996

bw

| | | |
|---|---|---|
| 1 | A. | No, she disagreed. |
| 2 | Q. | Why was -- why did she have to have an I.U.D.? |
| 3 | A. | They were afraid she have a second child. |
| 4 | Q. | How many children were you allowed to have? |
| 5 | A. | They only allow one child. |
| 6 | Q. | And what happened to the I.U.D.? |
| 7 | A. | My wife spend money to get a doctor to take out |
| 8 | | I.U.D. |
| 9 | Q. | When was that? |
| 10 | A. | June 1993. |
| 11 | Q. | And why did she do that? |
| 12 | A. | Because both of us loves childrens and we want to |
| 13 | | have another baby. |
| 14 | Q. | How many children did you want to have? |
| 15 | A. | As -- as being a parent, we like to have as much |
| 16 | | as -- the more, the better. |
| 17 | Q. | But did you ever discuss with your wife |
| 18 | | approximately or how many children you wanted? |
| 19 | A. | Four to five. |
| 20 | Q. | All right.  So were there any consequences for |
| 21 | | removing the I.U.D.? |
| 22 | A. | Yes, after the birth they will sterilize you and |
| 23 | | if it's -- |
| 24 | | INTERPRETER TO JUDGE |
| 25 | Q. | Let me ask him -- |

A 29 638 497                    56                    October 23, 1996

bw

1    MR. PIERCE TO MR. ZHANG

2            A.    -- also on top of that, they will fine me.

3            Q.    Were you or your wife ever sterilized?

4    INTERPRETER TO MR. PIERCE

5            Q.    I'm sorry?

6    MR. PIERCE TO MR. ZHANG

7            Q.    Were you or your wife ever sterilized?

8            A.    They -- up to now they don't know I have the

9    second child, so no.

10           Q.    Were you ever fined?

11           A.    No, because the second child has not registered.

12           Q.    But you said the second child was born in the

13   hospital, is that correct?

14           A.    That hospital was the small hospital in the

15   village that we know that they don't report to the family

16   plannings.

17           Q.    Is it a government hospital?

18           A.    It is a private, half-private, in the village.

19           Q.    Okay.  And why was the child never registered, the

20   second child?

21   INTERPRETER TO MR. PIERCE

22           Q.    Wh --

23   MR. PIERCE TO MR. ZHANG

24           Q.    Why was the second child never registered?

25           A.    As we were afraid that if we registered, then they

A 29 638 497                    57              October 23, 1996

bw

1   would come sterilize and also fine.

2           Q.   Why did you think that would happen?

3           A.   They have advertisements on televisions telling us

4   that you can only have one children and you can't have two.  And

5   if it happens, you'll be fined and sterilized.

6           Q.   So, sir, if you and your wife were to go back to

7   China, do you feel you could have more children?

8           A.   No.  No, right now if we go back, they will arrest

9   me and I already have two, so if they find out, I'm already in

10  trouble, how can I have another children?

11          Q.   Okay.

12  MR. PIERCE TO JUDGE

13          Q.   Okay, at this time, Your Honor, I would offer the

14  witness for cross-examination.

15          A.   Okay.

16- JUDGE TO MR. DUVIER

17          Q.   Go ahead, Mr. Duvier.

18  MR. DUVIER TO MR. ZHANG

19          Q.   Sir, on May 3rd, when the pol -- when the Public

20  Security came and gave you a warning, did they speak to you that

21  day?

22          A.   When the siren came on, the two cars came by, I

23  saw them came in and I went back and told father and then the

24  whole group.  And that's what we escaped from the

25  (indiscernible).

    A 29 638 497                 58             October 23, 1996

bw

1          Q.    I'm talking to you about May 3rd, when you

2    received this warning.

3          A.    Yes.

4          Q.    Did you speak to someone that day?

5          A.    Yes, they hand me a -- a note and tell me that you

6    cannot have group meetings.

7          Q.    What did the note say?

8          A.    This is warning you that you are not allowed to

9    have group meetings.  If there's anything happen, you will be

10   responsible for.

11         Q.    How many people dropped off this note?

12         A.    Two.

13         Q.    How long were they there?

14         A.    After they had informed me the situations, they

15   left.

16         Q.    This -- was this at your house where this

17   happened?

18         A.    Yes, it came to my house.

19         Q.    What day of the week was it?

20         A.    It's on Sunday.

21         Q.    Were you having a meeting then, right then?

22         A.    No.

23         Q.    Had you already had a meeting?

24         A.    We don't have a meeting that day.

25         Q.    Why not?

A 29 638 497                    59              October 23, 1996

bw

1          A.    It's not on a Sunday.  Only the -- the meetings on

2     a Sunday.

3          Q.    Well, I just asked you what day of the week it was

4     that they gave you this warning, and you told me a Sunday.  So

5     what I'm trying to find out is did the police -- sir, let me

6     finish my question please.  So what I'm trying to find out is,

7     did the police come and give you this warning while a meeting was

8     going on?

9          A.    The day is May 3rd and I heard, I thought I heard

10    from the interpreter he was saying on the May 26th.

11         Q.    Do you know what day of the week it was when the

12    police came and gave you this warning?

13         A.    I don't remember what day it is, because I -- it's

14    that day I didn't have a meeting.  I -- I didn't know.  And that

15    -- that is a school day that my wife had just took the kids to

16    school and I was at home.

17         Q.    Did you keep a copy of this warning?

18         A.    When they lock up the house, they can't -- it's at

19    home, but when they lock up the house, nobody can get anything in

20    the house.

21         Q.    They locked up the house July 10th, correct?

22         A.    Yes.  July 10th.

23         Q.    Did they tell you how it was they knew you were

24    having group meetings in your house?

25    INTERPRETER TO MR. DUVIER

A 29 638 497                    60              October 23, 1996

bw

1          Q.    I'm sorry?

2     MR. DUVIER TO MR. ZHANG

3          Q.    Did the -- did the two Public Security officers

4     explain to you how they found out that you had been having these

5     meetings?

6          A.    They didn't tell me, and I was at home and two of

7     them had come and knock on the door.

8          Q.    Now, your attorney has submitted some evidence on

9     your behalf, including two notices from the police.  Do you know

10    how you were able to get these notices to your attorney?

11         A.    Those are the notes that were sent from my mother

12    to my brother in United States.

13         Q.    Do you know how your mother got these?

14         A.    One note I bring with me when I leave China to

15    United States.  The June 20th one.

16         Q.    Do you know how your mother got the July 15 one?

17         A.    The Public Security went to my house.

18         Q.    Well, that doesn't answer my question, sir.  How

19    did you get the July 15 one?

20    JUDGE TO MR. DUVIER

21         Q.    How did -- I believe the question is how did your

22    mother get it?

23         A.    Okay.

24    MR. DUVIER TO MR. ZHANG

25         Q.    How did your mother get it?

A 29 638 497                        61                    October 23, 1996

bw

1          A.   When the Public Security came to my home and

2    couldn't find me, they have take that to my mother and ask my

3    mother to inform me.

4          Q.   Where does your mother live?

5          A.   He live with my younger brother.

6          Q.   And how far away is that from your house?

7    INTERPRETER TO JUDGE

8          Q.   You mean she?

9          A.   I mean, I'm sorry.  She lived with my younger

10   brother.

11   MR. DUVIER TO MR. ZHANG

12         Q.   How far away is that from your house?

13         A.   Walking about five to six minutes.

14         Q.   Do you know how they knew where she lived?

15         A.   I -- I -- I was here.  I don't know how they find

16   out.

17         Q.   You said first they went to your house and when

18   you weren't there, they went to your mother's house?  Is that

19   what you said?

20         A.   The details I don't know because I was here.  When

21   I was calling my brother, that's what he said, that, you know,

22   they tried to look for me and that they -- they found my mother

23   and get the note and all the stuff.

24         Q.   Did your brother tell you how he learned these

25   details?

A 29 638 497                   62            October 23, 1996

bw

1          A.    He didn't say.  The only thing he said was in

2    (indiscernible) Public Security have been -- has been looking for

3    me and they couldn't find me.

4          Q.    Now, do I understand you correctly, sir, that the

5    reason your brother's not here today is because you didn't know

6    you had a hearing today?

7          A.    No, I don't even know I have a hearing today.

8          Q.    Your attorney didn't tell you you had a hearing

9    today?

10         A.    The attorney had told me, but I don't know what

11   day is today.

12         Q.    Did you say to your attorney, why don't you see if

13   my brother can come since he knows so much about my claim and he

14   can help me stay in this country?

15         A.    No, I didn't.

16         Q.    Why not?

17         A.    Because I -- I know that he's very busy.

18         Q.    You think he's too busy to take one day out of his

19   life and drive four hours and help you and your wife get into

20   this country or otherwise you face return to China?

21         A.    I don't know if the attorney have inform or I

22   don't -- I really don't know.

23         Q.    Now, were you aware of Christianity before your

24   son got sick?

25         A.    Before I knew about it, and I believe in God in my

A 29 638 497                    63              October 23, 1996

bw

1    heart.

2              Q.    Well, what did you know about it?

3    JUDGE TO MR. DUVIER

4              Q.    Before he became a Christian?

5    MR. DUVIER TO MR. ZHANG

6              Q.    Before -- well, before your son got sick --

7    JUDGE TO MR. DUVIER

8              Q.    Before your son got sick?

9    MR. DUVIER TO MR. ZHANG

10             Q.    -- what did you know about Christianity?

11             A.    Because at that village a lot of people have

12   believing the Christians and -- but there's no father that comes

13   to the village and there's transportation that is very

14   inconvenient and so we just believe it in our own heart.

15             Q.    Well, what did you believe?  What did you even

16   know about it to believe in your heart?

17                           (OFF THE RECORD)

18                           (ON THE RECORD)

19   MR. DUVIER TO MR. ZHANG

20             A.    At that time we believed that if you believe in

21   Lord, if you need help and you will be save by the Jesus Christ

22   and if you want certain things done in a good way, that they will

23   help you.  Jesus Christ will help you.  And they said if you

24   believe in Jesus Christ, you will become their son and daughter

25   and you will live forever.

     A 29 638 497                    64              October 23, 1996

bw

1          Q.    Now, how did you learn all that before your son

2    got sick?

3          A.    Before they told me.

4          Q.    He told you this before your son got sick?

5          A.    That when my son was sick in the hospital for two

6    days and both of he and his wife had visit the hospital and saw

7    my son.  And that's when he told me the situa -- this.

8          Q.    When you were growing up, did your parents teach

9    you any particular religion?

10         A.    When we -- when I grow up, I mean, we were in a

11   village and we heard about things.  We really had a very vague

12   idea of what it is.  Even my parents had a very vague idea of

13   what it is.

14         Q.    Sir, my question is, were you raised in any

15   particular religion?

16         A.    Yeah, as ever since a kid, we know -- I know that

17   my parents are Christian and so we just -- we didn't be able to

18   do anything or learn anything about it and because my parents

19   didn't know anything about it, we just know Christian and so at

20   that time I believe I'm a Christian.

21         Q.    The whole time you were growing up you believed

22   you were a Christian, but you didn't know anything about it and

23   your parents didn't do anything about it?

24         A.    Yes, as we grow up, we in a remote village we

25   don't have any books.  It just proof of village people that most

A 29 638 497                    65              October 23, 1996

bw

1    of them believe in Christian and so everybody just follows and

2    believe in Christian -- Christians and we -- we don't know.  We

3    have a very vague idea of what it is I feel.  I did go and heal

4    my son.  God said that we had really find out.

5           Q.   After you started getting more heavily involved in

6    Christianity, did you study the Bible?

7           A.   We can't heavy study it because we have problem

8    getting Bi-Bibles.  I really want to study it and but we --

9    there's no opportunity for me there.

10          Q.   How long did the services last at your house every

11    Sunday?

12          A.   About one and a half hour.

13          Q.   And during that time, what would happen?

14          A.   We study the stories about Jesus Christ and also

15    learn where he (indiscernible).  Also sang.

16          Q.   Why did only your wife and yourself and the priest

17    and your two children escape on May 27th?

18    JUDGE TO MR. DUVIER

19          Q.   I don't think that there's testimony to that, Mr.

20    Duvier.

21    MR. DUVIER TO MR. ZHANG

22          Q.   Sir, do you remember testifying earlier that you,

23    your wife, each of you holding your children and the priest ran

24    through the back door to escape on May 26th?

25    INTERPRETER TO MR. DUVIER

A 29 638 497              66              October 23, 1996

bw

```
1              Q.    Do you remember?

2              A.    Yes.

3     MR. DUVIER TO MR. ZHANG

4              A.    Yes.

5              Q.    Did anybody else escape at that time?  You, your

6     wife and the priest and your kids?

7              A.    Yes.  The -- it's only six people got arrest.

8     Everybody else had ran -- have escaped.

9              Q.    Did you try to find out anything about what

10    happened to those six people while you were still in China?

11             A.    No.

12             Q.    What about the priest?  Do you know if he tried to

13    find out anything about what happened to those other six people?

14             A.    I don't know if he had tried.

15             Q.    As far as you know, they could have been released

16    the very day they were arrested, is that true?

17             A.    It's impossible, because when I was in Seattle,

18    and I call my brother and he told me that the six people are

19    still locked up.

20             Q.    He told you they were still locked up?

21             A.    While I was in Seattle, yes.

22             Q.    Did he tell you how he knew that?

23             A.    Because my mother had phone calls to him.

24             Q.    Did he tell you how your mother found that out?

25             A.    No, he didn't.
```

A 29 638 497                    67                October 23, 1996

bw

1          Q.    Did the father give you anything other than plane

2    tickets when you left China in order to get on the plane and come

3    to this country?

4          A.    He also give me two papers that have photograph.

5    Each person have two and they put -- they were two put together.

6          Q.    What did he tell you those were?

7          A.    No, he didn't.  He said, using this is good

8    enough.  It's not the father that hands to me, it's his friends

9    that hands to me.

10         Q.    What did you do when you arrived at the airport in

11   Alaska?

12         A.    When I arrive, I don't know where I'm at.  I gave

13   to the person who's there, and then they said this is a false and

14   I don't know what.  Because I don't know it was false.  If I know

15   that this is lie and being a Christian, you're not supposed to do

16   that.

17         Q.    Well, what did you think you were handing them?

18         A.    The person who hand me the -- the paper said this

19   is the paper I need.  So when I arrive there, I -- I gave to the

20   person, and I don't know how to fill out the form.  I even -- I

21   gave back to fill out the form.

22         Q.    Now, you and your wife have been living together

23   with your two children in your home in China since shortly after

24   the birth of your daughter in 1994, correct?

25   INTERPRETER TO MR. DUVIER

A 29 638 497                  68              October 23, 1996

bw

1          Q.    They were living in their home shortly after the

2    daughter was born in 19 --

3          A.    '94.  Yes.

4    JUDGE TO THE INTERPRETER

5          Q.    Since.

6    MR. DUVIER TO INTERPRETER

7          Q.    Since -- since that time.

8    JUDGE TO MR. DUVIER

9          Q.    Since that time, right?

10   INTERPRETER TO MR. DUVIER

11         Q.    Since 1994 -- since 1994?

12         A.    Yes.

13   JUDGE TO THE INTERPRETER

14         Q.    Living together since the child was born in 1994,

15   the second child.

16   INTERPRETER TO MR. DUVIER

17         Q.    In that house.  Is that the question?

18         A.    Yes.  Yes.

19   MR. DUVIER TO MR. ZHANG

20         A.    The house was built in 1988.

21         Q.    What I mean is it's been you, your wife and both

22   of your children living together in that house since the second

23   child was born?  Obviously you all four weren't there before she

24   was born.

25   JUDGE TO MR. DUVIER

A 29 638 497                    69              October 23, 1996

bw

1              Q.    Let's get the question clear.

2       JUDGE TO MR. ZHANG

3              Q.    Did you live -- you and your wife live anywhere

4       else after your second child was born?  Or did you only live in

5       the house where you had your -- or did you only live in the house

6       where you had your worship meetings?

