JUDGE'S COPY 

FILED
HARRISBURG, PA

OCT 0 4 2000

**In the United States District Court**
**for the Middle District of Pennsylvania**

MARY E. D'ANDREA, CLERK
PER_____ DEPUTY CLERK

---

**United States of America**
**ex re. Huang Ai Jin**

        **Petitioner,**

   v.

**Janet Reno, United States Attorney General,**

        **Respondent.**

**Amended Petition**
**for Writ of Habeas Corpus**
**Docket No. 1:CV00-1029**

---

Huang Ai Jin hereby states as follows:

1. I reside in New York, New York.

2. I am in "custody" by virtue of an order of removal dated September 28, 1999, from the United States, issued by the United States Department of Justice, Executive office for Immigration Review. Board of Immigration Appeals ("BIA") (Case No. A 29 638 497).

1

3.  This petition is submitted in support of my application for relief pursuant to 18 U.S.C. 2241.

4.  Petitioner and her husband entered the United States in Alaska on or about June 28, 1996.

5.  We were immediately detained by the Immigration and Naturalization Service ("INS") and subsequently charged with being removable upon the grounds of (1) not possessing a valid immigrant, visa pursuant to Immigration & Naturalization Act ("INA") §212(a)(7)(A)[1] and (2) committing fraud or willful misrepresentation of a material fact pursuant to INA §212(a)(6)(c)(i)[2]. Essentially the INS alleged that petitioner and her husband tried to enter the United States with false and fraudulent documents.

6.  Petitioner's husband was also charged with being a non-immigrant without a valid passport pursuant to INA §212(a)(7)(B)[3].

7.  Petitioner denied such charges and submitted an application for political

---

[1] 8 U.S.C. 1182(a)(7)(A)

[2] 8 U.S.C. 1182 (a)(6)(C)(i)

[3] 8 U.S.C. 1182(a)(7)(B)

2

asylum and withholding of deportation based on religious persecution and fear of sterilization because of China's one-child policy.

8. On August 7, 1996, the Immigration court granted a defense motion to change venue and transferred this matter to York, Pennsylvania.

9. On October 23, prior to commencing a formal hearing, petitioner admitted that she was removable from the United States because she did not have a valid immigrant visa. The Court dismissed the charge against petitioner's husband of being a non-immigrant without a valid passport (INA §212(a)(7)(B) as inconsistent with the admission under INA §212(a)(7)(A). A copy of the transcript dated October 23, 1996 is attached hereto as Exhibit A.

10. Also, on October 23, 1996, the Court commenced a hearing, without a jury, on the political asylum and withholding of deportation claims, as well as the fraud charge. This hearing was consolidated with that of my husband, Zhang Ke Liang, who likewise admitted that he was removable pursuant to charge of not having an immigrant visa and submitted the same asylum and withholding of deportation application.

11. Evidence at the hearing consisted of the testimony of petitioner and her

3

husband as well as documentary evidence, including the 1995 United States State Department report on country conditions in China. (copy of the relevant portions attached hereto as Exhibit B), copies of notices to petitioner from the Chinese police (attached hereto as Exhibit C) and photographs of petitioner's house in China locked up by the police (attached hereto as Exhibit D).

12. On or about November 1, 1996, the Court denied the religious persecution claim but granted asylum based on fear of sterilization in China. The Court also dismissed the fraud charges because the evidence was insufficient. A copy of the Court's decision, dated November 1, 1996, is attached hereto as Exhibit E.

13. The INS appealed the granting of the asylum and petitioner cross-appealed the denial of asylum based on religious persecution.

14. On or about September 28, 1999, the BIA, sustained INS' appeal, denied petitioner cross appeal, and ordered that petitioner and his wife be removed from the United States back to China. The BIA determined that, on both assylum claims, petitioners did not have a subjective fear of persecution and that there was no reasonable possibility of such

4

persecution if removed to China. A copy of BIA decision dated September 28, 1999 is attached hereto as Exhibit F.