7              A.    When he -- when she have the birth of -- she was

8       staying at --

9       INTERPRETER TO JUDGE

10             Q.    Let me -- let me ask -- let me try to understand

11      him again.  I think I forgot something that --

12             A.    What did he give an address?

13             Q.    I forgot something that he said.

14             A.    All right.

15      JUDGE TO MR. ZHANG

16             A.    Okay, she -- she was two months in the pregnancy

17      and she was living with my mother-in-law.  And after one month

18      and two days the child was born, she came back to live in the

19      house, and the child stays in mother-in-law's house.

20      MR. DUVIER TO MR. ZHANG

21             Q.    So since the second child has been born, your wife

22      has been living with you and your first child, but your second

23      child has been living at your mother-in-law's house, is that what

24      you're saying?

25             A.    The second child was stay in my mother-in-law's

A 29 638 497                    70                    October 23, 1996

bw

1    house until the new year time, then we bring her back.

2            Q.    New year, 1995?

3            A.    Yes, is the new year that fall in there is like if

4    it's 1996 then the new year would be 1997 if we're living in

5    1996.  So if it's 1994 when she born, so that would be -- the

6    following would be 1995 new year.

7            Q.    You -- you have not tried to hide your second

8    child, correct?

9            A.    What -- what did you say?

10           Q.    You -- you have not tried to hide the fact that

11   you have a second child?  She's lived with you and your wife and

12   your first child openly in your house, correct?

13           A.    The -- the government wouldn't know because I

14   didn't register the child.

15           Q.    All right, beyond not registering the child, you

16   haven't taken any steps to -- to keep the government from finding

17   out about her existence, have you?

18           A.    No, the only thing is if you don't register, then

19   later on you -- you can't go to school.

20           Q.    What did you do for a living in China?

21           A.    I'm a cook.  I -- I do like when people have

22   banquet for their marriage or for -- for their newborns.  I cooks

23   for them.

24           Q.    The notice from the police dated June 20th, 1996,

25   how did you get that document?

A 29 638 497                        71                  October 23, 1996

bw

1          A.    The -- the document went to my mother-in-law's

2    house.

3    INTERPRETER TO JUDGE

4          Q.    I didn't understand what he was saying.  I tried

5    to -- I'm sorry.

6          A.    I'm going to need to hear enough of what you do

7    understand and then we'll go back and clarify it, okay?  I can't

8    just have conversation going back and forth.

9          Q.    Okay.

10         A.    All right, the question was how did you get --

11         Q.    How did you get the --

12   MR. DUVIER TO MR. ZHANG

13         A.    They sent the document to my mother-in-law's

14   place.

15         Q.    Who's they?

16         A.    My mother sent.

17         Q.    How did your mother get it?

18         A.    She didn't say.  She just sent it to my mother-in-

19   law's house.

20         Q.    Did your mother ever live at your house with you

21   and your wife?

22         A.    No, she lived in my younger brother's house.

23         Q.    Okay.  Do you have any idea how she is getting all

24   of these -- how she was getting notices and then sending them to

25   your mother-in-law?

A 29 638 497                    72              October 23, 1996

bw

1              A.    No, she didn't say.  She just had them sent to me.

2     MR. DUVIER TO JUDGE

3              Q.    No further questions.

4              A.    Pardon me?

5              Q.    No further questions.

6     JUDGE TO MR. ZHANG

7              Q.    Sir, the church that you described that had a

8     steep roof and a cross on the top, where was that located?

9              A.    It's in Fujian -- Fuqing Town Gow Shan Tow.

10             Q.    Did people attend that church regularly?

11             A.    The -- Mr. Lin had took me there.

12             Q.    Did people attend that church for worship services

13    regularly?

14             A.    Yes, because on January the 17th that I was -- on

15    January the 7th when I was there, I saw people in there also.

16             Q.    And is -- and the father who came to your village,

17    to your house, was he a priest or minister at that church?

18             A.    No, he's not.

19             Q.    Where did he regularly do his religious work?

20             A.    He told me that anywhere that people who needed me

21    to preach, then I go.

22             Q.    And his name was John Zu Chi?  That was his name?

23             A.    John Zu Chi.

24             Q.    Okay, and John Zu Chi, did he have a regular

25    church that -- that he had worship services at?

A 29 638 497                      73              October 23, 1996

bw

1          A.    He didn't mention and I don't know.  He only comes

2     into Sundays my house.

3          Q.    How -- what day of the week would he come to your

4     house?  If it was the same day each time?

5     INTERPRETER TO JUDGE

6          Q.    If -- if it was the?

7     JUDGE TO MR. ZHANG

8          Q.    If it was the same day of the week -- first of

9     all, how often would he come to your house, say in a month's

10    time?

11         A.    Every Sunday he comes and so four days a month.

12         Q.    Before he went to your house on Sundays, what did

13    he do on Sundays?

14         A.    I don't know, because he didn't tell me.

15         Q.    Where did he come from?

16         A.    He's from Ling (phonetic sp.) Chung (phonetic

17    sp.).

18         Q.    And what's Ling Chung?

19         A.    It's about half an hour from my house.

20         Q.    Did any other of the -- any of the other people

21    who were at your meeting the day that you fled, did any of them

22    leave China besides you and your wife?

23         A.    No, I don't know.

24         Q.    Do you know whether the people who worshiped at

25    the church building in Fuqing were arrested around the time of

A 29 638 497                    74                  October 23, 1996

bw

```
 1   May 1996?

 2               A.   I have not heard anything about that.

 3               Q.   Which father helped you get the tickets?

 4               A.   John Zu Chi.

 5               Q.   Did you ask John Zu Chi if the same thing that you

 6   feared was happening to you was happening to other Christians in

 7   your area?

 8               A.   He told me it doesn't happen like that before.

 9               Q.   Did the police know that he's the father who was

10   in charge of those worship services?

11               A.   Police don't know.

12               Q.   Was John Zu Chi afraid of what might happen to

13   him?

14               A.   I don't know.  After that -- after the day I left,

15   I haven't heard from him.

16               Q.   Well, how about before the day you left, did you

17   ask for any counsel or advice from him as to what you should do?

18               A.   Yeah, I did ask him what his opinion was because

19   it's so close to a June 4th anniversary and so they have this

20   movements coming down, and that could be the only reasons that

21   that happened.

22               Q.   He got you the tickets after the June 4th

23   anniversary, didn't he?

24               A.   June 25th is when I got the ticket.

25               Q.   And on June 25th, did he believe that you still
```

A 29 638 497                        75                   October 23, 1996

bw

1    ran any risk because of the worship services in your house?

2          A.    On the 25th his -- his friend informed me that the

3    tickets arrived and (indiscernible) after -- shortly after that I

4    had left.  So I really don't know what his thinking or his

5    feelings were.

6          Q.    Well, now, you were leaving behind your family,

7    your children and he's the one who informed you that he thought

8    you were in trouble because of the June 4th movement, and those

9    circumstances didn't seem important to you to ask if the danger

10   was over now that June 4th was past?

11         A.    Two days after we escaped from the meetings, the

12   father had took the 20,000 renminbi and left.

13         Q.    Two days after we escaped from the meeting, the

14   father took 20,000 renminbi and left?  Is that what?

15         A.    Yes.

16         Q.    The answer (indiscernible).  What 20,000 renminbi

17   are you referring to?

18         A.    The 20,000 -- after we escaped, in two days later

19   he come and he received $20,000 for buying the plane tickets.

20   JUDGE TO THE INTERPRETER

21         Q.    Twenty thousand dollars or 20,000 renminbi?

22         A.    Twenty thousand renminbi, that's what he said.

23         Q.    Okay.

24   JUDGE TO MR. ZHANG

25         Q.    And where did he receive that?  Whom did he

A 29 638 497                    76                October 23, 1996

bw

1    receive that from?

2            A.    I -- I received that from my mother-in-law and

3    then I gave that to the father.

4            Q.    Why did you think the father would have any

5    special ability to get a ticket for you to leave China?

6            A.    He told me that my friend -- his friend have the

7    abilities to get me out of the countries and he -- his friends

8    need $20,000 renminbi -- 20,000 renminbi, I'm sorry.

9            Q.    Besides your brother, do you have any other family

10   here in the United States?

11           A.    No.

12           Q.    Does your wife have any family here in the United

13   States?

14           A.    No.

15           Q.    Does she have any close relatives?

16           A.    No.

17           Q.    Do you know who Huang Jing Yeu (phonetic sp.) is?

18   JUDGE TO MS. HUANG

19           Q.    This is -- the question's directed to him.

20   JUDGE TO MR. ZHANG

21           A.    No, I don't know.

22           Q.    Do you know who Xing Qiong Huang is?  Xing, X-i-n-

23   g, Qiong Q-i-o-n-g, Huang.

24   INTERPRETER TO JUDGE

25           Q.    I-o-n-g and --

A 29 638 497                    77              October 23, 1996

bw

1          A.    Huang, H-u-a-n-g.

2          Q.    H-u-a-n-g.

3          A.    I have feeling that Huang is the last name rather

4     than part of the first name.

5     JUDGE TO MR. ZHANG

6          A.    No, I don't.

7          Q.    Do you know who Claudia Che Fong Lee is?  Che, C-

8     h-e.  Fong, F-o-n-g, Lee.

9          A.    No.

10         Q.    One of the reports from the State Department

11    that's in your file here says that a lot of people in your area

12    have two or even three children.  Do you believe that all those

13    -- all the people who have two or more children are punished?

14         A.    Yeah, I think they -- I believe they're punished.

15    Some of them that when they don't have money to fine them, they

16    took all their furnitures.  A lot of them are -- are abusing the

17    -- the government system when they collect the money from the --

18    the -- from us, they just pocket it themselves.

19         Q.    Okay.

20    JUDGE TO MR. PIERCE

21         Q.    Redirect, Mr. Pierce?

22         A.    Thank you, Your Honor.

23    MR. PIERCE TO MR. ZHANG

24         Q.    Sir, when you were in China, how come you didn't

25    try and find out about the people who were arrested at your home?

A 29 638 497                        78                    October 23, 1996

bw

1          A.    I was -- I was jailed and how can I look for

2     informations.

3     JUDGE TO THE INTERPRETER

4          Q.    Let's see if you can get a clarification.

5     JUDGE TO MR. ZHANG

6          Q.    Would you repeat your answer, sir?

7     INTERPRETER TO JUDGE

8          Q.    I was jailed and --

9          A.    No, to him.

10    JUDGE TO MR. ZHANG

11         Q.    Would you repeat your answer please?

12         A.    What do you want?

13         Q.    Why -- why did you not try to find out about the

14    fate of the other people who were arrested at your home?

15    MR. DUVIER TO JUDGE

16         Q.    Did -- I don't mean to put words in your mouth,

17    but do you mean while he was in China, because I believe that was

18    Mr. Pierce's question.

19    JUDGE TO MR. ZHANG

20         Q.    I'm sorry, while you were in China.

21         A.    Because I was hiding in my mother-in-law's places

22    at that area that I was even afraid to come back down and it's --

23    it -- was worrying about they arresting me and I -- and at that

24    time I didn't even know they were arrested.

25    MR. PIERCE TO MR. ZHANG

A 29 638 497                    79              October 23, 1996

bw

1          Q.    And after the June 4th -- June 4th passed in '96,

2     did you feel you could continue your meetings in your home?

3          A.    It's -- no.  Because they had already locked up

4     the house.

5          Q.    And if you were permitted to remain in the United

6     States, would you continue to practice your religion?

7          A.    Yes, I also at the time I was praying to Jesus

8     Christ, I have promised him that I will send all his messengers

9     to everybody.  Message --

10    JUDGE FOR THE RECORD

11          Let's change tapes.

12                         (OFF THE RECORD)

13                         (ON THE RECORD)

14    JUDGE TO THE INTERPRETER

15          Q.    What's the correction on that last phrase?

16          A.    Messages -- message.

17          Q.    Okay.

18          A.    Instead of messenger.

19    MR. PIERCE TO MR. ZHANG

20          Q.    And, sir, do you feel that you could practice your

21    religion in China?

22          A.    I didn't understand what you're talking about.

23    JUDGE TO MR. PIERCE

24          Q.    Okay, you want to repeat the question, counsel?

25    INTERPRETER TO JUDGE

A 29 638 497                    80              October 23, 1996

bw

1           Q.   Do you want me to repeat or --

2           A.   Let's -- let's have counsel repeat the question so

3      we're sure that you get it straight as well.

4      MR. PIERCE TO MR. ZHANG

5           Q.   Do you feel you can continue to practice your

6      religion in China?

7           A.   If they didn't arrest me or they didn't try to

8      arrest me, I will continue to practice my religions there.

9           Q.   Do you feel there's any other place in China you

10     could go where you would be safe and could practice your

11     religion?

12          A.   I -- it is by transportation very far and I don't

13     know if there are places that I can practice.

14     MR. PIERCE TO JUDGE

15          Q.   All right, I have nothing further.

16     JUDGE TO MR. DUVIER

17          Q.   Recross?

18          A.   I just have a couple.

19     MR. DUVIER TO MR. ZHANG

20          Q.   Sir, how did you learn that the people who were

21     arrested at your house were beaten by the government and the

22     government used the excuse of the June 4th meeting to do that?

23          A.   When I'd speak to my brother over the phone and he

24     -- my brother had heard from the people who's in the area.  When

25     I heard that, I was crying and the person -- and the people in

A 29 638 497                    81              October 23, 1996

bw

1    there asked why -- why am I crying.

2              Q.   This is your brother here in the United States?

3              A.   Yes.

4              Q.   This is your older brother?

5    INTERPRETER TO JUDGE

6              Q.   Well, I need to clarify, because what he said gor

7    (phonetic sp.) is older brother.

8              A.   All right.

9    JUDGE TO MR. ZHANG

10             Q.   Okay, well, just make sure this is your older

11   brother that lives in the United States.

12             A.   Yes.

13             Q.   All right, and you say your mother lives with

14   another brother and he's younger?

15             A.   My younger brother, my younger brother's wife and

16   my father and -- and my younger brother's son live --

17             Q.   And your mother?  And your mother and father?

18             A.   Yes, and my mother.  Five people.

19             Q.   And the person who informed you about what's going

20   on is your older brother here in the United States, is that

21   right?

22             A.   Yes.

23             Q.   Today when you said your brother gave you the

24   information, is he the one you were always referring to or did

25   you get some information from your younger brother in China?

A 29 638 497                      82              October 23, 1996

bw

1              A.   It's my older brother in United States.

2              Q.   Okay.

3   JUDGE TO MR. DUVIER

4              Q.   Go ahead.

5   MR. DUVIER TO MR. ZHANG

6              Q.   So somebody in China told your brother in the

7   United States that these people were beaten and why they were

8   beaten, is that your testimony?

9              A.   Yes.

10             Q.   Did he tell you whether or not he knew how they

11   knew that?  Did your brother tell you how he -- strike that.  Did

12   you tell your priest about the May 3rd warning that you received

13   from Public Security?

14             A.   I -- I didn't told him because I thought that was

15   not nothing serious at that time.  And until after we had escaped

16   and then I have informed him afterwards.

17             Q.   Why didn't you think it was anything serious?

18             A.   Because I -- I believed that's just a religious

19   gathering and I don't think that's serious and I don't know that

20   becomes serious.

21             Q.   Well, had the Public Security ever visited your

22   house before May 3rd?

23             A.   No.

24             Q.   But you didn't think it was serious that two

25   officers from the government of China came to your home, ordered

A 29 638 497                83              October 23, 1996

bw

1    you not to have gatherings and gave you writing about that, you

2    didn't think that was serious?

3         A.    Yeah, I don't think it was serious because we were

4    doing the religious gathering and what I thought is they were

5    just trying to crank down on because it's so close on June 4th

6    anniversary and since we are not doing the June 4th anniversary

7    thing, it's just a few of religious thing, so I don't think that

8    they have anything to do with -- with what actually happened

9    afterwards.

10        Q.    Well, did you think that they were handing out

11   these warnings to everybody?