15. On or about October 21, 1999, petitioner submitted a motion for reconsideration to the BIA.

16. On or about December 23, 1999, the BIA denied the motion in its entirety. A copy of the BIA decision dated December 23, 1999, is attached hereto as Exhibit G.

17. Throughout the proceedings in York, Pennsylvania, including the motion for reconsideration, petitioner was represented by Stuart Pierce, Esq.

18. Petitioner is entitled to a habeas corpus relief for being unlawfully and unconstitutionally held in custody because the denial by respondent, by and through the BIA, of asylum based on fear of forced sterilization/abortion and religious persecution was arbitrary, capricious and unreasonable and in violation of petitioners' rights to equal protection of the law pursuant to the due process clause of the Fifth Amendment in that:

a. There was no rational basis to treat petitioner differently than similarly

situated people whose claims of asylum based on forced sterilization/abortion have been granted.

b. There was no rational basis to treat petitioner differently than similarly situated people whose claims of asylum based on forced religious persecution have been granted.

19. The facts supporting petitioner's claim based on religious persecution are as follows:

From 1988 through 1996, petitioner resided in the village of Qugian located in the province of Fujian, China. On or about January 3, 1996, her eldest child became ill with fever. He was brought to the local hospital where doctors apparently could not help him. (Ex. A at 34) Petitioner knew the doctor only as a doctor because that is what everyone else called him. (Id. at 94) While petitioner's husband was speaking to a friend, the friend suggested that praying to God in order to help his son. He told petitioner's husband that his son once had problems and when he prayed to God, the son got well. This friend then told petitioner's husband how to pray and where the nearest "Sha" (Christian church) was located. (Id. at 34-6)

Not having a church in their own village, on January 5 and 6, 1996, petitioner's husband rode his bicycle 30 kilometers to pray for his son at the

6

church. (Ex. at 37) Petitioner joined him to pray on January 7, 1996 (Id. at 100) Miraculously, the son began to get well and was discharged from the hospital on January 8, 1996. Petitioner believed her child's recovery was a direct result of her and her husband's prayers. (Id. at 34-7, 40-6, 66) In light of the child's recovery, petitioner, vowed to continue her Christian practice. (Id. at 64, 66, 80)

Petitioner, however, knew of the hardship in traveling so far to the Church. (Ex. A at 81) Subsequently, petitioner's husband's friend introduced him to a "Father" who could come to petitioner's village to hold Christian services every Sunday. (Id. at 40) Similar to the doctor who treated her son in January 1996, petitioner knew very little about the Father other than the village he was from and his name, but simply accepted him as a religious authority because that is how he was introduced. (Id. at 73-4)

A short time later, January 14, 1996, the services commenced at petitioner's home, each one lasting about one hour and a half. (Ex. A at 33-4, 66) Wanting to spread Jesus' message and share his faith, petitioner's husband had told the people in his village about the Father coming to hold services, many of whom we believed to be Christian who had no access to a church, priest or religious books. (Id at 40-1, 64-6, 80) Approximately 50 people attended the services regularly. (Id. at 32) It was at these services that

7

petitioner was able to learn more about Christianity. (Id at 40-42) She always had a vague idea about Christianity, but since no books or bibles were available to petitioner[4], she began learning through the teachings and biblical discussions with the Father and from reading the Father's Bible during the services. (Id. at 40-1, 65-6) Petitioner's husband was formally baptized in March, 1996. (Id at 47) Petitioner decided to wait for a formal baptism because she wanted to learn more and feel worthy of such a sacred rite.