12        A.    See what -- what my original thought was because

13   when they hand this out they were worrying about the so close to

14   the June 4th.  And since my case is basically for the religious,

15   that's why I think that it wasn't important at all since I'm

16   actually doing the religion, it's not what they think they're

17   doing, so and -- and now afterwards I have no idea that the

18   consequence is -- is happening that way.

19        Q.    How did you know that they thought or that they

20   were worried about the June 4th movements?

21        A.    Because it's very close to the June seventh year

22   anniversary and -- and that's why I was thinking that way.

23        Q.    Well, sir --

24        A.    And also being heard that on every anniversaries

25   usually that they were trying to prevent any group gatherings for

bw

1    serious oppositions to the governments.

2          Q.    Sir, have you ever hosted any gatherings in your

3    house with respect to the June 4th movement?

4          A.    No.  No, mainly -- mainly when I doing this is

5    after my son is got well and -- and mainly it's for the religions

6    gatherings.  And the main -- the main thing we did is just get

7    gatherings and for the Christians.

8          Q.    I don't know what you mean by mainly.  Did you

9    ever have meetings like this before your son was born?  I'm

10   sorry, before your son was sick?

11   INTERPRETER TO MR. DUVIER

12         Q.    Did he ever have meetings --

13   JUDGE TO MR. ZHANG

14         Q.    Did you ever have large gatherings in your house

15   for religious purposes, is this --

16   JUDGE TO MR. DUVIER

17         Q.    Do you want me to say it like this?

18   JUDGE TO MR. ZHANG

19         Q.    For religious purposes before your son was born --

20   before your son was sick?

21         A.    No.

22   MR. DUVIER TO MR. ZHANG

23         Q.    Did you ever have large gatherings in your house

24   for any purpose other than to practice your religion?

25         A.    No.

A 29 638 497                   85              October 23, 1996

bw

1          Q.    So the only large gatherings you had in your house

2    were from January 1996 to May 1996 and they were only for the

3    purpose of practicing your religion, correct?

4          A.    Yes.

5          Q.    And -- and when two officers of the Chinese

6    government came to your house and told you to stop having

7    gatherings in your house and gave you a piece of paper that

8    ordered you not to have or that warned you not to have gatherings

9    in your house, you didn't think that was connected to the

10   gatherings you were having in your house for religious purposes?

11         A.    After the sirens went -- went off, when the two

12   police car come in, you know, I don't know what's going on.  But

13   first thing I knew was to try to escape.

14   MR. DUVIER TO JUDGE

15         Q.    No further questions.

16   JUDGE TO MR. PIERCE

17         Q.    Your other witness, Mr. Pierce?

18         A.    Yes, the wife.

19         Q.    Let's take a very brief recess here just for a few

20   minutes.  You can get a drink and use the restrooms.  I want to

21   start in five minutes.

22                              (OFF THE RECORD)

23                              (ON THE RECORD)

24   JUDGE FOR THE RECORD

25          Okay, we're back after a recess.

     A 29 638 497                    86              October 23, 1996

bw

1    JUDGE TO MR. PIERCE

2              Q.    I want to just clarify something, Mr. Pierce?

3              A.    Yes.

4              Q.    Your clients, both of them submitted an asylum

5    application, biographical information and Mrs. Huang's

6    application is of course her own and there's an attachment to it

7    and the attachment is the same, it's as much as the same as it

8    is, a copy of her husband's.  In fact it starts off, my name is

9    Kur Lian Zhang, which is not her name, it's his name.  I just

10   want to make sure that I have everything she submitted and there

11   was not another affidavit that I didn't perhaps miss?

12             A.    No, Your Honor, they're using the same

13   application.  I'm -- I'm glad you can -- consolidated the two

14   cases, because basically --

15             Q.    Okay.  I just want to make sure that --

16             A.    -- it's nothing el --

17             Q.    -- that she didn't have another af-affidavit that

18   by mistake was not served on me, but a second copy of his was.

19             A.    I -- I understand that.  It shouldn't have been.

20   That -- that -- should have -- the name should have been changed

21   there.  Because they have him in the wife's statement, I guess

22   that's why they left it.

23             Q.    Uh-huh.

24             A.    But I had it in the -- during the recess I had a

25   discussion with the Government and for the wife's testimony with

bw

1    what it would help or the process where I would defer to the

2    trial attorney and then reserve any questions after that.

3           Q.    You have no direct examination?

4           A.    Huh?

5           Q.    You have no direct examination?

6           A.    Correct.   Correct.   I expect since I expected it

7    to be the same as the husband's, I figured we'd get right to the

8    --

9           Q.    Okay.

10          A.    -- cross and then if I had anything after that, I

11   would explore --

12          Q.    All right.

13          A.    -- if I may.   If that's all right with the Court.

14          Q.    Yeah, that's okay with the Court and in -- maybe

15   to do this in a formal way, I'll ask her a question.

16   JUDGE TO MS. HUANG

17          Q.    Ma'am, you're under oath, do you understand that?

18          A.    What did you say?

19          Q.    When you stood up and swore to tell the truth,

20   that means that you've taken an oath and that you will speak the

21   truth.   Do you understand that?

22          A.    Yes.

23          Q.    Okay, you were here when your husband gave all of

24   his testimony just now, is that right?

25          A.    Yes.

A 29 638 497                      88              October 23, 1996

bw

1           Q.    Okay, do you -- do you -- if you were to have been
2     -- if you were asked the same questions, would you have given the
3     same answers?  Do you agree with what he said?
4           A.    There are some difference.
5           Q.    All right, I suspect there might be some
6     differences with respect to your knowledge of family -- your
7     family members here in the United States.
8     JUDGE TO MR. PIERCE
9           Q.    Well, there may be some other differences.  All
10    right, and then we probably want to take this route.  Go ahead
11    and still -- what I'll do is I'll permit you to do cross-examina
12    -- redirect that will go beyond the extent of cross-examination
13    if necessary.
14          A.    Okay.  And thank you.
15    JUDGE TO MR. DUVIER
16          Q.    Okay, you may go ahead, Mr. Duvier.
17    JUDGE TO MS. HUANG
18          Q.    Ma'am, let me ask you, to the best of your -- of
19    your recollection as you're sitting here right now, what is it
20    that you would like to tell this Court that is different in any
21    way from what your husband just told?
22          A.    What he -- what my husband says regarding the
23    persecutions by the Chinese government is not detailed enough.
24          Q.    Okay.  Where was your first child born?
25          A.    Quqian Town.

A 29 638 497                    89            October 23, 1996

bw

| | | |
|---|---|---|
| 1 | Q. | Born in a hospital? |
| 2 | A. | Yes. |
| 3 | Q. | And where was your second child born? |

4    A.    It's in Shan-Shanya (phonetic sp.).  Song Jing
5  (indiscernible) health sector.

6    Q.    Is that a hospital as well?

7    A.    It's not consider a hospital.

8    Q.    How far is it from where you live?

9    A.    Twenty --

10  INTERPRETER TO JUDGE

11    Q.    I need to clarify the term dejuneay (phonetic
12  sp.).

13    A.    A different measure than the kilometers?

14    Q.    Yeah, it's a different -- I believe -- I think it
15  is so --

16    A.    Okay, so she said it's 20 lea (phonetic sp.) from
17  where she lives?

18    Q.    Twenty lea from --

19    A.    Okay, how much is --

20  JUDGE TO MS. HUANG

21    Q.    Do you know how much a lea is compared to
22  kilometers?

23    A.    Our kilometer is 2 lea.

24    Q.    That would be 10 kilometers.

25  JUDGE TO MR. DUVIER

A 29 638 497                    90                    October 23, 1996

bw

1              Q.    Go ahead.

2        MR. DUVIER TO MS. HUANG

3              Q.    And is there any particular reason why your

4        children were born in two different places?

5              A.    Because being abused by the Chinese government.

6              Q.    Do you consider yourself a Christian, ma'am?

7              A.    I have not been baptized, so I'm not supposedly a

8        Christian.

9              Q.    Why have you not been baptized?

10             A.    Be-because I am illiterate and I haven't really

11       learned the religions.  Therefore I have not been baptized.

12             Q.    Did -- were you present at -- in your home when

13       you had -- when these religious gatherings were held every

14       Sunday?

15             A.    Yes.

16             Q.    Did your husband do any -- take part in any

17       religious activities that were any different from the ones that

18       you took part in every week at these meetings?

19             A.    Yes.

20             Q.    In what way?

21             A.    You mean to attend the meetings, the stuff --

22       JUDGE TO MS. HUANG

23             Q.    Did he do any -- what did he do at the meetings

24       different from what you did, if you know?

25             A.    No, they are -- we do the same thing.

bw

1    MR. DUVIER TO MR. ZHANG

2          Q.   Did he go to any classes or -- or try to study

3    Christianity at any time other than at these meetings once a week

4    at your home?

5          A.   No.

6          Q.   Then I'm not really sure I understand why he was

7    baptized and you weren't.

8          A.   Because I -- I don't know how to read and write

9    and some things he understands I didn't quite pick up.

10         Q.   Did your -- did your -- the priest or the pastor

11    who was running these services ever tell you that you had to be

12    able to read and write in order to be baptized?

13         A.   I did not (indiscernible) myself that I want to --

14    to baptize later because I have not really know what's going on.

15         Q.   Where were you when the Public Security came and

16    warned you all not to have any more gatherings at your house?

17         A.   I was not home.  I was taking my son to school.

18         Q.   Did your husband tell you about this warning?

19         A.   Yes.

20         Q.   Did he show you the -- the written warning that

21    they gave him?

22         A.   He show me.  I don't know how to read.  I don't

23    know what it says.

24         Q.   What did you think the reason was that the Public

25    Security was telling you not to have gatherings in your home

A 29 638 497            92           October 23, 1996

bw

1   anymore?

2              A.   I thought that the government was against the

3   individual to organize a group to against the June 4th

4   anniversary to set up something for a June 4th anniversary.

5              Q.   So you didn't think that this warning had anything

6   to do with the religious meetings you'd been having in your

7   house?

8              A.   Would you repeat that again?

9              Q.   You didn't think that this warning had anything to

10  do with the fact that you had been having these religious

11  meetings in your house, is that what you're saying?

12             A.   The -- the (indiscernible) the warning indicates

13  that you're not just -- you're not allowed to have a group

14  gathering in your house and I thought that what we have is a

15  religious gathering is a good thing and I have not thought of

16  that what we are doing is wrong and therefore we -- I didn't

17  think it's important.

18             Q.   Well, did -- did you have any idea in your mind

19  why the Public Security would be telling you and your husband not

20  to have gatherings in your house to commemorate the June 4th

21  movement?

22  INTERPRETER TO MR. DUVIER

23             Q.   I didn't understand the question.

24  MR. DUVIER TO MS. HUANG

25             Q.   Well, had -- had you and your husband ever had any

A 29 638 497                    93                  October 23, 1996

bw

1    gatherings in your house of politically minded people who wanted

2    to do a demonstration about the June 4th movement?

3              A.    No.

4              Q.    What hospital was your son at when he was sick?

5              A.    Ing (phonetic sp.) Si Hospital.

6              Q.    And where is that hospital?

7              A.    It's not too far from my house, about 10 minutes

8    by bike.

9              Q.    Is it -- was he -- is that the hospital that he

10   was born in?

11             A.    No.

12             Q.    What was the name of the doctor who was treating

13   him?

14             A.    We did -- I didn't ask the name.  Everybody said

15   doctor, doctor.

16   MR. DUVIER TO INTERPRETER

17             Q.    I'm sorry, I'm asking the interpreter, everybody

18   said doctor, doctor?

19             A.    Every -- everybody call him doctor, doctor.

20   MR. DUVIER TO MS. HUANG

21             Q.    What was -- what was he doing to treat your son's

22   illness, if you know?

23             A.    They have needles and also have I.V. but the fever

24   stays.

25             Q.    Did the doctor tell you what he thought might be

A 29 638 497                    94                October 23, 1996

bw

1    causing the fever?

2              A.    The doctor didn't say.  He didn't know why the

3    fever's not going down.

4              Q.    Did you ask him whether or not it might be

5    contagious?

6              A.    He -- he didn't say about contagious.  He said if

7    it continues to have high fever, it -- it would be dangerous to

8    the childr -- to the child.

9              Q.    Did you ask him whether he was concerned that

10   whatever your son's problem was it might be contagious?

11             A.    I did ask him and he -- he said no, he's just

12   running a fever and just don't know why the fever's not going

13   down.

14             Q.    Did you tell the doctor that you had a second

15   child at home?

16             A.    Yes.

17             Q.    Were you present at home on May 26th, 1996 when

18   the Public Security officers came?

19             A.    Yes.

20             Q.    When did you first become aware that the Public

21   Security officers were there?

22             A.    When what?

23             Q.    When did you first become aware that the Public

24   Security officers were -- were at the home or were about to come

25   to the home?  How did you first become aware that there was a

A 29 638 497                    95              October 23, 1996

bw

1    problem?

2              A.    About 11 a.m.

3              Q.    How is it that you became aware that the -- the

4    police were there or were about to be there?

5              A.    The sirens that came on.

6              Q.    What did you do?

7              A.    I went to the doors and looked and saw the cars

8    coming in.

9              Q.    Then what'd you do?

10             A.    I went in and tell the peoples to run away.

11             Q.    Then what'd you do?

12             A.    And then I and the child and my husband and the

13   father went to my mother-in-law's house.

14             Q.    What door did you go out of?

15             A.    Our back door.

16             Q.    Had other people already left ahead of you?

17             A.    The same time, some before me and some after me.

18             Q.    How many people were in the house that day?

19             A.    Fifty some people.

20             Q.    When did you and your husband decide to leave

21   China?

22             A.    After I had escaped to my mother-in-law's house

23   and two days after that pri -- father had indicate that is not

24   safe to stay in Unite -- stay in China.  Actually the father says

25   you don't have the freedom of religions in China and you have --

A 29 638 497                    96                    October 23, 1996

bw

1    you can leave China.

2           Q.    Where was the father while you and your husband

3    were at your mother-in-law's house?

4           A.    The father had came to my mother's house together

5    when we escape.

6           Q.    How long did he stay at your mother-in-law's

7    house?

8           A.    Two days.  Two days.  He stayed for two days and

9    then left.

10          Q.    Do you know where he left to?  Where he went to?

11          A.    I don't know.

12          Q.    Do you know where he lived?

13          A.    Now, I don't and before I know.

14          Q.    Do you know why he stayed with you and your

15   husband at your mother-in-law's house for two days?

16          A.    Because they -- he escaped with us and he was

17   hiding there for two days.

18          Q.    Now at that point you had no idea what had

19   happened to the rest of the people in your house that morning, is

20   that correct?

21          A.    At that time I don't know.

22          Q.    Had you done anything to try to find out what had

23   happened?

24          A.    I afraid to do investigations at that time.

25          Q.    By the way, was your husband's mother at the

A 29 638 497                    97                  October 23, 1996

bw

1    church service that day?

2            A.    Yes.

3            Q.    Where did she go?

4            A.    My mother's at home.

5            Q.    Let me make sure you understood my question.  Was

6    your husband's mother, your mother-in-law, was she at your house

7    on May 26th when the Public Security officers came?

8            A.    No, she -- no, she -- she's not there.

9            Q.    Do you know why she wasn't there?

10   INTERPRETER TO JUDGE

11           Q.    Too fast, I didn't understand.

12   MR. DUVIER TO MS. HUANG

13           A.    Because she says she's in old age.  She's also il-

14   illiterate and have bad memories and therefore I -- she didn't

15   attend and she said that after you all learn what, you know,

16   learn what -- study what have to be studied and you can come back

17   and slowly and tell me what's going on.

18           Q.    What about your husband's brother?  Was he there

19   that day?

20           A.    He works on Sundays and he doesn't attend.

21   JUDGE TO MS. HUANG

22           Q.    Was your own mother there?

23           A.    No.

24   MR. DUVIER TO MS. HUANG

25           Q.    Why not?

        A 29 638 497                    98              October 23, 1996

bw

1          A.    My -- my own mother is at my mother's -- my own

2     mother's house.

3          Q.    Was she aware of the -- of the recovery of your

4     son?