On May 3, 1996, the two public authority officers came to petitioner's home and issued a formal verbal warning that no group gatherings were to occur anymore. (Ex. A at 59)

At the time, petitioner thought that the warning was in relation to the government's fear of uprising because of the upcoming 7th year anniversary of the Tiananmen Square revolt. Because she knew his gatherings[5] were religious and had nothing to do with the Tiananmen Square anniversary, she did not immediately foresee any problems. Therefore, she did not give the warning

---

[4] The 1995 country report confirms that there is limited publication and distribution of religious material which falls short of the demand. (See Ex. E at p. 27)

[5] There are credible reports of the government's efforts to reign the activities of unauthorized churches including "raiding and closing a number of unregistered churches." (See Exhibit E. at p. 29)

8

further thought and did not tell anyone. (Ex. A at 45-6, 84-5, 92-3) The Sunday services were continued.

Later on May 26, 1996, during a religious service at petitioner's home, sirens were heard approaching the house. (Ex. A at 33) Petitioner and her husband saw the Public Authority officials rapidly approaching. Fearing that they were coming to arrest people because of the continued gatherings, everyone fled out the back door[6]. (Ex. A at 33, 42-3, 51, 58) Petitioner, her husband, his two children and the "Father" went into hiding at petitioner's mother's house. They stayed there never risking going back to their home for fear of being arrested. (Id at 79) Petitioner and her husband eventually left China in June, 1996.

At petitioner's mother's house, petitioner told the Father about the May 3 warning. (Ex. A at 83) The Father, who only stayed for two days, told petitioner that there was no religious freedom in China and that in order to continue practicing his faith, she would need to leave China. (Id at 93-4) The Father also told petitioner that he could obtain travel documents and plane tickets for a fee. Desperately wanting to pursue her religious practice without

---

[6]Petitioner's husband subsequently learned through his relatives that six of the people attending the service that day were later arrested and detained. (See Ex. A at 51-2)

9

interference from the Chinese government, petitioner and her husband paid the fee and supplied photographs for the documents. (Id at 43) On June 25, 1996, a third party gave petitioner's husband the travel documents and plane tickets.

On June 28, 1996, having secured arrangements for petitioner's mother to care for the children until they settled, petitioner and her husband left for the United States where they intend to continue practicing Christianity without interference.

Once in the United States, while being detained by INS, petitioner's husband learned through his relatives in the United States that the Chinese government was looking for them. (Exhibit A, at 49-50) On June 10, 1996, Public Security officers had come to their house, locked it up[7] and left a notice stating:

> It is suspected that you, on the pretext of religion, have convened illegal meetings to gather the jobless people to participate in the unlawful activities. This has caused an adverse effect to the society. You are, therefore, require to come to our office July 5 to clarify this matter.[8]

The officers also went to petitioner's husband's mother's house looking

---

[7] See Exhibit D

[8] See Exhibit C

10

for them. (Ex.A at 62) On July 15, 1996, another notice with essentially the same warning as the June 10th notice was posted on her home. Petitioner's husband's mother eventually secured copies of these notices and mailed them to petitioner's husband.

20. Based on the foregoing, petitioner has demonstrated a detailed and reasonable fear of persecution and a reasonable possibility of that persecution if removed to China.

21. Also, based on the foregoing and the exhibits filed herewith, it is clear that in rendering its decision to deny asylum to petitioner, respondent, by and through the BIA, interpreted and applied 8 U.S.C. §1158 so as to exclude any alien from prevailing on any asylum application based on fear of religious persecution in China in violation of petitioner's right to equal protection of the law pursuant to the Fifth Amendment of the United States Constitution. The denial of asylum herein was arbitrary and discriminatory and denied equal protection of the law because there was no rational basis for the determination to treat petitioner's asylum application differently than similarly situated people whose asylum applications have been granted.