5                          (OFF THE RECORD)

6                          (ON THE RECORD)

7     MR. DUVIER TO MS. HUANG

8          A.    No, because they were so far away and didn't have

9     communication.

10         Q.    Your -- your mother was not even aware that your

11    son had been sick and that your husband had -- had prayed for his

12    recovery and he was well again?  Your mother -- you hadn't told

13    her about that?

14         A.    No, because she was far away and in a moun -- in a

15    very remote area had no phones, no communications.

16         Q.    Had you been aware of Christianity before your son

17    getting sick?

18         A.    No.  Vaguely.  Don't know exactly what it is.

19    MR. DUVIER TO INTERPRETER

20         Q.    Did -- did -- did you say they?  Mr. Interpreter?

21         A.    No.  Vaguely.  Very vaguely.

22    JUDGE TO MR. DUVIER

23         Q.    No, vaguely.  Vaguely.

24    MR. DUVIER TO MS. HUANG

25         Q.    Had -- did you ever go to the church that your

A 29 638 497                    99              October 23, 1996

bw

1    husband went to when he prayed for your son?

2              A.   No.

3              Q.   Have you ever been to any church?

4              A.   Yes, once.

5              Q.   When was that?

6              A.   January the 7th after my son had recovered from

7    his sickness.

8              Q.   What church did you go to on January 7th?

9              A.   The Gow Shan Tow -- Gow Shan Tow.

10             Q.   Is that the same church that your husband and --

11   had prayed for your son's recovery at?

12             A.   Yes.

13             Q.   Did your son go with you and your husband?

14             A.   No, he's still in hospital.

15             Q.   When was he released from the hospital?

16             A.   Eighth.

17             Q.   Did your -- your pastor Zu Chi John, to your

18   knowledge, did he have any other gatherings in people's homes

19   that he went to other than the one in you and your husband's

20   home?

21   INTERPRETER TO MR. DUVIER

22             Q.   The pastor John Zu Chi?

23   MR. DUVIER TO MS. HUANG

24             A.   This I don't know.

25             Q.   Did you ever ask him?

A 29 638 497                    100              October 23, 1996

bw

1              A.    No, I did not.

2              Q.    Did you ever ask him anything about his life prior

3    to the time that he started showing up at your house every Sunday

4    conducting church services?

5              A.    No, I didn't ask any.

6    MR. DUVIER TO JUDGE

7              Q.    I have nothing further at this time.  I would like

8    a moment to go through my notes if there's any redirect rather

9    than waste time in silence if Mr. Pierce or if the Court has any

10   --

11   JUDGE TO MR. PIERCE

12             Q.    Do you have any questions?

13   MR. PIERCE TO MS. HUANG

14             Q.    What do you think would happen to you if you went

15   back to China?

16             A.    They -- they will sterilize me and they might

17   sentence me.

18             Q.    Why do you think you'd be sterilized?

19             A.    Because in China they're not allowed to have

20   second child and I already have second child and they probably

21   know by now.

22             Q.    What makes you think that you in particular would

23   be sterilized?

24             A.    Because I have two childrens and now all this

25   things happen and now everybody know that I have two children and

     A 29 638 497                    101              October 23, 1996

bw

1    if I go back now they will have -- they will sterilize me.

2              Q.    Why do you think you'd be sentenced?

3              A.    I think they will because of the June 4th

4    anniversary gatherings.

5              Q.    But were they June 4th anniversary gatherings?

6    INTERPRETER TO MR. PIERCE

7              Q.    Were they?

8    MR. PIERCE TO MS. HUANG

9              Q.    Were they or were there any June 4th anniversary

10   gatherings at your home?

11             A.    No.

12             Q.    So why do you think you'd be sentenced for that?

13             A.    Even if the Chinese government suspected you of

14   and they will try to sentence.

15             Q.    Is it true that an I.U.D. was inserted in your

16   body?

17             A.    Yes.

18             Q.    How did you feel about that?

19             A.    After they inserted the I.U.D., I was bleeding.

20   And I have filed applications to ask them to removed it.  And

21   they not al -- they not allow.  And they have not took the I.U.D.

22   out and we have seen doctors after that and spend a lot of money

23   on it.  And -- and find that they have not taken the I.U.D. out

24   because they didn't allow and then spend a lot of money to -- to

25   try to cure it and then eventually it got cured.

         A 29 638 497                    102              October 23, 1996

bw

1          Q.   Okay.

2    INTERPRETER TO JUDGE

3          Q.   Too fast.  She have a highly accent.

4    MR. PIERCE TO MS. HUANG

5          A.   After ever since the I.U.D.'s are inserted, I

6    hasn't been feeling comfortable as far as the feelings.  And --

7    and the back continues to hurt.  And also bleed often.  Bleeding.

8          Q.   Okay.  Now, ma'am, I'm referring to something you

9    testified to earlier, was there any particular part about your

10   husband's testimony that you felt was not detailed enough?

11         A.   No.

12         Q.   Do you have any plans to continue to learn about

13   Christian -- Christianity?

14   INTERPRETER TO MR. PIERCE

15         Q.   I'm sorry, I didn't --

16   MR. PIERCE TO MS. HUANG

17         Q.   Do you have any plans to continue with Christi-

18   Christianity in any way?

19         A.   If I have not been prosecuted by the Chinese

20   government, I am -- I will continue to send message for Jesus

21   Christ.

22         Q.   Do you plan on having any more children in the

23   future?

24         A.   I -- I have -- I'd like to have, but the Chinese

25   government are not allow and the second one is already have a lot

A 29 638 497             ·      103            October 23, 1996

bw

1    of risk.

2    MR. PIERCE TO JUDGE

3              Q.    I have nothing further, Your Honor.

4    JUDGE TO MR. DUVIER

5              Q.    All right, any recross?

6              A.    Yeah, just a couple.

7    MR. DUVIER TO MS. HUANG

8              Q.    Ma'am, why do you say that now everybody knows

9    that you have two children?

10              A.    At that time we didn't -- I didn't tell people and

11    people think that child was somebody else's.

12              Q.    Well, what makes you think that people know who's

13    child it is now?

14              A.    After this and also from the -- the -- my daughter

15    had been calling me mom and mom and everybody had know.

16              Q.    Ma'am, are you saying that for about two years you

17    had a child living in your house with you and your husband and

18    your son and you told all your friends it was somebody else's

19    child?

20              A.    She has seldom go outside.  Also go outside to

21    play.

22              Q.    Well how has anything changed with that respect?

23              A.    Because of the gatherings in our house.

24              Q.    Well, ma'am, before you left China the government

25    knew about the gatherings in your house, didn't they?

A 29 638 497                        104                October 23, 1996

bw

1    JUDGE TO MR. DUVIER

2        Q.   I think the intention about what she said is

3    that's how everybody knows about her daughter rather than how the

4    government knows about something.  If -- if I'm not mistaken.  We

5    can go into that.

6    MR. DUVIER TO MS. HUANG

7        Q.   Ma'am, you believe that the government now knows

8    that you have two children?

9        A.   They -- the government should know I have two

10   children because of there are people arrested.

11       Q.   You mean because the people who were arrested at

12   your house on May 26th?

13   INTERPRETER TO JUDGE

14       Q.   I didn't understand.  I didn't understand.

15   MR. DUVIER TO MS. HUANG

16       A.   Because of the gathering they tried to -- the

17   government tried to arrest me.  And then because of that, they

18   would do investigations on I and my husband concerning on -- in

19   all scopes.  From that and they had talked to people around there

20   and they find out I have the second child.

21       Q.   Well, ma'am, since the time that the police raided

22   your house on May 26th, they've sent out at least two notices to

23   you and your husband to come and talk to them, haven't they?

24       A.   Yes.

25       Q.   And neither one of those notices mentions anything

A 29 638 497                  105            October 23, 1996

bw

1    about the fact that you have two children, does it?

2              A.    No.    No, they didn't mention anything like that.

3              Q.    Thank you.

4    MR. DUVIER TO JUDGE

5              Q.    I have no further questions.

6    MR. DUVIER TO MS. HUANG

7              A.    The -- that belongs to -- to the two departments.

8    That is on one thing and the birth with two childrens are usually

9    issued by birth control -- I mean, Family Control Planning

10   Agencies.

11             Q.    Well, what makes you think the Family Control

12   Planning Agency is going to know that the Public Security

13   officers are looking for you because you've been having June 4

14   meetings in your home?

15             A.    The Publ -- normally the Public Social -- Public

16   Security officer will notify the Family Planning Agencies.

17             Q.    Well, don't you think they would have done that by

18   now, ma'am?

19             A.    Yes.

20             Q.    And you're not aware of anything as you sit here

21   today that would lead you to believe that the Chinese government

22   either knows that you have two children or if they know, that

23   they care that you have two children, isn't that correct, ma'am?

24             A.    Because they have -- I'm -- I'm here in the United

25   States now.    If I going back, they will look after me because

A 29 638 497                      106                 October 23, 1996

bw

1    even now the Public Social -- the Public Security Agency couldn't

2    find us.  And what can the Family Planning Agency do?

3    MR. DUVIER TO JUDGE

4         Q.   I have any -- no further questions.

5         A.   Okay.

6    JUDGE TO MS. HUANG

7         Q.   Thank you.  You may go have a seat by your

8    husband, ma'am.

9    JUDGE TO COUNSEL

10        Q.   All right, I'd like to hear a brief closing from

11   both parties.  It seems to me there are two issues that form the

12   basis of her claim -- their claim I should say.  The family

13   planning issue and the religious persecution issue, and the issue

14   of credibility looms as a significant issue.  The new statute

15   passed September 30th has some matters that appear to be in

16   effect already, a new definition or amendment to the definition

17   of well-founded fear of persecution seems relevant in this case.

18   I'd like to hear both parties, if you're prepared to do so, how

19   you think that that may be relevant.  It's Section 6 -- I'll have

20   to check it.  I think it's 6 -- 600 or 601.  Yeah, it's 601 that

21   amendment, the definition of a well-founded fear and how -- it

22   seems to me one of the issues under that is still the genuineness

23   of the fear which goes to credibility and the other is the harm -

24   - what is the harm that would constitute the persecution for

25   political grounds based on opposition to application of the

A 29 638 497                    107                October 23, 1996

bw

1    family planning program to these people?  It is Section 601.  It

2    amends Section 101(a)(42)(A).

3    JUDGE TO MR. PIERCE

4           Q.    Are you ready, Mr. Pierce, or do you need a --

5           A.    Yes, yes, Your Honor.  I believe it's extremely

6    relevant to these proceedings here today.  I believe that section

7    of law which as you mentioned passed September 30th in effect is

8    overruling the previous law that the Court has been following.

9    That law being of Matter of Chang and Matter of G-, which gave

10   the definition of only a very narrow exception to this type of

11   persecution that the applicants face in returning to China.  I

12   believe it states now that if you're persecuted or fleeing -

13   persecution due to restrictive family matters can constitute a

14   well-founded fear of persecution under the Act.  And I believe

15   the applicants here today have demonstrated that they fall under

16   this section and that they have this relief available to them as

17   the law is today.  They stated that they have -- it's a one child

18   policy and there is pressure to only have one child.  And the

19   fact that they have two children and I believe they've openly

20   tried to keep the second child a secret.  The main reason I say

21   that is because they did not register the second child and that

22   has consequences in China which they took the risk of in the

23   future that child would not be able to go to school, but they

24   didn't let the child go out to play.  They tried to keep this

25   child -- child a secret.  I don't think a family should have to

A 29 638 497                     108              October 23, 1996

bw

1    go through that.  I don't think a family should have to be

2    pressured by the government as to the number of children they

3    should have, although I understand the government has a right --

4    or to protect its people and if they feel it's too many people,

5    it could cause a danger to everyone.  But I feel -- well, I think

6    from what the applicants testified that they're trying to avoid

7    persecution that the government -- that they see is happening in

8    their area.  That they see people being sterilized for having a

9    second child and also the applicant, the wife, underwent measures

10   herself against her will.  They entered an I.U.D., which she did

11   not agree to.  It caused her some problems which she did not feel

12   was warranted in having -- and they removed the I.U.D. which was

13   an open act of defiance against the law of the one child policy.

14   And then they did have the second child.  So I believe the way

15   the law is now, that can be characterized as opposing the policy

16   as their political opinion.  And she believes the government is

17   now aware that they have these two children.  So I believe the

18   fear they face in returning to China for having the second child

19   is a credible fear and a well-founded fear of persecution.  I ask

20   the Court not to have her sent back with the possibility, the

21   credible possibility, that she would be sterilized.  She's

22   testified that she wanted more than two children.  Her husband

23   testified that they can -- he would like four or five children.

24   And I believe the way the country reports say that China is now

25   and what they testified to, that's not possible in China.  And

A 29 638 497                     109                  October 23, 1996

bw

1   that's why I believe they come under this law.  As for

2   credibility, I submit to the Court that the applicant -- both of

3   them were very credible.  I think they were very consistent.  We

4   have before us an application for asylum with the addendum.  They

5   share the same addendum because they share the same experience,

6   but they gave a lot of detail about what's written in the asylum

7   application and I believe it's consistent with the application.

8   I believe they were specific in telling what happened to them in

9   China.  They were detail specific, coherent and it provides a

10  plausible account in light of the State Department opinion and in

11  light of the credibility.  In order to be found credible.  I

12  don't think we heard anything today that would be specifically

13  not credible.  There was a point in the testimony, a key point,

14  where when they got the notice on May 3rd and they felt this was

15  no big deal and they did not tell the pastor or priest or -- what

16  was happening.  Maybe it seems they should have.  Maybe it seems

17  that they should have thought this was serious.  But I don't

18  think we can use this to show that they're incredible.  Maybe

19  they were not -- they weren't for lack of a better word maybe

20  intelligence that they should have done that in hind sight.  When

21  the husband says oh, when I saw the police -- when I saw the

22  sirens, I knew.  Now I knew.  But he made a mistake.  He should

23  have told the priest what happened.  He should have thought it

24  was serious.  But the fact that he didn't should not be held

25  against him.  People make mistakes.  People sometimes don't think

A 29 638 497                    110            October 23, 1996

bw

1    clearly.  And I don't believe that should be a ground to find

2    incredibility.  Maybe just lack of what the right thing to do

3    was.  I believe we do have as far as the second ground,

4    persecution as to religion, I believe it is a short time that

5    they were practicing religion, but I don't think the time should

6    have an effect on what happened to them in China.  The fact that

7    they were -- suffered persecution, the church was far away and

8    was not convenient to get to, but he invited the priest to come

9    at his own home.  And I think the reasons why he did that were

10    very admirable, very credible.  And the fact that he went out to

11    tell other people to come to his home, I believe supports a

12    backdrop of the -- what's happening in the State Department

13    report as to proselytizing.  I believe going out and telling

14    other people, hey, there's a meeting in my home about religion.

15    Everyone's invited.  And the fact that he'd been having 50 or 60

16    people come shows that there's been an interest in the community

17    to learn about this religion.  That's been, as the applicant's

18    wife put it, a vague thought before about Christianity.  They

19    (indiscernible) out into the open, but they opened up to the

20    village.  And I believe because it is proselytizing the

21    government felt threatened that they wanted to suppress what was

22    happening.  This is why we have the notice on May 3rd.  This is

23    why we have the subsequent notices on June 20th and July 15th.

24    And from the photos we submitted of the applicant's door being

25    shut down on July 10th, 1996, we don't just have the applicant's

A 29 638 497                    111              October 23, 1996

bw

1    testimony, we have evidence in the record.

2            Q.    You say the applicant's door?

3            A.    I'm sorry.  I didn't say -- door -- door.  Yes,

4    (indiscernible) from the photos.  So it is not just the

5    applicant's own testimony even though I do believe it would

6    suffice because of how credible it was, how detailed and

7    specific.  But we also have other evidence in the record.  And I

8    ask the Court to grant their application for asylum so that they

9    can practice their religion in a country where they're free to do

10   so, so they can have more children in a country where they're

11   free to do so.  Thank you, Your Honor.