22.   Facts which support the petitioner's claim based on fear of sterilization are as follows:

On August 19, 1988, Petitioner and her husband gave birth to their first child, a son. The birth was in the local hospital in Qugian, where it was duly registered with the Chinese government.[9] (Ex. A at 30, 55) A few days after the birth, petitioner and her husband were approached by the family planning agency who demanded that petitioner have an IUD installed so that the couple could have no more children in accordance with China's one-child policy. Neither petitioner nor her husband wanted the IUD because they both wanted more children. Petitioner's husband tried to delay this procedure because petitioner had to recover from giving birth having ruptured her vagina during delivery. They were denied and the IUD was installed anyhow. (Ex. A at 54-6) Later, they petitioned the government to remove the IUD but were again denied. (Id at 102) The IUD caused petitioner to bleed often and made her very uncomfortable.

Still wanting more children and knowing they would never receive authorization from the government, in June, 1993 they located and paid a doctor who was willing to remove the IUD. (Ex. A at 56) Petitioner feared that if the government learned of removing the IUD, she or her husband would be

---

[9] See Exhibit C

sterilized, fined and/or arrested or petitioner would be forced to have an abortion[10]. (Id at 56-7) Petitioner knew that other people in their village were fined for having more than one child and that those who could not pay the fine had their furniture taken[11]. (Id at 78)

The couple proceeded to have their second child, a girl, who was born on April 24, 1994. Knowing that the hospital were their son was born would report the removal of the IUD and the unauthorized birth of their second child, this child was delivered in a small local health center in a nearby town, Shun-Shanya, which did not report to the government but which was considered a small "hospital" by the local villagers. The child was not registered with the government. (Ex. A at 57, 90) Because this child could not be registered, the child would not be eligible for many benefits from the government such as education. (Id. at 71)

Fearing that the government would learn of the unauthorized birth, this second child stayed with petitioner's mother for the remainder of the year. At

---

[10] There are confirmed reports and acknowledgments by Chinese officials of forced abortions and sterilizations. (See Exhibit E at p. 33)

[11] "Disciplinary measures against those who violate the policy can include stiff fines, withholding of social services, demotion and other administrative punishments, including, in some instances, loss of employment. Unpaid fines can result in confiscation of personal property, or even destruction of houses." Exhibit E at p. 33.

13

the beginning of 1995, the child came to live with petitioner and her husband. (Ex. A at 70) They told people in the village that the child was not theirs and they were taking care of her for other people. However, as the child grew older, particularly in the first half of 1996, she began to call petitioner "mom". Petitioner and her husband became increasingly worried that people and the government would realize that the child was theirs. (Id. at 104) It was during this time that the religious gatherings were occurring in the home.

After receiving the verbal warning on May 3, hearing the sirens and being chased from their home on May 26, petitioner feared that the government, once inspecting you for something, will check all aspects of you and your family thus enabling them to learn about the IUD removal and unauthorized birth of the second child. (Ex. A at 105) Having left China and knowing the government is looking for them, petitioner fears going back to China because the government will certainly learn of the IUD removal and second child and force petitioner, who is in her 30s, to be sterilized and fined. (Id. at 58) Petitioner and her husband still want more children. (Id. at 56, 103)

23. Based on the foregoing petitioner has demonstrated a detailed reasonable fear of persecution and a reasonably possibility of that persecution if returned to China.

14

24. Also, based on the foregoing and the exhibits filed herewith, it is clear that in rendering its decision to deny asylum to petitioner, respondent, by and through the BIA, interpreted and applied 8 U.S.C. §1158 so as to exclude any alien from prevailing on any asylum application based on fear of forced sterilization/abortion in China in violation of petitioner's right to equal protection of the law pursuant to the Fifth Amendment of the United States Constitution. The denial of asylum herein was arbitrary and discriminatory and denied equal protection of the law because there was no rational basis for the determination to treat petitioner's asylum application differently than similarly situated people whose asylum applications have been granted.

25. Petitioner has not filed any previous petitions for habeas corpus, motions under 28 U.S.C. 2255 or any other applications petitions or motions with respect to this conviction except as set forth above.

26. None of the grounds set forth herein have been presented to this or any other Federal Court.

Executed at New York, New York

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 29th 2000

Huang Ai Jin
———————————
Huang Ai Jin