12           Q.    Thank you, sir.

13   JUDGE TO MR. DUVIER

14           Q.    Mr. Duvier?

15           A.    The Government opposes the application.  I believe

16   the applicants haven't shown that they're statutorily eligible

17   for asylum or that their testimony has been credible.  First, I

18   think it's clear on this record that there has not been any past

19   persecution or a well-founded fear of pers-persecution with

20   respect to this claim for religion.  Nothing has happened to them

21   in China except unless you believe them that a religion service

22   was broken up, they fled.  They were not arrested.  They were not

23   harmed.  And we have no -- no real basis for understanding what

24   it is that they fear.  And we don't believe their testimony's

25   been credible at all with respect to this.  Their explanation for

A 29 638 497                          112                     October 23, 1996

bw

1    why they didn't take seriously this warning that they received on

2    May 3rd is ridiculous.  The only gatherings they've ever held in

3    their home at any time were for religious purposes.  It's a huge

4    change in their life.  A complete conversion to religion, so

5    complete that they invite people into their home every week, have

6    services, 50 to 60 people.  It's a huge event in their life.  A

7    huge change in their life and then they get a not only a note

8    from the government, but a visit from two government officers

9    telling them, stop.  You cannot have gatherings in your home.

10   And it doesn't occur to them that this refers to their religious

11   gatherings?  It -- it's -- it totally begs credulity to believe

12   that.  And along with that, why they wouldn't tell their pastor

13   about this and why they wouldn't take some precautions.  There --

14   there -- the thought that well, gee, this must be about the June

15   4th movement doesn't make any sense whatsoever.  They did not

16   inquire as to the fate of the other people who were arrested at

17   their homes.  And significantly, one of the people that the

18   applicant says was arrested at his home and according to his 589

19   is still being detained by the government, although he said today

20   that he had no idea, is the very person Guo, G-u-o Fei, F-e-i,

21   Lin, L-i-n, who -- who converted them essentially -- the father

22   of the son's classmate who introduced them to the pastor, who

23   told them to come pray, who helped save their son's life, if

24   they're to be believed.  He was arrested at their house.  And

25   they -- they don't know anything about it and apparently haven't

A 29 638 497                    113                    October 23, 1996

bw

1    bothered to ask anything about it, nor has the pastor who saved

2    them.  Because I asked him whether the pastor had inquired about

3    any of these people and he said he had not either.  So you have

4    this pretty miraculous situation.  You have 60 people in your

5    home.  The police come and break it up.  Everybody runs out and

6    two days later you're paying 20,000 renminbi to leave China.  You

7    have no idea what happened and apparently when you do find out

8    what happened it's that the very person who may have brought all

9    this about had been arrested and you don't acquire -- inquire

10   about them at all.  And I can't comment on this claim without

11   mentioning the -- the huge absence of the applicant's brother who

12   apparently could corroborate all of this and more.  And I would

13   note, Your Honor, that the motion for change of venue which is

14   Exhibit 2 in this record, filed before the Court in Seattle, not

15   by applicant's current counsel but by a prior counsel, noted that

16   the respondent's closest relatives and potential witnesses all

17   reside in the New York City area and if the case were transferred

18   to York, it would be possible for witnesses and family members to

19   attend their hearings.  And attached were documents relating to

20   immediate family members, including the brother and two other

21   people who it has gone completely unremarked here, the applicant

22   didn't know who they were.  But where's the brother?  The brother

23   who found out, I'd love to know how, not only that these people

24   are still detained but that they'd been beaten up and not only

25   that the reason they'd been beaten up.  They know why the police

A 29 638 497                    114              October 23, 1996

bw

1    are beating these people up.  This incredible network apparently

2    that they have to find out what's happening to these people in

3    detention back in China.  It's amazing that that person is not

4    here.  And what did the applicant say?  First, he said, I didn't

5    even know I had a hearing today.  Then he said, well, my

6    brother's very busy.  He runs a business.  And then finally he

7    said I'm not sure if my -- if I told my attorney or I'm not sure

8    if my attorney told him.  His absence, I believe on this record

9    looms very, very large.  It's clear under the new Act passed

10   September 30th that this is not a case of past persecution with

11   respect to the child policy.  The Act is clear that in order to

12   have past persecution, you have to have been forced to abort a

13   pregnancy or undergo involuntary sterilization or have been

14   persecution for failure or refusal to undergo such a procedure or

15   for other resistance to a coercive population control program.

16   Now the fact is, none of those things happened to them in the

17   past.  They had the child.  They were not sterilized.  They did

18   not undergo a forced abortion.  And they didn't -- and so they

19   had not been persecuted in the past.  So the only then issue with

20   respect to that question for this Court is, have they shown a

21   well-founded fear of persecution in the future based upon this

22   claim?  Well, we submit they haven't because, first of all, we

23   submit they haven't been credible.  And so you can't believe what

24   they've told you about their fears.  But also, you can't just

25   because of this new change in the law come into Court, I -- the

A 29 638 497                    115              October 23, 1996

bw

1    Government believes and say, well, I want to have more kids and,

2    of course, I'm not going to be able to and I'll forced to be --

3    I'll be sterilized or my wife will have to have an abortion and

4    therefore I get asylum.   There still has to be some kind of a

5    nexus between you and what it is that you fear.   And here there

6    is none.   They've had this second child for over two years.   They

7    had it in a hosp -- the second child in a hospital.   The

8    government apparently knows so much about them that they are

9    aware that they're having meetings in their house and the

10   government has been to their house twice, once to warn them to

11   stop having meetings and the second time to arrest -- to break up

12   the meeting.   I take that back.   They've been at least four

13   times.   And then two more times to drop off these warning notices

14   that we've seen.   They know where his mother lives, because when

15   they couldn't find him at home, they went to his mother's house.

16   They know everything they could possibly know about these people,

17   and there's no suggestion in this record that they know anything

18   or that they care about a second child.   And it -- and everything

19   to suggest that they would have known about it by now.   Nothing

20   in the two notices from the police that they have submitted which

21   says anything about a second child.   And so with respect to the

22   -- the coercive birth control policy, we just don't believe

23   they've made out a claim.   But we're not here to argue that

24   China's birth control policy is the correct one at all.   The

25   question is whether these applicants have shown a well-founded

A 29 638 497                        116                   October 23, 1996

bw

1    fear of that policy as defined in the Act and we don't believe on

2    this record that they have.

3    JUDGE TO MR. PIERCE

4            Q.   I'll going to give you a moment for a rebuttal in

5    a second.  And I want to address a question to Mr. Duvier.

6    JUDGE TO MR. DUVIER

7            Q.   It's the Government's view that Section 601 of the

8    September 30 Act does not simply mean that if a person wants to

9    have more children than just two that -- and they come from China

10   that the background -- the contextual situation there does not

11   give them a claim to fear persecution.  That almost sounds right

12   almost by, you know, as a rhetorical statement, and yet I look at

13   the definition and I look at Matter of Chang.  In the Board's

14   decision in Matter of Chang it says that China needs to be doing

15   something about its birth control and it's okay if it at least

16   sterilizes people and does some of the other things that are

17   mentioned in that case.  And now Congress is saying, we don't

18   look at it that way anymore.  As policy of the United States, if

19   anybody's forced to go under such a procedure or has a well-

20   founded fear that they will have to undergo such a procedure,

21   they should be deemed to have a well-founded fear of persecution.

22   It almost seems to me that that applies to anybody in China who

23   wants to have more than one child or two children or depending

24   again what the factual situation is and perhaps the factual

25   situation in the particular area as it's supplied, and of course

     A 29 638 497                    117              October 23, 1996

bw

1    the only evidence we have about that is what's given in the State

2    Department report here.  I wonder if you could comment on that

3    and see what the -- you know, does the -- if the policy -- what

4    the -- what Congress seems to have said is that this is not a

5    legitimate way for a government to control bir -- try to control

6    births in its population.  And if it does it, at least through

7    ster -- sterilization or forced sterilization or abortion, it's

8    stepping over the lines between what's not persecution and what

9    is persecution for political views.  Now, I don't think this

10   applies to compulsory use of birth control as such.  It doesn't

11   by its own terms and the insertion of an I.U.D. or other non --

12   or other reversible birth control matters, but does specifically

13   apply to sterilization.  Does this mean that -- and that's why

14   there's a thousand limit, which I have no idea how it's going to

15   be appli -- implemented.  But everybody in China, or at least the

16   first thousand each year will be in this lottery able to come

17   into the United States as refugees because of fleeing the birth

18   control policy.

19        A.   Well, I think if there were -- I think I guess

20   then what the issue gets down to is -- is the -- is there

21   background evidence to suggest that everyone gets sterilized or

22   had a forced abortion?  If that were the case, then I would -- I

23   would tend to agree with -- with Mr. Pierce's view or -- or with

24   the view that you've just suggested which is if you're from China

25   and you want to have more than two kids, you have a well-founded

A 29 638 497                    118              October 23, 1996

bw

1    fear of persecution because if you attempt to have more than two

2    kids, you will be sterilized and/or your wife will have her

3    pregnancies aborted.  And I don't think the background evidence

4    suggests that.  In fact, the background evidence suggests a very

5    spotty enforcement of this, depending on where you live, who you

6    are, how much money you have, what the particular birth control

7    rates are in any particular region at any particular time such

8    that there is pressure from the central government on a

9    particular location to get their rates down so to speak.  I do --

10   it is our position that you -- you still have to have an

11   individualized claim.  You have to have some sort of reason for

12   the Court to believe that if you go back, you will be sterilized

13   or you will undergo an abortion.  Or obviously that it's already

14   happened to you.  But with respect to the future, it -- it is our

15   position that you still have to have a particularized claim.  You

16   can't just stand up and say I want to have two kids, therefore

17   I'm a refugee.

18   JUDGE TO MR. PIERCE

19          Q.    Okay, Mr. Pierce?

20          A.    Your Honor, individualized claim, I think Mr.

21   Duvier's going back to Matter of Chang, that you have to prove

22   something specific happened to you.  I think what he's saying, it

23   depends who you are.  They --

24   JUDGE FOR THE RECORD

25          Let's change tapes.

A 29 638 497                 ·    119              October 23, 1996

bw

1                          (OFF THE RECORD)

2                          (ON THE RECORD)

3    JUDGE TO MR. PIERCE

4          Q.    Go ahead.

5          A.    It depends who you are, whether they want to get

6    their birth policy down.  It could happen anytime, anywhere,

7    anyplace.  You just don't know.  I think this is why the new law

8    took affect.  I think is there a credible, is there a well-

9    founded fear that if you have two children this will mean you're

10   subject to sterilization or if he attempts to have another child,

11   that child will be aborted.  I think there is a credible, well-

12   founded fear of that happening, and I think Congress addressed

13   that, that you don't have to show it's so individualistic anymore

14   because of what's going on in China, because it was written

15   what's going on in China from the State Department report.  We

16   don't know that everybody who has two children is going to be

17   sterilized or have forced abortions.  We can't know that.  But we

18   do know it's happening and I think Congress is trying to prevent

19   it.  The reason they limit it to 1,000 is because they know what

20   they're saying is that we're giving everybody who has more than

21   one child in China asylum.  They know they're doing that.  How do

22   they prevent that?  They limit it to 1,000.  They know it's

23   wrong, but they can't give everybody asylum from China who has

24   two children.  It just doesn't make sense and it's not practical.

25   Congress is -- I think their intent is to do something that's

A 29 638 497                    120                    October 23, 1996

bw

1    practical, at the same time doing what they know is right.  Okay,

2    in rebuttal to what Mr. Duvier said that there was no past

3    persecution and -- with religion, I don't think that's correct.

4    We have in that record that their home was sealed, the home where

5    they lived.  We have in the record that their home was raided.  I

6    don't think -- I think that can constitute a form of harassment

7    and that they had to flee and get out of China.  And when they

8    were at -- in hiding, they were afraid to go out to find out

9    about what happened to the people.  I believe (indiscernible)

10   persecution.  It's credible that when they said they were in·

11   hiding, a lot of things were happening at once.  But I do think

12   they cared about the people who were arrested.  I'll have you

13   remember that -- recall that when I asked the applicant who were

14   the people who were detained, and he did -- he knew all six

15   people.  He knew all their names, and there was no hesitation.

16   And then he said he cried when he heard that they were beaten.

17   Okay, so the brother knows it, so he don't know if he has

18   accurate information or not.  But we certainly have his feeling

19   of what he testified to how he felt when he heard that it's

20   possible they could have been beaten.  He says everyone just seen

21   him cry.  As far as what he said about this complete change, I

22   think Mr. Duvier used the word about finding this religion this

23   huge change.  It's not incredible because we do have something

24   that can spark this huge change.  His son was very sick.  I think

25   they thought their son may not make it.  The son was in the

A 29 638 497              121              October 23, 1996

bw

1  hospital for a week.  His fever would not go down.  He prayed and

2  the son got better.  I --

3          Q.    I don't think -- and this is (indiscernible) to

4  what I believe Mr. Duvier was saying --

5          A.    Uh-huh.

6          Q.    -- and you can address it in a perspective at

7  least in which I heard him -- in which I heard it.  It's not that

8  he believed the conversion was not credible but the fact that

9  with -- given the conversion and the huge change that it did

10  represent, the fact that they should get a warning and relate it

11  to something other than what's been going on in their house

12  because of this big change is not credible.  So that's more the

13  issue of their credibility.

14          A.    Okay.

15          Q.    And when they gave their response and he pointed

16  out that this response, why has this become an issue?  Why did

17  they say this?  It became an issue because they had testified

18  that they didn't tell the pastor about the notice.

19          A.    Yes.

20          Q.    And that begs for an explanation if they're now

21  seeking to live in another country because of what's implied in

22  that very same threat in that he didn't tell the very pastor.

23          A.    But I believe --

24          Q.    Priest.

25          A.    I'm sorry.  That is explained.  And we do have in

A 29 638 497                    122                 October 23, 1996

bw

1    the asylum application, it's not just coming out here today, that
2    they didn't think when they received the warning, but we thought
3    the government -- I'm reading from the fifth paragraph down from
4    the top, or the second one up from the bottom, but we thought the
5    government just scared people to get together to do something
6    against the government because the time was close to June 4th
7    student movement and we think we didn't do anything wrong.  We
8    just practice our religion and it didn't hurt anybody.  I think
9    if -- when we try and find out what the situation was like at
10   that time, what was going on, what the pastor was saying to them,
11   that maybe it wasn't the most prudent thing, of course, not to
12   tell the pastor, but I don't think this crosses the line to
13   incredibility.  They made a mistake.  They -- they knew
14   basically, they got the big oops when the sirens came that this
15   was a big deal and we should have realized it was a big deal.
16   But as far as to having to explain themselves to stay in this
17   country, I don't think that's totally fair.  I think people
18   should be allowed to make bad judgement calls.  That's really all
19   I can offer to the Court.  If it is a reason why it would cross
20   the line to incredibility, I just hope it wouldn't.  That's all I
21   can tell the Court.  They're being detained, obviously, and when
22   he said, I didn't know I had a hearing today, I think when he
23   clarified that, I don't -- I know what day the hearing is, but
24   since I'm in detention, you don't know, you know, one day from
25   the next.  It's true the brother's not here, and that definitely

A 29 638 497              123              October 23, 1996

bw

1    counts against them, but I hope the presence of another person

2    doesn't hurt what's happening here today.  And to -- finally,

3    when he said there was no, according to the statute with the

4    birth control policy, I do believe there was resistance to the --

5    (indiscernible) resistance to the population control policy, as

6    I've outlined earlier.  And also there was past persecution in

7    measures with the involuntary insertion of the I.U.D. and the

8    bleeding and the pain that accompanied it.  I do believe the

9    statement that there was no past persecution is -- is not

10    accurate.  There was and I believe the child having not to be

11    registered was also -- which could have consequences.  There were

12    acts that happened in China that didn't come up after they left

13    China.  So I believe past persecution has been established, and I

14    believe there's a very well-founded fear of future persecution.

15    Thank you.

16    JUDGE TO COUNSEL

17         Q.    Okay, thank you gentlemen.  We've run -- we've run

18    out of time today.  I'm going to have to reset this for a

19    decision.  Let's go off the record and find a time.

20                         (OFF THE RECORD)

21                         (ON THE RECORD)

22    JUDGE FOR THE RECORD

23         All right, we're going to reset this case for November

24    1 at 2 o'clock in the afternoon for a decision.  The Court will

25    waive the physical appearance of the applicant's counsel.

    A 29 638 497                .    124              October 23, 1996

bw

1    JUDGE TO MR. PIERCE

2           Q.   And this makes it sound like I think you look

3    funny.  You're not going to need to appear here in Court, but do

4    -- but you do need to appear by telephone, and we'll -- we'll

5    call you at that time.  It's just for the giving of the decision,

6    no more evidence or argument.

7    JUDGE TO COUNSEL

8           Q.   I'll just say this about argument, if either party

9    wishes, I'm not going to require it nor frankly will I expect it

10   here, but if either party wishes to brief the issue of the

11   application of Section 601, you're welcome to submit something as

12   long as I receive it the day before the hearing, by Thursday the

13   31st of October.  We'll give you a hearing notice for this.

14   JUDGE TO THE INTERPRETER

15          Q.   And I'd like to ask the interpreter to explain

16   this to the parties after we go off the record.

17                          <u>HEARING CONTINUED</u>

18

19

20

21

22

23

24


A 29 638 497                    .    125              October 23, 1996

U.S. Department of Justice
Executive Office for Immigration Review
Immigration Court


Matter of                                              File A 29 638 497
                                                            A 29 638 498


                                     )
                                     )
KUR LIAN ZHANG                       )
IJING HUANG                          )          IN EXCLUSION Proceedings
          Applicants                 )
                                     )          Transcript of Hearing


Before WILLIAM VAN WYKE, Immigration Judge


Date:  November 1, 1996          Place:  York, Pennsylvania


Transcribed by DEPOSITION SERVICES, INC. At Rockville, Maryland


Official Interpreter:  Yong Yeh


Language:  Foo Chow


Appearances:

     For the Immigration and              For the Applicants:
     Naturalization Service:

     Jeff Duvier, Esquire                 Stuart Pierce, Esquire

# 福建省福清市公安局

## 通知

张才亮、黄爱金：

经调查你俩确系非法召集
和会闻教人员以宗教为由勾往
国外不良分子进行破坏活动
造成严重影响。为此本局限
你俩在七月廿日到福清公安局
自首。否则我局将持取行动。



福清市公安局

一九七二年七月十五日

## CERTIFICATION

I, Coco Ng, certify that I am competent to translate this document, and that this translation is true and accurate, to the best of my abilities.

Date this 2nd day of October, 1996

_____
Coco Ng

State of New York  )
                   )  ss:
County of New York )

Sworn before me this 2nd of Oct, 1996

_____
Notary Public

STUART M. PIERCE
Notary Public, State of New York
No. 43-4988714
Qualified in Richmond County
Commission Expires Nov. 18, 199 7



Applicant's Home
in China

Closed down by FuQing
Public Security Bureau
on 7/10/96

Closed down by FuQing
Public Security Bureau
on 7/10/96





UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
York, Pennsylvania

File No.:    A 29 638 497                    November 1, 1996
             A 29 638 498

In the Matter of

    ZHANG, KUR LIAN         )    IN EXCLUSION PROCEEDINGS
    HUANG, IJING           )
              Applicants    )

CHARGE:      INA Section 212(a)(6)(C)(i), 212(a)(7)(B)(ii),
             212(a)(7)(A)(ii) in case number 29 638 497.

             Section 212(a)(6)(C)(i), 212(a)(7)(A)(ii) in case
             number 29 638 498.

APPLICATIONS: Political asylum and withholding of deportation to
             the People's Republic of China.

ON BEHALF OF APPLICANTS:              ON BEHALF OF SERVICE:

Stuart Pierce, Esquire               Jeffrey Duvier, Esquire
Law Office of Henry Lee M. Fong      Assistant District Counsel
7-8 Chaplin Square, Number 800       U.S. INS, 3400 Concord Road
New York, New York 10038             York, Pennsylvania 17402

## ORAL DECISION OF THE IMMIGRATION JUDGE

      Mr. Zhang and Ms. Huang are a married couple, husband
and wife, who came to the United States together on or about June
28th, 1996, at which time they did not appear admissible to the
Immigration inspectors and they were charged as recited above and
put in exclusion proceedings.  Since that date they have been
detained here in the York County Prison.  The Court expedited
their cases as much as possible in light of the fact that they
are a married couple and were not permitted to see each other

bw

while they were incarcerated, and the Court found a space that
was mutually convenient to both parties on October 23, 1996 and
has set the hearing for that date.  Mr. Zhang is 32 years old and
Ms. Huang is also 32.  The couple has two children, one a male
born August 19, 1988 (now eight years old) and the other a female
born April 24, 1994 (now two years old).

At a prior hearing the Court noted that a written
pleading was submitted by the counsel.  Excludability under
212(a)(6)(C) was denied in both cases and excludability under
212(a)(7)(A)(ii) was originally denied in both cases.  But at the
hearing on the merits, that plea was changed so that the
applicants both admitted excludability under 212(a)(7)(A)(ii),
that is that they are intending immigrants without an immigrant
visa.  The charge under 212(a)(6)(C) was still denied and the
matter was addressed at the hearing on the merits and the Court
will address it now.

Only Mr. Zhang gave testimony as to his manner of entry
into the United States.  And the only thing he said about it was
that the airplane landed in Alaska and he did not know where he
was.  And he handed something to some people (presumably
Immigration inspectors) and didn't know what he was handing that
person.  That is the extent of the testimony on the fraud issue.
The Court finds that this testimony is not sufficient to sustain
the charge of fraud in Mr. Zhang's case, especially when the
Board will look at a finding of fraud with "close scrutiny"

A 29 638 497                    2              November 1, 1996

bw

pursuant to its long line of cases on this issue.  No testimony was given about Ms. Huang's alleged fraud and the evidence therefore fails in that case as well.

     With respect to the application for political asylum, the applicants held a joint hearing and this is the decision about both cases.  Each has submitted an application for political asylum, although Ms. Huang's application only gives biographical data that is different than the application of her husband and she does not have a separate affidavit or statement of acts upon which she fears persecution independent of the claim made by her husband.  The Court considers all the evidence that was submitted in both cases to apply to both cases and sees each applicant as having a separate application for political asylum and each being included as a derivative in the application of the other.

     Both applicants allege two grounds for fearing persecution in China.  The first is that they are Christians and had an apparently political problem because they were holding meetings at a suspicious time, just prior to the seventh anniversary of the June 4th movement uprisings.  They were doing this in June of 1996.  And the government suspected them of holding meetings to plan for commemorations of the June 4th uprisings.  The other claim is based on their fear of being sterilized.  Each of them fears being sterilized because they have two children.  They testified that when Ms. Huang gave birth

A 29 638 497                    3                    November 1, 1996

bw

to their second child, she did so away from the home at another hospital that didn't report to the Family Planning Agency and that the child lived at first with her grandmother prior to coming to their home.  In the home, Ms. Huang let on as if the child was a child she was simply taking care of, but now that the child is nearly two years of age, it starts calling her mother and people know that she has two children.  Nonetheless, the couple claims that they did not register the second child because they had removed an I.U.D. with the help of a doctor from Ms. Huang so that she could become pregnant.  And she did this without getting the permission of the government.  They feared that if her pregnancy were discovered and she did not have permission for the second child that she would be forced to abort the child.  They feared that if she asked for permission for the second child, it would be denied and it would be discovered that she had illegally removed the I.U.D. from her body.  They testified that the child is not registered and, as a result of this, will not be eligible for recognition as a person eligible for the numerous benefits that are otherwise available to families and their children in China.

With respect to the first claim, Mr. Zhang testified that his son became extremely ill with a very high fever in January of this year.  After a couple of days in the hospital, the fever did not subside.  A friend advised he pray to God and he got some advice on how to do this.  And he did so and his

A 29 638 497                     4                November 1, 1996

bw

child's fever subsided. Both Mr. Zhang and Ms. Huang attributed
their child's curing to their answered prayers. They began to
show their gratitude by holding religious meetings in their home
In March of this year, Mr. Zhang was baptized, but Ms. Huang said
she was not baptized because she could not read or write,
although the connection between needing to read and write and
being able to be baptized was never satisfactorily explained.

 The family lived in a village that was some distance
from the central village. The central village was Fuqing, where
there was a church with a cross on the top and a father or priest
or pastor. It was not clear whether this church was of any
particular denomination, whether it was Catholic or Protestant.
And Mr. Zhang was unable to say whether it was registered with
the government or not. The priest or pastor in that church put
Mr. Zhang in contact with another person that he described as
"father," meaning a religious father who attended services at
the home of Mr. Zhang and Ms. Huang. In their home they invited
other people from their local village called Qiqian, who they
said were Christians, many of them for a long time in a dormant
manner with some vague beliefs and understandings but had never
developed their faith because their had never been a church or
pastor or priest in their village. Now, they held regular
meetings and a fair number of people attended these meetings in
their home each Sunday.

 On May 3, 1996, the government warned them through the

A 29 638 497      5      November 1, 1996

bw

Public Security that they should not hold any more gatherings in their home.  Two Public Security officials came to their home and left a written note.  The note was eventually obtained by Mr. Zhang's mother and was forwarded to him here in the United States.  A later note was given to them dated June 20, 1996 from the police office of Qiqian City and this note was submitted as Exhibit 5-B.  It stated "it is suspected that you on the pretext of religion have convened illegal meetings to gather the jobless people to participate in the unlawful activities.  This has caused an adverse affect to their society.  You are therefore required to come to our office before July 5 to clarify this matter."  It is handwritten.  It appears to be on a letterhead which reads, "Police Office of Qiqian City, Fujian Province." And it's signed and dated with a seal at the bottom.  And it is this note that was left for the applicant's mother.  The warning on May 3 was a verbal warning.

Mr. Zhang testified that he did not inform the pastor or priest about the warning on May 3.  He thought it was nothing serious, he said, because their gathering was simply a religious gathering and the constitution of China and the practice in China permitted people to hold religious gatherings.  He thought that the police officers intention was to close down the possibility that he was organizing a June 4th anniversary celebration, and since he was not doing that, he had no fear of the police and thought it was not necessary to tell the pastor about the request

bw

that they shut down the gathering.

On May 26th, while a religious service was in process at their home, both of the applicants heard a siren and saw a police car approaching. Everybody ran for the doors and both Mr. Zhang and Ms. Huang escaped out the back door. They said they never went back again. They heard that the police had arrested some six people. They had heard that these were people who had attended the worship meetings at the home. They said they heard this through Mr. Zhang's brother, who is a U.S. resident and lives in New York City. The brother was not present for the hearing, although he's here today for the decision of the Court.

Because the couple feared now after the police approached that they would be arrested, they went into hiding and obtained help from the pastor to obtain documents to leave China because he convinced them that there is no freedom of religion in China and that they should therefore leave. The father who was also present at the worship meeting and apparently fled as well, apparently remained in China. The applicants did not know much about this father, where he had come from, what work he had done prior to coming to their church, what work he did the rest of the week when he was not attending their worship services or even where he lived. They communicated with him because he'd come to Mr. Zhang's mother-in-law's house after the police had approached the house on May 26th.

The applicant testified that he learned through his

A 29 638 497                    7                    November 1, 1996

bw

brother that his mother had said that the Public Security officers in Qiqian came back to his own home to look for him. But she would not say where Mr. Zhang and Ms. Huang were. The couple fears that if they return to China, they will be in political trouble because they were viewed as preparing for a June 4th demonstration and regardless of how they were viewed, they were ordered to restrain from holding meetings in their home and they held meetings anyway. Because of the lack of religious freedom, they believed they would not be able to practice their religion in freedom if they returned.

The couple also makes a claim for asylum on a ground that appears unrelated. The Court has already stated the basic thrust of their claim; i.e., that they have a second child without authorization and without permission, that because it was without authorization or permission and because it followed their removing the I.U.D. from Ms. Huang's body illegally, they kept the existence of their child unknown to the government by not registering the child. They believe that they will both suffer persecution if they return in the form of sterilization and a fine. Sterilization to prevent them from having future children and a fine to pay for their past errors. They both testified that they would like to have more children. Mr. Zhang would even like to have four or five. And Ms. Huang stated that she would like to have more children as well, but that they cannot legally do so in China and they fear that they will be sterilized.

A 29 638 497                    8                  November 1, 1996

bw

Background evidence discusses sterilization to some extent, and it appears that either one of them runs an actual risk of being sterilized, given the birth of two children.  The fact that Ms. Huang is still only 32 years of age and has expressed an interest in having another child and has violated the birth control measures in the past by having a child secretly.

With respect to the claim regarding religion, the Court believes that the testimony of the applicants has not been detailed or particularly plausible in some important respects. While it is always conceivable that a person with a new found faith would be very excited about that faith and share it with others, and that may have happened here, there are indications in the testimony of events which the Court finds detract from this claim.  One is the fact that they knew nothing about the priest who was going to be the pastor of their congregation, who met with them every Sunday in a country where religion, especially a Western religion, is at least problematic, even though the actual meetings for worship might not be obstructed by the government on a regular basis.  And yet they knew nothing about this person.  A religious community is a community of people who know each other, who care about each other, who know about each other.  And it seems that it strains the imagination to think that this priest dropped out of the sky as it were to come and help them and then went on with a life during the rest of the week that they knew nothing about.  Ms. Huang's explanation as to why she was

A 29 638 497                    9                   November 1, 1996

bw

baptized, that is that she can't read or write seems to be non-secular from all that the Court gathers in its general knowledge about ~~religion~~ that baptism in any religion is a question of faith rather than intellectual ability. ~~Mr. Zhang's testimony~~ that he did not share with the priest the information about the warning not to meet in his house again also strains credulity. He stated that the reason was that he did not consider the matter important, but as was pointed out by the INS in its closing, there was no other conceivable reason why the warning was made other than for the religious meetings being held in the house, even if the government's subjective motive in addressing those meetings was to guard against the planning of celebrations of the June 4th movement in the weeks that followed. It obviously has bearing on the safety of the people meeting and the exercise of the group's religion. And it's hard to imagine the applicant's being so naive as to believe that the government of China was simply not concerned at all about the religious meetings given the history, especially in past years, of considerable persecution against religion in China.

        The Immigration Service also pointed out that its a glaring defect in their presentation of their case that their brother, who had all of the important information directly from the source and was present in the United States in New York City did not come and testify on their behalf. That indicates a lack of belief on the part of the applicants themselves that their

A 29 638 497                    10                    November 1, 1996

bw

brother actually has information to corroborate their claim.  The

brother's appearance today in Court to hear the decision raises

further questions as to why he was not present because it is

clear that it is at least possible for him to come to Court.

Finally, it's been argued by the Immigration Service

and the Court is in agreement that if the evidence is taken at

face value, it still does not show the reasonable fear of

persecution.  The only event that happened was the approach of

the police cars with their sirens on and the escape of this

family from their home.  Background evidence shows that there are

some arrests of people involved in proselytizing, especially

priests, but there is not even a claim in this case that the

priest involved in this case was arrested, was threatened with

arrest or was even concerned that he might be arrested.  He was

rather helping other members of his flock, in particular these

two people, to escape because "there's no religious freedom" in

China.  The family has not been persecuted as such on the grounds

of their religion.  There's no indication that the reason that

the police came was to keep them from practicing their religion.

In fact, it's been testified that they believed that the reason

was to keep them from planning for the June 4th movement, which

they were not doing anyway.  The Court is not unmindful that the

background evidence describes the government of China as being

authoritarian, extremely conscious about its security, intolerant

of people questioning its authority.  In fact people questioning

A 29 638 497                       11                    November 1, 1996

bw

its authority or challenging it are "often dealt with harshly and
arbitrarily." The State Department opinion, Exhibit 5, page 3.
Nonetheless, the same State Department exhibit goes into some
detail about the treatment of religion by the government and that
is the only evidence in this record about the treatment of
religion in China. And the Court finds that that background
evidence demonstrates that some people who are extremely active
and especially insisting on prosthetizing have been detained and
there may be many more people actually detained for longer
periods of time than what's reported. Nonetheless, the State
Department reports that there are some 20,000 house churches,
which is what the applicant was conducting; some 8,000 registered
churches and that the government includes within the registered
churches some six million "official" Protestants and some four
million "official" Catholics. The State Department opinion at
page 28. Nothing more was claimed by this couple than that they
had meetings in their house. And when they as well as 20,000
other people are doing it and the evidence supporting the entire
scenario is as weak as the evidence in this case, the Court
believes that they have not made out a claim to show that they
have a well-founded fear of persecution on account of their
religion if they return to China. Ipso facto, they have not
shown that they have a clear probability of persecution.

With respect to the claim regarding their being subject
to the birth control policies of China, the Court has no reason

A 29 638 497                    12                  November 1, 1996

bw

to doubt that they have two children.  Given the background
evidence snowing the requirement to get permission to have a
second child, the large number of people who do have second
children without getting permission and the persistence of the
government in seeking to enforce sometimes in systematic and
sometimes in more haphazard manners the birth control policy of
limiting each family to one child or in some regions two
children, the Court really does not doubt the testimony that they
hid from the birth control authorities when Ms. Huang was to give
birth to their second child.  This fits in with the background
evidence and is plausible in light of a national policy so
intrusive as the policy of the Chinese government as it's
described in the background evidence and the Court finds the
testimony regarding these events to be sufficiently detailed and
plausible to establish the facts on which this aspect of their
claim is based.  They do have two children.  An I.U.D. was
removed against the law.  The second child has not been
registered with the government and the couple fears that either
of them might be sterilized if they returned to China because of
their demonstrated disregard for birth control laws in the past
and the presumption that that raises that they will continue to
disregard the birth control laws while Ms. Huang continues in
child bearing age.

     Shortly before the hearing in this case, the Congress
of the United States amended for the first time the definition of

A 29 638 497                    13              November 1, 1996

bw

refugee for purposes of political asylum claims under Section
101(a)(42) of the Immigration and Nationality Act.  Section 601
of the Immigration Act of September 30, 1996 says as follows,
"Section 101(a)(42) [of the INA] is amended by adding at thé end
the following: 'For purposes of determinations under this Act, a
person who has been forced to abort a pregnancy or to undergo
involuntary sterilization, or who has been persecuted for failure
or refusal to undergo such a procedure or for other resistance to
a coercive population control program, shall be deemed to have
been persecuted on account of political opinion, and a person who
has a well-founded fear that he or she will be forced to undergo
such a procedure or be subject to persecution for such failure,
refusal or resistance, shall be deemed to have a well-founded
fear of persecution on account of political opinion.'"

By specifically stating in an act of Congress that
resistance to such a policy is a manifestation of a "political
opinion," it is obvious to the Court that the Congress is
referring to the decision of the Board of Immigration Appeals in
Matter of Chang and Matter of G-.  This Court is bound to follow
the decisions of the Board of Immigration Appeals as precedent
when those decisions interpret the law that is found in the
statute.  There is as yet no interpretation of this new law which
is effective now and so the Court believes that the decisions in
Chang and G-, although they relate, are binding on the language
of Section 101(a)(42) as it appeared prior to this amendment, do

A 29 638 497                    14              November 1, 1996

bw

not even purport to interpret the new language, and the Court
must address this new language as a matter of first impression.

In understanding what Congress has done in amending
Section 101(a)(42), the Court goes back to a case which was
decided following other amendments to the Immigration law
relating to persecution back in 1969. The case is <u>Kovak v. INS</u>,
407 F.2d 102. In that case, the 9th Circuit discussed the old
definition of persecution as "physical" persecution. <u>See</u> page
106. And it said that in removing the word physical the Congress
meant that the word persecution should bear its everyday meaning
and it cited Webster's Dictionary to quote that everyday meaning
as being "the infliction of suffering or harm upon those who
differ (in race, religion or political opinion) in a way regarded
as offensive." This definition has been adopted by the Board of
Immigration Appeals in <u>Matter of Acosta</u> as well, and the Court
finds some guidance in what Congress has intended here by looking
at this definition of the word persecution. The 9th Circuit says
at page 107 "no doubt 'persecution' is too strong a word to be
satisfied by proof of the likelihood of minor disadvantage or
trival inconvenience." When Congress used the word "persecution"
in Section 601 amending Section 101(a)(42) of the Act, it states
explicitly that a person that has a well-founded fear that they
will be forced to undergo sterilization has a well-founded fear
of "persecution" and that that "persecution" is "on account of
political opinion." In other words, while the focus of many

A 29 638 497                    15                November 1, 1996

bw

decisions of the Board and circuit courts have been on whether or not the harm feared is "on account of political opinion" there is also an aspect to which the Board's decisions are based on the view that the harm suffered is not sufficiently serious to constitute persecution. The Congress in amending this and in adding the amended language establishes both that the persecution is on account of political opinion and that it is persecution. That is, it can no longer be viewed as any "minor disadvantage or trivial inconvenience" but is sufficiently severe harm to constitute use of the term of art "persecution."

Applying this definition to the facts in this case, it is clear first of all that neither applicant has suffered past persecution. Ms. Huang has undergone an involuntary insertion of an I.U.D. into her body as a birth control measure against her will. She committed an illegal act in removing it. The act of Congress relates to a forced abortion of a pregnancy or an involuntary sterilization but does not refer to involuntary birth control measures. And it is clear that Mr. Zhang has not suffered past persecution as well.

Nor, has either party suffered past persecution because of their failure or refusal to undergo such a procedure. They did try to avoid such a procedure. They did not register their child in order to avoid such a procedure. But the Court does not find that that harm is sufficiently severe to constitute persecution nor does it believe that the Congress intended every

A 29 638 497                    16                    November 1, 1996

bw

act of avoidance of that policy to constitute the "infliction of
suffering or harm" that constitutes persecution under Kovak and
the Board's decisions.

On the other hand, it does appear that both applicants
have a reasonable fear that they will be forced to undergo one of
the two procedures which Congress has singled out, either an
abortion or involuntary sterilization.  Obviously, Mr. Zhang
cannot fear undergoing an abortion himself, but he can fear
undergoing involuntary sterilization.  Ms. Zhang can fear with an
involuntary sterilization or abortion.  The Immigration Service
argued in its argument also first impression on this matter that
there should be some nexus shown between the possible action by
the government and the specific individual facts in the case.
That is not established one way or the other, but the Court
believes that in this case the nexus is present.  It is not pure
conjecture on the applicant's part that they will be subject to
such a procedure as a forced sterilization if they return.  In
fact, the background evidence makes it clear that they have a
reasonable possibility of being subject to such a procedure even
if Ms. Huang does not become pregnant again, especially because
of her past flaunting of the birth control measures by having her
I.U.D. removed and getting pregnant without government
permission.  Because the nexus here is the family's already
having two children and having violated the birth control
policies in the past, it is not at all unlikely, in fact it is a

A 29 638 497                    17              November 1, 1996

bw

reasonable possibility, that they will be forced to undergo
either sterilization procedures or if Ms. Huang becomes pregnant,
she will be forced to undergo an abortion if returned to China.
The Court notes that the definition of withholding of deportation
has not changed with this change by Congress of Section
101(a)(42).  It would find on the basis of these facts, however,
that the applicants have not shown a "clear probability" that
either of them would be subject to such a procedure because the
actions which they have suffered so far and the actions that they
have taken so far do not bear a strong enough relation to the
policy to indicate that they would "probably" suffer
sterilization or abortion if returned to China.  The Court does
believe that they have shown that there is a "reasonable
possibility" of their suffering such a procedure and that that
procedure itself, if they underwent it, would be the "suffering
or harm" that constitutes the persecution and it would be deemed
to occur "on account of their political opinion."  Their
political opinion in this case is nothing more than their desire
to have children free of government interference.

          In trying to assess Congress's intent on this case, in
light of the Board's decisions, the Court does believe that the
Congress has considered the Board's findings in Matter of Chang
not to represent the policy of the United States.  In particular,
the Board's observation that China must do something to control
its population and the implicit finding that what China does do

A 29 638 497                    18              November 1, 1996

bw

is not in violation of fundamental human rights norms or that if

it is, it does not violate those norms "on account of" any

particular parent's political opinion or other characterization.

The Congress is stating that it is the public policy of the

United States to give international protection to those who flee

these coercive practices as long as they have a "reasonable

possibility" of suffering them and to give protection.  The Court

interprets this because of what is stated in Matter of Chang and

Matter of G- and what is stated in the new Act, and it also

interprets this way because of what is stated in Section B of

Section 601 of the Act of September 30, because Congress has

placed a numerical limitation of 1,000 people per year.  The

regulations have been promulgated showing how this limitation

will be effectuated, but given that the statute as applied to the

facts in these applicants' case shows them to meet the definition

of refugee, the Court will make a finding that they are refugees

subject to whatever other administrative regulations or practices

are promulgated that actually effectuates the Court's finding.

The Supreme Court has stated in Matter of Cardoza-

Fonseca that after there is a finding that a person is a

"refugee" under Section 101(a)(42), the Attorney General must

make a second finding as to whether or not the person should be

granted refugee status in the exercise of discretion, and the

Court will now address that issue.  In this case, the Court

believes it is bound still by the Board's determination in Matter

A 29 638 497                    19                    November 1, 1996

bw

of Pula, that a well-founded fear of persecution is already a strong equity in considering whether or not to exercise discretion in favor of a person who meets the refugee definition. In that case, 19 I&N Dec. 467 (BIA 1987), the Board was addressing the entry of a person into the United States through fraud and the circumvention of orderly refugee processing. And the Board held that in the absence of any adverse factors, asylum should be granted in the exercise of discretion. It says further, "A situation of particular concern involves an alien who has established his statutory eligibility for asylum that can't meet the higher burden required for withholding of deportation. Deportation to a country where the alien may be persecuted thus becomes a strong possibility. In such a case the discretionary factors should be carefully evaluated in light of the unusually harsh consequences which may befall an alien who has established a well-founded fear of persecution. The danger of persecution should generally outweigh all but the most egregious of adverse factors." At page 474. Here, the possibility of a forced sterilization or forced abortion is now by definition of Congress one of the "unusually harsh consequences which may befall an alien who has established a well-founded fear of persecution." There is, of course, in the background evidence sufficient basis to find that the government would carry out such an action, that the government of China would jealously protect its authority and exercise its authority to do what it wishes to any particular

A 29 638 497                    20                November 1, 1996

bw

family that may wish to violate the absolute legal requirements
regarding family size and the Court sees the Congress's
definition or inclusion within the definition of "persecution" a
finding that such a sterilization or abortion would be one of the
"unusually harsh consequences" of a deportation to China.  The
Court should be careful and is careful here and mindful of the
fact that after hearing many Chinese asylum applications over a
period of a year and a half, it has gotten to see the fear of a
sterilization as being something "minor" in a sense, because it
is not the kind of harm that the Board under <u>Chang</u> and <u>G-</u>
protected applicants against.  But now the Court believes it must
squarely accept the seriousness of such harm, given Congress's
definition and in this case it does not see strong adverse
factors that would justify not granting asylum to people who fear
such unusually harsh consequences of their past violation of the
birth control laws and their simple desire to have more than the
two children they have now.  The Court in coming to this
conclusion considers the shakiness of the testimony regarding the
other claim which was really the principal claim on which they
relied in this case, at least in terms of the amount of time
spent on it, but believes that the record does not support a
finding that there was an intention of lying about the claim or
other sort of fraud upon the Court.  Given the Board's decision
in <u>Matter of Pula</u> and its drawing back from the decision in
<u>Matter of Salim</u>, even fraud may allow the granting of political

A 29 638 497                    21              November 1, 1996

bw

asylum, but the Court in this case does not find that that
describes the facts before it and does not find that the
applicants have committed fraud or intentionally lied in order to
press their claim in this case.  In light of the foregoing,
therefore, the Court will exercise its discretion in favor of
this couple and grant political asylum in the United States and
will deny the application for withholding of deportation to
People's Republic of China.

ORDER

IT IS ORDERED that the application for political asylum
in both cases be and is hereby granted.

IT IS FURTHER ORDERED that the application for
withholding of deportation to China in both cases be and is
hereby denied.

IT IS FURTHER ORDERED that both applicants shall be
admitted to the United States as political asylis, subject to any
numerical limitations that may be imposed administratively and
that these proceedings be terminated.

WILLIAM VAN WYKE
Immigration Judge

A 29 638 497                  22              November 1, 1996

## CERTIFICATE PAGE

I hereby certify that the attached proceeding before

JUDGE WILLIAM VAN WYKE, in the matter of:

KUR LIAN ZHANG

A 29 638 497

IJING HUANG

A 29 638 498

York, Pennsylvania

was held as herein appears, and that this is the original

transcript thereof for the file of the Executive Office for

Immigration Review.

_____
(Barbara Webber, Transcriber)


Deposition Services, Inc.
6245 Executive Boulevard
Rockville, Maryland  20852
(301) 881-3344


___January 28, 1997_____
(Completion Date)

**U.S. DEPARTMENT OF JUSTICE**
Executive Office for Immigration Review
Office of the Immigration Judge

In the Matter of:

_Nubing Ai Jing_

APPLICANT

Case No.: A _29-638-498_

Docket: _York PA_

IN EXCLUSION PROCEEDINGS

## ORDER OF THE IMMIGRATION JUDGE

This is a summary of the oral decision entered on _Nov 1, 1996_. This memorandum is solely for the convenience of the parties. If the proceedings should be appealed or reopened, the oral decision will become the official opinion in this case.

☐ Applicant has been ordered excluded and deported from the United States.

☒ Applicant is admitted to the United States as a _political asylee_ until _indefinitely_.

☐ As a condition of admission, the applicant is to post a $ _____ Maintenance of Status and Departure Bond.

☐ Applicant's request to withdraw the application for admission to United States is granted. If the applicant fails to depart on or before the date set by the District Director, Immigration and Naturalization Service, the following order shall become immediately effective: Applicant shall be ordered excluded and deported from the United States.

☒ Applicant's application for asylum was (X)granted (  )denied (  )withdrawn (  )other.

☒ Applicant's application for withholding of deportation was (  )granted (X)denied (  )withdrawn (  )other.

☐ Applicant's application for waiver under Section _____ of the Immigration and Nationality Act was (  )granted (  )denied (  )withdrawn (  )other.

☒ Proceedings were terminated.

☐ The application for adjustment of status under Section (216)(216A)(245)(249) was (  )granted (  )denied (  )withdrawn (  )other. If granted, it was ordered that the applicant be issued all appropriate documents necessary to give effect to this order.

☐ Other _____
_____

Immigration Judge

Date: _11/1/96_

_Due December 2, 1996_

Appeal: RESERVED/WAIVED ( A / I / B )

Form EOIR - 58
REV. - JUNE 93

, Department of Justice
.nigration and Naturalization Service

**Notice of Action**

### THE UNITED STATES OF AMERICA

| RECEIPT NUMBER | | CASE TYPE  I730 |
| --- | --- | --- |
| SRC-97-214-52239 | | REFUGEE ASYLEE RELATIVE PETITION |
| RECEIPT DATE | PRIORITY DATE | PETITIONER  A29 638 497 |
| July 22, 1997 | | ZHANG, KE LIANG |
| NOTICE DATE | PAGE | |
| December 15, 1997 | 1 of 1 | |

| | |
| --- | --- |
| STUART M. PIERCE<br>7 8 CHATHAM SQUARE<br>SUITE 800<br>NEW YORK NY 10038 | Notice Type:  Approval Notice<br>Class: ASY |

Your "Refugee/Asylee Relative Petition" has been approved for the family member(s) listed on this notice, in accordance with Section 208 of the Immigration and Nationality Act, and forwarded to the Department of State. A separate notice will be sent for any person listed on your Form I-730 but not listed on this notice. This completes all INS action on this petition.

The Department of State will notify the U.S. Embassy or Consulate abroad having jurisdiction over the area where your relative(s) resides. The consular post will contact your relative(s) regarding procedures to be followed for travel to the United States.

THIS FORM IS NOT A VISA NOR MAY IT BE USED IN PLACE OF A VISA.

Family members:

| Name | DOB | COB | Class | |
| --- | --- | --- | --- | --- |
| ZHANG, GE JIE | 08/19/88 | CHINA, PEOPLE'S REPUBLIC OF | ASY | A76 455 276 |
| ZHANG, LU | 04/24/94 | CHINA, PEOPLE'S REPUBLIC OF | ASY | A76 455 275 |

"A" NUMBERS ADDED MANUALLY AT NSC

Please see the additional information on the back. You will be notified separately about any other cases you filed.
NEBRASKA SERVICE CENTER
U. S. IMMIG. & NATZ. SERVICE
P.O. BOX 82521
LINCOLN NE 68501-2521
Customer Service Telephone: 402-437-5218



U.S. Department of Justice
Executive Office for Immigration Review

Decision of the Board of Immigration Appeals

Falls Church, Virginia 22041

Files: A29 638 497 - York    Date:
   A29 638 498        SEP 2 8 1999

In re: KE LIANG ZHANG
   AI JIN HUANG

IN EXCLUSION PROCEEDINGS

APPEAL

ON BEHALF OF APPLICANTS: Stuart M. Pierce, Esquire
            7-8 Chatham Square, Suite 503
            New York, New York  10038

ON BEHALF OF SERVICE: Jeffrey T. Bubier
           Assistant District Counsel

EXCLUDABLE: Sec. 212(a)(6)(C)(i), I&N Act [8 U.S.C. § 1182(a)(6)(C)(i)] -
         Fraud or willful misrepresentation of material fact [1]
         (both applicants)

       Sec. 212(a)(7)(A)(i)(I), I&N Act [8 U.S.C. § 1182(a)(7)(A)(i)(I)] -
         No valid immigrant visa [2] (both applicants)

       Sec. 212(a)(7)(B)(i)(I), I&N Act [8 U.S.C. § 1182(a)(7)(B)(i)(I)] -
         Nonimmigrant without valid passport (A29 638 497)

APPLICATION: Asylum; withholding of exclusion and removal

  The Immigration and Naturalization Service has filed a timely appeal of the November 1, 1996, decision of the Immigration Judge, which granted the applicant's application for asylum under section 208(a) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a). [3] The appeal will be sustained.

---

[1]  The fraud charge was not sustained.

[2]  A finding of excludability under section 212(a)(7)(A) of the Immigration and Nationality Act renders excludability under the provisions of section 212(a)(7)(B) of the Act, inapplicable. See Matter of Healy and Goodchild, 17 I&N Dec. 22, 26 (BIA 1979).

[3]  The applicants are husband and wife. Except where otherwise indicated, the term "applicant" refers to the husband, the principal applicant herein.

A29 638 497
A29 638 498

The Immigration Judge denied the applicant's asylum application as to his claim of religious persecution, finding his account not credible (I.J. at 9-11). The Immigration Judge also determined that, even if the applicant's testimony were credible, the applicant had not demonstrated that he experienced past persecution on account of religion or that he has a well-founded fear of future persecution with respect to his religion claim (I.J. at 11-12). However, the Immigration Judge found the applicant's testimony credible with respect to his fear of sterilization and granted the applicant's asylum application on that basis (I.J. at 12-22). The Immigration Judge denied withholding of exclusion and deportation (I.J. at 22).

On appeal, the Service argues that the applicant's testimony, having been found not credible with respect to the religion claim, is also not credible with respect to the family planning claim. The Service also argues that the applicant's testimony, even if credible, would not constitute a basis for a finding of past persecution or well-founded fear of persecution.

Upon review of the record, we agree, for the reasons set forth by the Immigration Judge, that the applicant's testimony as to the major aspects of his case was not credible.[4] The Immigration Judge's credibility assessment finds significant support in the record. A persecution claim that lacks veracity cannot satisfy the burdens of proof and persuasion necessary to establish eligibility for asylum and withholding of deportation. See generally Matter of S-S-, Interim Decision 3257 (BIA 1995); Matter of Mogharrabi, 19 I&N Dec. 439, 445 (BIA 1987); 8 C.F.R. §§ 208.13(a) and 208.16(b). Generally, an Immigration Judge's findings regarding matters of credibility are accorded significant deference. See, e.g., Sarvia-Quintanilla v. INS, 767 F.2d 1387, 1395 (9th Cir. 1985); Matter of Kulle, 19 I&N Dec. 318, 331-32 (BIA 1985), aff'd, 825 F.2d 1188 (7th Cir. 1987), cert. denied, 484 U.S. 1042 (1988). We recently reaffirmed this principle in Matter of A-S-, Interim Decision 3336 (BIA 1998). We note that the lack of plausibility and the inconsistencies in the applicant's testimony cast substantial doubt on the credibility of all aspects of the applicant's testimony, including his family planning claims. We also agree with the Immigration Judge that, even if the testimony were credible, it does not, for the reasons stated by the Immigration Judge, demonstrate that the applicants have a well-founded fear of persecution on account of religion (I.J. at 11-12).

We also find that the two applicants have not demonstrated that they have a subjective fear of persecution with respect to their family planning claims. They did not attempt to flee until 2 years after the birth of their second child, although they had the opportunity to do so. The applicant states in his appeal brief that it does not matter what his reasons were for leaving China as long as he has a well-founded fear of persecution (Applicant's Appeal Brief at 3). However, it is clear that, without a subjective fear, an asylum applicant cannot demonstrate a well-founded fear. The applicants' failure to depart promptly or to be able to provide an explanation for their apparent lack of fear leads to the conclusion that a subjective fear of sterilization may not exist.

---

[4] The applicant's claim regarding religion encompassed by far the greater part of the applicant's testimony and appears to have been the major basis for the applicant's asylum case, as the Immigration Judge noted (I.J. at 21). However, we agree with the applicant that that fact does not mean that it is impossible to find the less-emphasized aspect of the asylum claim valid while rejecting the other.

2

A29 638 497
A29 638 498

We further find, even if it were determined that the applicants have a subjective fear of persecution, which we do not find, that the fear would not be well founded, as there is little indication of an inclination on the part of the Chinese authorities to persecute the applicants. The birth of their second child was not hidden; the child was born in a hospital rather than at home (Tr. at 57). While it is claimed that the police delivered notices to the applicant concerning alleged religious or political infractions, the notices mention nothing regarding family planning matters (Tr. at 105-06). The authorities were capable of ascertaining that the applicants had a second child, and may have known about it, yet no threats or warnings of impending sterilization were received. We do not agree with the applicant's contention at page 5 of his brief that, because his wife had her IUD removed, she or her husband might be sought for sterilization as a result. Finally, the authorities' apparent lack of interest in punishing the applicants for having a second child, or in seeking to forcibly sterilize either applicant, is consistent with U.S. State Department reports that enforcement of the "one-child" policy in Fujian Province is lax in many instances and that punitive measures are not enforced in any uniform fashion. The Immigration Judge, in assuming that the applicants face a reasonable possibility of undergoing coercive sterilization, did not take into account this reliable evidence of conditions in Fujian Province, which strongly suggests that such coercive measures are not characteristic of local birth control enforcement. See United States Department of State, Bureau of Democracy, Human Rights, and Labor, China - Country Conditions and Comments on Asylum Applications, December 11, 1995 (Exh. 5).

With respect to the applicant's documentation, we note that the applicant has failed to submit documents to support his claim that he has two children or to support any other aspect of his family planning claim other than the fact of his marriage. The applicant has not met his burden of proof with respect to his family planning claims because of his failure to produce readily available corroboration. See Matter of S-M-J-, Interim Decision 3303 (BIA 1997); Matter of Dass, 20 I&N Dec. 120 (BIA 1989); see also Matter of Y-B-, Interim Decision 3337 (BIA 1998) (noting that the weaker an applicant's testimony, the greater the need for corroborative evidence), and Matter of M-D-, Interim Decision 3339 (BIA 1998) (holding that, when evidence has not been submitted to corroborate a claim in situations where it is reasonable to expect such evidence, the alien has failed to satisfy his burden of proof). The applicant states on appeal that there were valid reasons for his brother's failure to testify, despite his availability and presence in this country (Applicant's Appeal Brief at 7). However, we note that the brother could have submitted a corroborative affidavit or statement to support the applicant's account, but did not do so.

Inasmuch as the applicants have failed to satisfy the lower statutory burden of proof required for asylum, it follows that they have also failed to satisfy the clear probability standard of eligibility required for withholding of deportation. See Matter of Mogharrabi, supra. The applicant's claim that the Immigration Judge should have granted withholding of exclusion and deportation is thus rejected.

A29 638 497
A29 638 498

ORDER:   The appeal is sustained and the decision of the Immigration Judge is vacated.

FURTHER ORDER:   It is ordered that the applicants be removed from the United States.

FOR THE BOARD

**U.S. Department of Justice**
Executive Office for Immigration Review

Decision of the Board of Immigration Appeals

Falls Church, Virginia 22041

Files:  A29 638 497 - York
        A29 638 498

Date:

**DEC 23 1999**

In re:  KE LIANG <u>ZHANG</u>
        AI JIN <u>HUANG</u>

IN EXCLUSION PROCEEDINGS

MOTION

ON BEHALF OF APPLICANTS:    Stuart M. Pierce, Esquire
                            7-8 Chatham Square, Suite 503
                            New York, New York  10038

EXCLUDABLE:  Sec.  212(a)(6)(C)(i), I&N Act [8 U.S.C. § 1182(a)(6)(C)(i)] -
                   Fraud or willful misrepresentation of material fact [1]
                   (both applicants)

             Sec.  212(a)(7)(A)(i)(I), I&N Act [8 U.S.C. § 1182(a)(7)(A)(i)(I)] -
                   No valid immigrant visa [2] (both applicants)

             Sec.  212(a)(7)(B)(i)(I), I&N Act [8 U.S.C. § 1182(a)(7)(B)(i)(I)] -
                   Nonimmigrant without valid passport (A29 638 497)

APPLICATION:  Reopening; reconsideration


        This case was last before us on September 28, 1999, when we sustained the Service appeal from the Immigration Judge decision to grant the applicants' applications for asylum and withholding of exclusion and deportation under sections 208(a) and 243(h) of the Immigration and Nationality Act, 8 U.S.C. §§ 1158(a) and 1253(h).  The applicants have since filed a motion to reopen and reconsider. [3]  The motion will be denied.

        Pursuant to 8 C.F.R. § 3.2(c), a party may request that this Board reopen or reconsider any case in which we have issued a decision.  A party seeking to reopen exclusion or deportation proceedings

---

[1]  The fraud charge was not sustained.

[2]  A finding of excludability under section 212(a)(7)(A) of the Immigration and Nationality Act renders excludability under the provisions of section 212(a)(7)(B) of the Act, inapplicable.  <u>See Matter of Healy and Goodchild</u>, 17 I&N Dec. 22, 26 (BIA 1979).

[3]  The applicants are husband and wife.

A29 638 497
A29 638 498

must state the new facts he or she intends to establish and must support the motion with affidavits or other evidentiary material. 8 C.F.R. §§ 3.2(c), 103.5; INS v. Jong Ha Wang, 450 U.S. 139 (1981); Matter of Leon-Orosco and Rodriguez-Colas, 19 I&N Dec. 136 (BIA 1983; A.G. 1984); Matter of Reyes, 18 I&N Dec. 249 (BIA 1982). A motion to reopen shall not be granted unless it appears to the Board that the evidence sought to be offered is material, was not previously available, and could not have been discovered or presented at the original hearing. 8 C.F.R. § 3.2. The alleged new facts must be sufficient, if proved, to change the result of the previous decision; that is, a prima facie showing must be made, both that the alien is statutorily eligible for the relief sought and that he or she warrants that relief in the exercise of discretion. See INS v. Doherty, 502 U.S. 314 (1992); INS v. Abudu, 485 U.S. 94 (1988); Matter of Coelho, 20 I&N Dec. 464 (BIA 1992).

As a part of their motion, the applicants submitted copies of the birth certificates of their children, stating that the children were not registered until after their parents came to the United States. Therefore, they state, the evidence was not previously available (Applicants' Motion at 2). We find, in the circumstances of these proceedings, that a consideration of the birth certificates would not alter the outcome of these proceedings. We previously found that, even if the applicants' testimony were determined to be credible and even if they had a subjective fear of persecution, the applicants' fears were not well founded. See BIA decision dated September 28, 1999, at 3 para. 1. The applicants have not made a prima facie showing.

Regarding the applicants' request for reconsideration, we note that a motion to reconsider is a request that the original Board decision be reexamined in light of additional legal arguments, a change of law, or an argument or aspect of the case that was overlooked. See Matter of Cerna, 20 I&N Dec. 399 (BIA 1991) (quoting Hurwitz, Motions Practice Before the Board of Immigration Appeals, 20 San Diego L. Rev. 79, 90 (1992). A motion to reconsider must state the reasons for reconsideration and be supported by any pertinent precedent decisions. 8 C.F.R. § 103.5. A motion to reconsider based on a legal argument that could have been raised earlier in the proceedings will be denied. See Matter of Tiwari, 20 I&N Dec. 254 (BIA 1991), citing Matter of Medrano, 20 I&N Dec. 216 (BIA 1990, 1991).

In their motion, the applicants made no legal arguments and mentioned no changes in the law. The issues they have addressed in their motion involve the following: 1) our conclusion that current conditions in China indicate that there is little likelihood that the applicants will be persecuted upon return; 2) our statement that testimony from the brother of one of the applicants could have helped satisfy the applicants' burden of proof and bolster their credibility overall; 3) our conclusion, contrary to that of the Immigration Judge, that the applicants' account lacked credibility; and 4) our conclusion that the applicants do not appear to have a subjective fear of persecution.

We first note that, although we disagreed with the views of the Immigration Judge, our conclusion regarding current conditions in China was well supported by the record. The applicants concede that the country conditions report submitted by the United States Department of State (Exh.

A29 638 497
A29 638 498

5) describes lax enforcement of the one-child policy in rural areas of China such as the area from which the applicants have come. They failed to provide sufficient reason to alter our decision. Second, in our September 28, 1999, decision, we expressed our view that testimony from the brother of one of the applicants could have helped satisfy the applicants' burden of proof and bolster their credibility. While such testimony might have assisted in presenting a persuasive claim and in fulfilling the applicants' burden of proof, we did not state that the brother's testimony was an absolute requirement. Third, the applicants contend that the Board should agree with the Immigration Judge's finding that their birth control claim is credible and valid. In our September 28, 1999, decision, we agreed with the applicants that the fact that the birth control claim was a relatively minor aspect of their original claim would not prevent it from being valid. The applicants now state that, because we stated that the lesser claim could be valid in some circumstances, we should therefore not reverse the decision of the Immigration Judge. However, in our decision, we held that, in the circumstances of these proceedings, their birth control claim was without merit. We set forth our reasoning in reaching that conclusion explained that the applicants had not proven that they have a well-founded fear of persecution. The applicants have not provided a reason to change that conclusion.

Finally, the applicants claim that, contrary to our conclusion, the 2 years that passed before they left China does not tend to indicate a lack of subjective fear on their part. They state that their subjective fear of persecution is demonstrated by their hiding their second child and by the fact that they did not register their children until they left China, noting that it is not easy to leave China quickly. No evidence on the difficulty of leaving China was provided during the applicants' hearing. We do not find their arguments persuasive with respect to the applicants' alleged subjective fear of persecution, for the reasons set out in our decision. Furthermore, as we previously stated, even if the applicants' alleged fears were subjectively felt by them, we have found that their fear is not well founded. We find that the applicants' arguments are without merit and that they have not refuted the conclusions we set forth in our decision. Accordingly, the motion will be denied.

ORDER: The applicants' motion to reopen and reconsider these exclusion proceedings is denied.

FOR THE BOARD

3